**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:16-CV-11715 |
| | ) | |
| MICHAEL FOX, | ) | |
| | ) | |
| Defendant. | ) | |
| | | |
| MICHAEL FOX, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Counter-Defendant, | ) | |
| -and- | ) | |
| | ) | |
| PARKER H. "PETE" PETIT, WILLIAM C. | ) | |
| TAYLOR, ALEXANDRA HADEN, THORNTON | ) | |
| A. KUNTZ, JR., CHRISTOPHER M. CASHMAN | ) | |
| and MICHAEL W. CARLTON. | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM TO PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendant Michael Fox ("Defendant" or "Fox"), by and through his attorneys, Christopher

S. Griesmeyer and Adam C. Maxwell of Greiman, Rome & Griesmeyer, LLC, for his Answer and

Affirmative Defenses to Plaintiff's First Amended Complaint (the "Amended Complaint") states

as follows:

## Introduction

1.      This action arises from Fox's breaches of his employment contract, confidentiality obligations, fiduciary duties, and duties of loyalty. Fox's conduct resulted in harm to MiMedx in the form of lost sales and loss of customer goodwill.

**ANSWER:**   Plaintiff's claims for breach of the duty of loyalty and for specific performance have been dismissed by prior order of this Court, and thus this action does not arise from any allegations contained or incorporated into those now-defunct claims.  Notwithstanding, Paragraph 1 states legal conclusions, to which no response is required.  To the extent Paragraph 1 is construed as asserting allegations of fact, those allegations are denied.

2.      Fox was, until recently, a Vice President of MiMedx, who while employed by MiMedx owed MiMedx contractual and legal obligations to faithfully perform his duties for MiMedx, report suspected employee misconduct, refrain from engaging in business other than MiMedx business, and refrain from disclosing MiMedx's trade secrets and other confidential information.

**ANSWER:**   Defendant admits only that he was, until recently, a Vice President of MiMedx, who had certain contractual and legal obligations in connection with his employment with MiMedx.  The remaining allegations of Paragraph 2 are legal conclusions, to which no response is required.  To the extent the remaining allegations in Paragraph 2 are construed as asserting allegations of fact, Defendant admits only the duties imposed on him by Illinois law and denies any remaining allegations.

3.      Despite owning these contractual and fiduciary duties to MiMedx, Fox breached these duties while employed by MiMedx by, including without limitation, providing then-current MiMedx employees with MiMedx trade secrets and confidential information to which they did not and would not otherwise have access and without MiMedx's consent (including trade secret information concerning customer sales history and product usage by specific doctors to which Fox was privy.) Shortly after one of these disclosures, at least one of the unauthorized recipients made sales of non-MiMedx products to MiMedx customers identified in the confidential materials sent by Fox.

**ANSWER:**   The first sentence of Paragraph 3 states legal conclusions, to which no response is required.  To the extent the first sentence of Paragraph 3 is construed as asserting

allegations of fact, Defendant states that he lacks sufficient information to either admit or deny those facts, and on that basis, denies the allegations. Defendant is without sufficient information to either admit or deny the remaining allegations of Paragraph 3, and on that basis, denies the remaining allegations.

4. Fox also breached his contractual and fiduciary duties by failing to report known misconduct by MiMedx employees. Fox was aware of at least one MiMedx employee making sales of non-MiMedx products to MiMedx customers. Rather than reporting this conduct, or advising the employee to follow the necessary procedures for clearing potential conflicts of interest, Fox reportedly permitted the MiMedx employee to make side sales of non-MiMedx product.

**ANSWER:** The first sentence of Paragraph 4 states legal conclusions, to which no response is required. To the extent the first sentence of Paragraph 4 is construed as asserting allegations of fact, those allegations are denied. Defendant denies all remaining allegations in Paragraph 4.

5. Fox also has failed to return MiMedx-issued devices, including: an HP EliteBook Folio laptop, an Apple iPad, an Apple iPhone, which he was contractually and legally obligated to return after the termination of his employment with MiMedx.

**ANSWER:** Defendant denies the allegation in Paragraph 5.

6. By this action, MiMedx seeks compensatory and punitive damages. MiMedx further seeks temporary, preliminary and permanent injunctive relief requiring Fox to return the MiMedx issued electronic devices.

**ANSWER:** Paragraph 6 states legal conclusions, to which no response is required. To the extent Paragraph 6 is construed as asserting allegations of fact, Defendant admits only that Plaintiff purports to seek certain damages and relief, but does not admit that such damages or relief is available to Plaintiff, and denies all remaining allegations in Paragraph 6.

### Parties, Jurisdiction & Venue

7. Plaintiff MiMedx is incorporated under the laws of the State of Florida, and its headquarters is located in the State of Georgia.

3

**ANSWER:**     Defendant admits the allegations in Paragraph 7.

8.     Defendant Fox is a natural person. Upon information and belief, Fox is, and at all times relevant hereto, was a citizen and resident of the State of Illinois.

**ANSWER:**     Defendant admits the allegations in Paragraph 8.

9.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that the dispute is between citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

**ANSWER:**     Paragraph 9 states a legal conclusion, to which no response is required.  To the extent these allegations can be construed as allegations of fact, Defendant denies the allegations but states that he does not challenge that this Court is sitting in diversity jurisdiction.

10.     Venue is also proper in the Court pursuant to 28 U.S.C. § 1332.

**ANSWER:**     Paragraph 10 states a legal conclusion, to which no response is required.  To the extent these allegations can be construed as allegations of fact, Defendant denies the allegations but states that he does not challenge the venue of this proceeding.

**Factual Background**

11.     MiMedx is a leading regenerative medicine company utilizing human amniotic tissue and patent-protected processes to develop and marked advanced products and therapies to various healthcare sectors. MiMedx sells its medical products in Illinois and throughout the United States in a highly competitive marketplace. MiMedx is a publicly traded company listed on the NASDAQ exchange.

**ANSWER:**     Defendant admits only that MiMedx is a publicly traded company listed on the NASDAQ exchange and that it sells its medical products in Illinois and throughout the United States.  Defendant lacks sufficient information to either admit or deny the remaining facts in paragraph 11 and, on that basis, denies the allegations.

**Fox's Employment at MiMedx**

12.     Fox separated from his employment as MiMedx's Vice President, Federal & Academic Institutions, in December, 2016, a position he assumed in or about January, 2016.

4

**ANSWER:**     Defendant admits the allegations in Paragraph 12.

13.     Fox began his employment with MiMedx as a Sales Director in or about July 2012. That position title was subsequently changed to Regional Sales Director East. By January, 2013, as one of only four Regional Sales Directors, Fox's Regional Sales Director East region had sales professionals based in the states of Iowa, Wisconsin, Kentucky, and Illinois, with sales territories covering in and around those geographies.

**ANSWER:**     Defendant admits only that he began his employment with MiMedx in or about July, 2012.  Defendant denies the remaining allegations in Paragraph 13.

14.     In or about October, 2013, Fox became Area Vice President – West and began reporting directly to Mike Carlton, VP Global Sales. By January, 2014, as one of only two Area Vice Presidents, Fox's Area Vice President – West area had sales professionals based in the states of Colorado, Washington, Arizona, Oregon, Nevada, Illinois, Michigan, Missouri, Wisconsin, Indiana, Kentucky, Minnesota, Tennessee, Louisiana, Oklahoma, Iowa and Texas, with sales territories covering in and around those geographies. In or about July, 2014, Fox's position became Area Vice President – Central, where he had sales professionals in the sates of Michigan, Missouri, Wisconsin, Indiana, Kentucky, Minnesota, Tennessee, Louisiana, Oklahoma, Iowa and Texas, with sales territories covering in and around those geographies. By the end of his time as Area Vice President – Central, Fox had responsibility for sales professionals in the state of Michigan, Missouri, Wisconsin, Indiana, Kentucky, Minnesota, Tennessee, Louisiana, Oklahoma, Iowa, Texas, North Dakota, Kansas, Ohio and West Virginia, with sales territories covering in and around those geographies.

**ANSWER:**     Defendant admits only that he was employed by MiMedx as an Area Vice President for a period of time and that he reported for a period of time to Mike Carlton.  Defendant denies the remaining allegations in Paragraph 14.

15.     As an Area Vice President, Fox assumed a position of trust and confidence within the management of MiMedx. Fox had more than 50 MiMedx employees, including regional managers and account executives, under his direction as an Area Vice President. Some of the employees Fox supervised while at MiMedx included: (1) Jess Kruchoski, a former Regional Sales Director for MiMedx, who was responsible for Iowa, Minnesota, Nebraska, North Dakota, South Dakota, and Wisconsin, (2) Harold "Hal" Purdy, a former Account Executive, who was responsible for sales in San Antonio and Dallas, Texas, (3) Bill Wagner, a former Area Federal Director, and (4) Jason Mahnke, an Account Executive.

**ANSWER:**     The first sentence of Paragraph 15 states a legal conclusion, to which no response is required.  To the extent the first sentence of Paragraph 15 can be construed as allegations of fact, Defendant denies those allegations and admits only those certain duties

imposed on an employee by Illinois law. Defendant further admits only that Kruchoski, Purdy, and Mahnke reported to Defendant at and for some brief period of time during Defendant's employment and denies the remaining allegations in Paragraph 15.

16. In or about January, 2016, Fox assumed the newly-formed position of Vice President, Federal & Academic Institutions with nationwide responsibility for that function. In that position, Fox continued reporting directly to Mike Carlton, Senior Vice President, Global Sales.

**ANSWER:** Defendant admits only that he was reassigned to Vice President, Federal & Academic Institutions in or about January, 2016, and that he reported directly to Mike Carlton, Senior Vice President, Global sales. Defendant denies the remaining allegations in Paragraph 16.

## Fox's Employment Contracts and Fiduciary Duties

17. Prior to and as a condition of his employment with MiMedx, Fox executed (among other contracts) a Non-Competition Agreement (the "Fox Non-Competition Agreement") and a Confidentiality and Non-Solicitation Agreement (the "Fox Confidentiality/Non-Solicitation Agreement").

**ANSWER:** Paragraph 17 states legal conclusions, to which no response is required. To the extent Paragraph 17 can be construed as allegations of fact, Defendant admits only that he executed a Non-Competition Agreement and a Confidentiality and Non-Solicitation Agreement. Defendant is without sufficient information to admit or deny any remaining allegations in Paragraph 17 and, on that basis, denies same.

18. The Fox Non-Competition Agreement provides (among other things) that during his employment with MiMedx, Fox "will faithfully devote [his] best efforts to advance the interests of [MiMedx]." A true and correct copy of the Fox Non-Competition Agreement is attached hereto as Exhibit 1 and incorporated herein by this reference.

**ANSWER:** Defendant admits only that a true and correct copy of the Non-Competition Agreement is attached as Exhibit 1. Defendant states that the language of any written document between Plaintiff and Mr. Fox (or any other party) speaks for itself, and further states that Plaintiff

has neither accurately nor completely summarized those documents and, on that basis, Defendant denies the allegations in Paragraph 18.

19.     The Fox Confidentiality/Non-Solicitation Agreement provides (among other things) that:

a.  Fox will faithfully perform the duties assigned to [Fox] and will not engage in any other employment or business activity while employed by [MiMedx] which would interfere with [Fox's] full-time performance of [Fox's] duties for [MiMedx's], or cause a conflict of interest."; and

b.  during his employment and for three years thereafter, Fox "shall hold all Confidential Information in confidence and shall not directly or indirectly divulge or make use of…any Confidential Information or Trade Secrets outside of employment with [MiMedx]."

A true and correct copy of the Fox Confidentiality/Non-Solicitation Agreement is attached hereto as Exhibit 2 and incorporated herein by this reference.

**ANSWER:**  Defendant admits only that a true and correct copy of the Confidentiality/Non-Solicitation Agreement is attached as Exhibit 2.  Defendant states that the language of any written document between Plaintiff and Mr. Fox (or any other party) speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized those documents and, on that basis, Defendant denies the allegations in Paragraph 19.

20.     Both Fox's Non-Competition Agreement and Confidentiality/Non-Solicitation Agreement further expressly provide, to which Fox agreed, that a breach thereof would cause MiMedx irreparable injury for which there is no adequate remedy at law.

**ANSWER:**  Defendant states that the language of any written document between Plaintiff and Mr. Fox (or any other party) speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized those documents and, on that basis, Defendant denies the allegations in Paragraph 20.

21.     In addition to the obligations and requirements contained in the Fox Confidentiality/Non-Solicitation Agreement and the Fox Non-Competition Agreement, at all times relevant hereto, Fox independently owed fiduciary duties to MiMedx as both an Area Vice President and Vice President of Federal & Academic Institutions.

7

**ANSWER:**   Defendant states that the language of any written document between Plaintiff and Mr. Fox (or any other party) speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized those documents and, on that basis, Defendant denies the allegations in Paragraph 21 relating to those documents.   Defendant denies the remaining allegations in Paragraph 21 and admits only those certain duties imposed on an employee by Illinois law.

22.    As part of his contractual and fiduciary duties to MiMedx, Fox had an obligation to abide by the provisions of MiMedx's Code of Conduct. On February 10, 2013, Fox acknowledged receipt and review of MiMedx's Code of Conduct. Among other things, the Code of Conduct provides:

    a.  MiMedx's "confidential information and Trade Secrets should not be transmitted, sent, or forwarded to other employees inside the Company who do not have a legitimate need and authorization to know the information.";

    b.  "It is MiMedx's policy that no employee shall maintain any relationship, activity, or ownership interest that might create a conflict between his or her personal interests and the business interests of MiMedx. Each employee is expected to adhere to a strict standard of loyalty and ethics in avoiding such situations that might be thought to influence her or his actions or prejudice her or his judgment in handling MiMedx's business. Implicit in such standard is the obligation to make prompt and full disclosure of <u>any</u> potential conflict of interest.";

    c.  Non-exclusive examples of potential conflicts of interest listed in the Code of Conduct include: "Employment by, or rendering advice or consulting services to, any business organization that does or seeks to do business with or is a competitor of, MiMedx, except as a representative of MiMedx with the written approval of MiMedx's General Counsel and the MiMedx officer having jurisdiction over the employee's activity.";

    d.  MiMedx employees must "disclose to the Company all possible conflicts of interest so that the Company can determine whether a conflict of interest exists and, if so, the appropriate corrective action" and "[w]henever a conflict of interest exists or may possibly exist and is not promptly eliminated, full disclosure of all relevant facts and circumstances must be made to the employee's immediate supervisor, who will transmit the information through the appropriate chain of authority to the Chairman & CEO."

**ANSWER:**   The first sentence of Paragraph 22 states a legal conclusion, to which no response is required.   To the extent the first sentence of Paragraph 22 can be construed as

allegations of fact, Defendant denies those allegations. Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized those documents and, on that basis, Defendant denies the allegations in Paragraph 22 relating to those documents. Defendant admits only that he acknowledged receipt and review of MiMedx's Code of Conduct. Defendant denies any remaining allegations in Paragraph 22.

23.     Importantly, the Code of Conduct specifically provides that: "[i]t is expected that each employee, officer and director will have the sensitivity to recognize when he or she is in a situation that raises ethical or legal questions and to seek advice from a manager, the Corporate Compliance Officer or any Deputy Corporate Compliance Officer, the Human Resources Department, or the Company's General Counsel." Attached hereto as Exhibit 3 is the February 1, 2013 version of MiMedx's "Corporate Compliance and Ethics Plan" which contains the Code of Conduct in Section B. Attached hereto as Exhibit 4 is Fox's acknowledgement that had received and would comply with the Code of Conduct, and that strict compliance with the Code of Conduct was a condition of his employment with MiMedx.

**ANSWER:**     Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized those documents and, on that basis, Defendant denies the allegations in Paragraph 23. Defendant admits only that true and accurate copies of the February 1, 2013 version of MiMedx's "Corporate Compliance and Ethics Plan" and the acknowledgement Defendant received are attached as Exhibits 3 and 4, respectively. Defendant denies any remaining allegations in Paragraph 23.

### Fox's Access to MiMedx Confidential and Trade Secret Information

24.     As a result of Fox's position as a Vice President – Central, Fox had access and was privy to trade secrets and other confidential business sales information of MiMedx concerning its customers located throughout the Central area of United States, including without limitation accounts receivables reports detailing the amounts owed by MiMedx's customers and the aging of those accounts. As a result of his position with MiMedx, Fox also had access and was privy to trade secrets and other confidential business information of MiMedx concerning its customers located in the Central area of the United States, including without limitation sales reports (including the sale of each specific MiMedx product to each private hospital, Veterans' Administration hospital and Department of Defense ("DOD") facility, including specific woundcare clinics with specific doctor and/or practice group associated with each MiMedx

customer), commissions, reports, reports of variances against forecasts and quotas, and reports identifying the Group Purchasing Organizations, Integrated Delivery Networks, and Hospitals (which include actual and potential MiMedx customers) in his Area and their specific purchasing needs, as well as information concerning MiMedx business, product and sales strategy in his Area.

**ANSWER:** Paragraph 24 states legal conclusions, to which no response is required. To the extent Paragraph 24 can be construed as asserting allegations of fact, Defendant admits only that he was privy to certain MiMedx information and is without sufficient information to admit or deny the remaining allegations in Paragraph 24 and, on that basis, denies the remaining allegations.

25.    As of January, 2016, as a result of Fox's position as MiMedx's Vice President Federal & Academic Institutions, Fox continued to have access to the foregoing and also had access and was privy to trade secrets and other confidential business sales information of MiMedx, concerning all Veterans' Administration Hospitals, DOD facilities associated doctors and practice groups, and MiMedx distributors and agencies and Veterans' Administration management personnel. As a result of his national position, Fox also had access and was privy to trade secrets and other confidential business information of MiMedx concerning its customers located throughout the United States, including without limitation sales reports (including the sale of each specific MiMedx product to each specific facility, doctor and/or practice group associated with each MiMedx customer), commissions reports, reports of variances against forecasts and quotas, and reports identifying the Federal hospitals and facilities nationally (which include actual and potential MiMedx customers) and their specific purchasing needs, as well as information concerning MiMedx business, product and sales strategy within the overall National Veterans' Administration and global DOD facilities.

**ANSWER:** Paragraph 25 states legal conclusions, to which no response is required. To the extent Paragraph 25 can be construed as asserting allegations of fact, Defendant admits only that he was privy to certain MiMedx information and is without sufficient information to admit or deny the remaining allegations in Paragraph 25 and, on that basis, denies the remaining allegations.

26.    The trade secret and other confidential information of MiMedx that Fox had access to shall be referred to collectively as the "Confidential Information and Trade Secrets."

**ANSWER:** Paragraph 26 states legal conclusions or otherwise does not state any facts, and thus no response is required. To the extent Paragraph 26 can be construed as asserting any allegations of fact, Defendant admits only the characterization of the information and is without

10

sufficient information to admit whether the information is protected from disclosure by any contract or applicable law.

27.     The Confidential Information and Trade Secrets are not known by or available to the public or to MiMedx's competitors. Furthermore, the Confidential Information and Trade Secrets are not known by or available to all MiMedx employees; instead, MiMedx determines what information its employees have access to based on their job responsibilities (including territory) and seniority levels and controls access to its Trade Secrets in accordance with such determination, including without limitation by setting and administering access control lists.

**ANSWER:**     Defendant is without sufficient information to either admit or deny the allegations in Paragraph 27 and, on that basis, denies the allegations.

28.     In addition, MiMedx's Confidential Information and Trade Secrets derive economic value from not being generally known to, and not being readily ascertainable by proper means by others who can obtain economic value from its disclosure and use, including MiMedx's competitors. In this regard, if disclosed to and used by a competitor, MiMedx's Confidential Information and Trade Secrets would allow competitors to know the exact persons and/or medical practice groups who should be solicited for the sale of specific competitive or comparable product to that being sold by MiMedx, thereby usurping MiMedx's product sales. Disclosure to and use of MiMedx's Confidential Information and Trade Secrets by its competitors would also enable MiMedx's competitors to cherry pick MiMedx's top sales people, including by disclosure of the economic terms which may lure them away from MiMedx's employ.

**ANSWER:**     Defendant is without sufficient information to either admit or deny the allegations in Paragraph 28 and, on that basis, denies the allegations.

### Fox Wrongfully Disclosed MiMedx's Confidential Information and Trade Secrets to Unauthorized Recipients

29.     Without MiMedx's consent, Fox provided MiMedx's Confidential Information and Trade Secrets to then current employees of MiMedx, which information they were not entitled to access and would not otherwise have access. These disclosures violated Fox's contractual and fiduciary duties to MiMedx. These disclosures also directly contravened MiMedx above-alleged policies that prohibited forwarding confidential information to employees who lacked the authorization to review that information.

**ANSWER:**     The first sentence of Paragraph 29 states a legal conclusion, to which no response is required.  To the extent the first sentence can be construed as asserting allegations of fact, those allegations are denied.  Defendant denies the remaining allegations in Paragraph 29.

30.    For example, on February 16, 2015, Fox without authorization from MiMedx, provided a confidential report to several employees of MiMedx, including without limitation Jess Kruchoski ("Kruchoski"). These individuals were not authorized to view the information that Fox sent and they would not otherwise have had access to such a report. This report contained detailed volumes and total sales for each MiMedx customer nationwide, which included information outside the regions for which the employees were responsible. When he provided this MiMedx confidential information to the unauthorized employees, Fox stated "DO NOT FORWARD TO ANYONE! FOR YOUR EYES ONLY."

**ANSWER:**    Paragraph 30 states legal conclusions, to which no response is required.  To the extent Paragraph 30 can be construed as asserting allegations of fact, Defendant admits only that on February 16, 2015, he followed the MiMedx protocol utilized by employees and sent a copy of a single report to managers/directors authorized to view the information contained within that document.  Defendant denies the remaining allegations in Paragraph 30.

31.    Kruchoski admits in a sworn declaration filed in another action that he began "exploring the option" of selling non-MiMedx products in January or February 2015. A few days after receiving the report from Fox, and without the knowledge or approval of MiMedx's Chairman & CEO (as required by MiMedx's policies), Kruchoski then executed an Independent Distributor Agreement with Academy Medical LLC ("Academy"), a competitor of MiMedx. Academy sales records demonstrate that in March 2015, Kruchoski made non-MiMedx sales to at least three (3) Veterans' Affairs Hospitals that were included on the report forwarded by Fox on February 16, 2015. Because these hospitals were outside of Kruchoski's assigned Region, he would not have had access to MiMedx's confidential sales data for these MiMedx customers but for Fox's improper disclosure.

**ANSWER:**    Defendant is without sufficient information to either admit or deny the allegations in Paragraph 31 and, on that basis, denies the allegations.

32.    Fox also, without authorization from MiMedx, provided another confidential MiMedx report to then-current MiMedx employee, Kruchoski, in October, 2016; Kruchoski did not otherwise have access to such report and he was not authorized to access it. This October 2016 confidential report contained detailed information about specific sales and sales efforts to existing and prospective customers, including specifically identifying hospitals and doctors, in a Region other than the Region for which Kruchoski was responsible.

**ANSWER:**    The first sentence of Paragraph 32 states a legal conclusion, to which no response is required.  To the extent the first sentence of Paragraph 32 can be construed as asserting allegations of fact, those allegations are denied.  Defendant is without sufficient information to

either admit or deny the remaining allegations in Paragraph 32 and, on that basis, denies the allegations.

33.     At all times material hereto, Fox was aware of MiMedx's policies preventing disclosure of materials to any employees lacking the correct authorization.

**ANSWER:**     Defendant denies the allegations in Paragraph 33.

### Fox Failed to Report Known Misconduct by MiMedx Employees

34.     In contravention of his contractual and fiduciary duties, Fox was aware of misconduct by MiMedx employees and failed to report that misconduct to his superiors as required by the above-alleged MiMedx company policies.

**ANSWER:**     Defendant denies the allegations in Paragraph 34.

35.     Fox was aware of—and failed to report—sales of non-MiMedx products to MiMedx customers by MiMedx employees. Jason Mahnke ("Mahnke"), a subordinate of Fox, sold non-MiMedx products for a company called Halo Would Solutions LLC ("Halo"). Halo distributes medical products, including those used for wound care applications, a segment of the medical industry in which MiMedx competes.

**ANSWER:**     Defendant admits only that Jason Mahnke was his subordinate for a period of time.  Defendant denies the allegations in the first sentence of Paragraph 35.  Defendant is without sufficient information to admit or deny the remaining allegations in Paragraph 35 and, on that basis, denies those allegations.

36.     Mahnke's sales were made without the knowledge or approval of MiMedx's Chairman & CEO (as required by MiMedx's policies relating to potential or actual conflicts of interest). However, Mahnke asserts that Fox informed him that it was permissible for him to sell non-MiMedx products and encouraged him to sell the Halo products. Mahnke's sales of non-MiMedx products created an actual, or at least a potential, conflict of interest. However, Fox did not report this conflict of interest to his direct report, Mike Carlton, or otherwise through "the appropriate chain of authority to the Chairman & CEO" as he was required to do under MiMedx's Code of Conduct.

**ANSWER:**     Defendant is without sufficient information to admit the allegations in the first and second sentences of Paragraph 36 and, on that basis, denies those allegations.  The third sentence of Paragraph 36 states a legal conclusion, to which no response is required.  To the extent

the third sentence of Paragraph 36 can be construed as asserting allegations of fact, those allegations are denied. Defendant denies the remaining allegations in Paragraph 36.

### Fox Failed to Return MiMedx Property Following His Termination

37. During his employment with MiMedx, Fox was given the following electronic devices for use in connection with this employment by MiMedx:

    a. An HP EliteBook Folio laptop, model: 948M J5P81UT#AB;

    b. An Apple® iPad® with Retina Display 16GB in Black, device ID: 9900013382347503; and

    c. An Apple iPhone® 7 128GB in Black, device ID: 355310080960530.

**ANSWER:** Defendant admits only that he was issued company-owned electronic devices during his employment, including a HP EliteBook, an iPad, and an iPhone, but denies the identifying description of the devices in Paragraph 37 as inaccurate.

38. MiMedx believes the value of the MiMedx-owned electronic devices is more than $2,000.00.

**ANSWER:** Defendant is without sufficient information to admit or deny the allegations in Paragraph 38 and, on that basis, denies those allegations.

39. MiMedx terminated Fox's employment on December 29, 2016. Pursuant to the Fox Confidentiality/Non-Solicitation Agreement, Fox was required to return to MiMedx his company-issued electronic devices, as well as any other MiMedx property in his possession, within three (3) days of his termination.

**ANSWER:** Defendant admits that MiMedx terminated his employment on December 29, 2016. Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 39 relating to that document.

40. To date, Fox has not returned his company-issued electronic devices or any other MiMedx property he may have in his possession, despite MiMedx's demand, made on January 23, 2017, for their return. On February 17, 2017, MiMedx's outside counsel demanded return of the company-owned electronic devices by February 21, 2017. Fox did not comply. Attached hereto as Exhibit 5 is a true and correct copy of the February 17, 2017 letter from MiMedx's counsel regarding the electronic devices.

**ANSWER:** Defendant denies the first sentence in paragraph 40. Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 40 relating to that document. Defendant admits only that on February 17, 2017 MiMedx's outside counsel demanded return of the electronic devices, but denies that he was obligated to comply with any such demand. Defendant admits a true and correct copy of the February 17, 2017 letter is attached as Exhibit 5.

**COUNT I**
**BREACH OF CONTRACT-CONFIDENTIALITY/NON-SOLICITATION**
**AGREEMENT**

41. MiMedx realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

**ANSWER:** Defendant incorporates by this reference each of his answers to the foregoing paragraphs as if fully set forth herein.

42. MiMedx has complied with its obligations under the Fox Confidentiality/Non-Solicitation Agreement, except and to the extent that the same have been executed or prevented.

**ANSWER:** Paragraph 42 states legal conclusions, to which no response is required. To the extent Paragraph 42 can be construed as asserting allegations of fact, Defendant is without sufficient information to admit or deny the truth of those allegations, and on that basis, denies the allegations of Paragraph 42.

43. Fox has violated and is in material breach of his obligations under Sections 2 and 3 of the Fox Confidentiality/Non-Solicitation Agreement as a result of at least the following:

    a. His disclosure of MiMedx Confidential Information and Trade Secrets to unauthorized individuals, including Kruchoski; and

    b. His failure to report Jason Mahnke's engaging in side sales of non-MiMedx products, without obtaining the appropriated approvals.

**ANSWER:** Paragraph 43 states legal conclusions, to which no response is required. To the extent Paragraph 43 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 43 relating to that document. Defendant denies any remaining allegations contained in Paragraph 43.

44. Fox has violated and is in material breach of his obligations under Section 4 of the Fox Confidentiality/Non-Solicitation Agreement as a result of his failure to return to MiMedx his company-issued electronic devices, despite MiMedx's demand for their return.

**ANSWER:** Paragraph 44 states legal conclusions, to which no response is required. To the extent Paragraph 44 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 44 relating to that document. Defendant denies any remaining allegations contained in Paragraph 44.

45. As a direct and proximate result of Fox's above-alleged material breaches of his obligations under the Fox Confidentiality/Non-Solicitation Agreement, MiMedx has paid for services (including salaries) not rendered to it, has lost sales of MiMedx's products that its employees would have otherwise made, and has suffered other damages, all to MiMedx's injury in an amount to be proven at trial.

**ANSWER:** Paragraph 45 states legal conclusions, to which no response is required. To the extent Paragraph 45 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 45 relating to that document. Defendant is without sufficient information to admit or deny any remaining allegations in Paragraph 45, and on that basis, denies any remaining allegations in Paragraph 45.

46.     Pursuant to the terms of the Fox Confidentiality/Non-Solicitation Agreement, MiMedx is also entitled to recovery of its attorneys' fees and costs incurred in this action should it prevail.

**ANSWER:**  Paragraph 46 states legal conclusions, to which no response is required.  To the extent Paragraph 46 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 46.

## COUNT II

## BREACH OF CONTRACT-NON-COMPETITION AGREEMENT

47.     MiMedx realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

**ANSWER:**  Defendant incorporates by this reference each of his answers to the foregoing paragraphs as if fully set forth herein.

48.     MiMedx has complied with its obligations under the Fox Non-Competition Agreement, except and to the extent that the same have been executed or prevented.

**ANSWER:**  Paragraph 48 states legal conclusions, to which no response is required.  To the extent Paragraph 48 can be construed as asserting allegations of fact, Defendant is without sufficient information to admit or deny the truth of those allegations, and on that basis, denies the allegations of Paragraph 48.

49.     Fox has violated and is in material breach of his obligations under Section 1(c) of the Fox Non-Competition Agreement as a result of at least the following:

    a.  His disclosure of MiMedx Confidential Information and Trade Secrets to unauthorized individuals, including Kruchoski; and

    b.  His failure to report Jason Mahnke's engaging in side sales of non-MiMedx products, without obtaining the appropriated approvals.

**ANSWER:**  Paragraph 49 states legal conclusions, to which no response is required.  To the extent Paragraph 49 can be construed as asserting allegations of fact, Defendant states that the

language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 49 relating to that document. Defendant denies any remaining allegations contained in Paragraph 49.

50. As a direct and proximate result of Fox's above-alleged material breaches of his obligations under the Fox Non-Competition Agreement, MiMedx has paid for services (including salaries) not rendered to it, has lost sales of MiMedx's products that its employees would have otherwise made, and has suffered other damages, all to MiMedx's injury in an amount to be proven at trial.

**ANSWER:** Paragraph 50 states legal conclusions, to which no response is required. To the extent Paragraph 50 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 50 relating to that document. Defendant is without sufficient information to admit or deny any remaining allegations in Paragraph 50, and on that basis, denies any remaining allegations in Paragraph 50.

51. Pursuant to the terms of the Fox Non-Competition Agreement, MiMedx is also entitled to recover of its attorneys' fees and costs incurred in this action should it prevail.

**ANSWER:** Paragraph 51 states legal conclusions, to which no response is required. To the extent Paragraph 51 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced document and, on that basis, Defendant denies the allegations in Paragraph 51.

## COUNT III

## SPECIFIC PERFORMANCE

Count III has been dismissed by prior court order and therefore no response is required by Defendant.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

58.     MiMedx realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

**ANSWER:**     Defendant incorporates by this reference each of his answers to the foregoing paragraphs as if fully set forth herein.

59.     At all times relevant hereto, Fox was an Area Vice President and then Vice President of Federal and Academic Institutions for MiMedx.

**ANSWER:**     Defendant admits only that he was an Area Vice President and then Vice President of Federal and Academic Institutions for MiMedx.  Defendant denies any remaining allegations in Paragraph 59.

60.     As an Area Vice President and as the Vice President, Federal & Academic Institutions for MiMedx, Fox owed a fiduciary duty to MiMedx.

**ANSWER:**     Paragraph 60 states a legal conclusion, to which no response is required.  To the extent the Paragraph 60 can be construed as allegations of fact, Defendant admits only those certain duties imposed on an employee by Illinois law.  Defendant denies any remaining allegations in Paragraph 60.

61.     Fox breached his fiduciary duty to MiMedx, including without limitation, by through breaches of his contractual agreements and company policies, through:

> a.  His disclosure of MiMedx Confidential Information and Trade Secrets to unauthorized individuals, including Kruchoski; and
>
> b.  His failure to report Jason Mahnke's engaging in side sales of non-MiMedx products, without obtaining the appropriated approvals.

**ANSWER:** Paragraph 61 states legal conclusions, to which no response is required. To the extent Paragraph 61 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced documents and, on that basis, Defendant denies the allegations in Paragraph 61 relating to those documents. Defendant denies any remaining allegations in Paragraph 61.

62. As a direct and proximate result of Fox's breaches of his fiduciary duty to MiMedx, MiMedx has paid for services (including salaries) not rendered to it, has lost sales of MiMedx's products that its employees would have otherwise made, and has suffered other damages, all to MiMedx's injury in an amount to be proven at trial.

**ANSWER:** Paragraph 62 states legal conclusions, to which no response is required. To the extent Paragraph 62 can be construed as asserting allegations of fact, Defendant is without sufficient information to admit or deny any allegations in Paragraph 62, and on that basis, denies any allegations in Paragraph 62.

63. Fox willfully and maliciously engaged in the above-alleged breaches of his fiduciary duty to MiMedx, and as a result, MiMedx is entitled to an aware of exemplary damages.

**ANSWER:** Paragraph 63 states legal conclusions, to which no response is required. To the extent Paragraph 63 can be construed as asserting allegations of fact, Defendant denies those allegations.

## COUNT V
## BREACH OF DUTY OF LOYALTY

Count V has been dismissed by prior court order and therefore no response is required by Defendant.

## COUNT VI
## REPLEVIN

69. MiMedx realleges each of the allegations in the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

**ANSWER:** Defendant incorporates by this reference each of his answers to the foregoing paragraphs as if fully set forth herein.

70. Fox was issued the following company-owned electronic devices during his employment:

a. An HP EliteBook Folio laptop, model: 948M J5P81UT#AB;

b. An Apple® iPad® with Retina Display 16GB in Black, device ID: 9900013382347503; and

c. An Apple iPhone® 7 128GB in Black, device ID: 355310080960530.

**ANSWER:** Defendant admits only that he was issued company-owned electronic devices during his employment, including a HP EliteBook, an iPad, and an iPhone, but denies the identifying description of the devices in Paragraph 70 as inaccurate.

71. MiMedx is the owner of these electronic devices and is lawfully entitled to possession of the same following Fox's termination of employment.

**ANSWER:** Paragraph 71 states legal conclusions, to which no response is required. To the extent Paragraph 71 can be construed as asserting allegations of fact, Defendant admits only that MiMedx is the owner of the electronic devices and denies any remaining allegations in Paragraph 71.

72. Specifically, pursuant to the Fox Confidentiality/Non-Solicitation Agreement, Fox was required to return these electronic devices to MiMedx no later than January 1, 2017.

**ANSWER:** Paragraph 72 states legal conclusions, to which no response is required. To the extent Paragraph 72 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced documents and, on that basis, Defendant denies the allegations in Paragraph 72 relating to those documents.

73. Despite repeated demands from MiMedx, as of the date of this filing, Fox has yet to return these electronic devices.

21

**ANSWER:**    Paragraph 73 states legal conclusions, to which no response is required. To the extent Paragraph 73 can be construed as asserting allegations of fact, Defendant states that the language of any written document speaks for itself, and further states that Plaintiff has neither accurately nor completely summarized the referenced documents and, on that basis, Defendant denies the allegations in Paragraph 73 relating to those documents. Answering further, Defendant admits that he tried several times to have the electronic devices delivered to MiMedx, but Plaintiff's counsel refused to allow it.

74.    MiMedx has a superior right to possession of the MiMedx-owned electronic devices, and Fox is wrongfully detaining the company-owned electronic devices. Fox has not taken the company-owned electronic devices for any tax, assessment, or fine levied by virtue of any law, against the property of MiMedx, or against Fox. Fox has not seized the company-owned electronic devices under any lawful process against the goods and chattels of MiMedx. Nor has Fox held the company-owned electronic devices by virtue of any order for replevin against MiMedx.

**ANSWER:**    Paragraph 74 states legal conclusions, to which no response is required. To the extent Paragraph 74 can be construed as asserting allegations of fact, Defendant denies those allegations.

75.    Accordingly, MiMedx seeks an order pursuant to 735 Ill. Comp. Stat. Ann. 5/19-104 that the company-owned electronic devices be seized and returned to MiMedx.

**ANSWER:**    Paragraph 75 states legal conclusions or otherwise does not contain any assertion of facts, and thus no response is required. To the extent Paragraph 75 is construed as asserting allegations of fact, Defendant admits only that MiMedx seeks an order for the return of electronic devices and denies any remaining allegations.

WHEREFORE, Defendant, Michael Fox, respectfully requests that this Court enter an Order:

A. Denying all relief sought by Plaintiffs, and dismissing all claims asserted in the Amended Complaint, *with prejudice*;

B. Awarding Judgment in favor of Defendant and against Plaintiff on all remaining claims asserted in the Amended Complaint;

C. Awarding to Defendant all of its costs and attorneys' fees incurred in connection with this action; and

D. Awarding to Defendant any further relief that this Court deems just and proper.

## AFFIRMATIVE DEFENSES

Defendant Michael Fox ("Fox" or "Defendant"), by and through his attorneys, Christopher S. Griesmeyer and Adam C. Maxwell of Greiman, Rome & Griesmeyer, LLC, respectfully submits the following Affirmative Defenses to Plaintiff's Amended Complaint (the "Amended Complaint"):

### FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims must be dismissed because Defendant's actions do not constitute a breach of contract or a breach of fiduciary duty as a matter of law.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed because the claims are barred by the doctrine of merger.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims must be dismissed because Defendant's actions have been ratified by Plaintiff.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Defendant was ready, willing, and able to perform the contracts, and Plaintiff prevented and frustrated Defendant's performance.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed because the contracts are unenforceable contracts of adhesion.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed for lack of consideration.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed because Defendant has fully performed and discharged all duties under the contracts.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract are barred by the parol evidence rule.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed as it constitutes an unfair restraint on trade.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed for reason that Defendant had implied or express consent.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed due to Plaintiff's acquiescence.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed because the contracts are contrary to public policy.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed because the parties substituted new and different contracts for the originals.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract must be dismissed because the contracts are substantively and procedurally unconscionable.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims must be dismissed because Defendant's actions with respect to the electronic devices the MiMedx issued to Defendant were justified, privileged, or necessary to protect and preserve evidence in this lawsuit.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the business judgment rule.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Defendant was not an officer or director while he was employed by Plaintiff.

### NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff cannot recover because Defendant's conduct was in good faith.

### TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims must be dismissed because its alleged damages are speculative.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff has failed to mitigate its damages.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims must be dismissed because Plaintiff has incurred no damages.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claim for damages must be reduced in whole or in part due to setoffs.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of waiver.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of estoppel.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part on principle of lack of equity.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred as a matter of law as the complaint makes numerous false claims.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of laches.

### TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims must be dismissed because Plaintiff has been unjustly enriched by the acts of Defendant.

### THIRTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Defendant was not the proximate or legal cause of Plaintiff's injury.

### THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because another or others were the sole proximate cause of Plaintiff's injury.

### THIRTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part because Plaintiff's damages were caused by an intervening or superseding cause.

### THIRTY-THIRD AFFIRMATIVE DEFENSE

Any and all alleged events and happenings, injuries, losses or damages referred to in the Complaint were directly and proximately caused and contributed to, in whole or in part, by the carelessness and negligence of Plaintiff, and therefore the extent of loss, damages, or injury sustained by Plaintiff, if any, should be reduced in proportion to the amount of negligence or fault attributable to Plaintiff.

### THIRTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part against this Defendant because third parties are responsible for all or part of Plaintiff's damages.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part against this Defendant because Plaintiff's own conduct, or the conduct of Plaintiff's agents, representatives, and consultants, caused Plaintiff's damages.

**THIRTY-SIXTH AFFIRMATIVE DEFENSE**

Plaintiff's claims must be dismissed for failure to join necessary parties.

**THIRTY-SEVENTH AFFIRMATIVE DEFENSE**

Defendant by this statement preserves all future affirmative defenses that may arise and reserves the right to supplement his affirmative defenses.

WHEREFORE, for all of the reasons set forth above, Defendant, Michael Fox, respectfully requests that this Court enter an Order:

A. Awarding Judgment in favor of Defendant and against Plaintiff on all claims assert in the Amended Complaint;

B. Denying all relief sought by Plaintiff, and dismissing all claims asserted in the Amended Complaint, *with prejudice*;

C. Awarding to Defendant all of its costs and attorneys' fees incurred in connection with this action; and

D. Awarding to Defendant any further relief that this Court deems just and proper.

## COUNTERCLAIM

Defendant/Counter-Plaintiff Michael Fox, by and through his attorneys, Christopher S. Griesmeyer and Adam C. Maxwell of Greiman, Rome & Griesmeyer, LLC, and Clayton D. Halunen, Mack H. Reed, and Stephen M. Premo of Halunen Law, for his Counterclaim against Plaintiff/Counter-Defendant MiMedx Group, Inc. ("MiMedx," the "Company," or "Defendant") and Third-Party Defendants Parker H. "Pete" Petit, William C. Taylor, Alexandra Haden, Thornton A. Kuntz, Jr., Christopher M. Cashman, and Michael W. Carlton (collectively, the "Third-Party Defendants"), states and alleges as follows:

## I. INTRODUCTION

1.    Defendant/Counter-Defendant Michael Fox ("Fox") is a former employee of MiMedx, a publicly-traded company with about 500 employees. During his more than four-year

28

tenure at MiMedx, Fox was a top-performing sales manager; indeed, Fox was one of the first sales executives hired by MiMedx.

2.      At the time of his termination, the Company improperly withheld nearly $250,000 in deferred compensation from Fox and made unauthorized deductions from, and retroactive adjustments to, Fox's earned compensation.  Subsequently, Petit and other Company executives defamed Fox on multiple occasions and tortiously interfered with the contractual relations between Fox and his subsequent employer.

## II. <u>PARTIES</u>

3.      Fox is a citizen of the State of Illinois.

4.      MiMedx is a Florida corporation with its principal place of business in Marietta, Georgia.

5.      Petit, MiMedx's Chairman of the Board and Chief Executive Officer, is a citizen of the State of Georgia.

6.      Alexandra Haden ("Haden"), MiMedx's General Counsel and Secretary, is a citizen of the State of Georgia.

7.      William C. Taylor ("Taylor"), MiMedx's President and Chief Operating Officer, is a citizen of the State of Georgia.

8.      Thornton A. Kuntz, Jr. ("Kuntz"), MiMedx's Senior Vice President of Administration, is a citizen of the State of Georgia.

9.      Christopher M. Cashman ("Cashman"), MiMedx's Executive Vice President and Chief Commercialization Officer, is a citizen of the State of Georgia.

10.     Michael W. Carlton ("Carlton"), MiMedx's Senior Vice President of Global Sales, is a citizen of the State of Georgia.

### III. JURISDICTION AND VENUE

11.      This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332, as Fox, on the one hand, and MiMedx and the Third-Party Defendants, on the other hand, are citizens of different States, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims described herein occurred within and/or were directed toward this District.

### IV. FACTS

**A.      MiMedx's Background**

13.      MiMedx holds itself out as the global premier processor, marketer, and distributor of human amniotic tissue.[1]

**B.      Fox's Background**

14.      MiMedx hired Fox as a Regional Sales Director for the Company's Central territories in July 2012.  In connection with his employment with MiMedx, on July 14, 2012, Fox and the Company executed a non-competition agreement (the "Non-Competition Agreement"). (Exhibit 1).

15.      Fox was one of the first five direct sales employees whom MiMedx hired.  By the end of 2012, the Company's revenue in Fox's district had increased by more than $3,000,000.

---

[1] *See* http://www.mimedx.com/

16.     In October 2013, MiMedx promoted Fox to the position of Area Vice President for the Company's Central area.  In the three years Fox held this position, overall Company revenue increased over $140,000,000.

17.     During his tenure with MiMedx, Fox never received any formal or informal discipline, corrective actions, or coaching, and was never informed by anyone at the Company that his performance was unsatisfactory.

## C.     FOX'S DEFERRED MiMEDX COMPENSATION

18.     In or around 2006, MiMedx adopted the MiMedx Group, Inc. Assumed 2006 Stock Incentive Plan, which the Company subsequently amended on or around May 10, 2012 (the "Plan").  (Exhibit 2).

19.     As a reward for his outstanding performance, MiMedx made several stock option awards to Fox pursuant to the terms of the Plan.  MiMedx made these awards to Fox every quarter in which Fox was employed by the Company.

20.     On March 6, 2013, MiMedx granted Fox the option to purchase 35,000 shares of Company stock at a price of $5.07 per share.  (Exhibit 3) (the "March 2013 Grant").  As of December 16, 2016, Fox's option under the 2013 Grant was vested with respect to 100% of the shares granted therein.  (*Id*.).

21.     Additionally, on October 29, 2013, MiMedx granted Fox the option to purchase 7,500 shares of Company stock at a price of $5.49 per share.  (Exhibit 4) (the "October 2013 Grant").  As of December 16, 2016, Fox's option under the October 2013 grant was vested with respect to 100% of the shares granted therein.  (*Id*.).

22.     Moreover, on February 25, 2014, MiMedx granted Fox the option to purchase 25,000 shares of Company stock at a price of $7.24 per share.  (Exhibit 5) (the "February 2014

Grant"). As of December 16, 2016, Fox's option under the February 2014 Grant was vested with respect to 66.66% of the shares granted therein. (*Id*.).

23.    On April 24, 2014, MiMedx granted Fox the option to purchase 4,500 shares of Company stock at a price of $5.84 per share.  (Exhibit 6) (the "April 2014 Grant").  As of December 16, 2016, Fox's option under the April 2014 Grant was vested with respect to 66.66% of the shares granted therein.  (*Id*.).

24.    On July 28, 2014, MiMedx granted Fox the option to purchase 2,000 shares of Company stock at a price of $6.28 per share (the "July 2014 Grant").  As of December 16, 2016, Fox's option under the July 2014 Grant was vested with respect to 100% of the shares granted therein.

25.    The foregoing option grants are reflected in an Equity Compensation Portfolio Statement attached hereto as Exhibit 7.  As of December 16, 2016, the unrealized gains associated with Fox's options granted pursuant to the March 2013 Grant, the October 2013 Grant, the February 2014 Grant, the April 2014 Grant, and the July 2014 Grant amounted to $235,845.00. (*Id*.).

**D.    MiMedx Terminates Fox's Employment, Breaches the Plan, Makes Improper Deductions from his Wages, and Subsequently Defames Him**

26.    On December 29, 2016, Cashman called Fox at approximately 4:30 p.m. Central time.  Fox was in a meeting at the time and did not answer his phone; Cashman left Fox a message.

27.    Shortly thereafter, Fox received phone calls in rapid succession from three of the seven individuals under his supervision, all of whom informed him MiMedx had just terminated their employment.

28.     Fox then called Cashman to ask what had happened.  Cashman and Kuntz (who was apparently in Cashman's office, as he also participated in the call) informed Fox that his employment with MiMedx was terminated effectively immediately.

29.     Kuntz informed Fox during this call that the Company was terminating his employment for cause.  He further informed Fox that MiMedx was unilaterally deducting $12,500 from Fox's final paycheck (purportedly to recover Fox's monthly draw from October 2016), and unilaterally reducing Fox's rate of pay for the last nine days of his employment to the Illinois minimum wage of $8.25 per hour.

30.     Kuntz also told Fox during this call that Fox would only have until the end of the day to exercise those vested options he had been awarded pursuant to the Plan.  When Fox pointed out that it was past 6:00 p.m. on the East Coast and the stock market was closed, Kuntz replied: "Exactly."

31.     Kuntz memorialized Fox's termination, and the Company's deductions from Fox's pay, in a letter dated December 29, 2016.  (Exhibit 8).  Petit, Taylor, Cashman, Haden, and Carlton were all copied on that letter.  (Id.).

32.     The following day, on December 30, 2016, MiMedx issued a press release (the "Press Release") stating it had terminated Fox.  (Exhibit 9).  In explaining the decision behind Fox's termination, the press release quoted Petit as saying:

> [W]hen an employee violates the duty of loyalty and contractual obligations by selling competitive products, employment actions must be taken.  Although the sales employees who participated in these violations were a very small number of the more than 300 employees in our sales organization, we are always disappointed when individuals choose to follow self-serving financial motives rather than adhere to the high standards of conduct and compliance that we foster and instill at MiMedx.

(Id.).

33

33.     A recipient of these statements would reasonably understand them to mean that Fox, out of self-serving financial motives, had violated his duty of loyalty and contractual obligations to MiMedx by selling competitive products while employed at MiMedx.

34.     MiMedx and Petit's statements were and are false.

35.     The Press Release also noted that MiMedx filed a lawsuit against Fox. The press release included a statement from Taylor stating "No legal actions have been taken with individuals who have cooperated and been truthful with the Company during [MiMedx's] investigation." (*Id*.).  A recipient of these statements would reasonably understand them to mean that Fox had been untruthful with MiMedx and had not cooperated with MiMedx.

36.     MiMedx and Taylor's statements were and are false.

37.     Finally, the press release stated Fox had "engaged in acts warranting termination of employment," and that he had "followed self-serving financial motives rather than adhere to the high standards of conduct and compliance that we foster and instill at MiMedx." (*Id*.).

38.     MiMedx and Petit's statements were and are false.

39.     On January 16, 2017, Kuntz sent an e-mail to Veronica Loch, one of the sales representatives Fox managed for MiMedx, and whom the Company also terminated on December 29, 2016.  (Exhibit 10) (the "Kuntz E-mail").  Kuntz sent that e-mail in response to an e-mail from Ms. Loch to MiMedx's Vice President of Human Resources regarding the reasons for her termination.  (*Id*., p. 3).  Kuntz stated to Ms. Loch that Fox "did not meet expectations related to the investment the Company made," and provided "ineffective and inadequate" leadership.  (*Id*., p. 2).  During his tenure with MiMedx, no one at the Company ever informed Fox that his job performance was deficient in any respect.

40.     A recipient of these statements would reasonably understand them to mean that Fox lacked the competency to perform his job duties.

41.     MiMedx and Kuntz's statements to Loch were and are false.

42.     On February 24, 2017, Petit participated in a conference call to discuss MiMedx's earnings with investors and financial analysts. During that conference call, Petit stated:

> We think it's well known we terminated four and filed lawsuits against them. We've terminated some others and didn't file lawsuits because we felt that they hadn't reached the point of being problematic. And then we've had some others that came clean with us. We sat people down and said just tell us the truth, and we'll go from there. Most of these others – all of them didn't tell us the truth. It appeared they were – continued to dig deeper with their lies, and the few that came clean with us, they're still here. . . . Mostly disappointing to me is the lack of integrity that we uncovered in the process.

43.     A recipient of this statement would reasonably understand it to mean that Fox had lied to the company and lacked integrity.

44.     MiMedx and Petit's statements were and are false.

45.     On April 27, 2017, Administrative Law Judge Niki Georgopoulos determined that there was no evidence Fox had engaged in any of the alleged misconduct MiMedx used to justify his termination.  (Exhibit 11).

**E.     MiMedx Interferes with Fox's Business Expectancy with a New Employer, Alleging That Fox was in Violation of His Non-competition Agreement with MiMedx – Despite MiMedx's Prior Admissions That Fox's New Employer was Not a Competitor**

46.     On April 6, 2017, Fox received a job offer from CPN Biosciences, LLC ("CPN"), which he accepted the next day.

47.     Under the terms of CPN's offer, Fox would become CPN's Vice President of Business Operations.  He would receive an annual salary of $200,000.00 plus commissions,

including two percent (2%) of all national sales. CPN's Chairman, Mihir Taneja ("Taneja"), and its President Adam Miscik ("Miscik") expected Fox's overall annual compensation would "exceed seven figures easily."

48. On April 10, 2017, Fox began his employment with CPN.

49. On April 21, 2017, Brian Anders ("Anders"), a former MiMedx employee and one of Fox's co-employees at CPN, received a letter from MiMedx accusing Anders of breaching his Non-Competition Agreement with the Company by virtue of his employment with CPN.

50. About four months before MiMedx's letter to Anders, on January 10, 2017, MiMedx's Senior Vice President Kevin D. Lilly had disseminated an internal e-mail to MiMedx's sales team acknowledging that CPN products were ancillary to and did not compete with MiMedx products. Lilly stated in pertinent part:

> Pete [Petit], Bill [Taylor], and Chris [Cashman] spoke to the fact that individuals that had been truthful about their involvement in selling *ancillary and non-competitive products* have been given opportunities to redeem themselves and remain with the company. I would like to take this opportunity to reiterate to everyone that if they participated in, or know of anyone who sold products on the side, *including but not limited to . . . CPN Biosciences products*, to call senior management to explain.
>
> . . . .
>
> If . . . we find an employee who has participated but has not come forward and been forthright about disclosing their involvement in selling *ancillary and non-competitive products*, the consequences will be far more severe than if they voluntary advise us before we find out another way.
>
> (Exhibit 12) (emphasis added).

51. In May 2017, Taneja called Fox and informed him that MiMedx had requested a list of all former MiMedx employees now working at CPN. That same month, Miscik told Fox

that he was in regular communication with MiMedx regarding CPN employing the Company's former employees.

52. On or around June 1, 2017, Miscik called Fox and told him about a confidential meeting scheduled between Taneja, Miscik, and MiMedx leadership. CPN had requested the meeting with MiMedx to discuss the Company's intentions and to educate MiMedx on its products. Miscik stated that only executives from both companies would attend the meeting and no lawyers would be present. The goal, according to Miscik, was to explain to MiMedx that CPN's products were ancillary to and not competitive with the Company's products and convince MiMedx that suing CPN for employing ex-MiMedx employees was unnecessary and unjustified.

53. On or around June 6, 2017, Taneja and Miscik flew to MiMedx's headquarters in Marietta, Georgia and met with MiMedx's executive team. Among those present from MiMedx were Petit, Taylor, Lilly, Cashman, and Executive Vice President Deborah L. Dean. At the conclusion of the meeting, Petit told Miscik that MiMedx would reconvene alone and let CPN know its thoughts in a few weeks.

54. Throughout the month of June, 2017, Miscik had frequent communication with ex-MiMedx employees who were now working for CPN. Miscik refused to provide details that would reveal the content of CPN's discussions with MiMedx or reveal the future plans for CPN's ex-MiMedx employees.

55. On July 20, 2017, Taneja terminated Fox's employment with CPN over the phone. Taneja stated that CPN and its lawyers could not handle any more of the MiMedx "legal drama." Taneja continued that he was confident CPN was non-competitive with the Company, but simply did not want get into a legal battle with a multimillion-dollar corporation like MiMedx. Fox asked

Taneja if other ex-MiMedx employees working at CPN were going to be terminated as well. Taneja responded that other employees would be dealt with on a "case-by-case" basis.

56. On July 21, 2017, Miscik called Fox and reaffirmed Taneja's representations to Fox the day before. Miscik reiterated CPN's desire to avoid the "legal drama" MiMedx was causing.

57. On information and belief, at some point in MiMedx's discussions with CPN, MiMedx alleged, directly or indirectly, that Fox's employment at CPN violated his Non-Competition Agreement with the Company.

58. On information and belief, at some point in MiMedx's discussions with CPN, MiMedx threatened to sue CPN if CPN continued to employ Fox.

59. As a result of MiMedx's conduct, CPN terminated Fox's employment.

60. MiMedx interfered with Fox's business expectancy with CPN and caused Fox's termination without justification, much less a true belief that Fox's employment with CPN violated his Non-Competition Agreement with MiMedx.

## COUNT ONE

### BREACH OF CONTRACT
### (Against MiMedx)

61. Fox re-alleges Paragraphs 1-60 of this Counterclaim as if fully set forth herein.

62. At all times relevant hereto there existed a valid and binding contract between MiMedx and Fox – namely, the Plan.

63. At all times relevant hereto, Fox performed his obligations to the Company under the Plan.

64. The Plan provides that employees whose employment with MiMedx is terminated for "cause" cannot exercise options granted to them under the Plan. (Ex. 2, Section 7(d)(iii)(D)).

65.     The Plan defines "cause" as dishonesty; refusal or continued failure to perform duties for the Company; fraudulent conduct; or any conduct that could be materially damaging to the Company without a reasonable good faith belief that such conduct was in the best interest of the Company.  (*Id*., Section 1(g)).

66.     The decision as to whether an employee's termination is for "cause" as defined in the Plan is determined by MiMedx's Board of Directors.  (*Id*., Section 1(a), (f), (g)).

67.     MiMedx had no cause to terminate Fox's employment, as the term "cause" is defined in the Plan.

68.     Moreover, on information and belief, the Company's Board of Directors did not make a determination as to whether Fox's termination was for "cause," as that term is defined in the Plan.

69.     MiMedx materially breached the Plan by forfeiting Fox's vested stock options granted pursuant thereto.

70.     As a direct and proximate result of MiMedx's breach, Fox has suffered and will continue to suffer damages, in an amount equal to, *inter alia*, the unrealized gains relating to his vested, unexercised Company stock options.

WHEREFORE, Defendant/Counter-Plaintiff Michael Fox respectfully requests that this Court enter an Order awarding judgment in his favor and against the Defendant, MiMedx Group, Inc., providing for:

    a.  Monetary damages resulting from Defendant's breach of contract, in an amount in excess of $75,000; and

    b.  Any such other and further relief as the Court deems just and proper.

## COUNT TWO

### DEFAMATION
### (Against Petit, Taylor, and Kuntz)

71.     Fox re-alleges Paragraphs 1-60 of this Counterclaim as if fully set forth herein.

72.     Petit, Taylor, and Kuntz made false statements regarding Fox.

73.     Petit, Taylor, and Kuntz made unprivileged publications of those statements to third parties, as alleged in detail above.

74.     These statements impute an inability by Fox to perform or want of professional integrity in performing employment duties, and/or statements imputing a lack of ability or that otherwise prejudice Fox in his profession or business.

75.     These statements therefore constitute defamation *per se*.

76.     Petit, Taylor, and Kuntz made these statements with actual malice.

77.     As a direct and proximate result of Petit, Taylor, and Kuntz's illegal conduct, Fox has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and other serious damages.

WHEREFORE, Defendant/Counter-Plaintiff Michael Fox respectfully requests that this Court enter an Order awarding judgment in his favor and against the Third-Party Defendants, Parker H. "Pete" Petit, William "Bill" Taylor, and Thornton A. Kuntz, Jr., providing for:

a.   Monetary damages resulting from Petit, Taylor, and Kuntz's defamatory statements, in an amount in excess of $75,000;

b.   Punitive damages; and

c.   Any such other and further relief as the Court deems just and proper.

## COUNT THREE

**VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT, 820
ILCS 115/1, *ET SEQ.*
(Against MiMedx, Petit, Haden, Taylor, Kuntz, Cashman, and Carlton)**

78.     Fox re-alleges Paragraphs 1-60 of this Counterclaim as if fully set forth herein.

79.     MiMedx's deduction of $12,500 from Fox's pay was done without Fox's express written consent given freely at the time the deduction was made, was not to Fox's benefit, was not required by law, and was not otherwise authorized by the Illinois Wage Payment and Collection Act (the "Act").  MiMedx therefore violated 820 ILCS 115/9 by making this deduction.

80.     Furthermore, at the time of Fox's termination MiMedx paid him a base salary of $225,000 per year.  By unilaterally and retroactively adjusting Fox's rate of pay to the Illinois minimum wage for purposes of calculating his final compensation, MiMedx failed to pay Fox his final compensation in full.  MiMedx thereby violated 820 ILCS 115/5.

81.     Petit, Kuntz, Haden, Taylor, Cashman, and Carlton all knowingly permitted these improper acts.  Fox's termination letter (in which these improper acts are described in detail) bears Kuntz's signature, and Petit, Haden, Taylor, Cashman, and Carlton were all copied on that letter.

82.     At all times relevant hereto, Petit, Kuntz, Haden, Taylor, Cashman, and Carlton were officers or agents of MiMedx.

83.     As a direct and proximate result of Defendant's and the Third-Party Defendants' illegal conduct, Fox has suffered and continues to suffer damages, including, *inter alia*, the wages MiMedx deducted from his final paycheck and the unpaid, earned wages the Company withheld from his final paycheck by retroactively reducing his base rate of pay.

WHEREFORE, Defendant/Counter-Plaintiff Michael Fox respectfully requests that this Court enter an Order awarding judgment in his favor and against the Defendant, MiMedx Group,

Inc., and Third-Party Defendants Parker H. "Pete" Petit, William C. Taylor, Alexandra Haden, Thornton A. Kuntz, Jr., Christopher M. Cashman, and Michael W. Carlton, providing for:

    a.  Monetary damages resulting from Defendant and Third-Party Defendants' violations of the Act, in an amount to be determined at trial;

    b.  A penalty in the amount of 2% of the amount of Fox's monetary damages for each month from December 2016 through the date of judgment;

    c.  Costs and reasonable attorneys' fees pursuant to 820 ILCS 115/14(a); and

    d.  Any such other and further relief as the Court deems just and proper.

## <u>COUNT FOUR</u>

### **TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**
### **(Against MiMedx)**

84.    Fox re-alleges Paragraphs 1-60 of this Counterclaim as if fully set forth herein.

85.    As of the commencement of his employment with CPN, Fox had a reasonable expectation in continuing in a valid business relationship with CPN.

86.    MiMedx was aware of Fox's expectancy.

87.    MiMedx intentionally interfered with that expectancy causing the termination of his business relationship with CPN, with Fox, as alleged in detail above.

88.    MiMedx's interference with Fox's business expectancy was unjustified or malicious, in that MiMedx had previously acknowledged that CPN did not sell products competitive with the Company's.

89.    As a direct and proximate result of MiMedx's conduct, Fox has suffered and continues to suffer damages, including emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and other serious damages.

WHEREFORE, Defendant/Counter-Plaintiff Michael Fox respectfully requests that this Court enter an Order awarding judgment in his favor and against Defendant MiMedx Group, Inc., providing for:

    a. Monetary damages resulting from Defendant's tortious conduct, in an amount to be determined at trial;

    b. Permanent injunctive relief prohibiting MiMedx, its officers, managers, employees, and agents from taking any action, directly or indirectly, to interfere with Fox's business expectancy with CPN in the future;

    c. Punitive damages; and

    d. Any such other and further relief as the Court deems just and proper.

## COUNT FIVE

## DECLARATORY JUDGMENT THAT FOX'S BUSINESS RELATIONSHIP WITH CPN DOES NOT VIOLATE FOX'S NON-COMPETITION AGREEMENT WITH MIMEDX

90. Fox re-alleges Paragraphs 1-60 of this Counterclaim as if fully set forth herein.

91. Fox brings this cause of action seeking a declaration that, as a matter of law, Fox's employment at CPN does not violate any contractual obligation he owes to MiMedx.

92. Fox further seeks permanent injunctive relief enjoining MiMedx, its officers, managers, employees, and agents from taking any action, directly or indirectly, to interfere with Fox's business expectancy with CPN in the future.

93. Fox has a real, tangible, and protectable interest in his business expectancy with CPN. CPN has assured Fox that it would re-hire him once the legal question of whether Fox's employment at CPN violates his contractual obligations, if any, to MiMedx is resolved.

94. A real and actual controversy exists between Fox and MiMedx as to whether Fox's employment at CPN violates his contractual obligations, if any, to MiMedx. Further, this controversy is ripe for adjudication: Fox accepted employment with, and worked for, CPN.

MiMedx used Fox's Non-Competition Agreement as a pretext to interfere with Fox's business expectancy in his continued employment with CPN without justification.

WHEREFORE, Defendant/Counter-Plaintiff Michael Fox respectfully requests that this Court enter an Order awarding judgment in his favor and against the Counter-defendant MiMedx Group, Inc., providing for:

    a. Declaratory judgment that Fox's employment at CPN does not violate his contractual obligations, if any, to MiMedx;

    b. Permanent injunctive relief prohibiting MiMedx, its officers, managers, employees, and agents from taking any action, directly or indirectly, to interfere with Fox's business expectancy with CPN; and

    c. Any such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE AVAILABLE**

Dated: August 24, 2017          Respectfully submitted,

                        **MICHAEL FOX**

                        */s/ Christopher S. Griesmeyer*

                        Christopher S. Griesmeyer (ARDC No. 6269851)
                        Adam C. Maxwell (ARDC No. 6306534)
                        Greiman, Rome & Griesmeyer, LLC
                        Two North LaSalle, Suite 1601
                        Chicago, Illinois 60602
                        Bus: (312) 428-2750
                        Fax: (312) 332-2781
                        cgriesmeyer@grglegal.com
                        amaxwell@grglegal.com

 */s/ Mack H. Reed*

Clayton D. Halunen (N.D. Ill. Bar No. 219721)
Mack H. Reed (ARDC No. 6287171)
Stephen M. Premo (*pro hac vice application to be submitted*)
Halunen Law
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
halunen@halunenlaw.com
reed@halunenlaw.com
premo@halunenlaw.com

*ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF MICHAEL FOX*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2017, I electronically filed the foregoing ***Answer, Affirmative Defenses, and Counterclaim to Plaintiff's First Amended Complaint*** with the Clerk of the Court via the CM/ECF System, which will send notification of such filing to those registered to receive electronic notices via email transmission at the email addresses provided by them:

Ami N. Wynne                     Joseph D. Wargo
Jason G. Marsico                 Shanon J. McGinnis
SIDLEY AUSTIN LLP                WARGO & FRENCH, LLP
One South Dearborn               999 Peachtree Street, NE, 26th Floor
Chicago, IL 60603                Atlanta, GA 30309
awynne@sidley.com                jwargo@wargofrench.com
jmarsico@sidley.com              smcginnis@wargofrench.com


                                 */s/ Mack H. Reed*
                                 Mack H. Reed (ARDC No. 6287171)
                                 Halunen Law
                                 1650 IDS Center
                                 80 South Eighth Street
                                 Minneapolis, MN 55402
                                 Telephone: (612) 605-4098
                                 Facsimile: (612) 605-4099
                                 reed@halunenlaw.com

# EXHIBIT 1

*MiMedx Copy*

# Non-Competition Agreement

THIS AGREEMENT is made by and between MiMedx Group, Inc., (the "Company") and Michael P. Fox ("Employee"). In consideration of the employment of the Employee and the salary and other remuneration and benefits paid by the Company to the Employee while Employee is employed by the Company, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree:

1. Non-Competition

(a)     The Employee agrees that the Company is engaged in the highly competitive business of an integrated developer, manufacturer and marketer of A) collagen based biomaterials or products and durable hydrogel biomaterials or products, B) bioimplants manufactured from human amniotic membrane or C) amnion based products (the "Business"). Employee is responsible for managing and supporting the Company's Sales & Marketing for the Business throughout the United States. The Employee agrees that, due to Employee's position, Employee's engaging in any business which is competitive with the Business will cause the Company great and irreparable harm.

(b)     The Employee agrees that Employee's work for the Company will bring Employee into close contact with many of the Company's customers, trade secrets and confidential and proprietary information. The Employee further agrees that the covenants in subsection 1(d) of this Agreement are reasonable and necessary to protect the Company's legitimate business interests in its customer relationships, trade secrets and proprietary and confidential information. The Employee agrees that the Employee would inevitably disclose the Company's confidential information and trade secrets if he were to violate subsection 1(d).

(c)     The Employee agrees that while employed by the Company, Employee will faithfully devote Employee's best efforts to advance the interests of the Company and will not directly or indirectly, on Employee's own behalf or another's behalf, engage in any manner in any business of the type described in subsection 1(a) other than as an employee of the Company.

(d)     The Employee agrees that, for one (1) year after the cessation of employment with the Company, the Employee will not, directly or indirectly, perform the same or substantially the same job duties described in subsection 1(a) on behalf of any business that competes with the Business of the Company. Subsection 1(d) is limited to the 48 contiguous states of the United States.

2. Severability

If any part or provision in this Agreement is determined to be in violation of any law, rule or regulation or otherwise unenforceable, such determination shall not affect the validity of any other part or provision of this Agreement, but such other parts or provisions shall remain in full force and effect. Each provision, paragraph, and subparagraph of this Agreement is severable from every other provision, paragraph and subparagraph and constitutes a separate and distinct covenant. If a court concludes that any provision, paragraph or subparagraph of this Agreement is overbroad or unenforceable for any reason, the court may modify that provision, paragraph or subparagraph to the minimum extent necessary and then enforce it as modified. The covenants in this Agreement are independent of any other rights or obligations between the parties, and any dispute between the parties as to any such right or obligations shall not delay, preclude or otherwise limit the enforcement of any rights or obligations in this Agreement.

3. Successors

This Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and the Employee, Employee's heirs, executors and administrators.

4. Injunctive Relief

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement, the Company shall suffer irreparable injury for which there is no adequate remedy at law, and the Company will therefore be entitled to injunctive relief from the courts enjoining said breach or threatened breach. The Employee further acknowledges that the Company also shall have the right to seek a remedy at law as well as or in lieu of equitable relief in the event of any such breach.

Employee Initial

5. Waiver of Breach

The Company's waiver of a breach of any provision of this Agreement by the Employee does not waive any subsequent breach by the Employee, nor does the Company's failure to take action against any other employee for similar breaches operate as a waiver by the Company of a breach.

6. Entire Agreement and Modification

This Agreement represents the entire understanding between Employee and the Company on the matters addressed herein and may not be modified, changed or altered by any promise or statement by the Company other than in writing signed by Employee and an authorized representative of Company. This Agreement supersedes and entirely replaces any other all prior discussions, agreements, and understandings of every kind and nature, whether oral or in writing, between the parties with respect to the subject matters addressed herein. The waiver by the Company of a breach of any provision of this Agreement by any employee shall not be construed as a waiver of rights with respect to any subsequent breach by Employee.

7. Choice of Law and Forum Selection

All provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Florida without reference to principles of conflict of laws. Any lawsuit, claim, or other legal proceeding arising out of or relating to this Agreement shall be brought exclusively in the federal or state courts located in the State of Florida, and the Employee and the Company hereby submit to personal jurisdiction in the State of Florida and to venue in such courts. In the event Company is the prevailing party in any such proceeding, the Employee shall reimburse the Company for the costs (including reasonable attorney's fees) incurred by the Company in such proceeding.

8. Future Employment

For so long as the restricted periods in the covenants in this Agreement remain in effect, Employee shall provide any employers or prospective employers with a copy of this Agreement. For so long as the restricted periods in the covenants in this Agreement remain in effect, the Employee also expressly consents to the Company providing a copy of this Agreement to any of the Employee's future employers.

The parties hereto have duly executed this Agreement on the date identified below.

**Employee has carefully read and understands the provisions of this Agreement and has had the opportunity to seek independent legal advice prior to signing this Agreement. Nothing contained in this Agreement creates a contractual right to continued employment for a definite term, and either Party may terminate the Employee's employment with the Company with or without cause at any time and for any reason, including no reason. Employee represents and warrants that Employee has entered into this Agreement voluntarily and after consulting with whomsoever Employee wished.**

Executed this ___14___ day of ___July___ , 20 _12_ .
         (day)           (month)      (year)

_Michael P. Fox_

___Michael P. Fox___
(Print Name)

MiMedx Group, Inc.

By: Thornton A. Kuntz, Jr.
Vice President, Human Resources and Administration

# EXHIBIT 2

As Amended as of May 10, 2012

**MIMEDX GROUP, INC.**
**ASSUMED 2006 STOCK INCENTIVE PLAN**

*1. Definitions*

In addition to other terms defined herein, the following terms shall have the meanings given below:

(a) Administrator means the Board, and, upon its delegation of all or part of its authority to administer the Plan to the Committee, the Committee.

(b) Affiliate means any Parent or Subsidiary of the Corporation, and also includes any other business entity which is controlled by, under common control with or controls the Corporation; provided, however, that the term "Affiliate" shall be construed in a manner in accordance with the registration provisions of applicable federal securities laws and any requirements imposed under Code Section 409A, related regulations or other guidance.

(c) Applicable Laws means any applicable laws, rules or regulations (or similar guidance), including but not limited to the Securities Act, the Exchange Act and the Code.

(d) Award means, individually or collectively, a grant under the Plan of an Option (including an Incentive Option or Nonqualified Option); a Stock Appreciation Right (including a Related SAR or a Freestanding SAR); a Restricted Award (including a Restricted Stock Award or a Restricted Unit Award); a Dividend Equivalent Award; or any other award granted under the Plan.

(e) Award Agreement means an agreement (which may be in written or electronic form, in the Administrator's discretion, and which includes any amendment or supplement thereto) between the Corporation and a Participant specifying the terms, conditions and restrictions of an Award granted to the Participant. An Award Agreement may also state such other terms, conditions and restrictions, including but not limited to terms, conditions and restrictions applicable to shares or any other benefit underlying an Award, as may be established by the Administrator.

(f) Board or Board of Directors means the Board of Directors of the Corporation.

(g) Cause means, unless the Administrator determines otherwise, a Participant's termination of employment or service resulting from the Participant's (i) termination for "cause" as defined under the Participant's employment, consulting or other agreement with the Corporation or an Affiliate, if any, or (ii) if the Participant has not entered into any such employment, consulting or other agreement (or if any such agreement does not address the effect of a "cause" termination), then the Participant's termination shall be for "Cause" if termination results due to the Participant's (A) dishonesty; (B) refusal or continued failure to perform his duties for the Corporation, as determined by the Administrator or its designee; (C) engaging in fraudulent conduct; or (D) engaging in any conduct that could be materially damaging to the Corporation without a reasonable good faith belief that such conduct was in the best interest of the Corporation. The determination of "Cause" shall be made by the Administrator and its determination shall be final and conclusive. Without in any way limiting the effect of the foregoing, for the purposes of the Plan and any Award, a Participant's employment or service shall be deemed to have terminated for Cause if, after the Participant's employment or service has terminated, facts and circumstances are discovered that would have justified, in the opinion of the Administrator, a termination for Cause.

(h) Change in Control:

(i) *General:* Except as may be otherwise provided in an individual Award Agreement or as may be otherwise required in order to comply with Code Section 409A, a Change in Control shall be deemed to have occurred on the earliest to occur of a change in the ownership of the Corporation, a change in the effective control of the Corporation, a change in ownership of a substantial portion of the Corporation's assets and a disposition of a substantial portion of the Corporation's assets, all as defined below:

(a) A change in the ownership of the Corporation occurs on the date that any one person, or more than one person acting as a group, acquires ownership of stock of the Corporation which, together with stock held by such person or group, represents more than fifty percent (50%) of the total fair market value or total voting power of the stock of the Corporation. An increase in the percentage of stock owned by any one person, or persons acting as a group, as a result of a transaction in which the Corporation acquires its stock in exchange for property will be treated as an acquisition of stock.

(b) A change in the effective control of the Corporation occurs on the date that either: any one person, or more than one person acting as a group becomes the beneficial owner of stock of the Corporation possessing more than fifty percent (50%) of the total voting power of the stock of the Corporation; or a majority of members of the Corporation's board of directors is replaced during any 24-month period by directors whose appointment or election is not endorsed by at least two-thirds (2/3) of

the members of the Corporation's board of directors who were directors prior to the date of the appointment or election of the first of such new directors.

(c) A change in the ownership of a substantial portion of the Corporation's assets occurs on the date that any one person, or more than one person acting as a group, acquires (or has acquired during the 12-month period ending on the date of the most recent acquisition by such person or persons) assets from the Corporation that have a total fair market value equal to seventy-five percent (75%) or more of the total fair market value of all of the assets of the Corporation immediately prior to such acquisition or acquisitions. The transfer of assets by the Corporation is not treated as a change in the ownership of such assets if the assets are transferred to an entity more than fifty percent (50%) of the total value or voting power of which is owned, directly or indirectly, by the Corporation.

(d) A disposition of a substantial portion of the Corporation's assets occurs on the date that the Corporation transfers assets by sale, lease, exchange, distribution to shareholders, assignment to creditors, foreclosure or otherwise, in a transaction or transactions not in the ordinary course of the Corporation's business (or has made such transfers during the 12-month period ending on the date of the most recent transfer of assets) that have a total fair market value equal to seventy-five percent (75%) or more of the total fair market value of all of the assets of the Corporation as of the date immediately prior to the first such transfer or transfers. The transfer of assets by the Corporation is not treated as a disposition of a substantial portion of the Corporation's assets if the assets are transferred to an entity, more than fifty percent (50%) of the total value or voting power of which is owned, directly or indirectly, by the Corporation.

(e) The Administrator shall have full and final authority, in its discretion, to determine whether a Change in Control of the Corporation has occurred pursuant to the above definition, the date of the occurrence of such Change in Control and any incidental matters relating thereto.

For purposes of the above-definition of a "Change in Control," the terms "person," "acting as a group" and "ownership" shall have the meanings prescribed in Sections 3(a)(9) and 13(d)(3) of the Securities Exchange Act of 1934, as amended, and Rule 13d-3 promulgated thereunder; provided, however, that in any merger, consolidation or share exchange in which less than fifty percent (50%) of the outstanding voting securities of the Corporation or its successor corporation are held by the former shareholders of the Corporation, the shareholders of the other parties to the transaction shall be deemed to have acted as a group that acquired ownership of more than fifty percent (50%) of the outstanding voting securities of the Corporation, resulting in a change in ownership under (a) above.

(ii) *Definition Applicable to Awards subject to Code Section 409A*: Notwithstanding the preceding provisions of Section 1(h)(i), in the event that any Awards granted under the Plan are deemed to be deferred compensation subject to the provisions of Code Section 409A, then distributions related to such Awards may be permitted, in the Administrator's discretion, upon the occurrence of one or more of the following events (as they are defined and interpreted under Code Section 409A, related regulations or other guidance): (A) a change in the ownership of the Corporation, (B) a change in effective control of the Corporation, or (C) a change in the ownership of a substantial portion of the assets of the Corporation.

(i) Code means the Internal Revenue Code of 1986, as amended.

(j) Committee means the Compensation Committee of the Board, which may be appointed to administer the Plan.

(k) Common Stock means the common stock of MiMedx Group, Inc., $0.001 par value per share.

(l) Corporation means MiMedx Group, Inc., a Florida corporation, together with any successor thereto.

(m) Covered Employee shall have the meaning given the term in Section 162(m) of the Code and related regulations.

(n) Director means a member of the Board or of the board of directors of an Affiliate.

(o) Disability shall, except as may be otherwise determined by the Administrator or required under Code Section 409A or related regulations or other guidance, have the meaning given in any employment agreement, consulting agreement or other similar agreement, if any, to which a Participant is a party, or, if there is no such agreement (or if any such agreement does not address the effect of termination due to disability), "Disability" shall mean the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. The Administrator shall have discretion to determine if a termination due to Disability has occurred.

(p) Displacement shall, as applied to any Participant, be as defined in any employment agreement, consulting agreement or other similar agreement, if any, to which the Participant is a party, or, if there is no such agreement (or if any such agreement does not address the effect of a termination due to displacement), "Displacement" shall mean the termination of the Participant's employment

or service due to the elimination of the Participant's job or position without fault on the part of the Participant (as determined by the Administrator).

(q) Dividend Equivalent Award means a right granted to a Participant pursuant to Section 10 to receive the equivalent value (in cash or shares of Common Stock) of dividends paid on Common Stock.

(r) Effective Date means the effective date of the Plan, as provided in Section 4.

(s) Employee means any person who is an employee of the Corporation or any Affiliate (including entities which become Affiliates after the Effective Date of the Plan). For this purpose, an individual shall be considered to be an Employee only if there exists between the individual and the Corporation or an Affiliate the legal and bona fide relationship of employer and Employee; provided, however, that, with respect to Incentive Options, "Employee" means any person who is considered an employee of the Corporation or any Parent or Subsidiary for purposes of Treas. Reg. Section 1.421-1(h) (or any successor provision related thereto).

(t) Exchange Act means the Securities Exchange Act of 1934, as amended.

(u) Fair Market Value per share of the Common Stock shall be established in good faith by the Administrator and, unless otherwise determined by the Administrator, the Fair Market Value shall be determined in accordance with the following provisions: (A) if the shares of Common Stock are listed for trading on the New York Stock Exchange or the American Stock Exchange, the Fair Market Value shall be the closing sales price per share of the shares on the New York Stock Exchange or the American Stock Exchange (as applicable) on the date immediately preceding the date an Option is granted or other determination is made (such date of determination being referred to herein as a "valuation date"), or, if there is no transaction on such date, then on the trading date nearest preceding the valuation date for which closing price information is available, and, provided further, if the shares are quoted on the Nasdaq National Market or the Nasdaq SmallCap Market of the Nasdaq Stock Market but are not listed for trading on the New York Stock Exchange or the American Stock Exchange, the Fair Market Value shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such system on the date immediately or nearest preceding the valuation date for which such information is available, and, provided further, if the shares are not listed for trading on the New York Stock Exchange or the American Stock Exchange or quoted on the Nasdaq National Market or the Nasdaq SmallCap Market, the Fair Market Value shall be the average between the highest bid and lowest asked prices for such stock on the date immediately or nearest preceding the valuation date as reported on the Nasdaq OTC Bulletin Board Service or by the National Quotation Bureau, Incorporated or a comparable service; or (B) if the shares of Common Stock are not listed or reported in any of the foregoing, then the Fair Market Value shall be determined by the Administrator based on such valuation measures or other factors as it deems appropriate. Notwithstanding the foregoing, (i) with respect to the grant of Incentive Options, the Fair Market Value shall be determined by the Administrator in accordance with the applicable provisions of Section 20.2031-2 of the Federal Estate Tax Regulations, or in any other manner consistent with the Code Section 422 and accompanying regulations; and (ii) Fair Market Value shall be determined in accordance with Section 409A, related regulations or other guidance to the extent required by such provisions.

(v) Freestanding SAR means an SAR that is granted without relation to an Option, as provided in Section 8.

(w) Incentive Option means an Option that is designated by the Administrator as an Incentive Option pursuant to Section 7 and intended to meet the requirements of incentive stock options under Code Section 422 and related regulations.

(x) Independent Contractor means an independent contractor, consultant or advisor providing services to the Corporation or an Affiliate.

(y) Nonqualified Option means an Option granted under Section 7 that is not intended to qualify as an incentive stock option under Code Section 422 and related regulations.

(z) Option means a stock option granted under Section 7 that entitles the holder to purchase from the Corporation a stated number of shares of Common Stock at the price set forth in an Award Agreement.

(aa) Option Period means the term of an Option, as provided in Section 7(d)(i).

(bb) Option Price means the price at which an Option may be exercised, as provided in Section 7(b).

(cc) Parent means a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(dd) Participant means an individual employed by, or providing services to, the Corporation or an Affiliate who satisfies the requirements of Section 6 and is selected by the Administrator to receive an Award under the Plan.

(ee) Performance Measures mean one or more performance factors which may be established by the Administrator with respect to an Award. Performance factors may be based on such corporate, business unit or division and/or individual performance factors and criteria as the Administrator in its discretion may deem appropriate; provided, however, that, if and to the extent that Section 162(m)

of the Code is applicable, then such performance factors shall be limited to one or more of the following (as determined by the Administrator in its discretion): (i) cash flow; (ii) return on equity; (iii) return on assets; (iv) earnings per share; (v) operations expense efficiency milestones; (vi) consolidated earnings before or after taxes (including earnings before interest, taxes, depreciation and amortization); (vii) net income; (viii) operating income; (ix) book value per share; (x) return on investment; (xi) return on capital; (xii) improvements in capital structure; (xiii) expense management; (xiv) profitability of an identifiable business unit or product; (xv) maintenance or improvement of profit margins; (xvi) stock price or total shareholder return; (xvii) market share; (xviii) revenues or sales; (xix) costs; (xx) working capital; (xxi) economic wealth created; (xxii) strategic business criteria; (xxiii) efficiency ratio(s); (xxiv) achievement of division, group, function or corporate financial, strategic or operational goals; and (xxv) comparisons with stock market indices or performances of metrics of peer companies. If and to the extent that Section 162(m) of the Code is applicable, the Administrator shall, within the time and in the manner prescribed by Section 162(m) of the Code and related regulations, define in an objective fashion the manner of calculating the Performance Measures it selects to use for Participants during any specific performance period and determine whether such Performance Measures have been met. Such performance factors may be adjusted or modified due to extraordinary items, transactions, events or developments, or in recognition of, or in anticipation of, any other unusual or nonrecurring events affecting the Corporation or the financial statements of the Corporation, or in response to, or in anticipation of, changes in Applicable Laws, accounting principles or business conditions, in each case as determined by the Administrator.

(ff) Plan means the MiMedx Group, Inc. Assumed 2006 Stock Incentive Plan, as it may be hereafter amended and/or restated.

(gg) Related SAR means an SAR granted under Section 8 that is granted in relation to a particular Option and that can be exercised only upon the surrender to the Corporation, unexercised, of that portion of the Option to which the SAR relates.

(hh) Restricted Award means a Restricted Stock Award and/or a Restricted Stock Unit Award, as provided in Section 9.

(ii) Restricted Stock Award means shares of Common Stock awarded to a Participant under Section 9. Shares of Common Stock subject to a Restricted Stock Award shall cease to be restricted when, in accordance with the terms of the Plan and the terms and conditions established by the Administrator, the shares vest and become transferable and free of substantial risks of forfeiture.

(jj) Restricted Stock Unit means a Restricted Award granted to a Participant pursuant to Section 9 which is settled (i) by the delivery of one share of Common Stock for each Restricted Stock Unit, (ii) in cash in an amount equal to the Fair Market Value of one share of Common Stock for each Restricted Stock Unit, or (iii) in a combination of cash and Shares equal to the Fair Market Value of one share of Common Stock for each Restricted Stock Unit, as determined by the Administrator. A Restricted Stock Unit Award represents the promise of the Corporation to deliver shares, cash or a combination thereof, as applicable, upon vesting of the Award and compliance with such other terms and conditions as may be determined by the Administrator.

(kk) Retirement shall, as applied to any Participant, be as defined in any employment agreement, consulting agreement or other similar agreement, if any, to which the Participant is a party, or, if there is no such agreement (or if any such agreement does address the effect of termination due to retirement), "Retirement" shall mean retirement in accordance with the retirement policies and procedures established by the Corporation, as determined by the Administrator.

(ll) SAR means a stock appreciation right granted under Section 8 entitling the Participant to receive, with respect to each share of Common Stock encompassed by the exercise of such SAR, the excess of the Fair Market Value on the date of exercise over the SAR base price, subject to the terms of the Plan and any other terms and conditions established by the Administrator. References to "SARs" include both Related SARs and Freestanding SARs, unless the context requires otherwise.

(mm) Securities Act means the Securities Act of 1933, as amended.

(nn) Shareholders' Agreement means that certain Shareholders' Agreement which may be entered into between the Corporation and certain or all shareholders of the Corporation, as it may be amended.

(oo) Subsidiary means a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

(pp) Termination Date means the date of termination of a Participant's employment or service with the Company as a non-employee Director or Independent Contractor, for any reason, as determined by the Administrator in its discretion.

## 2. Purpose

The purpose of the Plan is to encourage and enable selected Employees, Directors and Independent Contractors of the Corporation and its Affiliates to acquire or to increase their holdings of Common Stock of the Corporation and other proprietary interests in the Corporation in order to promote a closer identification of their interests with those of the Corporation and its shareholders, thereby further stimulating their efforts to enhance the efficiency, soundness, profitability, growth and shareholder value of the Corporation. This purpose may be carried out through the grant of Awards to selected Employees, Directors and Independent Contractors, which may include the grant to selected Participants of Options in the form of Incentive Stock Options and Nonqualified

4

Options; SARs in the form of Related SARs and Freestanding SARs; Restricted Awards in the form of Restricted Stock Awards and Restricted Stock Units; and/or Dividend Equivalent Awards.

### 3. Administration of the Plan

(a) The Plan shall be administered by the Board of Directors of the Corporation, or, upon its delegation, by the Committee. In the event that the Corporation shall become subject to the reporting requirements of the Exchange Act, the Committee shall be comprised solely of two or more "non-employee directors," as such term is defined in Rule 16b-3 under the Exchange Act, or as may otherwise be permitted under Rule 16b-3, unless the Board determines otherwise. Further, in the event that the provisions of Section 162(m) of the Code or related regulations become applicable to the Corporation, the Plan shall be administered by a committee comprised of two or more "outside directors" (as such term is defined in Section 162(m) or related regulations) or as may otherwise be permitted under Section 162(m) and related regulations. For the purposes of the Plan, the term "Administrator" shall refer to the Board and, upon its delegation to the Committee of all or part of its authority to administer the Plan, to the Committee. Notwithstanding the foregoing, the Board shall have sole authority to grant Awards to Directors who are not Employees of the Corporation or its Affiliates.

(b) Subject to the provisions of the Plan, the Administrator shall have full and final authority in its discretion to take any action with respect to the Plan including, without limitation, the authority (i) to determine all matters relating to Awards, including selection of individuals to be granted Awards, the types of Awards, the number of shares of the Common Stock, if any, subject to an Award, and all terms, conditions, restrictions and limitations of an Award; (ii) to prescribe the form or forms of Award Agreements evidencing any Awards granted under the Plan; (iii) to establish, amend and rescind rules and regulations for the administration of the Plan; and (iv) to construe and interpret the Plan, Awards and Award Agreements made under the Plan, to interpret rules and regulations for administering the Plan and to make all other determinations deemed necessary or advisable for administering the Plan. Except to the extent otherwise required or restricted under Code Section 409A or related regulations or other guidance, (i) the Administrator shall have the authority, in its sole discretion, to accelerate the date that any Award which was not otherwise exercisable, vested or earned shall become exercisable, vested or earned in whole or in part without any obligation to accelerate such date with respect to any other Award granted to any recipient; and (ii) the Administrator also may in its sole discretion modify or extend the terms and conditions for exercise, vesting or earning of an Award. The Administrator may determine that a Participant's rights, payments and/or benefits with respect to an Award (including but not limited to any shares issued or issuable and/or cash paid or payable with respect to an Award) shall be subject to reduction, cancellation, forfeiture or recoupment upon the occurrence of certain specified events, in addition to any otherwise applicable vesting or performance conditions of an Award. Such events may include, but shall not be limited to, termination of employment for cause, violation of policies of the Corporation or an Affiliate, breach of non-solicitation, noncompetition, confidentiality, proprietary rights and invention assignment agreements or other restrictive covenants that may apply to the Participant, or other conduct by the Participant that is determined by the Administrator to be detrimental to the business or reputation of the Corporation or any Affiliate.

In addition, the Administrator shall have the authority and discretion to establish terms and conditions of Awards (including but not limited to the establishment of subplans) as the Administrator determines to be necessary or appropriate to conform to the applicable requirements or practices of jurisdictions outside of the United States. In addition to action by meeting in accordance with Applicable Laws, any action of the Administrator with respect to the Plan may be taken by a written instrument signed by all of the members of the Board or Committee, as appropriate, and any such action so taken by written consent shall be as fully effective as if it had been taken by a majority of the members at a meeting duly held and called. No member of the Board or Committee, as applicable, shall be liable while acting as Administrator for any action or determination made in good faith with respect to the Plan, an Award or an Award Agreement. The members of the Board or Committee, as applicable, shall be entitled to indemnification and reimbursement in the manner provided in the Corporation's articles of incorporation and bylaws and/or under Applicable Laws.

(c) Notwithstanding the other provisions of Section 3, the Administrator may delegate to one or more officers of the Corporation the authority to grant Awards, and to make any or all of the determinations reserved for the Administrator in the Plan and summarized in Section 3(b) with respect to such Awards (subject to any restrictions imposed by Applicable Laws, and such terms and conditions as may be established by the Administrator); provided, however, that, if and to the extent required by Section 16 of the Exchange Act or Section 162(m) of the Code, the Participant, at the time of said grant or other determination, (i) is not deemed to be an officer or director of the Corporation within the meaning of Section 16 of the Exchange Act; and (ii) is not deemed to be a Covered Employee as defined under Section 162(m) of the Code and related regulations. To the extent that the Administrator has delegated authority to grant Awards pursuant to this Section 3(c) to one or more officers of the Corporation, references to the Administrator shall include references to such officer or officers, subject, however, to the requirements of the Plan, Rule 16b-3, Section 162(m) of the Code and other Applicable Laws.

### 4. Effective Date; Term

The Effective Date of the Plan shall be November 27, 2006. Awards may be granted under the Plan on and after the Effective Date, but not after November 26, 2016. Awards that are outstanding at the end of the Plan term (or such earlier termination date as

may be established by the Board pursuant to Section 12(a)) shall continue in accordance with their terms, unless otherwise provided in the Plan or an Award Agreement.

### 5. Shares of Stock Subject to the Plan; Award Limitations

(a) *Shares of Stock Subject to the Plan*: Subject to adjustments as provided in Section 5(d), the aggregate number of shares of Common Stock that may be issued pursuant to Awards granted under the Plan shall not exceed 16,500,000 shares. Shares delivered under the Plan shall be authorized but unissued shares, treasury shares or shares purchased on the open market or by private purchase. The Corporation hereby reserves sufficient authorized shares of Common Stock to meet the grant of Awards hereunder.

(b) *Award Limitations*: Notwithstanding any provision in the Plan to the contrary, the following limitations shall apply to Awards granted under the Plan, in each case subject to adjustments pursuant to Section 5(d):

(i) The maximum number of shares of Common Stock that may be issued to any one Participant under the Plan pursuant to the grant of Incentive Options shall not exceed 8,500,000 shares;

(ii) If and to the extent Section 162(m) of the Code is applicable:

(A) In any calendar year, no Participant may be granted Options and SARs that are not related to an Option for more than 1,000,000 shares of Common Stock;

(B) No Participant may be granted Awards in any calendar year for more than 1,000,000 shares of Common Stock; and

(C) No Participant may be paid more than $2,000,000 with respect to any cash-settled award or awards which were granted during any single calendar year.

(For purposes of Section 5(b)(iii)(A) and (B), an Option and Related SAR shall be treated as a single Award.)

(c) *Shares Not Subject to Limitations*: The following will not be applied to the share limitations of Section 5(a) above: (i) dividends, including dividends paid in shares, or dividend equivalents paid in cash in connection with outstanding Awards; (ii) Awards which by their terms are settled in cash rather than the issuance of shares; (iii) any shares subject to an Award under the Plan which Award is forfeited, cancelled, terminated, expires or lapses for any reason or any shares subject to an Award which shares are repurchased or reacquired by the Corporation; and (iv) any shares surrendered by a Participant or withheld by the Corporation to pay the Option Price or purchase price for an Award or shares used to satisfy any tax withholding requirement in connection with the exercise, vesting or earning of an Award if, in accordance with the terms of the Plan, a Participant pays such Option Price or purchase price or satisfies such tax withholding by either tendering previously owned shares or having the Corporation withhold shares.

(d) *Adjustments*: If there is any change in the outstanding shares of Common Stock because of a merger, consolidation or reorganization involving the Corporation or an Affiliate, or if the Board of Directors of the Corporation declares a stock dividend, stock split distributable in shares of Common Stock, reverse stock split, combination or reclassification of the Common Stock, or if there is a similar change in the capital stock structure of the Corporation or an Affiliate affecting the Common Stock, the number of shares of Common Stock reserved for issuance under the Plan shall be correspondingly adjusted, and the Administrator shall make such adjustments to Awards and to any provisions of this Plan as the Administrator deems equitable to prevent dilution or enlargement of Awards or as may be otherwise advisable.

### 6. Eligibility

An Award may be granted only to an individual who satisfies all of the following eligibility requirements on the date the Award is granted:

(a) The individual is either (i) an Employee, (ii) a Director, or (iii) an Independent Contractor.

(b) With respect to the grant of Incentive Options, the individual is otherwise eligible to participate under Section 6, is an Employee of the Corporation or a Parent or Subsidiary and does not own, immediately before the time that the Incentive Option is granted, stock possessing more than 10% of the total combined voting power of all classes of stock of the Corporation or a Parent or Subsidiary. Notwithstanding the foregoing, an Employee who owns more than 10% of the total combined voting power of the Corporation or a Parent or Subsidiary may be granted an Incentive Option if the Option Price is at least 110% of the Fair Market Value of the Common Stock, and the Option Period does not exceed five years. For this purpose, an individual will be deemed to own stock which is attributable to him under Section 424(d) of the Code.

(c) With respect to the grant of substitute awards or assumption of awards in connection with a merger, consolidation, acquisition, reorganization or similar business combination involving the Corporation or an Affiliate, the recipient is otherwise eligible to receive the Award and the terms of the award are consistent with the Plan and Applicable Laws (including, to the extent necessary,

the federal securities laws registration provisions and Section 409A and Section 424(a) of the Code and related regulations or other guidance).

(d) The individual, being otherwise eligible under this Section 6, is selected by the Administrator as an individual to whom an Award shall be granted (as defined above, a "Participant").

### 7. *Options*

(a) *Grant of Options*: Subject to the limitations of the Plan, the Administrator may in its sole and absolute discretion grant Options to such eligible individuals in such numbers, subject to such terms and conditions, and at such times as the Administrator shall determine. Both Incentive Options and Nonqualified Options may be granted under the Plan, as determined by the Administrator; provided, however, that Incentive Options may only be granted to Employees of the Corporation or a Parent or Subsidiary. To the extent that an Option is designated as an Incentive Option but does not qualify as such under Section 422 of the Code, the Option (or portion thereof) shall be treated as a Nonqualified Option. An Option may be granted with or without a Related SAR.

(b) *Option Price*: The Option Price shall be established by the Administrator and stated in the Award Agreement evidencing the grant of the Option; provided, that (i) the Option Price of an Option shall be no less than 100% of the Fair Market Value per share of the Common Stock as determined on the date the Option is granted (or 110% of the Fair Market Value with respect to Incentive Options granted to an Employee who owns stock possessing more than 10% of the total voting power of all classes of stock of the Corporation or a Parent or Subsidiary, as provided in Section 6(b)); and (ii) in no event shall the Option Price per share of any Option be less than the par value per share (if any) of the Common Stock. Notwithstanding the foregoing, the Administrator may in its discretion authorize the grant of substitute or assumed options of an acquired entity with an Option Price not equal to at least 100% of the Fair Market Value on the date of grant, if such options are assumed or substituted in accordance with Reg. Section 1.424-1 (or any successor provision thereto) and if the option price of any such assumed or substituted option was at least equal to 100% of the fair market value of the underlying stock on the original date of grant, or if the terms of such assumed or substituted option otherwise comply with Code Section 409A, related regulations and other guidance. The preceding sentence shall also apply to SARs that are assumed or substituted in a corporate transaction, to the extent required under Code Section 409A, related regulations or other guidance.

(c) *Date of Grant*: An Incentive Option shall be considered to be granted on the date that the Administrator acts to grant the Option, or on any later date specified by the Administrator as the effective date of the Option. A Nonqualified Option shall be considered to be granted on the date the Administrator acts to grant the Option or any other date specified by the Administrator as the date of grant of the Option.

(d) *Option Period and Limitations on the Right to Exercise Options*:

(i) The Option Period shall be determined by the Administrator at the time the Option is granted and shall be stated in the Award Agreement. With respect to Incentive Options, the Option Period shall not extend more than 10 years from the date on which the Option is granted (or five years with respect to Incentive Options granted to an Employee who owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Corporation or a Parent or Subsidiary, as provided in Section 6(b)). Any Option or portion thereof not exercised before expiration of the Option Period shall terminate. The period or periods during which, and conditions pursuant to which, an Option may become exercisable shall be determined by the Administrator in its discretion, subject to the terms of the Plan.

(ii) An Option may be exercised by giving written notice to the Corporation in form acceptable to the Administrator at such place and subject to such conditions as may be established by the Administrator or its designee. Such notice shall specify the number of shares to be purchased pursuant to an Option and the aggregate purchase price to be paid therefore and shall be accompanied by payment of such purchase price. Unless an Award Agreement provides otherwise, such payment shall be in the form of cash or cash equivalent; provided that, where permitted by the Administrator and Applicable Laws (and subject to such terms and conditions as may be established by the Administrator), payment may also be made:

(A) By delivery (by either actual delivery or attestation) of shares of Common Stock owned by the Participant for a time period, if any, determined by the Administrator and otherwise acceptable to the Administrator;

(B) With respect only to purchases upon exercise of an Option after a public market for the Common Stock exists, by delivery of written notice of exercise to the Corporation and delivery to a broker of written notice of exercise and irrevocable instructions to promptly deliver to the Corporation the amount of sale or loan proceeds to pay the Option Price;

(C) By cash bonuses, loans or such other payment methods as may be approved by the Administrator (and subject to such terms as may be established by the Administrator), and which methods are acceptable under Applicable Laws; or

(D) By any combination of the foregoing methods.

Shares tendered or withheld in payment on the exercise of an Option shall be valued at their Fair Market Value on the date of exercise, as determined by the Administrator. For the purposes of the Plan, a "public market" for the Common Stock shall be deemed to exist (i) upon consummation of a firm commitment underwritten public offering of the Common Stock pursuant to an effective registration statement under the Securities Act, or (ii) if the Administrator otherwise determines that there is an established public market for the Common Stock.

(iii) Unless the Administrator determines otherwise, no Option granted to a Participant who was an Employee at the time of grant shall be exercised unless the Participant is, at the time of exercise, an Employee, and has been an Employee continuously since the date the Option was granted, subject to the following:

(A) The employment relationship of a Participant shall be treated as continuing intact for any period that the Participant is on military or sick leave or other bona fide leave of absence, provided that the period of such leave does not exceed three months, or, if longer, as long as the Participant's right to reemployment is guaranteed either by statute or by contract. The employment relationship of a Participant shall also be treated as continuing intact while the Participant is not in active service because of Disability. The Administrator shall have sole authority to determine whether a Participant is disabled and, if applicable, the Participant's Termination Date.

(B) Unless the Administrator determines otherwise, if the employment of a Participant is terminated because of Disability or death, the Option may be exercised only to the extent exercisable on the Participant's Termination Date, except that the Administrator may in its sole discretion accelerate the date for exercising all or any part of the Option which was not otherwise exercisable on the Termination Date. The Option must be exercised, if at all, prior to the first to occur of the following, whichever shall be applicable: (X) the close of the one-year period following the Termination Date (or such other period stated in the Award Agreement); or (Y) the close of the Option Period. In the event of the Participant's death, such Option shall be exercisable by such person or persons as shall have acquired the right to exercise the Option by will or by the laws of intestate succession.

(C) Unless the Administrator determines otherwise, if the employment of the Participant is terminated for any reason other than Disability, death or for "Cause," his Option may be exercised to the extent exercisable on his Termination Date, except that the Administrator may in its sole discretion accelerate the date for exercising all or any part of the Option which was not otherwise exercisable on the Termination Date. The Option must be exercised, if at all, prior to the first to occur of the following, whichever shall be applicable: (X) the close of the period of three months next succeeding the Termination Date (or such other period stated in the Award Agreement); or (Y) the close of the Option Period. If the Participant dies following such termination of employment and prior to the earlier of the dates specified in (X) or (Y) of this subparagraph (C), the Participant shall be treated as having died while employed under subparagraph (B) (treating for this purpose the Participant's date of termination of employment as the Termination Date). In the event of the Participant's death, such Option shall be exercisable by such person or persons as shall have acquired the right to exercise the Option by will or by the laws of intestate succession.

(D) Unless the Administrator determines otherwise, if the employment of the Participant is terminated for "Cause," his Option shall lapse and no longer be exercisable as of his Termination Date, as determined by the Administrator.

(E) Notwithstanding the foregoing, the Administrator may, in its sole discretion (subject to any requirements imposed under Code Section 409A, related regulations or other guidance), accelerate the date for exercising all or any part of an Option which was not otherwise exercisable on the Termination Date, extend the period during which an Option may be exercised, modify the terms and conditions to exercise, or any combination of the foregoing.

(iv) Unless the Administrator determines otherwise, an Option granted to a Participant who was a Director but who was not an Employee at the time of grant may be exercised only to the extent exercisable on the Participant's Termination Date (unless the termination was for Cause), and must be exercised, if at all, prior to the first to occur of the following, as applicable: (X) the close of the period of three months next succeeding the Termination Date (or such other period stated in the Award Agreement); or (Y) the close of the Option Period. If the services of a Participant are terminated for Cause, his Option shall lapse and no longer be exercisable as of his Termination Date, as determined by the Administrator. Notwithstanding the foregoing, the Administrator may in its sole discretion (subject to any requirements imposed under Code Section 409A, related regulations or other guidance) accelerate the date for exercising all or any part of an Option which was not otherwise exercisable on the Termination Date, extend the period during which an Option may be exercised, modify the other terms and conditions to exercise, or any combination of the foregoing.

(v) Unless the Administrator determines otherwise, an Option granted to a Participant who was an Independent Contractor at the time of grant (and who does not thereafter become an Employee, in which case he shall be subject to the provisions of Section 7(d)(iii)) may be exercised only to the extent exercisable on the Participant's Termination Date (unless the termination was for Cause), and must be exercised, if at all, prior to the first to occur of the following, as applicable: (X) the close of the period of three months next succeeding the Termination Date (or such other period stated in the Award Agreement); or (Y) the close of the Option Period. If the services of a Participant are terminated for Cause, his Option shall lapse and no longer be exercisable as of his Termination Date, as determined by the Administrator. Notwithstanding the foregoing, the Administrator may in its sole discretion (subject to any requirements imposed under Code Section 409A, related regulations or other guidance) accelerate the date for

exercising all or any part of an Option which was not otherwise exercisable on the Termination Date, extend the period during which an Option may be exercised, modify the other terms and conditions to exercise, or any combination of the foregoing.

(e) *Notice of Disposition*: If shares of Common Stock acquired upon exercise of an Incentive Option are disposed of within two years following the date of grant or one year following the transfer of such shares to a Participant upon exercise, the Participant shall, promptly following such disposition, notify the Corporation in writing of the date and terms of such disposition and provide such other information regarding the disposition as the Administrator may reasonably require.

(f) *Limitation on Incentive Options*: In no event shall there first become exercisable by an Employee in any one calendar year Incentive Options granted by the Corporation or any Parent or Subsidiary with respect to shares having an aggregate Fair Market Value (determined at the time an Incentive Option is granted) greater than $100,000. To the extent that any Incentive Options are first exercisable by a Participant in excess of such limitation, the excess shall be considered a Nonqualified Option.

(g) *Nontransferability*: Incentive Options shall not be transferable (including by sale, assignment, pledge or hypothecation) other than by will or the laws of intestate succession or, in the Administrator's discretion, as may otherwise be permitted in accordance with Treas. Reg. Section 1.421-1(b)(2) or any successor provision thereto. Nonqualified Options shall not be transferable (including by sale, assignment, pledge or hypothecation) other than by will or the laws of intestate succession, except for such transfers to immediate family members or related entities as may be permitted by the Administrator in a manner consistent with the registration provisions of the Securities Act. Except as may be permitted by the preceding sentence, an Option shall be exercisable during the Participant's lifetime only by him or by his guardian or legal representative. The designation of a beneficiary in accordance with the Plan does not constitute a transfer.

### 8. Stock Appreciation Rights

(a) *Grant of SARs*: Subject to the limitations of the Plan, the Administrator may in its sole and absolute discretion grant SARs to such eligible individuals, in such numbers, upon such terms and at such times as the Administrator shall determine. SARs may be granted to the holder of an Option (a "Related Option") with respect to all or a portion of the shares of Common Stock subject to the Related Option (a "Related SAR") or may be granted separately to an eligible individual (a "Freestanding SAR"). The base price per share of an SAR shall be no less than 100% the Fair Market Value per share of the Common Stock on the date the SAR is granted (except as may be otherwise permitted in the case of substituted or assumed SARs in accordance with Section 7(b)).

(b) *Related SARs*: A Related SAR may be granted either concurrently with the grant of the Related Option or (if the Related Option is a Nonqualified Option) at any time thereafter prior to the complete exercise, termination, expiration or cancellation of such Related Option; provided, however, that Related SARs must be granted in accordance with Code Section 409A, related regulations and other guidance. The base price of a Related SAR shall be equal to the Option Price of the Related Option. Related SARs shall be exercisable only at the time and to the extent that the Related Option is exercisable (and may be subject to such additional limitations on exercisability as the Administrator may provide in the Award Agreement), and in no event after the complete termination or full exercise of the Related Option. Notwithstanding the foregoing, a Related SAR that is related to an Incentive Option may be exercised only to the extent that the Related Option is exercisable and only when the Fair Market Value exceeds the Option Price of the Related Option. Upon the exercise of a Related SAR granted in connection with a Related Option, the Option shall be canceled to the extent of the number of shares as to which the Related SAR is exercised, and upon the exercise of a Related Option, the Related SAR shall be canceled to the extent of the number of shares as to which the Related Option is exercised or surrendered.

(c) *Freestanding SARs*: An SAR may be granted without relationship to an Option (as defined above, a "Freestanding SAR") and, in such case, will be exercisable upon such terms and subject to such conditions as may be determined by the Administrator, subject to the terms of the Plan.

(d) *Exercise of SARs*:

(i) Subject to the terms of the Plan, SARs shall be exercisable in whole or in part upon such terms and conditions as may be established by the Administrator and stated in the applicable Award Agreement. The period during which an SAR may be exercisable shall not exceed 10 years from the date of grant or, in the case of Related SARs, such shorter Option Period as may apply to the Related Option. Any SAR or portion thereof not exercised before expiration of the period established by the Administrator shall terminate.

(ii) SARs may be exercised by giving written notice to the Corporation in form acceptable to the Administrator at such place and subject to such terms and conditions as may be established by the Administrator or its designee. Unless the Administrator determines otherwise, the date of exercise of an SAR shall mean the date on which the Corporation shall have received proper notice from the Participant of the exercise of such SAR.

(iii) Each Participant's Award Agreement shall set forth the extent to which the Participant shall have the right to exercise an SAR following termination of the Participant's employment or service with the Corporation. Such provisions shall be determined in the sole discretion of the Administrator, need not be uniform among all SARs issued pursuant to this Section 8,

and may reflect distinctions based on the reasons for termination of employment or service. Notwithstanding the foregoing, unless the Administrator determines otherwise, no SAR may be exercised unless the Participant is, at the time of exercise, an eligible Participant, as described in Section 6, and has been a Participant continuously since the date the SAR was granted, subject to the provisions of Sections 7(d)(iii), (iv) and (v).

(e) *Payment Upon Exercise*: Subject to the limitations of the Plan, upon the exercise of an SAR, a Participant shall be entitled to receive payment from the Corporation in an amount determined by multiplying (i) the difference between the Fair Market Value of a share of Common Stock on the date of exercise of the SAR over the base price of the SAR by (ii) the number of shares of Common Stock with respect to which the SAR is being exercised. Notwithstanding the foregoing, the Administrator in its discretion may limit in any manner the amount payable with respect to an SAR. The consideration payable upon exercise of an SAR shall be paid in cash, shares of Common Stock (valued at Fair Market Value on the date of exercise of the SAR) or a combination of cash and shares of Common Stock, as determined by the Administrator.

(f) *Nontransferability*: Unless the Administrator determines otherwise, (i) SARs shall not be transferable (including by sale, assignment, pledge or hypothecation) other than by will or the laws of intestate succession, and (ii) SARs may be exercised during the Participant's lifetime only by him or by his guardian or legal representative. The designation of a beneficiary in accordance with the Plan does not constitute a transfer.

### 9. Restricted Awards

(a) *Grant of Restricted Awards*: Subject to the limitations of the Plan, the Administrator may in its sole and absolute discretion grant Restricted Awards to such individuals in such numbers, upon such terms and at such times as the Administrator shall determine. Such Restricted Awards may be in the form of Restricted Stock Awards and/or Restricted Stock Units that are subject to certain conditions, which conditions must be met in order for the Restricted Award to vest and be earned (in whole or in part) and no longer subject to forfeiture. Restricted Stock Awards shall be payable in shares of Common Stock. Restricted Stock Units shall be payable in cash or shares of Common Stock, or partly in cash and partly in shares of Common Stock, in accordance with the terms of the Plan and the discretion of the Administrator. The Administrator shall determine the nature, length and starting date of the period, if any, during which a Restricted Award may be earned (the "Restriction Period"), and shall determine the conditions which must be met in order for a Restricted Award to be granted or to vest or be earned (in whole or in part), which conditions may include, but are not limited to, payment of a stipulated purchase price, attainment of performance objectives, continued service or employment for a certain period of time (or a combination of attainment of performance objectives and continued service), Retirement, Displacement, Disability, death or any combination of such conditions. In the case of Restricted Awards based upon performance criteria, or a combination of performance criteria and continued service, the Administrator shall determine the Performance Measures applicable to such Restricted Awards (subject to Section 1(ee)).

(b) *Vesting of Restricted Awards*: Subject to the terms of the Plan and Code Section 409A, related regulations or other guidance, the Administrator shall have sole authority to determine whether and to what degree Restricted Awards have vested and been earned and are payable and to establish and interpret the terms and conditions of Restricted Awards. The Administrator may (subject to any restrictions imposed under Code Section 409A, related regulations or other guidance) accelerate the date that any Restricted Award granted to a Participant shall be deemed to be vested or earned in whole or in part, without any obligation to accelerate such date with respect to other Restricted Awards granted to any Participant.

(c) *Forfeiture of Restricted Awards*: Unless the Administrator determines otherwise, if the employment or service of a Participant shall be terminated for any reason and all or any part of a Restricted Award has not vested or been earned pursuant to the terms of the Plan and the individual Award, such Award, to the extent not then vested or earned, shall be forfeited immediately upon such termination and the Participant shall have no further rights with respect to the Award or any shares of Common Stock, cash or other benefits related to the Award.

(d) *Shareholder Rights; Share Certificates*: The Administrator shall have sole discretion to determine whether a Participant shall have dividend rights, voting rights or other rights as a shareholder with respect to shares subject to a Restricted Stock Award which has not yet vested or been earned. If the Administrator so determines, a certificate or certificates for whole shares of Common Stock subject to a Restricted Stock Award may be issued in the name of the Participant as soon as practicable after the Award has been granted; provided, however, that, notwithstanding the foregoing, the Administrator or its designee shall have the right to retain custody of certificates evidencing the shares subject to a Restricted Stock Award and to require the Participant to deliver to the Corporation a stock power, endorsed in blank, with respect to such Award, until such time as the Restricted Stock Award vests (or is forfeited) and is no longer subject to a substantial risk of forfeiture.

(e) *Nontransferability*: Unless the Administrator determines otherwise, Restricted Awards that have not vested shall not be transferable (including by sale, assignment, pledge or hypothecation) other than by will or the laws of intestate succession, and the recipient of a Restricted Award shall not sell, transfer, assign, pledge or otherwise encumber shares subject to the Award until the

10

Restriction Period has expired and until all conditions to vesting have been met. The designation of a beneficiary in accordance with the Plan does not constitute a transfer.

### 10. Dividends and Dividend Equivalents

Awards granted under the Plan shall, to the extent vested, earn dividends or dividend equivalents. Such dividends or dividend equivalents may be paid currently or may be credited to a Participant's account. Any crediting of dividends or dividend equivalents may be subject to such restrictions and conditions as the Administrator may establish, including reinvestment in additional shares of Common Stock or share equivalents. Notwithstanding the other provisions herein, any dividends or dividend equivalent rights related to an Award shall be structured in a manner so as to avoid causing the Award to be subject to Code Section 409A or shall otherwise be structured so that the Award and dividends or dividend equivalents are in compliance with Code Section 409A, related regulations or other guidance.

### 11. No Right or Obligation of Continued Employment or Service

Neither the Plan, the grant of an Award nor any other action related to the Plan shall confer upon the Participant any right to continue in the service of the Corporation or an Affiliate as an Employee, Director or Independent Contractor or to interfere in any way with the right of the Corporation or an Affiliate to terminate the Participant's employment or service at any time. Except as otherwise provided in the Plan, an Award Agreement or as may be determined by the Administrator, all rights of a Participant with respect to an Award shall terminate upon the termination of the Participant's employment or service.

### 12. Amendment and Termination of the Plan

(a) *Amendment and Termination*: The Plan may be amended, altered and/or terminated at any time by the Administrator; provided, however, that approval of an amendment to the Plan by the shareholders of the Corporation shall be required to the extent, if any, that shareholder approval of such amendment is required by Applicable Laws. Any Award may be amended, altered and/or terminated at any time by the Administrator; provided, however, that any such amendment, alteration or termination of an Award shall not, without the consent of the recipient of an outstanding Award, materially adversely affect the rights of the recipient with respect to the Award.

(b) *Unilateral Authority of Administrator to Modify Plan and Awards*: Notwithstanding Section 12(a) herein, the following provisions shall apply:

(i) The Administrator shall have unilateral authority to amend the Plan and any Award (without Participant consent and without shareholder approval, unless such shareholder approval is required by Applicable Laws) to the extent necessary to comply with Applicable Laws or changes to Applicable Laws (including but not limited to Code Section 409A and Code Section 422, related regulations or other guidance and federal securities laws).

(ii) The Administrator shall have unilateral authority to make adjustments to the terms and conditions of Awards in recognition of unusual or nonrecurring events affecting the Corporation or any Affiliate, or the financial statements of the Corporation or any Affiliate, or of changes in accounting principles, if the Administrator determines that such adjustments are appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan or necessary or appropriate to comply with applicable accounting principles.

(c) *Cash Settlement*: Notwithstanding any provision of the Plan, an Award or an Award Agreement to the contrary, the Administrator shall have discretion (subject to (i) any requirements imposed under Code Section 409A, related regulations or other guidance and (ii) consideration of such accounting principles as the Administrator deems relevant) to cause any Award (or portion thereof) granted under the Plan to be canceled in consideration of an alternative award or cash payment of an equivalent cash value, as determined by the Administrator in its sole discretion, made to the holder of such canceled Award.

### 13. Restrictions on Awards and Shares

(a) *General*: As a condition to the issuance and delivery of Common Stock hereunder, or the grant of any benefit pursuant to the Plan, the Corporation shall require a Participant or other person to become a party to an Award Agreement, the Shareholders Agreement, other agreement(s) restricting the transfer, purchase or repurchase of shares of Common Stock of the Corporation, voting agreement or such other agreements and any other employment agreements, consulting agreements, non-competition agreements, confidentiality agreements, non-solicitation agreements or other similar agreements imposing such restrictions as may be required by the Corporation. In addition, without in any way limiting the effect of the foregoing, each Participant or other holder of shares issued under the Plan shall be permitted to transfer such shares only if such transfer is in accordance with the terms of Section 13 herein, the Award Agreement, the Shareholders Agreement and any other applicable agreements. The acquisition of shares of Common Stock under the Plan by a Participant or any other holder of shares shall be subject to, and conditioned upon, the agreement of the Participant or other holder of such shares to the restrictions described in this Section 13, the Award Agreement, the Shareholders Agreement and any other applicable agreements.

(b) *Compliance with Applicable Laws*: The Corporation may impose such restrictions on Awards, shares and any other benefits underlying Awards hereunder as it may deem advisable, including without limitation restrictions under the federal securities laws, the requirements of any stock exchange or similar organization and any blue sky, state or foreign securities laws applicable to such securities. Notwithstanding any other Plan provision to the contrary, the Corporation shall not be obligated to issue, deliver or transfer shares of Common Stock under the Plan, make any other distribution of benefits under the Plan, or take any other action, unless such delivery, distribution or action is in compliance with Applicable Laws (including but not limited to the requirements of the Securities Act). The Corporation may cause a restrictive legend to be placed on any certificate issued pursuant to an Award hereunder in such form as may be prescribed from time to time by Applicable Laws or as may be advised by legal counsel.

## 14. Change in Control

In the event of a Change in Control, all Awards shall vest and become immediately exercisable in full.

## 15. Compliance with Code Section 409A

(a) *General*: Notwithstanding any other provision in the Plan or an Award to the contrary, if and to the extent that Section 409A of the Code is deemed to apply to the Plan or any Award granted under the Plan, it is the general intention of the Corporation that the Plan and all such Awards shall comply with Code Section 409A, related regulations or other guidance, and the Plan and any such Award shall, to the extent practicable, be construed in accordance therewith. Deferrals of shares or any other benefit issuable pursuant to an Award otherwise exempt from Code Section 409A in a manner that would cause Code Section 409A to apply shall not be permitted unless such deferrals are in compliance with Code Section 409A, related regulations or other guidance. Without in any way limiting the effect of the foregoing, in the event that Code Section 409A, related regulations or other guidance require that any special terms, provisions or conditions be included in the Plan or any Award, then such terms, provisions and conditions shall, to the extent practicable, be deemed to be made a part of the Plan or Award, as applicable. Further, in the event that the Plan or any Award shall be deemed not to comply with Code Section 409A or any related regulations or other guidance, then neither the Corporation, the Administrator nor its or their designees or agents shall be liable to any Participant or other person for actions, decisions or determinations made in good faith.

(b) *Special Code Section 409A Provisions for Nonqualified Options*: Notwithstanding the other provisions of the Plan, unless otherwise permitted under Code Section 409A, related regulations or other guidance, (i) the Option Price for a Nonqualified Option may never be less than the Fair Market Value of the Common Stock on the date of grant of the Option and the number of shares subject to the Option shall be fixed on the original grant date; (ii) the transfer or exercise of the Option shall be subject to taxation under Code Section 83 and related regulations; and (iii) the Nonqualified Option may not include any feature for the deferral of compensation other than the deferral of recognition of income until the later of exercise or disposition of the Option or the time the shares acquired pursuant to the exercise of the Option first became substantially vested.

(c) *Special Code Section 409A Provisions for SARs*: Notwithstanding the other provisions the Plan, unless otherwise permitted under Code Section 409A, related regulations or other guidance, (i) compensation payable under an SAR cannot be greater than the difference between the Fair Market Value of the Common Stock on the SAR grant date and the Fair Market Value of the Common Stock on the SAR exercise date; (ii) the SAR base price may never be less than the Fair Market Value of the Common Stock on the date the SAR is granted; and (iii) the SAR may not include any feature for the deferral of compensation other than the deferral of recognition of income until the exercise of the SAR.

(d) *Short-Term Deferrals*: Except to the extent otherwise required or permitted under Code Section 409A, related regulations or other guidance, distributions pursuant to Restricted Stock Units or any Awards granted under the Plan that are subject to Code Section 409A must be made no later than the later of (A) the 15th day of the third month following the Participant's first taxable year in which the amount is no longer subject to a substantial risk of forfeiture; or (B) the 15th day of the third month following the end of the Corporation's first taxable year in which the amount is no longer subject to a substantial risk of forfeiture. Notwithstanding the foregoing, if and to the extent that the distribution of shares of Common Stock or any other benefit payable pursuant to an Award is deemed to involve the deferral of compensation that is not otherwise exempt from Code Section 409A, then (i) the distribution of such shares or benefit shall occur no later than the end of the calendar year in which the Award vests; and (ii) if the Participant is or may be a "specified employee" (as defined in Code Section 409A, related regulations or other guidance), a distribution due to separation from service may not be made before the date that is six months after the date of separation from service (or, if earlier, the date of death of the Participant), except as may be otherwise permitted pursuant to Code Section 409A, related regulations or other guidance.

## 16. General Provisions

(a) *Shareholder Rights*: Except as otherwise determined by the Administrator (and subject to the provisions of Section 9(d) regarding Restricted Stock Awards), a Participant and his legal representative, legatees or distributes shall not be deemed to be the holder of any shares subject to an Award and shall not have any rights of a shareholder unless and until certificates for such shares

have been issued and delivered to him or them under the Plan. A certificate or certificates for shares of Common Stock acquired upon exercise of an Option or SAR shall be promptly issued in the name of the Participant (or his beneficiary) and distributed to the Participant (or his beneficiary) as soon as practicable following receipt of notice of exercise and, with respect to Options, payment of the Option Price (except as may otherwise be determined by the Corporation in the event of payment of the Option Price pursuant to Section 7(d)(ii)(C)). Except as otherwise provided in Section 9(d) regarding Restricted Stock Awards, a certificate for any shares of Common Stock issuable pursuant to a Restricted Award shall be promptly issued in the name of the Participant (or his beneficiary) and distributed to the Participant (or his beneficiary) after the Award (or portion thereof) has vested or been earned and any other conditions to distribution have been met.

(b) *Withholding:* The Corporation shall withhold all required local, state, federal, foreign and other taxes and any other amount required to be withheld by any governmental authority or law from any amount payable in cash with respect to an Award. Prior to the delivery or transfer of any certificate for shares or any other benefit conferred under the Plan, the Corporation shall require any recipient of an Award to pay to the Corporation in cash the amount of any tax or other amount required by any governmental authority to be withheld and paid over by the Corporation to such authority for the account of such recipient. Notwithstanding the foregoing, the Administrator may establish procedures to permit a recipient to satisfy such obligation in whole or in part, and any local, state, federal, foreign or other income tax obligations relating to such an Award, by electing (the "election") to have the Corporation withhold shares of Common Stock from the shares to which the recipient is entitled. The number of shares to be withheld shall have a Fair Market Value as of the date that the amount of tax to be withheld is determined as nearly equal as possible to (but not exceeding) the amount of such obligations being satisfied. Each election must be made in writing to the Administrator in accordance with election procedures established by the Administrator.

(c) *Section 16(b) Compliance*: If and to the extent that any Participants in the Plan are subject to Section 16(b) of the Exchange Act, it is the general intention of the Corporation that transactions under the Plan by such persons shall comply with Rule 16b-3 under the Exchange Act and that the Plan shall be construed in favor of such Plan transactions meeting the requirements of Rule 16b-3 or any successor rules thereto. Notwithstanding anything in the Plan to the contrary, the Administrator, in its sole and absolute discretion, may bifurcate the Plan so as to restrict, limit or condition the use of any provision of the Plan to Participants who are officers or directors subject to Section 16 of the Exchange Act without so restricting, limiting or conditioning the Plan with respect to other Participants.

(d) *Code Section 162(m) Performance-Based Compensation*. If and to the extent to which Section 162(m) of the Code is applicable, the Corporation intends that compensation paid under the Plan to Covered Employees will, to the extent practicable, constitute "qualified performance-based compensation" within the meaning of Section 162(m) and related regulations, unless otherwise determined by the Administrator. Accordingly, Awards granted to Covered Employees which are intended to qualify for the performance-based exception under Code Section 162(m) and related regulations shall be deemed to include any such additional terms, conditions, limitations and provisions as are necessary to comply with the performance-based compensation exemption of Section 162(m), unless the Administrator, in its discretion, determines otherwise.

(e) *Unfunded Plan; No Effect on Other Plans:*

(i) The Plan shall be unfunded, and the Corporation shall not be required to create a trust or segregate any assets that may at any time be represented by Awards under the Plan. The Plan shall not establish any fiduciary relationship between the Corporation and any Participant or other person. Neither a Participant nor any other person shall, by reason of the Plan, acquire any right in or title to any assets, funds or property of the Corporation or any Affiliate, including, without limitation, any specific funds, assets or other property which the Corporation or any Affiliate, in their discretion, may set aside in anticipation of a liability under the Plan. A Participant shall have only a contractual right to the Common Stock or other amounts, if any, payable under the Plan, unsecured by any assets of the Corporation or any Affiliate. Nothing contained in the Plan shall constitute a guarantee that the assets of such entities shall be sufficient to pay any benefits to any person.

(ii) The amount of any compensation deemed to be received by a Participant pursuant to an Award shall not constitute compensation with respect to which any other employee benefits of such Participant are determined, including, without limitation, benefits under any bonus, pension, profit sharing, life insurance or salary continuation plan, except as otherwise specifically provided by the terms of such plan or as may be determined by the Administrator.

(iii) The adoption of the Plan shall not affect any other stock incentive or other compensation plans in effect for the Corporation or any Affiliate, nor shall the Plan preclude the Corporation from establishing any other forms of stock incentive or other compensation for employees or service providers of the Corporation or any Affiliate.

(f) *Applicable Laws*: The Plan shall be governed by and construed in accordance with the laws of the State of Florida, without regard to the conflict of laws provisions of any state, and in accordance with applicable federal laws of the United States.

(g) *Beneficiary Designation*: The Administrator may in its discretion permit a Participant to designate in writing a person or persons as beneficiary, which beneficiary shall be entitled to receive settlement of Awards (if any) to which the Participant is otherwise entitled in the event of death. In the absence of such designation by a Participant, and in the event of the Participant's death,

the estate of the Participant shall be treated as beneficiary for purposes of the Plan, unless the Administrator determines otherwise. The Administrator shall have sole discretion to approve and interpret the form or forms of such beneficiary designation. A beneficiary, legal guardian, legal representative or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and any Award Agreement applicable to the Participant, except to the extent that the Plan and/or Award Agreement provide otherwise, and to any additional restrictions deemed necessary or appropriate by the Administrator.

(h) *Gender and Number*: Except where otherwise indicated by the context, words in any gender shall include any other gender, words in the singular shall include the plural and words in the plural shall include the singular.

(i) *Severability*: If any provision of the Plan shall be held illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining parts of the Plan, and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

(j) Rules of Construction: Headings are given to the sections of this Plan solely as a convenience to facilitate reference. The reference to any statute, regulation or other provision of law shall be construed to refer to any amendment to or successor of such provision of law.

(k) *Successors and Assigns*: The Plan shall be binding upon the Corporation, its successors and assigns, and Participants, their executors, administrators and permitted transferees and beneficiaries.

(l) *Right of Offset*: Notwithstanding any other provision of the Plan or an Award Agreement, the Corporation may reduce the amount of any payment or benefit otherwise payable to or on behalf of a Participant by the amount of any obligation of the Participant to or on behalf of the Corporation that is or becomes due and payable.

(m) *Effect of Changes in Status*: An Award shall not be affected by any change in the terms, conditions or status of the Participant's employment or service, provided that the Participant continues to be an employee of, or in service to, the Corporation or an Affiliate.

(n) *Shareholder Approval*: The Plan is subject to approval by the shareholders of the Corporation, which approval must occur, if at all, within 12 months of the Effective Date of the Plan. Awards granted prior to such shareholder approval shall be conditioned upon and shall be effective only upon approval of the Plan by such shareholders on or before such date.

(o) *Fractional Shares*: Except as otherwise provided by an Award Agreement or the Administrator, (i) the total number of shares issuable pursuant to the exercise, vesting or earning of an Award shall be rounded down to the nearest whole share, and (ii) no fractional shares shall be issued. The Administrator may, in its discretion, determine that a fractional share shall be settled in cash.

IN WITNESS WHEREOF, this MiMedx Group, Inc. Assumed 2006 Stock Incentive Plan, is, by the authority of the Board of Directors of the Corporation, executed in behalf of the Corporation, effective as of the 10th day of May, 2012.

**MIMEDX GROUP, INC.**

By: /s/ Parker H. Petit
    Name: Parker H. "Pete" Petit
    Title: Chairman

ATTEST:

/s/ Roberta L. McCaw
Secretary

[Corporate Seal]

14

# EXHIBIT 3

MIMEDX GROUP, INC.
ASSUMED 2006 STOCK INCENTIVE PLAN

**Incentive Stock Option Agreement**
(Employees)

<u>Schedule A/Grant Notice</u>

1.  Pursuant to the terms and conditions of the Corporation's Assumed 2006 Stock Incentive Plan (the "Plan"), you (the "Participant") have been granted an option (the "Option") to purchase **35,000** shares (the "Shares") of our Common Stock as outlined below.

Name of Participant:     **Michael Fox**
Address:     **1274 Birchdale Lane**
    **Aurora, IL 60504**

| | |
|---|---|
| Grant Date: | **March 6, 2013** |
| Number of Shares Subject to Option: | **35,000** |
| Option Price: | **$5.07** |
| Type of Option: | **Incentive Stock Option ("ISO")** |
| Expiration Date (Last day of Option Period): | **March 5, 2023** |
| Vesting Schedule/Conditions: | **33.33% on March 6, 2014** |
| | **66.66% on March 6, 2015** |
| | **100% on March 6, 2016** |

2.  By my signature below, I, the Participant, hereby acknowledge receipt of this Grant Notice and the Option Award Agreement (the "Agreement") dated **March 6, 2013**, between the Participant and MiMedx Group, Inc. (the "Corporation") which is attached to this Grant Notice. I understand that the Grant Notice and other provisions of Schedule A herein are incorporated by reference into the Agreement and constitute a part of the Agreement. <u>By my signature below, I further agree to be bound by the terms of the Plan and the Agreement, including but not limited to the terms of this Grant Notice and the other provisions of Schedule A contained herein. The Corporation reserves the right to treat the Option and the Agreement as cancelled, void and of no effect if the Participant fails to return a signed copy of this Grant Notice within 30 days of receipt of this Grant Notice.</u>

Signature: _____     Date: __3/22/13__

Agreed to by:

**MiMedx Group, Inc.**

By: _____
Name: Parker H. Petit
Its: Chairman and Chief Executive Officer

Attest:

_____
Vice President, Human Resources and Administration

# EXHIBIT 4

**MIMEDX GROUP, INC.**
**ASSUMED 2006 STOCK INCENTIVE PLAN**

Incentive Stock Option Agreement
(Employees)

1.      Pursuant to the terms and conditions of the Corporation's Assumed 2006 Stock Incentive Plan (the "Plan"), you (the "Participant") have been granted an option (the "Option") to purchase **7,500** shares (the "Shares") of our Common Stock as outlined below.

| | |
|---|---|
| Name of Participant: | **Michael Fox** |
| Address: | **1274 Birchdale Lane** |
| | **Aurora, IL 60504** |

| | |
|---|---|
| Grant Date: | **October 29, 2013** |
| Number of Shares Subject to Option: | **7,500** |
| Option Price: | **$5.49** |
| Type of Option: | **Incentive Stock Option ("ISO")** |
| Expiration Date (Last day of Option Period): | **October 28, 2023** |
| Vesting Schedule/Conditions: | **33.33% on October 29, 2014** |
| | **66.66% on October 29, 2015** |
| | **100% on October 29, 2016** |

2.      By my signature below, the Participant hereby acknowledges receipt of this Incentive Stock Option Agreement (the "Agreement") and a copy of the Plan, and furthermore, the Participant agrees to be bound by the terms of the Plan and the Agreement.   The Participant understands that the applicable provisions of the Plan are hereby incorporated by reference into the Agreement and constitute a part of the Agreement.  The Corporation reserves the right to treat the Option and the Agreement as cancelled, void and of no effect if the Participant fails to return a signed copy of this Grant Notice within 30 days of receipt of this Grant Notice.

Participant: _____       Date: _____

Agreed to by:

**MiMedx Group, Inc.**

By: _____
Name: Parker H. Petit
Its: Chairman and Chief Executive Officer

Attest: _____
Vice President, Human Resources and Administration

# EXHIBIT 5

MIMEDX GROUP, INC.
ASSUMED 2006 STOCK INCENTIVE PLAN

Incentive Stock Option Agreement
(Employees)

1.      Pursuant to the terms and conditions of the Corporation's Assumed 2006 Stock Incentive Plan (the "Plan"), you (the "Participant") have been granted an option (the "Option") to purchase **25,000** shares (the "Shares") of our Common Stock as outlined below.

|  |  |
|---|---|
| Name of Participant: | **Michael Fox** |
| Address: | **1274 Birchdale Lane** |
|  | **Aurora, IL 60504** |
|  |  |
| Grant Date: | **February 25, 2014** |
| Number of Shares Subject to Option: | **25,000** |
| Option Price: | **$7.24** |
| Type of Option: | **Incentive Stock Option ("ISO")** |
| Expiration Date (Last day of Option Period): | **February 24, 2024** |
| Vesting Schedule/Conditions: | **33.33% on February 25, 2015** |
|  | **66.66% on February 25, 2016** |
|  | **100% on February 25, 2017** |

2.      By my signature below, the Participant hereby acknowledges receipt of this Incentive Stock Option Agreement (the "Agreement") and a copy of the Plan, and furthermore, the Participant agrees to be bound by the terms of the Plan and the Agreement.  The Participant understands that the applicable provisions of the Plan are hereby incorporated by reference into the Agreement and constitute a part of the Agreement.  <u>The Corporation reserves the right to treat the Option and the Agreement as cancelled, void and of no effect if the Participant fails to return a signed copy of this Grant Notice within 30 days of receipt of this Grant Notice.</u>

Participant: _____

Signed & mailed,
3/21/14

Date: _3/21/14_____

Agreed to by:

**MiMedx Group, Inc.**

By: _____
Name: Parker H. Petit
Its: Chairman and Chief Executive Officer

Attest:_____
Vice President, Human Resources and Administration

# EXHIBIT 6

**MIMEDX GROUP, INC.**
**ASSUMED 2006 STOCK INCENTIVE PLAN**

**Incentive Stock Option Agreement**
**(Employees)**

1.      Pursuant to the terms and conditions of the Corporation's Assumed 2006 Stock Incentive Plan (the "Plan"), you (the "Participant") have been granted an option (the "Option") to purchase **4,500** shares (the "Shares") of our Common Stock as outlined below.

| | |
|---|---|
| Name of Participant: | **Michael Fox** |
| Address: | **1274 Birchdale Lane** |
| | **Aurora, IL  60504** |

| | |
|---|---|
| Grant Date: | **April 24, 2014** |
| Number of Shares Subject to Option: | **4,500** |
| Option Price: | **$5.84** |
| Type of Option: | **Incentive Stock Option ("ISO")** |
| Expiration Date (Last day of Option Period): | **April 23, 2024** |
| Vesting Schedule/Conditions: | **33.33% on April 24, 2015** |
| | **66.66% on April 24, 2016** |
| | **100% on April 24, 2017** |

2.      By my signature below, the Participant hereby acknowledges receipt of this Incentive Stock Option Agreement (the "Agreement") and a copy of the Plan, and furthermore, the Participant agrees to be bound by the terms of the Plan and the Agreement.   The Participant understands that the applicable provisions of the Plan are hereby incorporated by reference into the Agreement and constitute a part of the Agreement.  The Corporation reserves the right to treat the Option and the Agreement as cancelled, void and of no effect if the Participant fails to return a signed copy of this Grant Notice within 30 days of receipt of this Grant Notice.

Participant: _____     Date: ___5/23/14___

Agreed to by:        (Sent on 5/24/14)

**MiMedx Group, Inc.**

By: _____
Name: Parker H. Petit
Its: Chairman and Chief Executive Officer

Attest: _____
Senior Vice President, Administration

# EXHIBIT 7

12/16/2016                                    Equity Compensation Portfolio Statement

Close  Print

Run Date: 12/16/2016

| | |
|---|---|
| | MiMedx Group Inc. |
| | RAYJAM_MDXG |
| | 1775 West Oak Commons Ct. NE |
| | Marietta, GA 30062 |
| | USA |

Report Nbr: ACT_PARTSTMT_COMP
Company Phone: (770) 651-9100
Company Fax:(678) 384-6741

## Equity Compensation Portfolio Statement

Statement Period: 2/1/1900 to 12/16/2016
MDXG: 9.18;
Year-to-Date for Year Ending: 2016

FOX, MICHAEL
UA3000051
1274 BIRCHDALE LANE AURORA, IL 60504 USA

### Portfolio Summary of Grants Outstanding as of Ending Date

| Grant Type | Grant Number | Plan Name | Quantity | Grant Date | Grant Price / Purchase Price | Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain / Loss of Outstanding | Options Exercisable Balance | Outstanding Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| RSA | 1583 | MiMedx Group 2016 Equity and Cash Incentive Plan | 1,500 | 10/28/2016 | $0.000000 | $0.00 | $13,770.00 | $13,770.00 | N/A | 1,500 |
| ISO | 429 | MiMedx, Inc. 2006 Stock Incentive Plan | 31,140 | 3/6/2013 | $5.070000 | $157,879.80 | $285,865.20 | $127,985.40 | 31,140 | 31,140 |
| NQSO | 429N | MiMedx, Inc. 2006 Stock Incentive Plan | 3,860 | 3/6/2013 | $5.070000 | $19,570.20 | $35,434.80 | $15,864.60 | 3,860 | 3,860 |
| ISO | 610 | MiMedx, Inc. 2006 Stock Incentive Plan | 2,500 | 10/29/2013 | $5.490000 | $13,725.00 | $22,950.00 | $9,225.00 | 2,500 | 2,500 |
| NQSO | 610N | MiMedx, Inc. 2006 Stock Incentive Plan | 5,000 | 10/29/2013 | $5.490000 | $27,450.00 | $45,900.00 | $18,450.00 | 5,000 | 5,000 |
| ISO | 668 | MiMedx, Inc. 2006 Stock Incentive Plan | 12,080 | 2/25/2014 | $7.240000 | $87,459.20 | $110,894.40 | $23,435.20 | 3,746 | 12,080 |
| NQSO | 668N | MiMedx, Inc. 2006 Stock Incentive Plan | 12,920 | 2/25/2014 | $7.240000 | $93,540.80 | $118,605.60 | $25,064.80 | 12,920 | 12,920 |
| RSA | 53 | MiMedx, Inc. 2006 Stock Incentive Plan | 10,000 | 2/25/2014 | $0.000000 | $0.00 | $30,606.12 | $30,606.12 | N/A | 3,334 |
| ISO | 868 | MiMedx, Inc. 2006 Stock Incentive Plan | 1,500 | 4/24/2014 | $5.840000 | $8,760.00 | $13,770.00 | $5,010.00 | 0 | 1,500 |
| NQSO | 868N | MiMedx, Inc. 2006 Stock Incentive Plan | 3,000 | 4/24/2014 | $5.840000 | $17,520.00 | $27,540.00 | $10,020.00 | 3,000 | 3,000 |
| ISO | 932 | MiMedx, Inc. 2006 Stock Incentive Plan | 1,000 | 7/28/2014 | $6.280000 | $6,280.00 | $9,180.00 | $2,900.00 | 0 | 1,000 |
| NQSO | 932N | MiMedx, Inc. 2006 Stock Incentive Plan | 2,000 | 7/28/2014 | $6.280000 | $12,560.00 | $18,360.00 | $5,800.00 | 2,000 | 2,000 |
| RSA | 124 | MiMedx, Inc. 2006 Stock Incentive Plan | 1,500 | 7/28/2014 | $0.000000 | $0.00 | $4,590.00 | $4,590.00 | N/A | 500 |
| RSA | 157 | MiMedx, Inc. 2006 Stock Incentive Plan | 2,350 | 10/29/2014 | $0.000000 | $0.00 | $7,197.12 | $7,197.12 | N/A | 784 |
| RSA | 259 | MiMedx, Inc. 2006 Stock Incentive Plan | 15,000 | 2/25/2015 | $0.000000 | $0.00 | $91,800.00 | $91,800.00 | N/A | 10,000 |
| RSA | 498 | MiMedx, Inc. 2006 Stock Incentive Plan | 3,000 | 4/27/2015 | $0.000000 | $0.00 | $18,360.00 | $18,360.00 | N/A | 2,000 |
| RSA | 646 | MiMedx, Inc. 2006 Stock Incentive Plan | 3,250 | 7/29/2015 | $0.000000 | $0.00 | $19,893.06 | $19,893.06 | N/A | 2,167 |
| RSA | 817 | MiMedx, Inc. 2006 Stock Incentive Plan | 9,000 | 1/4/2016 | $0.000000 | $0.00 | $82,620.00 | $82,620.00 | N/A | 9,000 |
| RSA | 840 | MiMedx, Inc. 2006 Stock Incentive Plan | 12,000 | 2/22/2016 | $0.000000 | $0.00 | $110,160.00 | $110,160.00 | N/A | 12,000 |
| RSA | 1234 | MiMedx, Inc. 2006 Stock Incentive Plan | 2,500 | 4/25/2016 | $0.000000 | $0.00 | $22,950.00 | $22,950.00 | N/A | 2,500 |
| RSA | 1391 | MiMedx, Inc. 2006 Stock Incentive Plan | 2,500 | 7/25/2016 | $0.000000 | $0.00 | $22,950.00 | $22,950.00 | N/A | 2,500 |
| Total Portfolio: | | | | | | $444,745.00 | $1,113,396.30 | $668,651.30 | 64,166 | 121,285 |

### Distribution Transactions Summary

**Stock Option / SAR Exercises**

| Grant Type | Grant Number | Grant Date | Grant Price | Exercised Shares | Total Grant Price | Ordinary Income | Shares Delivered |
|---|---|---|---|---|---|---|---|
| ISO | 339 | 8/2/2012 | $2.450000 | 50,000 | $122,500.00 | $0.00 | 50,000 |
| ISO | 358 | 10/31/2012 | $2.940000 | 10,000 | $29,400.00 | $0.00 | 10,000 |
| | | | | | | $0.00 | 60,000 |

**Restricted-Based Awards: Dividends and Dividend Equivalents**

**Restricted-Based Awards: Vesting and Releases**

| Grant Type | Grant Number | Grant Date | Grant Price | Total Shares | Total Grant Price | Ordinary Income | Shares Delivered |
|---|---|---|---|---|---|---|---|
| RSA | 24 | 7/30/2013 | $0.000000 | 5,750 | $0.00 | $49,336.48 | 5,154 |
| RSA | 27 | 10/29/2013 | $0.000000 | 10,000 | $0.00 | $83,533.76 | 8,964 |
| RSA | 53 | 2/25/2014 | $0.000000 | 6,986 | $0.00 | $59,227.41 | 6,666 |
| RSA | 124 | 7/28/2014 | $0.000000 | 1,000 | $0.00 | $10,125.00 | 845 |
| RSA | 157 | 10/29/2014 | $0.000000 | 1,566 | $0.00 | $12,582.81 | 1,323 |
| RSA | 259 | 2/25/2015 | $0.000000 | 5,000 | $0.00 | $41,250.00 | 5,000 |
| RSA | 498 | 4/27/2015 | $0.000000 | 1,000 | $0.00 | $7,720.00 | 1,000 |
| RSA | 646 | 7/29/2015 | $0.000000 | 1,083 | $0.00 | $8,111.67 | 747 |
| | | | | | | $271,887.13 | 29,699 |

### Total Distributions from 2/1/1900 to 12/16/2016

| Value of Distributions | Shares Delivered |
|---|---|
| $271,887.13 | 89,699 |

## Stock Options / SARs

**Grant Details for: ISO**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 339 | 8/2/2012 | 50,000 | | $2.450000 | 50,000 | 0 | 8/2/2022 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 0 | $0.00 | $0.00 | $0.00 |
| Total: | 0 | $0.00 | $0.00 | $0.00 |

**Period Activity**

Exercises:

| Exercise Date | Exercise Sequence No. | Shares Exercised | Total Grant Price | Taxable Gain FMV | Ordinary Income | Total Taxes | Other Transactional Costs | Total Participant Investment | Shares Delivered | Cash Delivered |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/11/2016 | 616 | 50,000 | $122,500.00 | $8.450000 | $0.00 | $0.00 | $0.00 | $122,500.00 | 50,000 | $0.00 |

## Stock Options / SARs

**Grant Details for: ISO**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|

12/16/2016

Equity Compensation Portfolio Statement

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 358 | 10/31/2012 | 10,000 | 0 | $2.940000 | 10,000 | 0 | 10/31/2022 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 0 | $0.00 | $0.00 | $0.00 |
| Total: | 0 | $0.00 | $0.00 | $0.00 |

**Period Activity**

Exercises:

| Exercise Date | Exercise Sequence No. | Shares Exercised | Total Grant Price | Taxable Gain FMV | Ordinary Income | Total Taxes | Other Transactional Costs | Total Participant Investment | Shares Delivered | Cash Delivered |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/11/2016 | 617 | 10,000 | $29,400.00 | $8.450000 | $0.00 | $0.00 | $0.00 | $29,400.00 | 10,000 | $0.00 |

## Stock Options / SARs

**Grant Details for: ISO**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 429 | 3/6/2013 | 31,140 | 0 | $5.070000 | 0 | 0 | 3/6/2023 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 31,140 | $157,879.80 | $285,865.20 | $127,985.40 |
| Total: | 31,140 | $157,879.80 | $285,865.20 | $127,985.40 |

## Stock Options / SARs

**Grant Details for: NQSO**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 429N | 3/6/2013 | 3,860 | 0 | $5.070000 | 0 | 0 | 3/6/2023 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 3,860 | $19,570.20 | $35,434.80 | $15,864.60 |
| Total: | 3,860 | $19,570.20 | $35,434.80 | $15,864.60 |

## Stock Options / SARs

**Grant Details for: ISO**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 610 | 10/29/2013 | 2,500 | 0 | $5.490000 | 0 | 0 | 10/29/2023 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 2,500 | $13,725.00 | $22,950.00 | $9,225.00 |
| Total: | 2,500 | $13,725.00 | $22,950.00 | $9,225.00 |

## Stock Options / SARs

**Grant Details for: NQSO**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 610N | 10/29/2013 | 5,000 | 0 | $5.490000 | 0 | 0 | 10/29/2023 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 5,000 | $27,450.00 | $45,900.00 | $18,450.00 |
| Total: | 5,000 | $27,450.00 | $45,900.00 | $18,450.00 |

## Stock Options / SARs

**Grant Details for: ISO**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 668 | 2/25/2014 | 12,080 | 0 | $7.240000 | 0 | 0 | 2/25/2024 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 8,334 | $60,338.16 | $76,506.12 | $16,167.96 |
| Vested and/or Exercisable: | 3,746 | $27,121.04 | $34,388.28 | $7,267.24 |
| Total: | 12,080 | $87,459.20 | $110,894.40 | $23,435.20 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 8,334 |

## Stock Options / SARs

**Grant Details for: NQSO**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 668N | 2/25/2014 | 12,920 | 0 | $7.240000 | 0 | 0 | 2/25/2024 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|

12/16/2016 — Equity Compensation Portfolio Statement

| | | | |
|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 12,920 | $93,540.80 | $118,605.60 | $25,064.80 |
| Total: | 12,920 | $93,540.80 | $118,605.60 | $25,064.80 |

## Stock Options / SARs
### Grant Details for: ISO

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 868 | 4/24/2014 | 1,500 | 0 | $5.840000 | 0 | 0 | 4/24/2024 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 1,500 | $8,760.00 | $13,770.00 | $5,010.00 |
| Vested and/or Exercisable: | 0 | $0.00 | $0.00 | $0.00 |
| Total: | 1,500 | $8,760.00 | $13,770.00 | $5,010.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 1,500 |

## Stock Options / SARs
### Grant Details for: NQSO

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 868N | 4/24/2014 | 3,000 | 0 | $5.840000 | 0 | 0 | 4/24/2024 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 3,000 | $17,520.00 | $27,540.00 | $10,020.00 |
| Total: | 3,000 | $17,520.00 | $27,540.00 | $10,020.00 |

## Stock Options / SARs
### Grant Details for: ISO

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 932 | 7/28/2014 | 1,000 | 0 | $6.280000 | 0 | 0 | 7/28/2024 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 1,000 | $6,280.00 | $9,180.00 | $2,900.00 |
| Vested and/or Exercisable: | 0 | $0.00 | $0.00 | $0.00 |
| Total: | 1,000 | $6,280.00 | $9,180.00 | $2,900.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 1,000 |

## Stock Options / SARs
### Grant Details for: NQSO

| Plan Name | Grant Number | Grant Date | Granted Quantity | Incremental Shares | Grant Price | Exercised | Cancelled | Expiration Date |
|---|---|---|---|---|---|---|---|---|
| MMedx, Inc. 2006 Stock Incentive Plan | 932N | 7/28/2014 | 2,000 | 0 | $6.280000 | 0 | 0 | 7/28/2024 |

| | Quantity | Cost Basis Total Grant Price | Market Value of Outstanding as of 12/16/2016 | Unrealized Gain/Loss of Outstanding |
|---|---|---|---|---|
| Unvested: | 0 | $0.00 | $0.00 | $0.00 |
| Vested and/or Exercisable: | 2,000 | $12,560.00 | $18,360.00 | $5,800.00 |
| Total: | 2,000 | $12,560.00 | $18,360.00 | $5,800.00 |

## Restricted-Based Awards
### Grant Details for RSA

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx Group 2016 Equity and Cash Incentive Plan | 1583 | 10/26/2016 | 1,500 | $0.000000 | 1,500 | 0 | 0 | 0 | 0 |

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 1,500 | $0.00 | $13,770.00 | $13,770.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 500 |
| 2018 | 500 |
| 2019 | 500 |

Period Activity from 2/1/1900 to 12/16/2016

## Restricted-Based Awards
### Grant Details for RSA

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 24 | 7/30/2013 | 5,750 | $0.000000 | 0 | 0 | 0 | 0 | 5,750 |

12/16/2016      Equity Compensation Portfolio Statement

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 0 | $0.00 | $0.00 | $0.00 |

Period Activity from 2/1/1900 to 12/16/2016

Vesting Releases / Taxable Events:

| Event Date | Event Type | Event Shares | Purchase Price per Share | Total Grant Price | Taxable Gain FMV | Taxable Gain | Shares Delivered |
|---|---|---|---|---|---|---|---|
| 7/30/2014 | Vest w/Release Taxable Event | 1,916 | $0.000000 | $0.00 | $7,100000 | $13,603.60 | 1,916 |
| 7/30/2015 | Vest w/Release Taxable Event | 1,917 | $0.000000 | $0.00 | $11,150000 | $21,374.55 | 1,917 |
| 7/30/2016 | Vest w/Release Taxable Event | 1,917 | $0.000000 | $0.00 | $7,490000 | $14,358.33 | 1,321 |

## Restricted-Based Awards

Grant Details for RSA

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 27 | 10/29/2013 | 10,000 | $0.0000000 | 0 | 0 | 0 | 0 | 10,000 |

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 0 | $0.00 | $0.00 | $0.00 |

Period Activity from 2/1/1900 to 12/16/2016

Vesting Releases / Taxable Events:

| Event Date | Event Type | Event Shares | Purchase Price per Share | Total Grant Price | Taxable Gain FMV | Taxable Gain | Shares Delivered |
|---|---|---|---|---|---|---|---|
| 10/29/2014 | Vest w/Release Taxable Event | 3,333 | $0.000000 | $0.00 | $8,990000 | $29,963.67 | 3,333 |
| 10/29/2015 | Vest w/Release Taxable Event | 3,333 | $0.000000 | $0.00 | $7,290000 | $24,297.57 | 3,333 |
| 10/29/2016 | Vest w/Release Taxable Event | 3,334 | $0.000000 | $0.00 | $8,780000 | $29,272.52 | 2,298 |

## Restricted-Based Awards

Grant Details for RSA

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 53 | 2/25/2014 | 10,000 | $0.000000 | 3,334 | 0 | 0 | 0 | 6,666 |

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 3,334 | $0.00 | $30,606.12 | $30,606.12 |

Vesting Schedule:

| | Vesting Date | Shares Vesting |
|---|---|---|
| | 2017 | 3,334 |

Period Activity from 2/1/1900 to 12/16/2016

Vesting Releases / Taxable Events:

| Event Date | Event Type | Event Shares | Purchase Price per Share | Total Grant Price | Taxable Gain FMV | Taxable Gain | Shares Delivered |
|---|---|---|---|---|---|---|---|
| 2/25/2015 | Vest w/Release Taxable Event | 3,333 | $0.000000 | $0.00 | $9,520000 | $31,730.16 | 3,333 |
| 2/25/2016 | Vest w/Release Taxable Event | 3,333 | $0.000000 | $0.00 | $8,250000 | $27,497.25 | 3,333 |

## Restricted-Based Awards

Grant Details for RSA

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 124 | 7/28/2014 | 1,500 | $0.000000 | 500 | 0 | 0 | 0 | 1,000 |

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 500 | $0.00 | $4,590.00 | $4,590.00 |

Vesting Schedule:

| | Vesting Date | Shares Vesting |
|---|---|---|
| | 2017 | 500 |

Period Activity from 2/1/1900 to 12/16/2016

Vesting Releases / Taxable Events:

| Event Date | Event Type | Event Shares | Purchase Price per Share | Total Grant Price | Taxable Gain FMV | Taxable Gain | Shares Delivered |
|---|---|---|---|---|---|---|---|
| 7/28/2015 | Vest w/Release Taxable Event | 500 | $0.000000 | $0.00 | $12,800000 | $6,400.00 | 500 |
| 7/28/2016 | Vest w/Release Taxable Event | 500 | $0.000000 | $0.00 | $7,450000 | $3,725.00 | 345 |

## Restricted-Based Awards

Grant Details for RSA

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 157 | 10/29/2014 | 2,350 | $0.000000 | 784 | 0 | 0 | 0 | 1,566 |

12/16/2016

## Equity Compensation Portfolio Statement

| Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|
| 784 | $0.00 | $7,197.12 | $7,197.12 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 784 |

**Period Activity from 2/1/1900 to 12/16/2016**

Vesting Releases / Taxable Events:

| Event Date | Event Type | Event Shares | Purchase Price per Share | Total Grant Price | Taxable Gain FMV | Taxable Gain | Shares Delivered |
|---|---|---|---|---|---|---|---|
| 10/29/2015 | Vest w/Release Taxable Event | 783 | $0.000000 | $0.00 | $7.290000 | $5,708.07 | 783 |
| 10/29/2015 | Vest w/Release Taxable Event | 783 | $0.000000 | $0.00 | $8.780000 | $6,874.74 | 540 |

## Restricted-Based Awards

**Grant Details for RSA**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 259 | 2/25/2015 | 15,000 | $0.000000 | 10,000 | 0 | 0 | 0 | 5,000 |

| Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|
| 10,000 | $0.00 | $91,800.00 | $91,800.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 5,000 |
| 2018 | 5,000 |

**Period Activity from 2/1/1900 to 12/16/2016**

Vesting Releases / Taxable Events:

| Event Date | Event Type | Event Shares | Purchase Price per Share | Total Grant Price | Taxable Gain FMV | Taxable Gain | Shares Delivered |
|---|---|---|---|---|---|---|---|
| 2/25/2016 | Vest w/Release Taxable Event | 5,000 | $0.000000 | $0.00 | $8.250000 | $41,250.00 | 5,000 |

## Restricted-Based Awards

**Grant Details for RSA**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 498 | 4/27/2015 | 3,000 | $0.000000 | 2,000 | 0 | 0 | 0 | 1,000 |

| Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|
| 2,000 | $0.00 | $18,360.00 | $18,360.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 1,000 |
| 2018 | 1,000 |

**Period Activity from 2/1/1900 to 12/16/2016**

Vesting Releases / Taxable Events:

| Event Date | Event Type | Event Shares | Purchase Price per Share | Total Grant Price | Taxable Gain FMV | Taxable Gain | Shares Delivered |
|---|---|---|---|---|---|---|---|
| 4/27/2016 | Vest w/Release Taxable Event | 1,000 | $0.000000 | $0.00 | $7.720000 | $7,720.00 | 1,000 |

## Restricted-Based Awards

**Grant Details for RSA**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 646 | 7/29/2015 | 3,250 | $0.000000 | 2,167 | 0 | 0 | 0 | 1,083 |

| Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|
| 2,167 | $0.00 | $19,893.06 | $19,893.06 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 1,083 |
| 2018 | 1,084 |

**Period Activity from 2/1/1900 to 12/16/2016**

Vesting Releases / Taxable Events:

| Event Date | Event Type | Event Shares | Purchase Price per Share | Total Grant Price | Taxable Gain FMV | Taxable Gain | Shares Delivered |
|---|---|---|---|---|---|---|---|
| 7/29/2016 | Vest w/Release Taxable Event | 1,083 | $0.000000 | $0.00 | $7.490000 | $8,111.67 | 747 |

## Restricted-Based Awards

**Grant Details for RSA**

12/16/2016

Equity Compensation Portfolio Statement

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 817 | 1/4/2016 | 9,000 | $0.000000 | 9,000 | 0 | 0 | 0 | 0 |

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 9,000 | $0.00 | $82,620.00 | $82,620.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 3,000 |
| 2018 | 3,000 |
| 2019 | 3,000 |

**Period Activity from 2/1/1900 to 12/16/2016**

## Restricted-Based Awards

**Grant Details for RSA**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 840 | 2/22/2016 | 12,000 | $0.000000 | 12,000 | 0 | 0 | 0 | 0 |

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 12,000 | $0.00 | $110,160.00 | $110,160.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 4,000 |
| 2018 | 4,000 |
| 2019 | 4,000 |

**Period Activity from 2/1/1900 to 12/16/2016**

## Restricted-Based Awards

**Grant Details for RSA**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 1234 | 4/25/2016 | 2,500 | $0.000000 | 2,500 | 0 | 0 | 0 | 0 |

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 2,500 | $0.00 | $22,950.00 | $22,950.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 833 |
| 2018 | 833 |
| 2019 | 834 |

**Period Activity from 2/1/1900 to 12/16/2016**

## Restricted-Based Awards

**Grant Details for RSA**

| Plan Name | Grant Number | Grant Date | Granted Quantity | Purchase Price Per Share | Unvested | Cancelled | Performance Incremental Banked Quantity | Performance Total Banked Quantity | Total Vested Quantity |
|---|---|---|---|---|---|---|---|---|---|
| MiMedx, Inc. 2006 Stock Incentive Plan | 1391 | 7/25/2016 | 2,500 | $0.000000 | 2,500 | 0 | 0 | 0 | 0 |

| | Quantity Outstanding | Cost Basis Total Grant Price | Market Value as of 12/16/2016 | Unrealized Gain/Loss |
|---|---|---|---|---|
| | 2,500 | $0.00 | $22,950.00 | $22,950.00 |

Vesting Schedule:

| Vesting Date | Shares Vesting |
|---|---|
| 2017 | 833 |
| 2018 | 833 |
| 2019 | 834 |

**Period Activity from 2/1/1900 to 12/16/2016**

# EXHIBIT 8



December 29, 2016

Mr. Michael P. Fox
1274 Birchdale Lane
Aurora, IL 60504

Dear Mike:

This letter ("Termination Agreement") will serve to confirm the terms and conditions regarding your termination of employment with MiMedx Group, Inc., ("Company") for cause, effective December 29, 2016. This letter is intended to summarize in full the arrangements provided to you upon termination of employment, and is intended to be in lieu of and to supersede any previous agreement or understanding between the parties with respect to such matters.

**Final Salary:** Your final payment of wages will be made on Friday, January 6, 2017. In that final payment of wages, you will be paid for the nine (9) days of work (December 19, 2016 through December 29, 2016) during the Company's bi-weekly payroll period that began December 18, 2016 and will end December 31, 2016.

**Commissions:** You are eligible to be paid the actual commissions as calculated in accordance with your achievement of the goals and objectives assigned to you for the fourth quarter of 2016. You have not successfully attained any of the goals and objectives assigned to you for the fourth quarter of 2016; therefore, you will not be paid any commission for fourth quarter of 2016. You were previously paid the October 2016 monthly draw ($12,500 gross before withholdings). You are required to repay to the Company the full amount of the October 2016 monthly draw. The October 2016 monthly draw that you were paid will be deducted from your final wages. MiMedx is required to pay you no less that the applicable minimum wage for any work performed for the Company. Therefore, payment of base salary for the above nine days (72 hours) of work will be at the Illinois state minimum hourly wage rate of $8.25 per hour rather than your standard base rate of pay. The Company will also demand and seek all available remedies for your repayment of the remaining balance of the October 2016 monthly draw not recovered from your final payment of base salary.

**PTO:** Personal Time Off (PTO) accruals will cease on your date of termination of employment. Your unused earned and accrued PTO balance will be paid to you with the final payment of wages on January 6, 2017. You may elect to have the payment of your PTO balance applied against the repayment of the October 2016 monthly draw.

**Benefits:** If you are participating in the Medical, Dental, Vision, Health Savings Account and/or Flexible Spending Account, you will receive COBRA continuation information from our COBRA vendor. In order to protect your rights to COBRA coverage, you must elect and return the election notice by the grace date on the election form.

**Conditions:** You continue to be bound by any previously executed agreements containing confidentiality, non-disclosure, non-solicitation, inventions and non-competition restrictive covenants terms and conditions which remain in effect following your termination of employment with the Company. These include the MiMedx Non-Competition Agreement, executed by you on July 14, 2012; MiMedx Confidentiality and Non-Solicitation Agreement, executed by you on July 14, 2012; and MiMedx Employee Inventions and Assignment Agreement, executed by you on July 14, 2012. In the event that you do not



*Innovations in Regenerative Biomaterials*

MiMedx Group, Inc. | 1775 West Oak Commons Ct NE | Marietta, GA 30062 | 770.651.9100 | Fax 770.218.6195 | www.mimedx.com

fully comply with your obligations under these agreements, the Company will seek all available remedies to enforce your compliance.

You acknowledge that you are bound by the above described previously executed agreements. You are required to keep strictly confidential any and all confidential, proprietary, sensitive or secret material or information that you acquired or became aware of in connection with your employment and not to disclose to any person, or otherwise use or exploit for any purpose whatsoever such materials or information. No Company material should be taken with you upon leaving the Company.

Please be advised that in addition to seeking legal remedies to enforce your compliance with the agreements referenced above, the Company will also seek all available remedies for any violations of your post-employment obligations that include, but are not limited to, the following:

- ➢ Failure to keep strictly confidential any and all confidential, proprietary, sensitive or secret material or information that you acquired or became aware of in connection with your employment with the Company, and not to disclose to any person, or otherwise use or exploit for any purpose whatsoever such materials or information;

- ➢ Failure to return to the Company all property and all confidential and proprietary business information and materials (in whatever medium) that you received while, or in connection with, your employment; or

- ➢ Your making statements, taking any actions, or conducting yourself in any way that adversely affects the reputation or goodwill of the Company and any subsidiary, or related entity of the Company.

This agreement will be modified where applicable to comply with state and local statutes that have mandatory provisions different from those contained herein.

If you have any questions regarding information contained in this letter, please do not hesitate to contact me at 770-651-9112 (office) or 770-330-4062 (cell).

Sincerely,

Thornton A. Kuntz, Jr.
Senior Vice President, Administration


cc: Pete Petit
    Bill Taylor
    Chris Cashman
    Lexi Haden
    Mike Carlton

# EXHIBIT 9



# MiMedx Files Lawsuits Against Two Additional Former Sales Employees For Breach Of Contractual Obligations

NEWS PROVIDED BY
**MiMedx Group, Inc. →**
Dec 30, 2016, 11:32 ET

MARIETTA, Ga., Dec. 30, 2016 /PRNewswire/ -- MiMedx Group, Inc. (NASDAQ: MDXG), the leading regenerative medicine company utilizing human amniotic tissue and patent-protected processes to develop and market advanced products and therapies for the Wound Care, Surgical, Orthopedic, Spine, Sports Medicine, Ophthalmic, and Dental sectors of healthcare, today announced that the Company has filed lawsuits for breach of contractual and common law obligations against two former sales employees.

Parker H. "Pete" Petit, Chairman and CEO, said, "As announced in our press release of December 15, 2016, we terminated the employment of and filed lawsuits against two sales employees, Jess Kruchoski and Luke Tornquist, for breaches of common law and contractual obligations to MiMedx. Through further investigation, the Company has determined that two additional sales employees engaged in acts warranting termination of employment as well as other actions. Correspondingly, lawsuits have now been filed against these two former sales employees, Michael Fox and Harold Purdy. Additionally, we have taken disciplinary action against a small number of other individuals in our sales organization who were also found to be associated with this or similar improper acts."

Bill Taylor, President and COO, stated, "The Company took employment actions with various other employees based on the degree of transgression and the openness and willingness of these employees to cooperate in the Company's investigation. No legal actions have been taken with individuals who have cooperated and have been truthful with the Company during the investigation."

Petit added, "It is important to note that the two new lawsuits and the recent terminations were not related to allegations made against the Company by Mr. Kruchoski and Mr. Tornquist. The investigations conducted by our Board of Directors and MiMedx management found no merit to the actions alleged in the lawsuit filed by Messrs. Kruchoski and Tornquist. Nonetheless, when an employee violates the duty of loyalty and contractual obligations by selling competitive products or other products, employment actions must be taken. Although the sales employees who participated in these violations were a very small number of the more than 300 employees in our sales organization, we are always disappointed when individuals choose to follow self-serving financial motives rather than adhere to the high standards of conduct and compliance that we foster and instill at MiMedx."

The Company has been notified that another large supplier of human tissue products has terminated a member of their sales leadership, namely Lex Harris, for being involved in a similar untoward sales scheme. Mr. Harris was terminated by MiMedx over two years ago, and the Company has determined that he was involved with a few members of the MiMedx sales organization in recruiting for and perpetrating this scheme. MiMedx previously filed a lawsuit against Mr. Harris on December 12, 2016.

**About MiMedx**

MiMedx® is an integrated developer, processor and marketer of patent protected and proprietary regenerative biomaterial products and bioimplants processed from human amniotic membrane and other human birth tissues, such as amniotic fluid, umbilical cord and placental collagen, and human skin and bone. *"Innovations in Regenerative Biomaterials"* is the framework behind our mission to give physicians products and tissues to help the body heal itself. We process the human amniotic membrane utilizing our proprietary PURION® Process, to produce a safe and effective implant. MiMedx proprietary processing methodology employs aseptic processing techniques in addition to terminal sterilization. MiMedx is the leading supplier of amniotic tissue, having supplied over 700,000 allografts to date for application in the Wound Care, Burn, Surgical, Orthopedic, Spine, Sports Medicine, Ophthalmic and Dental sectors of healthcare.

**Safe Harbor Statement**

This press release includes statements that look forward in time or that express management's beliefs, expectations or hopes. Such statements are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements include, but are not limited to, statements regarding the litigation brought against various persons. These statements are based on current information and belief, and are not guarantees of future performance. Among the risks and uncertainties that could cause actual results to differ materially from those indicated by such forward-looking statements include the normal risks of litigation, and the risk factors detailed from time to time in the Company's periodic Securities and Exchange Commission filings, including, without limitation, its 10-K filing for the fiscal year ended December 31, 2015, and its most recent Form 10Q filing. By making these forward-looking statements, the Company does not undertake to update them in any manner except as may be required by the Company's disclosure obligations in filings it makes with the Securities and Exchange Commission under the federal securities laws.

SOURCE MiMedx Group, Inc.

Related Links

http://www.mimedx.com

# EXHIBIT 10

**From:** Thornton Kuntz <TKuntz@mimedx.com>
**Date:** January 16, 2017 at 3:28:14 PM CST
**To:** VERONICA LOCH <vloch128@comcast.net>
**Cc:** Chris Cashman <CCashman@mimedx.com>, Bill Taylor <BTaylor@mimedx.com>, Pete
Petit <PPetit@mimedx.com>, Mike Carlton <MCarlton@mimedx.com>, "Lee Ann Lawson"
<lalawson@mimedx.com>, Lexi Haden <LHaden@mimedx.com>
**Subject: RE: Termination Agreement and General Release**

Veronica,

In am responding to the questions that you posed in your email of January 6, 2017. My responses to each
question/request are printed in red following each of your questions/requests:

A couple of questions.  The reason for the dismissal of the AFD's was given as "liquefying" of the
position, which obviously is well within any company's rights. Response: The reason for the termination
of your employment on December 29, 2016 was communicated to you on the phone call from Chris
Cashman and me on that date as the elimination of the Area Federal Director position. As such, this
reduction in force resulted in the termination of your employment. I am not sure where you heard the
term "liquefying". That term was never used or spoken during our phone conversation.

I guess my question is if you are truly dissolving the federal team, it would seem the right and
decent thing to do would be to pay us for the entire quarter worked, the applicable MBO attained
(which is certainly not 25% for any of us - which Chris said he pulled from the numbers - his assessment
is completely inaccurate), in addition to severance. Response: As a result of the elimination of the Area
Federal Director position, all incumbents in that position that were affected by the reduction in force
were eligible to be paid the actual commissions as calculated in accordance with your achievement of
the goals and objectives assigned for the fourth quarter of 2016, provided each individual complied with
the terms and conditions of his/her Termination Agreement. The goals and objectives that were
submitted by you, approved by your immediate manager, and provided to Mike Carlton and Chris
Cashman were thoroughly reviewed and evaluated to determine the degree of successful attainment.
Based on management's assessment of the actual results achieved, you were given credit for the
successfully attainment of one-quarter or twenty-five percent (25%) of the goals and objectives assigned
to you for the fourth quarter of 2016.  Therefore, you are eligible to earn 25% of your fourth quarter of
2016 target commission. As you are aware, your quarterly target commission was $37,500 (gross before
withholdings), and 25% of that amount is $9,375 (gross before withholdings). As you are also aware, you
were previously paid the October 2016 monthly draw of $9,375 (gross before withholdings). Consistent
with the Company's standard practice, the October 2016 monthly draw was applied against your earned
fourth quarter of 2016 commissions. As a result, no further payment for earned fourth quarter
commissions was due and payable to you, and you have no repayment obligations for the October draw.
Please note however, that if you do not comply with the arrangements detailed in the Termination

Agreement of December 29, 2016, you will not be eligible to be paid any commissions for the fourth quarter and you will therefore be required to repay the full amount of the October 2016 draw payment.

Simply being given 8 weeks of severance, without being compensated for the huge amount of work we did while employed has the feeling of a more hostile termination - and to be very honest, I'm not sure what I did to deserve to be treated this way. Response: Let me reiterate that the elimination of the Area Federal Director position was unrelated to other for cause terminations that occurred in December. MiMedx implemented a few organizational changes to gain more efficiency in our Company. Some of those efficiencies resulted in some positions that were eliminated. The Area Federal Director position was one such position that was eliminated. The eight (8) weeks severance pay and benefits that was offered to you is commensurate with customary Company practices. The amount of severance pay and benefits that you were offered is the same amount of severance pay and benefits that was offered to the other employees in the sales organization whose employment was terminated due to the reduction in force at the end of the year.

I reopened the Pittsburgh VA the week of Christmas ...which wasn't even on my MBO's. The day I was terminated I was up at 4:30AM, to in-service the OR at the Philadelphia VA. Every prior quarter I was awarded stock for performance. Due to this, there was never a concern that my employment status was at risk. Response: Management has no doubt that you were working very diligently in your Area Federal Director role. The termination of your employment is not a result of any performance failure on your part. This was a business decision that impacted all of the Area Federal Directors positions, and unfortunately, you were individually impacted by that decision. The leadership of that group did not meet expectations related to the investment the Company made, and as a result, management decided to disband the roles.

I was 200% committed to my job and the company - have a conversation with the people I worked with...Andy Sole being one of them. I know Andy would have found a spot for me if given the opportunity, and would have no problem speaking to my strength as a resource and value. Response: I again reiterate that there is no doubt that you were a highly committed employee. We believe that assessment of your performance is held by employees and managers that worked directly with you. The reason for your termination of employment is the elimination of the Area Federal Director position. As mentioned above, the leadership of that group did not meet expectations related to the investment made by the Company, and as a result, management decided to disband the roles. While we regret that the direct leadership provided to the Area Federal Directors was ineffective and inadequate; nonetheless, the necessary results were not achieved in aggregate to sustain those positions within the organization. Based on your individual performance, you remain eligible for consideration for future employment. If you are interested in applying for an open position within MiMedx, you are certainly eligible to do so. You will be given consideration based on the requirements of the position, your specific experience and qualifications, your past performance.

I will review my MBO's and send a write up. Response: We look forward to receiving any information that you wish to present regarding your fourth quarter performance and your attainment of the goals and objectives that were assigned to you. Should management become aware of facts that confirm a

higher level of your fourth quarter of 2016 goals and objectives attainment, the Company will consider a revision in its previously calculated payment to you for the fourth quarter of 2016.

I trust my responses are self-explanatory and fully answer your questions and requests.
Regards,
Thornton




Thornton A. Kuntz, Jr.
*Senior Vice President Administration*
Office 770-651-9112 | Cell 770-330-4062 | Fax 770-590-3556

**MiMedx Group, Inc.**
1775 West Oak Commons Ct. NE
Marietta, GA 30062
tkuntz@mimedx.com
www.mimedx.com




**From:** VERONICA LOCH [mailto:vloch128@comcast.net]
**Sent:** Friday, January 6, 2017 7:29 AM
**To:** Lee Ann Lawson <lalawson@mimedx.com>
**Cc:** Chris Cashman <CCashman@mimedx.com>; Thornton Kuntz <TKuntz@mimedx.com>; Bill Taylor <BTaylor@mimedx.com>; Pete Petit <PPetit@mimedx.com>; Mike Carlton <MCarlton@mimedx.com>
**Subject:** Re: Termination Agreement and General Release


Hi Lee Ann,

A couple of questions. The reason for the dismissal of the AFD's was given as "liquefying" of the position, which obviously is well within any company's rights.



I guess my question is if you are truly dissolving the federal team, it would seem the right and decent thing to do would be to pay us for the entire quarter worked, the applicable MBO attained (which is certainly not 25% for any of us - which Chris said he pulled from the numbers - his assessment is completely inaccurate), in addition to severance.



Simply being given 8 weeks of severance, without being compensated for the huge amount of work we did while employed has the feeling of a more hostile termination - and to be very honest, I'm not sure what I did to deserve to be treated this way.

I reopened the Pittsburgh VA the week of Christmas ...which wasn't even on my MBO's. The day I was terminated I was up at 4:30AM, to in-service the OR at the Philadelphia VA. Every prior quarter I was awarded stock for performance. Due to this, there was never a concern that my employment status was at risk.

I was 200% committed to my job and the company - have a conversation with the people I worked with...Andy Sole being one of them. I know Andy would have found a spot for me if given the opportunity, and would have no problem speaking to my strength as a resource and value.

I will review my MBO's and send a write up.

I look forward to your response.

Veronica

> On December 29, 2016 at 6:36 PM Lee Ann Lawson <lalawson@mimedx.com> wrote:
>
> Veronica,
>
> Attached please find the scanned copies of the Termination Agreement and General Release referenced in your phone conversation today. The hard copy originals of the attached documents have been sent to you via FedEx for delivery to your home tomorrow. Two originals of the attached Termination Agreement and General Release will be included in the FedEx package. Please sign all sets of originals. One fully executed original of the Termination Agreement and General Release would be retained by you and the other set of those executed originals should be returned to me. A return envelope is included in the FedEx package for your return of the documents.
>
> You have been provided with MiMedx IT equipment and company property. Cara Cook will email you a FedEx label for your convenience in returning these assets to the Company, please take them to any FedEx store and have them shipped to her attention at the MiMedx office address listed below. Please have them package the items in the FedEx standard packaging for electronic items of this nature. In this package, also please include all other MiMedx materials that you have been provided. Any expenses that you incur in shipping these items should be included in your final MiMedx expense report.

Please do not hesitate to contact Thornton if you have any questions regarding the severance arrangements that were discussed.

Regards,

Lee Ann

Lee Ann Lawson, SPHR

*Vice President, Human Resources*

Office 770-651-9155 | Fax 770-651-9053

**MiMedx Group, Inc.**

1775 West Oak Commons Ct. NE

Marietta, GA 30062

lalawson@mimedx.com

www.mimedx.com

This email message and any attachments are for the sole use of the above-named intended recipient(s). This email and any attachments are confidential and proprietary to MiMedx Group, Inc. and its subsidiaries, and may also contain certain privileged attorney-client information. You are not to use, disclose, distribute or disseminate this email by any means without the express permission of MiMedx Group, Inc. If you are not the intended recipient, or the employee or agent responsible for delivering this email to the intended recipient, you are hereby notified that any use, disclosure, printing, copying, distribution or dissemination by any means of this email or any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone at (770) 651-9100 or by reply email and delete this email and any attachments and destroy all hard copies. Thank you.

This email message and any attachments are for the sole use of the above-named intended recipient(s). This email and any attachments are confidential and proprietary to MiMedx Group, Inc. and its subsidiaries, and may also contain certain privileged attorney-client information. You are not to use, disclose, distribute or disseminate this email by any means without the express permission of MiMedx Group, Inc. If you are not the intended recipient, or the employee or

agent responsible for delivering this email to the intended recipient, you are hereby notified that any use, disclosure, printing, copying, distribution or dissemination by any means of this email or any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone at (770) 651-9100 or by reply email and delete this email and any attachments and destroy all hard copies. Thank you.

# EXHIBIT 11

4210-0575

**Illinois Department of Employment Security**
Appeals - Chicago
33 S State St - 8th Floor
Chicago, IL 60603
Phone: (800) 244-5631 · TTY: (312) 793-3184
www.ides.illinois.gov

MICHAEL P. FOX
1425 N RIVER RD
MCHENRY, IL 60051-4547

| | |
|---|---|
| Date Mailed: | 04/27/2017 |
| Claimant ID: | 5900570 |
| Docket Number: | 1710970 |
| Appeal Filed Date: | 04/06/2017 |
| Date of Hearing: | 04/26/2017 |
| Type of Hearing: | Telephone |
| Place of Hearing: | Chicago |

## Administrative Law Judge's Decision

(Este es un documento importante. Si usted necesita un intérprete, póngase en contacto con el Centro de Servicio al
Reclamante al (800) 244-5631)

**Claimant**
MICHAEL P. FOX
1425 N RIVER RD
MCHENRY, IL 60051-4547

**Employer Appellant**
MIMEDX GROUP INC MIMEDX GROUP INC
1775 W OAK COMMONS CT
MARIETTA, GA 30062-2254

**Appearances/Issues/Employer Status:** The claimant and employer appeared and testified. The claimant was represented by an attorney. The employer was represented by an attorney. The issue is whether the claimant was discharged for misconduct connected with the work? See 820 ILCS 405/602A. The employer is a party to the appeal.

**Findings of Fact:** The claimant was employed as a full time vice President of Sales. He started working for the employer in July of 2012. The claimant last performed work and earned wages on 12/29/2016. The claimant was discharged on the premise that the employer believed that the claimant had knowledge that employees were violating the employer's non compete policy and failed to report it and that he sent emails with confidential information to employees who were not authorized to receive that information. The claimant sent an email indicating the sale's team rankings in order to promote competition. The claimant did inform those employees that they could not share that information. The claimant had emailed another employee a report that he wanted to discuss for business related purposes. The claimant denied having knowledge of any activity by the sales people that was in violation of the employer's non compete policies.

**Conclusion:** 820 ILCS 405/602A provides that an individual shall be ineligible for benefits for the weeks in which he has been discharged for misconduct connected with his work and, thereafter, until he has become re-employed and has had earnings equal to or in excess of his current weekly benefit amount in each of four calendar weeks. The term "misconduct" means the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit. The previous definition notwithstanding, "misconduct" shall include any of the following work-related circumstances: 1. Falsification of an employment application, or any other documentation provided to the employer, to obtain employment through subterfuge. 2. Failure to maintain licenses, registrations, and certifications reasonably required by the employer, or those that the individual is required to possess by law, to perform his or her regular job duties, unless the failure is not within the control of the individual. 3. Knowing, repeated violation of the attendance policies of the employer that are in compliance with State and federal law following a written warning for an attendance violation, unless the individual can demonstrate that he or she has made a reasonable effort to remedy the reason or reasons for the violations or that the reason or reasons for the violations were out of the individual's control. Attendance policies of the employer shall be reasonable and provided to the individual in writing, electronically, or via posting in the workplace. 4. Damaging the employer's property through conduct that is grossly negligent. 5. Refusal to obey an employer's reasonable and lawful instruction, unless the refusal is due to the lack of ability, skills, or training for the individual required to obey the instruction or the instruction would result in an unsafe act. 6. Consuming alcohol or illegal or non-prescribed prescription drugs, or using an impairing substance in an off-label manner, on the employer's premises during working hours in violation of the employer's policies. 7. Reporting to work under the influence of alcohol, illegal or non-prescribed prescription drugs, or an impairing substance used in an off-label manner in violation of the employer's policies, unless the individual is compelled to report to work by the employer outside of scheduled and on-call working hours and informs the employer that he or she is under the influence of alcohol, illegal or non-prescribed prescription drugs, or an impairing substance used in an off-label manner in violation of the employer's policies. 8. Grossly negligent conduct endangering the safety of the individual or co-workers. For purposes of paragraphs 4 and 8, conduct is "grossly negligent" when the individual is, or reasonably should be, aware of a substantial risk that the conduct will result in the harm sought to be prevented and the conduct constitutes a substantial deviation from the standard of care a reasonable person would exercise in the situation. Nothing in paragraph 6 or 7 prohibits the lawful use of over-the-counter drug products as defined in Section 206 of the Illinois Controlled Substances Act, provided that the medication does not affect the safe performance of the employee's work duties.

MICHAEL P. FOX                                                    04/27/2017

None of the subsections of Section 602A are applicable in this case. Under the general definition of misconduct a preponderance of competent and compelling evidence must show that the claimant willfully and deliberately violated a known and reasonable policy of the employer. In this case there was no evidence that the claimant had any knowledge of the sales peoples violations or that he sent the emails in violation of the employer's policies. A finding is made that the claimant did not commit actions in this instance which would constitute misconduct connected with work. Accordingly, the claimant is not subject to the disqualification provisions of 602A of the Act.

**Decision**: The Local Office Determination is AFFIRMED. Pursuant to 820 ILCS 405/602A, the claimant is eligible for benefits, as to this issue only, from 02/12/2017.

NIKI GEORGOPOULOS, Administrative Law Judge
Appeals - Chicago
Fax: (312) 793-0977


## **FURTHER APPEAL RIGHTS**

**A. LATE APPEAL:** If this appeal was dismissed without a scheduled hearing on a finding the appeal was not filed in a timely manner under the provisions of 56 Ill. Adm. Code 2720.207, this dismissal may be appealed to the Board of Review.

**B. FAILURE TO APPEAR:** IF YOU FAILED TO APPEAR AT THE HEARING, then you may request a rehearing of the appeal, but only if you failed to appear. Your request for a rehearing must state the reason/s you did not attend the hearing and why you did not request a continuance (or why a continuance was erroneously denied) (See 56 Ill. Adm. Code 2720.255(e) (1)) A request for rehearing must be made within 10 days of the scheduled hearing or first receipt of notice of hearing, whichever is later. A request for rehearing must be made in writing, to the Appeals Division, 33 S State St - 8th Floor, Chicago, IL 60603, directed to the referee Administrative Law Judge whose name appears on this decision. A request for rehearing may also be made by fax at the referee Administrative Law Judge fax number (312) 793-1119.

You may also file an appeal to the Board of Review. It must be in writing and filed within 30 days from 04/27/2017. **See paragraph C. below.**

**C.** If the decision is against you then you may file a further Appeal to the Board of Review. An appeal to the Board of Review must be in writing and filed within 30 days from 04/27/2017. The appeal to the Board of Review must be mailed to the Board of Review at 33 S State St, 9th Floor, Chicago, IL, 60603 or by fax at (630) 645-3731.


**TO:** MICHAEL P. FOX, Claimant
**TO:** MIMEDX GROUP INC MIMEDX GROUP INC, Employer

# EXHIBIT 12

From: **Lilly Kevin** KLilly@mimedx.com
Subject: Follow up to Management Call
Date: January 10, 2017 at 8:16 PM
To: Sales sales@mimedx.com

Sales Team,

I have heard some very positive feedback from many of you in which members of our sales organization expressed their appreciation for the amount of factual information that was discussed on yesterday's call. Many of those I have spoken with stated that it was an "eye-opener" to learn of the distorted facts and contrived falsehoods that were shared through the rumor mill to "excuse" the improper and dishonest actions that were being perpetrated by members of our own team. The explanation of the proper practices and diligence the Company follows in its Purchase Order process was valuable information that many had not fully understood before the call.

During the call, Pete, Bill and Chris spoke to the fact that individuals that had been truthful about their involvement in selling ancillary and non-competitive products have been given opportunities to redeem themselves and remain with the Company. I would like to take this opportunity to reiterate to everyone that if they participated in, or know of anyone who sold products on the side, including but not limited to HALO or CPN Biosciences products, to call senior management to explain. Those calls could be placed to Nick, me or any of the executives at the corporate office. Management intends to offer similar opportunities for those individuals. If you have any information to disclose, please do so by no later than the **close of business this Friday**.

Obviously, the Company will be continuing its diligence related to the lawsuits. If during that process, we find an employee who has participated but has not come forward and been forthright about disclosing their involvement in selling ancillary and non-competitive products, the consequences will be far more severe than if they voluntarily advise us before we find out another way.

We hope that these lapses of judgement and naivety about one's duty of loyalty to a company are behind us. We look for your support and openness in making this totally a thing of the past.

Regards,

Kevin

Kevin Lilly

SVP, Wound Care