1    TRANSCRIBED FROM DIGITAL RECORDING

2                    IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
3                           EASTERN DIVISION

4    MIMEDX GROUP, INC.,              )   Docket No. 16 C 11715
                                      )
5                 Plaintiff           )
                  Counter-Defendant,  )
6                                     )
                      v.              )   Chicago, Illinois
7                                     )   September 20, 2017
     MICHAEL FOX,                     )   9:48 o'clock a.m.
8                                     )
                  Defendant           )
9                 Counter-Plaintiff.  )

10              TRANSCRIPT OF PROCEEDINGS -  STATUS, MOTION
              BEFORE THE HONORABLE SIDNEY I. SCHENKIER
11
     APPEARANCES:
12
     For the Plaintiff:              WARGO & FRENCH, by
13                                   MS. SHANON J. McGINNIS
                                     999 Peachtree Street
14                                   26th Floor
                                     Atlanta, Georgia 30309
15
                                     SIDLEY AUSTIN LLP (CHICAGO), by
16                                   MS. AMI NICOLE WYNNE
                                     One South Dearborn Street
17                                   Chicago, Illinois 60603

18

19                        ALEXANDRA ROTH, CSR, RPR
                            Official Court Reporter
20                       219 South Dearborn Street
                                Room 1224
21                        Chicago, Illinois 60604
                              (312) 408-5038
22
     NOTE:  Please notify of correct speaker identification.
23   FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE OR MORE THAN
     ONE PERSON TALKING AT A TIME MAKES PORTIONS INAUDIBLE.
24

25

```
1   APPEARANCES:   (Continued)

2   For the Defendant:          GREIMAN, ROME & GRIESMEYER,
                                LLC, by
3                               MR. ADAM C. MAXWELL
                                MR. CHRISTOPHER SCOTT GRIESMEYER
4                               2 North LaSalle Street
                                Suite 1601
5                               Chicago, Illinois 60602

6                               HALUNEN LAW, by
                                MR. STEPHEN M. PREMO
7                               80 South 8th Street
                                IDS Center, Suite 1650
8                               Minneapolis, Minnesota 55402
                                (appearing telephonically)
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings had in open court:)

2        THE CLERK:  Case No. 16 C 11715, MiMedx Group, Inc.,

3    versus Fox.  Status and motion hearing.

4        MS. McGINNIS:  Good morning, your Honor.  Shanon

5    McGinnis on behalf of plaintiff, MiMedx Group, Inc.

6        MS. WYNNE:  Good morning, your Honor.  Ami Wynne on

7    behalf of the plaintiff.

8        MR. MAXWELL:  Good morning, your Honor.  Adam Maxwell

9    on behalf of the defendant Michael Fox.

10        MR. GRIESMEYER:  Good morning, your Honor.  Chris

11    Griesmeyer also on behalf of the defendants, Mr. Fox.  And Mr.

12    Fox is here with us today.

13        THE COURT:  Good morning.  And we have an attorney by

14    phone?

15        MR. PREMO:  Yes, your Honor.  This is Stephen Premo,

16    Halunen Law, also representing Michael Fox.

17        THE COURT:  All right.  Welcome.

18        MS. McGINNIS:  Thank you.

19        MS. WYNNE:  Thank you.

20        MR. PREMO:  Thank you.

21        THE COURT:  We have a number of things up this

22    morning.  The things that I want to address in particular are

23    the motions for protective order and the motion to compel filed

24    by MiMedx in the joint Rule 26(f) report.  I know there is a

25    defense motion as well.  As I said in my order, I want to talk

1   about a schedule for how we are going to address that.

2       But looking first at the MiMedx motions, had there

3   been any further discussions or any developments that I need to

4   know about subsequent to the filing of the omnibus opposition?

5       MS. McGINNIS:  No, your Honor.

6       MR. MAXWELL:  No, your Honor.

7       THE COURT:  Okay.  Let me take the motion for

8   protective order first.  That motion addresses several

9   discovery requests that the defense served.  One is request for

10  admissions, which I think -- is it 208 requests?

11      MS. McGINNIS:  212, your Honor, yes.

12      THE COURT:  Okay.

13      MR. MAXWELL:  Yes, your Honor.

14      THE COURT:  Well, I know your position would be

15  completely different if it was 208.

16      MS. McGINNIS:  It would.  It would, completely

17  different.

18    (Laughter.)

19      THE COURT:  And then a related interrogatory that

20  says, if you deny any of these, give us all sorts of

21  information about the denial.  And then three requests for

22  production, 5 through 7, which asked for certain information

23  about documents that were reviewed at various times by you,

24  with you being defined as including counsel.

25      So I take a look at the request to admit.  I take a

1    look at the interrogatory and read the positions that you've
2    asserted.  So here is my ruling:
3            With respect to the request for productions -- I'm
4    sorry -- request to admit, I've read through them.  There are a
5    number of them.  There is no doubt about that.  Interestingly,
6    in the last go around with the rules of civil procedure, there
7    was in the initial drafting a presumptive limit to the number
8    of requests to admit, which kind of got to the cutting room
9    floor.
10           And the reason for that, I think, is because you
11   couldn't agree on what it should be, and they're very case
12   specific, and not all requests for admission are equal.  I
13   looked at these, and I think that each request is the kind of
14   particular bit of information.  A number of them are about
15   establishing certain levels of foundation for documents but,
16   you know, specific enough bits of information that they're kind
17   of things they could be answered in a request to admit or they
18   could be answered by witnesses in depositions.
19           I don't really think that merely because there are
20   212 -- I take your correction -- numbered requests, that makes
21   them automatically improper.  And when having read through
22   them, I'm sure you can pick out some that you may think aren't
23   appropriate.  But in the main, I don't have any problem with
24   them.  And so I'm going to deny the motion for protective order
25   as to the requests for admission.

1          As to the interrogatory, I grant the protective order.

2    There we do have a limit.  We have a, you know, limit on

3    numbers of interrogatories.  And it seems to me that if the

4    requests to admit are not admitted, then that's something

5    you'll be able to pursue if you wish in depositions.  And some

6    of them you may have to.  If they are with respect to documents

7    and you need to take depositions or otherwise use the rules to

8    establish foundation, then you'll have to do this.

9          But even if they didn't admit ten percent of them, you

10   know, we're already at 21.  Then you ask for lots of

11   information about those.  That's going to blow way past, I

12   think, the 25 interrogatory limit.  And I don't think that's

13   the most provident use of the interrogatories.

14         So I am going to deny the motion for protective order

15   as to the -- I'm sorry -- grant it as to the interrogatory.

16         As to the request for production, these requests in 5

17   and 6 asked for any documents.  Five, describe, concern or

18   otherwise relate to the allegations against Mr. Fox that

19   counsel for MiMedx reviewed when conducting the investigation.

20         Six is really the same thing, asking for that kind of

21   information with respect to what MiMedx counsel reviewed during

22   the time period between the termination and the filing of the

23   complaint.  And then what Ms. Wynne reviewed prior to signing

24   the complaint.

25         The defense says, well, what's the big deal?  I'm

1    asking for documents, documents that if they're not privileged

2    in the origin, they're not privileged simply because an

3    attorney reviewed them.  Fair enough.

4          But you're not really asking them simply to produce

5    underlying documents.  Your specific inquiry is, what did they

6    review.  I don't see that's relevant to a single claim or

7    defense.  If anything, it's a stalking course for a Rule 11

8    motion.  And if you think you have a Rule 11 motion, send them

9    a Rule 11 letter.

10          MR. PREMO:  Judge --

11          THE COURT:  But you're not entitled to have discovery

12   that is solely dedicated to trying to develop a Rule 11 motion.

13          So I will grant the motion for protective order as to

14   request for productions 5 through 7.  Because I'm granting in

15   part and denying in part the motion, I deny the request for

16   fees.  You don't get fees for a split decision.

17          MS. McGINNIS:  Thank you, your Honor.

18          THE COURT:  So that takes us now to --

19          MS. McGINNIS:  Your Honor, I'm sorry to interrupt.

20   But if I might, can we just establish a deadline for responding

21   to the request for admission --

22          THE COURT:  Sure.

23          MS. McGINNIS:  -- so there isn't any confusion there?

24          THE COURT:  Sure.

25          MS. McGINNIS:  If we could have 21 days?

1            THE COURT:  Any objection?

2            MR. MAXWELL:  We may have an objection based on we

3    had -- we had currently scheduled depositions.  And we might be

4    -- we'd like to have answers to discovery prior to taking those

5    depositions.  I'm not -- as of yesterday, counsel has

6    rescheduled those.  So they're not set currently.

7            But as long as the -- the Rule 26(f) order and the

8    discovery deadline is sufficient to allow for it, there will be

9    no objection from us.

10           THE COURT:  And by the way, I should have said this

11   before.  If I could ask each of you when you speak to state

12   your name.  And it's really for the record because if you ever

13   get a transcript, you want the court reporter to know who's

14   speaking.  So thank you.

15           MR. MAXWELL:  That was Adam Maxwell, your Honor.

16           MS. McGINNIS:  Shanon McGinnis, your Honor.

17           With respect to the -- the depositions, Mr. Fox had

18   previously -- about a week ago, MiMedx's deposition had been

19   set, and they canceled that.  That pushed that back to early

20   November.  The only one that we canceled was -- the only one

21   that was set was one of MiMedx's witnesses, and he's had a

22   conflict come up.  And so we've asked that one.

23           The other two had not been set yet officially, and we

24   hadn't received new notices or -- or confirmation of the date.

25   So this shouldn't be a issue.

1          THE COURT:  So 21 days from today would be October 11.

2   Is there any deposition that's set between now and October 11?

3          MS. McGINNIS:  No, your Honor.

4          MR. MAXWELL:  No.

5          THE COURT:  Then I don't think it's an issue.  With

6   that, Mr. Maxwell, do you have any objection?

7          MR. MAXWELL:  No, your Honor.

8          THE COURT:  All right.  October 11 to answer the

9   request for admission.

10          So that brings us then to MiMedx's motion to compel.

11   And we're talking about two categories.  One is with respect to

12   certain discovery requests where, according to MiMedx, the

13   defense agreed to supplementation they didn't provide.  And the

14   defense said, we didn't agree to this, but we have produced

15   more stuff.  So I'm not really clear on exactly where we're at.

16   Let's take each of them in particular.

17          According to the plaintiff, there was an agreement to

18   further supplement the response to requests for production 31

19   to 43 based on a particular timeframe.  I think it was July 1

20   of '12 going forward.

21          So my -- my question first is, is there -- was there

22   agreement from the defense perspective to do that?

23          MR. MAXWELL:  Your Honor, Adam Maxwell on behalf of

24   the defendant.

25          It's a little more nuanced than that, your Honor.  And

1    just to provide some background -- I guess the short answer is,

2    yes.  But just to provide some background with respect to that.

3    Judge Shah had previously -- back up.

4         We -- we had brought this issue to Judge Shah and

5    discussed it briefly without filing motions and things.

6    Judge Shah had suggested that we meet and confer, which the

7    parties have done.  And Judge Shah suggested that MiMedx

8    basically concoct a subject matter limitation.

9         We are willing to supplement the discovery based on a

10   reasonable subject matter limitation.  However, MiMedx -- every

11   time they suggest a reasonable subject matter limitation, take

12   it to our client, and we can't get -- it's not -- it's not

13   reasonable.  The -- the most recent subject matter limitation

14   is communications related to MiMedx.

15        So if -- if the subject matter limitation was as

16   Judge Shah suggested previously, if it was, for example,

17   communications relating to conduct that occurred while Mr. Fox

18   was employed, okay, we have a specific reasonable subject

19   matter limitation.

20        How about, conduct that was related to any of the

21   allegations in the complaint?

22        THE COURT:  Can I stop you for a moment?  Request 31

23   to 43 all asked for documents and communications between Mr.

24   Fox and certain specified people.

25        MR. MAXWELL:  Yes, your Honor.

1      THE COURT:  That's not a matter of subject matter

2  concerning MiMedx.

3      There is -- there is another alleged agreement -- and

4  I say alleged because I don't know if there is agreement

5  because I actually never saw in the various materials some

6  letter that documented the agreement.  There is a reference to

7  phone calls where this happened.

8      And I'll tell you right now, if this is how we're

9  going to do things, then we're going to have a different way of

10  doing things.  If this is a case where I have to order that

11  every meet and confer be in the presence of the court reporter

12  that you share the cost for, I'll do that.

13      MR. MAXWELL:  Right.

14      THE COURT:  That's like kind of getting put into the

15  corner.  But if your conduct merits it, then we're not going to

16  have this issue.

17      But anyway, 31 to 43 are a definition of MiMedx.  It's

18  a question, what -- what communications did you have with these

19  people.

20      MR. GRIESMEYER:  Judge, Chris Griesmeyer.

21      If I could just shed further light on that.  That is

22  exactly what we brought to the attention of Judge Shah.  So --

23  so when he looked at those requests, he said, wait a minute --

24      THE COURT:  Is there a transcript?

25      MR. GRIESMEYER:  There is a transcript.

1      THE COURT:  Did anybody give it to me?

2      MR. MAXWELL:  Yes, your Honor.  We -- I'm sorry, your

3  Honor.  It's not -- it's not attached, but I do have it.

4      This -- this --

5      MR. GRIESMEYER:  That's what Judge Shaw -- so Judge

6  Shah said, you don't get to --

7      THE COURT:  One at a time.

8      MR. GRIESMEYER:  Apologize.  So Judge Shah basically

9  said, no, you can't ask him all communications with these

10 people.  Communications seem to be limited.  So he told MiMedx

11 to come up with a subject matter limitation, communications

12 about what.  And so that's what the parties have been talking

13 about.

14     THE COURT:  Go ahead.

15     MS. McGINNIS:  Your Honor, if I may, Shanon McGinnis.

16     I don't dispute that at all.  The original request was

17 communications and documents between Mr. Fox and specific --

18 specific now former employees, or some might -- are still

19 current.  And Judge Shah did say, you know, I think that's a

20 little too broad.  Go back.

21     We narrowed it, and that's where the qualifier about

22 MiMedx was added.  And that's what they agreed to was that they

23 would produce --

24     THE COURT:  Do you have a document that shows their

25 agreement?

1          MS. McGINNIS:  It's in a letter, your Honor.  Hold on

2   a second.  And it's attached.  I'll find it for you.

3          THE COURT:  And -- and so what is the defined -- what

4   is the limitation now with respect to these requests?

5          MR. MAXWELL:  It is -- that's part of the problem,

6   your Honor, is that we -- we agreed to --

7          THE COURT:  Tell me -- you know --

8          MR. MAXWELL:  We agreed to supplement the

9   communications, your Honor.  Adam Maxwell, excuse me.

10         We agreed to supplement the communications that relate

11  to MiMedx.  But in that same vein, this sort of implicates the

12  ESI order.  You don't have any search terms that, you know,

13  potentially -- that we can query an electronic device in this

14  regard.

15         So if we -- if we searched for just MiMedx, I don't

16  know that that would encompass all of the documents.  So we've

17  been trying to work on agreeing on an electronically stored

18  information order so that we could supplement.

19         We did indicate in our letter that we don't have

20  responsive documents at this time.  It may need to be

21  supplemented after the agreement on electronically stored

22  information letter.

23         THE COURT:  So let me go back for a moment.  With

24  respect to document request 31 to 43, what the plaintiff now

25  seeks are documents that are more targeted than the request

1   that is as phrased.

2           MS. McGINNIS:  Correct, your Honor.

3           THE COURT:  Tell me what that limitation is.

4           MS. McGINNIS:  It is documents from the timeframe in

5   the request, which is January 2012 to the present, between

6   Mr. Fox and the specifically enumerated individuals that relate

7   to MiMedx.  And that is in Exhibit 14 to our motion to compel.

8   Opposing counsel had indicated, as we discussed, with respect

9   to requests for production 31 through 43, we will produce post-

10  termination.  And -- and then there was an e-mail after that

11  that indicates it's pre-termination as well.  Correspondence

12  with Mr. Fox and the person's identified in your request to the

13  extent that correspondence discusses or relates to MiMedx.

14          THE COURT:  So your issue isn't that you now disagree

15  with the limitation.  But you say, to answer this, we need to

16  do searches for ESI, and we don't have yet a protocol or

17  agreement how to do that.

18          MR. MAXWELL:  We will, your Honor, yes.

19          THE COURT:  Okay.

20          MS. McGINNIS:  And we'll say, your Honor, they have

21  already produced a handful of e-mails.  So if they weren't

22  going to produce anything until there was an ESI agreement,

23  then that's something that should have been discussed.

24  Instead, you know, they could easily do a search for MiMedx in

25  Mr. Fox's e-mails.  We're talking about his personal e-mails

1    and his personal text messages.  That would at least be an

2    initial start.

3           The -- the letter says that they will endeavor to

4    supplement by August 18.  And then they just didn't do so, and

5    they didn't have -- there is no further communication after

6    that.

7           THE COURT:  I know.  And endeavor means try.

8           MS. McGINNIS:  Well --

9           THE COURT:  Right?

10          MS. McGINNIS:  But they didn't address it at all.

11   They didn't do anything.  We asked them for it and that when --

12          THE COURT:  I -- I --

13          MS. McGINNIS:  Yeah.

14          THE COURT:  I understand.  I understand.

15          So is there anything that would prevent you from

16   searching for this, the e-mails at this time, any e-mails or

17   texts between Mr. Fox and these particular people?  I'm

18   focusing now on 31 to 42 --

19          MR. MAXWELL:  Your Honor --

20          THE COURT:  -- because 43 is a little bit different

21   because it's not a particular person.

22          MR. MAXWELL:  Your Honor, Adam Maxwell on behalf of

23   Mike Fox.

24          The -- so Mr. Fox has gone through his e-mails and had

25   produced some documents, without the -- without the additional

1   search terms.  Unless MiMedx just wants us to run a search for

2   MiMedx, then we can certainly do that.  We can run a search for

3   just MiMedx and produce those documents.

4       With respect -- with respect to text message

5   communications, those phones or Mr. Fox's devices have not been

6   imaged or they're not searchable other than manually.  And

7   if -- I'm not sure how we would go about searching for just

8   anything related to MiMedx in a bank of text messages on an

9   iPhone without imaging the phone.

10      Notwithstanding if you pulled -- pulled down the

11  search and type in MiMedx, if that's all they want is just text

12  messages responsive to MiMedx, we can certainly produce those.

13      MS. McGINNIS:  Your Honor, if I may, Shanon McGinnis

14  on behalf of plaintiff.

15      I think it would be pretty easy to -- let's take

16  e-mails first, to go through e-mails and see what e-mails Mr.

17  Fox has with the enumerated individuals, and see if they relate

18  to MiMedx.  Don't need search terms for that.

19      THE COURT:  Well -- okay.

20      MS. McGINNIS:  And same thing for the text messages.

21  His text messages are with certain people.  So you open up the

22  text message on the phone.  You scroll through.  If there is --

23  I mean, we've had text messages produced in other cases with

24  the screen shot of text messages.  It's not something that has

25  to be, you know, downloaded and a -- and a, you know, formal

1    search term run through.

2              THE COURT:  Do we have any idea what the volume is if

3    you just did a search, you know, Mr. Fox and each of these

4    people?

5              MR. MAXWELL:  Judge, Adam Maxwell on behalf of Mike

6    Fox.

7              Just to clarify --

8              THE COURT:  Do you have an idea of the volume?

9              Every time I ask a question, you guys always have

10   something else you want to say instead of answering my

11   question.  I think it will be better if you answer my question.

12             MR. MAXWELL:  No, your Honor.

13             THE COURT:  Okay.  So have you like gone through

14   e-mails and say, let's just take one.  And let's see if we ran

15   this, what do we get?  And how many of these really have

16   anything to do with MiMedx as opposed to, let's go to lunch,

17   let's go to the Bulls game, because that also goes to whether

18   you ought to narrow it further with search terms; you know,

19   whether there is a burden that's imposed that's unfair in just

20   saying, give me every e-mail with these people.

21             Because you say, limited to MiMedx, but how do you do

22   that?  You are either going to do it in some way through search

23   terms, or you're going to do it through manual review.  And

24   that can be somewhat time consuming if it's a manual review.

25             MS. McGINNIS:  And -- and, your Honor --

1  THE COURT:  And if that -- and that goes to my

2  observation over the years that everybody always thinks

3  everybody else's discovery obligation is very easy to do, but

4  that theirs is very complicated, a door that I found swings

5  both ways.

6  But maybe that's one thing that people ought to do

7  when they're making discovery requests is put themselves in the

8  other side's shoes and say, okay.  If I had to do this, what

9  would I do?  And how would I think it would be reasonable if I

10  had to do this to limit it and to tailor it?

11  So on this one, I think that maybe what we have to do

12  in terms of supplementing the things that they're going to

13  supplement -- because I don't think, as I am hearing it -- and

14  Mr. Maxwell can correct me -- that you're disagreeing about

15  what you would supplement.  But what you are saying is that you

16  need to have some agreements or understanding about how you're

17  handling ESI, how you're going to search for these things in

18  order to do it.

19  MR. MAXWELL:  That's correct, your Honor.

20  THE COURT:  But we're going to address ESI in the Rule

21  26(f) planning report.  So why don't we -- at this point I'm

22  going to grant the motion to produce the things that were

23  agreed to be produced.  But we're going to hold off on setting

24  a deadline for that until we sort through some other things.

25  Okay?

1      MS. McGINNIS:  Yes.  Thank you, your Honor.  Shanon

2  McGinnis.

3      THE COURT:  Then -- then with respect to the second

4  part of the motion, that's interrogatory 10 in request for

5  production 47.  And interrogatory No. 10 asks that the

6  defendant -- I should say, asks to identify any and all persons

7  and entities that you communicated with about the lawsuit and

8  describe in detail the date and substance of communications.

9  You is defined to include counsel.

10      So you want to know who their counsel talked to?

11      MS. McGINNIS:  Shanon McGinnis, your Honor.

12      Yes, that's correct.

13      THE COURT:  You want to tell them who you talk to?

14      MS. McGINNIS:  Third parties?  Yes, your Honor,

15  that's -- that's fine.  That's what we're asking for here is

16  communications with third parties.  We made it very clear that

17  we're not seeking --

18      THE COURT:  Okay.  Are you interested in who they talk

19  to?

20      MR. GRIESMEYER:  It's probably work product.  But I

21  don't think you get to know them as (inaudible) of counsel --

22      THE COURT:  Well, but --

23      MR. GRIESMEYER:  -- as to who they interview and --

24      THE COURT:  Well --

25      MR. GRIESMEYER:  -- talk to.

1      THE COURT:  Well I know you guys never cited Mike

2   Wolbert (phonetic) of the EEO -- or EEOC versus Jewel case,

3   which they cited.  You didn't discuss that.  Where, you know,

4   for better or for worse, you know, my assessment was simply the

5   fact that he interviewed somebody doesn't mean that you're

6   invading the work product.  Just like if I say, I talked to my

7   client, that doesn't invade the privilege.  It's knowing what I

8   talked to my client about that would do that.  And in terms of

9   what you discussed to the third party, there certainly isn't

10  any attorney-client privilege.

11      Now, there may be an issue of work product.  But I go

12  back to the proposition.  You want to have an agreement that

13  everybody will produce whatever, identify what third parties

14  they may have interviewed about the case and provide the

15  substance of the information provided.

16      MR. MAXWELL:  Your Honor, Adam Maxwell on behalf of

17  Mike Fox.

18      We didn't ask for that information.

19      THE COURT:  I know.  I know.  But if there -- if

20  that's something you agree to, I'll let you ask for it.

21      MR. MAXWELL:  Honestly, your Honor, I don't think we

22  need it or want it.  I don't -- I don't really want to agree to

23  that.

24      THE COURT:  You don't have to.  I'm just asking.

25      MR. MAXWELL:  Okay.

1    THE COURT:  Okay.  So with respect to the EEOC versus

2  Jewel decision, there are -- I guess, there is an aspect about

3  that decision that's a little different than here because in

4  that case -- well, maybe it's not different.

5    Let me ask you a question.  If you had answered the

6  interrogatory to say, okay, here is who was talked to.  Here is

7  what they said.  Is there anything about the request that would

8  identify whether the person was interviewed or communicated

9  with by Mr. Fox versus by counsel?

10    MR. MAXWELL:  Your Honor, I guess --

11    THE COURT:  Do you understand what I'm asking?

12    MR. MAXWELL:  I did not understand.

13    THE COURT:  So -- so let's say that they asked, tell

14  me who you communicate with about the case and the substance of

15  it.  So let's say you answered that and you had a list that

16  said, okay, here is five people.  Here is the dates that there

17  were contacts.  And here is what the third person said.

18    Is there anything about that request or that answer

19  that would disclose who of those five people counsel talked to

20  as opposed to Mr. Fox?  Is there anything about the way it's

21  asked that would call for that, contrary to frankly the way you

22  asked, which is, tell me what the attorney did.

23    Interrogatory doesn't phrase it quite that way.

24    MR. MAXWELL:  Your Honor, Adam Maxwell again.

25    Yes, your Honor.  The -- the -- from my understanding,

1    based on our numerous meet and confers, is that counsel wants
2    us to designate who counsel spoke with versus who Mike Fox --
3            THE COURT:  The interrogatory doesn't say that.  And
4    right now you haven't provided any information with respect to
5    that interrogatory.  You haven't identified anybody who anybody
6    talked to.  So there isn't anything in the answer that would
7    automatically allow that to be determined.
8            I'm talking about interrogatory No. 10.  Okay?
9    Interrogatory No. 10.
10           MR. MAXWELL:  But, your Honor, Adam Maxwell.
11           Just to answer your question, no, then.  My
12   understanding was mistaken.  However, we -- we do have an
13   objection on the over-breadth nature or the overbroad nature of
14   the request to the extent that that -- that the request calls
15   for communications, for example, with Mr. Fox's girlfriend, his
16   ex-wife.  I just don't think those are relevant.
17           THE COURT:  Well, if -- I don't know if it's over-
18   broad because what Mr. Fox may say to people, if he says
19   anything to people -- maybe his attorneys tell him not to say
20   anything to people.  I don't know.  But if he says anything to
21   people, you know, isn't that potentially admission?
22           MR. FOX:  I can't talk, can I?
23           THE COURT:  So, you know, it is.
24           So I'm going to require the answer to interrogatory
25   10.

1       Now, with respect to document request No. 47, I don't

2  know if there are any documents concerning, you know,

3  interviews with -- that counsel may have had with third

4  parties.  Certainly I think any attorney notes of that would be

5  privileged, would be work product.  So but there may be other

6  things that aren't covered by work product.

7       So I will require you to answer that.  And to the

8  extent that you think anything covered would be properly

9  withheld on the basis of work product, you can certainly assert

10 that and log it.

11      So I will grant the motion with that understanding as

12 to interrogatory 10 and request for production 47.

13      MS. McGINNIS:  Your Honor, can we set a deadline for

14 that as well?

15      THE COURT:  Sure.  How long would you like?

16      MR. MAXWELL:  At least 21 days, your Honor.

17      MS. McGINNIS:  That's fine.

18      THE COURT:  Is reasonable?

19      MS. McGINNIS:  Yeah.

20      THE COURT:  You think it should be sooner?

21      MS. McGINNIS:  Well, no, 21 days is fine, your Honor.

22      THE COURT:  Did you listen to anything I said?

23      MS. McGINNIS:  I am listening.

24      THE COURT:  Just remember that the world is circular.

25 The wheel does turn.

1          MS. McGINNIS:  Yes.  21 days is fine, your Honor.

2          THE COURT:  Okay.  October 11.

3          All right.  Let's turn to the Rule 26(f) planning

4     report.  Sounds like it's too early to really talk about a

5     settlement conference.  What I would suggest to you all is

6     that, unless this case is markedly different than just about

7     every other case, there will come a day when you have those

8     discussions.  And I think it's always good to keep that in mind

9     as you litigate the case, so that in litigating the case you

10    don't unnecessarily do things that unduly complicate those

11    efforts when they come.

12         The second thing is to keep in mind the fact that

13    probably you will have a conference at some point, and to

14    really look at discovery and look at it carefully to identify

15    the earliest date possible to do that.

16         In other words, when do I know enough that we could

17    have a meaning -- meaningful conference?  Knowing enough

18    doesn't mean knowing everything you would want to try the case

19    or to satisfy anybody's curiosity.  But it means knowing enough

20    that you can sit down and meaningfully assess this.  And my

21    observation is that you typically don't need 20-plus

22    depositions to do this.

23         So I just would suggest to you that you all keep that

24    in mind.  Okay?

25         In terms of supplementing Rule 26(a)(1) disclosures,

1    the report suggests doing that September 21, tomorrow.  That's

2    fine.  So we will put that into the order.

3         I think that the biggest area of disagreement that I

4    saw in the report was with respect to the ESI issues.  So

5    looking at the three areas of disagreement, I guess -- let me

6    take first the form of production.  It wasn't clear to me

7    exactly what the disagreement is.

8         MR. MAXWELL:  Your Honor, Adam Maxwell on behalf of

9    Mike Fox.

10        The -- the disagreement was that we suggested an

11   alternative method of production, including -- to include PDF.

12        THE COURT:  Well, when you say an alternative method,

13   alternative, for instance, to native or TIF?

14        MR. MAXWELL:  Correct, your Honor.

15        THE COURT:  All right.  So -- and when you're talking

16   about an alternative form, do you mean the same information

17   being produced in multiple forms?  Or being able to ask for

18   category A in native but category B in PDF?

19        MR. MAXWELL:  The former, your Honor.

20        THE COURT:  Okay.  I deny that.  I mean, the rules

21   don't generally say you have to produce the same information in

22   multiple forms.  And I don't see a compelling reason to do that

23   here.

24        MR. MAXWELL:  Your Honor, Adam Maxwell.

25        If I -- if I may, the driving factor behind that was

1     more from our side a cost perspective in that if Mr. Fox can

2     apply reasonable search terms, maybe it would not be necessary

3     to image the -- a cell phone, for example, which costs about

4     $700.  And then produce -- you know, hire an outside vendor to

5     -- to produce those documents in TIF or a load file format.

6              THE COURT:  So right now we're talking about, as I

7     understood it, a request that MiMedx produce things in multiple

8     ways.  This issue didn't really address how Mr. Fox produces --

9              MS. McGINNIS:  That's my understand as well, your

10    Honor.

11             THE COURT:  -- form of production.  I don't know that

12    they have asked for things in a certain format from Mr. Fox?

13    If in your discussions there is a format that they seek but you

14    say, well, that's more expensive.  We could give you it in this

15    format.  It's usable by you and it's less expensive for us.

16    That's a discussion to have.

17             MR. MAXWELL:  Okay.  Thank you, your Honor.  That's --

18             THE COURT:  Because this particular -- as called out

19    in the 26(f) report, it really applied to MiMedx' production.

20             MR. MAXWELL:  I understand, your Honor, and I

21    understand how that can be interpreted by MiMedx in that

22    manner.  It was a mutual provision in the -- in the ESI order.

23             THE COURT:  Well, I guess what I would say is, I would

24    resort back to Rule 34, that the party seeking information can,

25    you know, request that it be in a particular form.  And if the

1    responding party says, that's not the form we should use, then

2    the parties have to have a discussion about that.

3            But -- I -- I don't know at this point, without

4    knowing what's being sought, what the alternatives are, that

5    it's really appropriate for me to weigh in and say, it's got to

6    be this way or got to be that way.

7            MR. MAXWELL:  Understood, your Honor.

8            THE COURT:  To borrow one of your phrases, it may be

9    more nuanced.

10           MR. MAXWELL:  Maybe.

11           THE COURT:  Now, then there is the issue of electronic

12   device comparison.  I guess it's subpart 2 under areas of

13   disagreement.  So, as I understand it -- and I just want to lay

14   this out to make sure I am understanding it correctly.  What

15   this pertains to are, I guess, certain devices or images of

16   devices that were made as part of certain devices being turned

17   over by Mr. Fox to MiMedx?

18           MR. PREMO:  Steven Premo.

19           MS. McGINNIS:  Yes, your Honor.

20           MR. PREMO:  That's correct, your Honor.

21           THE COURT:  Right.

22           MS. McGINNIS:  Shanon McGinnis.

23           Those are devices --

24           THE COURT:  Like --

25           MS. McGINNIS:  -- that he had imaged before he turned

1   them over to MiMedx.

2         THE COURT:  Okay.  All right.  And so StoneTurn now

3   has those images?

4         MS. McGINNIS:  Correct, your Honor.

5         THE COURT:  StoneTurn, Mr. Fox's vendor, correct?

6         MS. McGINNIS:  Correct, your Honor.  Shanon McGinnis.

7         MR. PREMO:  Correct.  Correct, your Honor.

8         THE COURT:  All right.  So what I understand the

9   defense to be saying is, so now MiMedx has with respect to

10  these particular devices, the devices and the software on the

11  devices.  And what the defense is proposing, I guess, is that

12  the experts or the consultants on each side do a comparison to

13  make sure that what is on the devices that MiMedx now has that

14  StoneTurn imaged, that they match.

15        MS. McGINNIS:  Your Honor, Shanon McGinnis.

16        They're suggesting that compare the two images.  DTI

17  and MiMedx's vendor made a mirror image as well.  So, yes.

18        THE COURT:  And that's fine.  So -- but an image of

19  those devices.  So you would expect that the DTI -- well, you

20  want -- they want to see if the DTI image matches the image

21  that StoneTurn made.

22        MS. McGINNIS:  Correct, your Honor.

23        THE COURT:  Okay.  Now -- and that -- this applies to

24  a subset of all of the sources of ESI that MiMedx may wind up

25  looking --

1          MS. McGINNIS:  Shanon McGinnis.

2          Correct, your Honor.  It --

3          THE COURT:  The specific devices that Mr. Fox had.

4          MS. McGINNIS:  The devices that were in Mr. Fox's

5    possession.  Yes, your Honor.

6          THE COURT:  Okay.  Now, you guys have a disagreement

7    about whether Judge Shah held forth on what use could or should

8    be made of the images being held by StoneTurn.

9          MS. McGINNIS:  Correct, your Honor.

10          THE COURT:  According to the plaintiff, Judge Shah

11   said that they are not to be looked at except under certain

12   circumstances, none of which are present here.  The defense

13   says, the issue has not been ruled on.

14          Now, you both may be correct.  I don't know, because I

15   don't know what you mean, Mr. Maxwell, by the issue has not

16   been ruled on.  So let me go back and kind of start with this

17   proposition.

18          Did Judge Shah discuss what use may be made of the

19   mirror images held by StoneTurn?

20          MS. McGINNIS:  Yes, your Honor.  Shanon McGinnis.

21          Judge Shah's preliminary injunction order.

22          THE COURT:  Okay.  Okay.  Do you agree that he

23   addressed that in the injunction order?

24          MR. MAXWELL:  Your Honor, Adam Maxwell.

25          Somewhat.  He -- he said that the images are not to be

1   accessed prior to turning them over, and that -- now, the order

2   doesn't say this.  But Judge Shah said that if in discovery you

3   need to request that information, then issue a discovery

4   request, which is what we've done.

5          And ironically, counsel for MiMedx is the one who

6   requested a copy of the devices from Mr. Fox from StoneTurn.

7   And in response to counsel's request for those images, Judge

8   Shah said, issue a discovery request, if that's what you would

9   like.

10         That's -- that's undisputed.  It is at the March 8

11  hearing on page 19 of the transcript.

12         MS. McGINNIS:  Your Honor, if I may, Shanon McGinnis.

13         We didn't issue a discovery request for those devices

14  because the Court ordered them that those images were not to be

15  accessed, used, anything.  The Court then provided the

16  appropriate assurances that we were looking for.  So we did not

17  issue a discovery request for them.  There is not a document

18  request or an interrogatory or anything about them.

19         What the Judge did say, what Judge Shah did say, was

20  that if at some point down the road there was an argument that

21  the plaintiff MiMedx had not fully complied with the discovery

22  request or was hiding the ball about data, then at that point

23  there may be an argument that somebody should be allowed to

24  look at the images and confirm what's on there.  He said, at

25  that point he wasn't convinced that they needed assurances at

1    this point that the images were successfully duplicated.

2         MR. MAXWELL:  Your Honor, that was the -- that was not

3    counsel's request for a copy of the devices.  That was prior

4    to -- or was not prior to Judge Shah's ruling.  But subsequent

5    to that, counsel requested.  She specifically stated, I

6    understand your Honor's order, but they get to maintain a copy

7    of or get to maintain whatever they copied.  And they can't

8    access it.  That's what I was talking about.

9         THE COURT:  They can't access it.

10        MR. MAXWELL:  They can't access it.

11        We're not accessing it.  Counsel said, is it possible?

12   We would request that we would be permitted to have a copy of

13   what they have, so that again it can be maintained in an

14   evidence vault, the same way that theirs is.

15        That's all we're asking for.  And Judge Shah said, if

16   you want to make a request through ordinary discovery

17   mechanisms of that kind of thing, you can meet and confer about

18   it and see if you can reach some kind of agreement.  We've met

19   and conferred, but we can't reach an agreement.

20        MS. McGINNIS:  We didn't make a request, though, your

21   Honor, is -- is the point that I was trying to make.

22        THE COURT:  I know, but they're making a request.

23        MS. McGINNIS:  But they're making a request that

24   allows them to --

25        THE COURT:  Well, who is them?

1          MS. McGINNIS:  Allows Mr. Fox to --

2          THE COURT:  Who --

3          MS. McGINNIS:  -- access.

4          THE COURT:  No.

5          MS. McGINNIS:  His vendor.  It allows his vendor to

6 access.  But the -- the safeguards that Judge Shah had in place

7 are not -- are not present here.

8          THE COURT:  So let me -- I understand -- you

9 understand that what they seek is to make sure that there isn't

10 any dispute about the integrity of the image from the devices

11 that were obtained back from Mr. Fox when you do the searches.

12          MS. McGINNIS:  When -- the way that I take the

13 request, your Honor, is that they take issue with the images

14 that DTI made.

15          THE COURT:  No, no, no.  I don't know that they take

16 image -- they take issue.  What they want to do is, rather than

17 have a fight after production, when somebody says, gee, I know

18 there was more there.  I don't know why we're not getting this

19 because there was more there -- to at the front end to ensure

20 through experts locking at it that they match up, and if there

21 are discrepancies to vet that.

22          MS. McGINNIS:  Two points, if I may, your Honor.

23 Shanon McGinnis.

24          Judge Shah specifically addressed that.  His -- his

25 order was that let's take discovery in the normal course of

1  business.  There is no suggestion at this point that we

2  haven't --

3          THE COURT:  But he --

4          MS. McGINNIS:  -- produced something on --

5          THE COURT:  He gave this to me for discovery.

6          MS. McGINNIS:  I understand.

7          THE COURT:  So I am going to look at this in a way

8  that hopefully can avoid issues on the back end.

9          MS. McGINNIS:  Okay.

10          THE COURT:  Because from what I'm seeing here, left to

11  your own devices, no pun intended, you guys will fight forever.

12  So I think you need to be reined in.

13          Do you not trust StoneTurn to work with DTI?

14          MS. McGINNIS:  That's not it at all, your Honor.

15  My --

16          THE COURT:  Okay.

17          MS. McGINNIS:  My point with this is that I'm not sure

18  what StoneTurn had.  If the document at the time that they had

19  the documents, there were --

20          THE COURT:  The devices.

21          MS. McGINNIS:  -- security protocols -- the devices.

22  Thank you.  Sorry.

23          At the time they had the devices, there were security

24  protocols in place.  So I'm not sure what -- what StoneTurn

25  had.  And I think that depending on -- you know, there is a

1    greater chance that -- that it might not match up.  Maybe

2    StoneTurn has less.  Maybe StoneTurn doesn't have anything.

3            But I think that there is a greater chance of there

4    being a dispute at that point than trusting us to have a

5    reputable vendor image the devices, make the production.

6            THE COURT:  Well, the devices have been imaged.

7            MS. McGINNIS:  They have been imaged.

8            THE COURT:  All right.

9            MS. McGINNIS:  But to have -- have a production made

10   from the images.  And -- and then if there is a point of, hey,

11   we thought that this might have contained additional documents,

12   to have that discussion.

13           THE COURT:  Yeah.  Well, based on what I'm seeing, as

14   night follows day that's what's going to happen.  So if you

15   tell me you don't trust StoneTurn, then, you know, what I would

16   do is I would have each of them get together and pick a third

17   vendor to compare.  You can share the cost of that.

18           MS. McGINNIS:  Your Honor, would the -- and this is a

19   technology question.  I don't -- I don't know the answer of

20   whether or not this comparison would allow anybody to see the

21   documents, access the images, because that's something that

22   Judge Shah's order expressly says that's not permitted.

23           MR. MAXWELL:  Your Honor, we have addressed this ad

24   nauseam in meet and confers.

25           THE COURT:  You know, I am really tired of hearing

1   about everybody criticizing everybody else right now.  Do you

2   think that that's persuasive?  Whether you think it's ad

3   nauseam, whether she thinks you're holding back, do you think

4   any of that is persuasive?

5        MR. MAXWELL:  No, your Honor.  And --

6        THE COURT:  Okay.  Maybe they are with some judges.

7   I'm telling you right now, it's not with me.  So let's stop it.

8        MR. MAXWELL:  I apologize, your Honor.  Adam Maxwell.

9        I just wanting to establish that we had -- we had in

10  fact explained that the documents on the imaged devices would

11  not be viewed.

12       MR. GRIESMEYER:  Judge, Chris Griesmeyer on behalf of

13  Mr. Fox.

14       Just to provide further context, so what happened

15  after Mr. Fox received the complaint, he immediately turned

16  over (inaudible) three MiMedx devices in his possession.  He

17  immediately turned them over to StoneTurn for evidence

18  preservation purposes.

19       They created an image.  StoneTurn then gave the

20  devices to DTI.  DTI took the devices, created an image.  What

21  I explained to Ms. McGinnis is that what we just want to do, we

22  want to make sure that the image that DTI has is the same thing

23  that StoneTurn has and is working off the same image, after

24  which -- and I've explained that we don't need to see anything

25  that's on either one of those devices.  Just want the two

1    experts to get in the room, make sure everybody is working off

2    the same page, after which they can have the StoneTurn devices.

3    We don't want them.  We don't want to access them.

4               THE COURT:  Images.

5               MR. GRIESMEYER:  The images, yes.

6               I've explained all this.  And she doesn't want to

7    allow that type of comparison.  That's exactly what I want to

8    do.  I just want to avoid any type of evidentiary dispute that,

9    well, listen, you're pulling, you know --

10              THE COURT:  I think I understand.

11              MR. GRIESMEYER:  Thank you.

12              MS. McGINNIS:  Your Honor, Shanon McGinnis.

13              THE COURT:  Yes.

14              MS. McGINNIS:  Judge Shah's order, if -- if this

15   involves accessing or manipulating or using the mirror image

16   that StoneTurn has, then it's in violation of the preliminary

17   injunction order, because that specifically states that -- that

18   the images cannot be accessed, used, manipulated, viewed,

19   anything along those lines.  The mirror image, documents on it

20   or the data or the image itself.

21              THE COURT:  Well, that's why I asked you if you don't

22   trust StoneTurn.  And if your answer is, I don't, then fine.

23   We'll have the two experts get a third party, a different

24   vendor.  And I'm happy to have an order that says that this is

25   simply to compare -- really I think we're comparing bits and

1    bytes.  But it's not in any way a review of any of the content

2    of any of the information.

3            So, you know, I'll -- I'll be guided by the plaintiff

4    in terms of whether you have concern because StoneTurn was

5    engaged by Mr. Fox to be the consultant.  If you don't trust

6    StoneTurn, then get somebody else.

7            MS. McGINNIS:  I -- I am inclined to go then with a

8    third-party vendor, your Honor --

9            THE COURT:  Okay.  Have the two --

10           MS. McGINNIS:  -- experts can agree.

11           THE COURT:  Have the two of them pick a third.

12           MR. MAXWELL:  (Inaudible) vendors?

13           THE COURT:  Yes.

14           MR. MAXWELL:  -- (inaudible) StoneTurn.

15           THE COURT:  Yeah, the two -- two vendors pick a third.

16           MS. McGINNIS:  Your Honor, may I inquire further on

17   that?  Will -- will there be -- and again this is the

18   technology issues that I'm not sure.  Will a file list be

19   created that goes to counsel or to Mr. Fox?  That -- that's my

20   concern -- that's my concern is that there is a -- you know,

21   somehow any of the information that's contained on the

22   StoneTurn -- that the StoneTurn mirror image be provided to --

23   to counsel or to -- to the parties?  Because the Court has --

24           THE COURT:  You're --

25           MS. McGINNIS:  -- indicated --

1    THE COURT:  -- talking about the -- you're talking

2  about the contents.  That's your concern.

3    MS. McGINNIS:  Yes.

4    THE COURT:  All right.

5    MS. McGINNIS:  But that would include like the names

6  of documents.  So --

7    THE COURT:  That's not what we're talking about.

8    Correct, Mr. Maxwell?

9    MR. MAXWELL:  That's my understanding, your Honor.

10    MS. McGINNIS:  But how do they compare what's on each

11  device if they don't look at the documents, or even a name of

12  documents, a file list that shows --

13    THE COURT:  Well, the first --

14    MS. McGINNIS:  -- the documents are.

15    THE COURT:  At the first level I would expect that

16  what you're doing is looking at the architecture of it.  You're

17  looking at, you know, does this one have, for instance, so many

18  bytes of information, this one half as much?

19    MS. McGINNIS:  Okay.

20    MR. MAXWELL:  That's correct, your Honor.

21    THE COURT:  The same amount?  So -- but I -- I think

22  that since what Mr. Maxwell is assuring is that none of this

23  involves any kind of review of the contents, including titles

24  of documents or dates of documents or anything like that.  For

25  that you have to have a protocol for this comparison.

1          MR. MAXWELL:  Correct, your Honor.

2          THE COURT:  And that the protocol be put together by

3    the expert, like a consultant, with the participation of the

4    attorney.  Okay?

5          MS. McGINNIS:  Understood, your Honor.

6          THE COURT:  All right.  So that's how we're going to

7    handle that issue.  And then the third issue is a data

8    repository issue.  So I -- I was trying to work my way through

9    the red-lining and such on attachment A to Exhibit 1.  I'm

10   trying to figure out what it is the defense wants.  And I

11   assume that what's going to happen is, you're going to have a

12   conversation.  And you're going to say, okay, on the defense --

13   on the plaintiff's side, here are the custodians.  Here are the

14   databases that we think are most reasonably likely to have

15   relevant information.

16          You'll say, fine.  Or you'll say, well, wait a minute.

17   What about this other one?  And you'll have a conversation.

18   And either you'll agree or I'll rule.  And then once you have

19   those databases custodians determined, you're going to say,

20   okay, what are we going to look for?

21          And I -- the report suggests that you are going to use

22   search terms, right?

23          MR. MAXWELL:  Correct, your Honor.

24          MS. McGINNIS:  Correct.

25          THE COURT:  Have you had any conversation about that?

1          MR. MAXWELL:  We have not, your Honor.

2          THE COURT:  Okay.  So you're going to have search

3    terms.  And you're going to talk about the search terms.  And

4    then you're going to have hopefully agreement on the search

5    terms.  And if you don't, you're going to have agreement on

6    some number of them.  And then there is going to be a debate,

7    well, should we have this other one, or should we have some

8    kind of connector with this one because without a connector

9    it's going to be too broad.

10          And you're going to have agreement on search terms.

11    Either you'll agree or it will be imposed on you.  And then

12    you're going to do a search, right?

13          MS. McGINNIS:  Uh-huh.

14          THE COURT:  So let me stop for a moment.  Is it your

15    anticipation that once you have the search terms and the time

16    parameters and such, and you got the databases, you're just

17    going to run them against all the databases?  Have you --

18          MS. McGINNIS:  The --

19          THE COURT:  -- thought about that?

20          MS. McGINNIS:  They would be searched by custodians --

21          THE COURT:  Well --

22          MS. McGINNIS:  -- so that the documents --

23          THE COURT:  I understand that you have different

24    e-mail custodians, at least a dozen based on request for

25    production 31 to 42.  But what I have done or suggested in the

1    past is that once you have the search terms, that instead of

2    doing all of the searches or all of the databases, you run it

3    as a sample against one of them, and maybe not for the entire

4    time period.  But to see what you get, because, you know, you

5    may wind up as, you know, smart attorneys with clients

6    knowledgeable about how people talk and what words may hit on

7    things.  But until you run it, you don't know.

8              And if you run it and you say, gee, now, I can see

9    that this particular search term generated 90 percent of the

10   hits, and in looking at the 90 percent of the hits 99 percent

11   of those are worthless, doesn't that tell you something you

12   want to know before you run it against anything else?

13             MS. McGINNIS:  Uh-huh.

14             THE COURT:  So I would suggest that to you as a -- as

15   a means of potentially verifying that you've got the right

16   terms or vetting those to see how you might adjust them before

17   you run it on everything.  And then it's kind of harder to take

18   a look at everything.  So I would suggest that to you.

19             But so -- so then they would do that process.  There

20   would be so many documents generated ultimately.  They would

21   review them.  They would determine what's responsive.  And to

22   the extent it's not privileged or they didn't assert privilege

23   they produce it.  Okay.

24             And on the same -- and you would be doing the same

25   thing on your side of the case but with fewer sources.  Fair?

1          MR. MAXWELL:  Yes, your Honor.

2          THE COURT:  Okay.  So what is the data repository that

3     you have in mind that you want?  And I don't know that data

4     repository is really the right word, term.  What do you -- what

5     is it that you want them to do and give to you beyond what I

6     have discussed?

7          MR. MAXWELL:  Your Honor, Adam Maxwell on behalf of

8     Mike Fox.

9          We suggested in the ESI order to identify custodians

10    and custodians' devices basically.

11         THE COURT:  Well, and I think that that's part of what

12    was embraced by what I said, right?  You're going to have a

13    discussion, identify custodians and sources.

14         MS. McGINNIS:  The -- the detail that they want,

15    however, is much more.  Yeah.

16         THE COURT:  Okay.

17         MR. MAXWELL:  That's fine, your Honor.  We -- we can

18    agree to custodians and sources without the make, model, you

19    know, serial number, things like that.  That wasn't broached

20    previously.  But --

21         THE COURT:  I'm glad I can be of help.

22         MR. MAXWELL:  It's very helpful, your Honor.

23         THE COURT:  You shouldn't have to have a chaperoned

24    conversation.

25         MR. MAXWELL:  I agree, your Honor, hundred percent.

1    So that -- so that's essentially what we had suggested is a

2    schedule in the ESI order for things like that.

3            THE COURT:  Well, okay.  That's then at the front end

4    of identifying who are the custodians and what sources are we

5    looking at.

6            Then as they go through the process, it seemed as

7    though your proposal was that there be certain documentation

8    that they maintain of that process and then provide to you.

9    Did I read that incorrectly?

10            MR. MAXWELL:  No, your Honor.  Adam Maxwell.

11            THE COURT:  Why is that?

12            MR. MAXWELL:  Your Honor, it's sort of in the same

13    vein as you had suggested with respect to running a sample

14    through one custodian's repository, for lack of a better word.

15    And my understanding from prior experience with some of these

16    vendors is that they will generate a report.  It's essentially

17    an Excel file that says, you know, here are the numbers of

18    hits.

19            THE COURT:  It's a hit list.

20            MR. MAXWELL:  Yeah, hit list.  So that's what was --

21            THE COURT:  Well, but let me go back for a moment.  If

22    they run a sample and they say, this is fine.  You know, it's

23    in response to stuff.  So we'll run against everything.  We'll

24    produce it to you.  What do you care about the hit list?

25            If they say, whoa, this is getting way too much stuff,

1    then in order to persuade you that they need -- that there has

2    to be a limitation, then I would expect they're going to show

3    you the hit list.  Because in the end, if they don't, why are

4    you going to agree?  If you don't agree, then you're going to

5    have to come to me.  And what are you going to have to show me?

6          MR. MAXWELL:  Adam Maxwell, your Honor.  I agree.

7          THE COURT:  Okay.  So it seems to me that we can make

8    this simple.  And the real lifting is at the front end of who

9    the custodians are, who are the sources, what are the terms

10   we're going to use.  Let's run it against the sample.  Let's

11   see what it generates.  Let's see what revision we have to do.

12   And then once that's all sorted out -- hopefully on your own,

13   but if not then with assistance -- then you're going to run it

14   against everything.

15         And then it's going to be producing what's responsive,

16   except for whatever you're asserting privilege on and producing

17   a log.  I think we can make it a little more simpler at the

18   back end by doing the work at the front.  So that's how I

19   resolve that issue.

20         Now, that takes us to deadline for discovery.  So the

21   report says, plaintiff proposes February -- I'm sorry --

22   December 15.  Defense proposes April 13.  So I have to say,

23   given that we're getting to the end of September, we have less

24   than three months between now and December 15.

25         I have not seen anything that tells me it's realistic

1    to say you're going to have these conversations, you're going

2    to work this stuff out, you're going to finish off the written

3    discovery.  You're going to take collectively 15 or 20

4    depositions and get that done in the middle of the holiday

5    season.  It just doesn't seem like it works.

6           MS. McGINNIS:  We had as an offer of compromise, your

7    Honor -- Shanon McGinnis.

8           In here we had offered the middle of January as well

9    as a cutoff.

10           THE COURT:  All right.  Okay.  Not exactly Solomonic.

11           Well, let's talk for a moment, before we get to the

12    schedule, about a couple other things.  At this point I'm not

13    going to authorize more than ten depositions a side.  I mean,

14    one of the things that I saw in the report from the defense

15    perspective is, you may want 12, and a number of these are

16    third parties.  And at least my experience is that sometimes

17    once you embark on that process, kind of like witnesses at

18    trial, you decide I don't really need them all.

19           So rather than kind of write a blank check at this

20    point, that's something if you really feel a strong need later

21    on for one or two, it may be that you can reach agreement on

22    that.  And if not, then we can address it in the context of

23    what actually has been done and why more is --

24           With respect to the discussions concerning ESI,

25    custodians, sources to be explored -- and I'm setting aside the

1   imaged ones because there is a whole lot more than those that

2   are going to be accessed.  So resolving whatever comparison

3   doesn't have to hold up negotiating what other sources are

4   looked at, what custodians, search terms, any of that.  Doesn't

5   have to hold any of that.  So I expect that to proceed, and I

6   expect that to proceed quickly.

7           So in terms of meeting and conferring about --

8   within -- in a genuine effort to reach agreement -- and if I

9   may diverge for a moment?

10          A genuine desire and effort to reach agreement

11  generally means, I don't get it all my way, right?  Because

12  there are competing.  And sometimes what that means as part of

13  compromise, as part of I know that's important to you, I don't

14  know that I care -- agree with that, but okay.  But this is

15  important to me.  You make compromises.  That's what a genuine

16  effort to reach agreement is.

17          It isn't pounding the other side into submission.

18  I'll give up, I do whatever you want.  It's to reach reasonable

19  accommodation.  So I would expect you to approach it with that

20  in mind.

21          Now, with respect to a timeline, has there been -- I

22  take it, there has been no discussion about custodians yet or

23  search terms?

24          MS. McGINNIS:  Not yet, your Honor.

25          THE COURT:  Okay.  Somebody has got to go first and

```
 1   make a proposal, right?

 2             MS. McGINNIS:  Uh-huh.

 3             THE COURT:  So I would normally say, it should be the

 4   plaintiff, at least for your devices.  I mean, for Mr. Fox

 5   that's not so much an issue.  In part because they are your

 6   systems.  They are your people.  And you in the first instance,

 7   you know, ought to have some knowledge about that.

 8             So in terms of proposals as to what sources to look at

 9   and what custodians and what time period, okay, recognizing

10   what time period you sought discovery for.

11             MS. McGINNIS:  Sure.  That's -- that's no problem.

12             THE COURT:  Okay.  When can you get a proposal over to

13   the defense?

14             MS. McGINNIS:  Custodian and search term proposal?

15             THE COURT:  No, no, just right now, let's focus on

16   custodian, sources, type.

17             MS. McGINNIS:  Oh, we can do that next week, your

18   Honor.

19             THE COURT:  Seven days?

20             MS. McGINNIS:  Yeah.

21             THE COURT:  Okay.  Now, in terms of search terms, does

22   the defense have a view about who should go first on that?

23             MR. MAXWELL:  Adam Maxwell, your Honor.  No.

24             THE COURT:  Okay.

25             MR. MAXWELL:  No view.
```

1          THE COURT:  Are you -- on the plaintiff's side, are

2  you willing to propose that?

3          MS. McGINNIS:  We are, your Honor.

4          THE COURT:  Could you do it in that same timeframe?

5          MS. McGINNIS:  We can, your Honor.

6          THE COURT:  Okay.  So October 27 -- I'm sorry --

7  September 27 plaintiff will deliver a written proposal as to

8  custodians to search, search terms, which would cover all the

9  devices, plaintiff and defense, and timeframe, and sources.

10         Then how long do you need to get back to the plaintiff

11  with any suggested additions, revisions?

12         MR. MAXWELL:  Your Honor, Adam Maxwell on behalf of

13  Mike Fox.

14         It depends on the number of custodians.  The

15  allegations in the complaint suggest that Mr. Fox supervised 50

16  people.  If they produce 50 custodians with search terms, I

17  would say 21 days.  If it's less, less time.

18         MS. McGINNIS:  For clarification, your Honor, you are

19  not asking us to actually produce the documents.  You are

20  asking us to suggest which custodians --

21         THE COURT:  Talking --

22         MS. McGINNIS:  -- and sources.

23         THE COURT:  -- about which custodians.

24         So I guess if they said, all 50, then there is not

25  much for you to add for custodians.  So I guess I don't

1    understand why that would require more time.  We know, at least

2    from request for production 31 to 42, that there is about a

3    dozen people that, based on those discovery requests, they

4    thought might be important.  If they listed 20, Mr. Fox knows

5    who he worked with.  If he says, you know, I think there ought

6    to be more.  Here is why I think there ought to be more.  Does

7    it really take three weeks to do that?

8           MR. MAXWELL:  No, your Honor.

9           THE COURT:  Okay.

10          MR. MAXWELL:  Probably, seven to ten days --

11          THE COURT:  Okay.

12          MR. MAXWELL:  -- would be fine.

13          THE COURT:  Okay.

14          MR. MAXWELL:  Your Honor, just to clarify --

15          THE COURT:  And search terms.

16          MR. MAXWELL:  Yes, your Honor.

17          Just to clarify, it's not necessarily just people that

18   Mr. Fox supervised.  It's also people above.

19          THE COURT:  Oh, I know.  You know, I understand that

20   he's not limited by who they think they should search.  But all

21   I'm saying is whether there are people you report to, whatever

22   the organizational structure is, he is going to know that.  So

23   I -- I didn't think that you needed three weeks.

24          So if you want seven to ten days, if we say the 27th

25   for the plaintiff to provide this, then how about by the 6th of

1    October you'll provide.

2              MR. MAXWELL:  Agreed, your Honor.

3              THE COURT:  And I want to mention that when I set

4    those kinds of deadlines, that doesn't preclude anybody from

5    doing it early.  I know almost nobody files a brief earlier

6    than the deadline.  I know the work expands to fill the time

7    allotted.  But if you can do it faster, do it faster.

8              And then I would like the parties to meet and confer

9    about any variations there are in the two proposals.  I'd like

10   that to take place the following week.  If we said by mid-week

11   the next week, can you do that?  That would be October 11?

12             MS. McGINNIS:  Of course, your Honor.

13             MR. MAXWELL:  Yes, your Honor.

14             THE COURT:  Okay.  Now, do I need to have you do it in

15   the presence of a court reporter?

16             MS. McGINNIS:  No, your Honor, that's not necessary.

17             MR. MAXWELL:  I don't think that's necessary at this

18   point, your Honor.

19             THE COURT:  Okay.  I'll accept that.  But I -- I did

20   grow up in this area.

21             MR. MAXWELL:  So did I, your Honor.

22             THE COURT:  Where?

23             MR. MAXWELL:  St. Louis.

24             THE COURT:  Me too.  University City.  The

25   significance, of course, is that Missouri is the show-me state.

1    So show me.

2        Now, with that timeline, and then if you have

3    agreements after that, it's kind of easy.  If you don't have

4    agreement, then it's a little more complicated.

5        Now, I'm going to be out from the 17th to the 30th.

6    If you want, I'll see you on the 16th, if that's enough time

7    for you to vet this process.

8        MS. McGINNIS:  I think we can -- I think we can

9    definitely do that, your Honor.

10        THE COURT:  Okay.  Jenny, do I have anything at 9:00

11    o'clock?

12        THE CLERK:  Yes, there is (inaudible).

13        THE COURT:  Pardon me?

14        THE CLERK:  You do.  You have two status hearings at

15    9:00.

16        THE COURT:  In which case?

17        THE CLERK:  Ronin and Gage.  Actually three.  Sorry.

18    Strabala as well.

19        THE COURT:  What's the last one?

20        THE CLERK:  I'm sorry?

21        THE COURT:  What was the last one?

22        THE CLERK:  Strabala versus Zhang.

23        THE COURT:  Okay.  I'll see you at 9:00 o'clock on the

24    16th.

25        So what I want by noon on the 13th is a report on what

1    agreements you have reached with respect to the ESI search and

2    what areas of disagreement there are.  I would also like by

3    that time a report on what agreements you reached in terms of

4    what third party -- if I haven't received it already.  Actually

5    let me amend that.

6          I'd like you to move faster on this issue of finding

7    this expert as a consultant that StoneTurn and DTI would select

8    to do this comparison and the protocol for accomplishing it.  I

9    want to get a report on that by noon on Friday the 6th.

10         Now, in terms of the rest of the schedule, let's

11   assume that you have complete agreement on the terms and

12   everything by your meet and confer on the 11th.  Or happy

13   world, you don't even need a meet and confer.  Then you got to

14   do the -- you know, the sample run.

15         Now, if that requires some adjustment of the terms

16   before running against the whole database, or the databases,

17   then realistically when looking at MiMedx, because you have

18   more sources, when -- how long from the time that you actually

19   have that -- the terms, to running them, to reviewing the

20   documents, produce them?

21         MS. McGINNIS:  Shanon McGinnis, your Honor.

22         In part I think it's going to depend on -- on the

23   volume.  I can tell you that -- that we have already

24   gathered -- because we are in litigation in other places.

25         THE COURT:  Yes.

1        MS. McGINNIS:  We have already gathered documents

2  from -- from certain custodians and source.  So some of those,

3  to the extent that we've already got it, we can produce that

4  relatively quickly, as long as the -- it's the same search

5  terms.

6        THE COURT:  It's probably not going to be less than 30

7  days.

8        MS. McGINNIS:  Right.

9        THE COURT:  All right.  I'm just running the numbers

10  because that's probably going to take us to the end of

11  November.

12        MS. McGINNIS:  Uh-huh.

13        THE COURT:  Is January 15 reasonable to finish

14  everything?  I'll ask a rhetorical question.

15        By the way, in those other cases, did you do -- use

16  search terms?

17        MS. McGINNIS:  Yes, your Honor, we did.

18        THE COURT:  Okay.  So that may facilitate use of them

19  here.

20        MS. McGINNIS:  Exactly.

21        THE COURT:  At least what you propose.

22        Here is what I am going to do with respect to the

23  discovery schedule.  It seems to me that if everything goes as

24  smoothly as possible, we are not going to be through this ESI

25  phase for two months.  It's going to take us to the end of

1    November.  And then we're going to talk about scheduling

2    depositions, because generally you are not going to do a lot of

3    that before you get the documents.

4          So it seems to me that what would make sense right now

5    is to pick the date suggested by the defense of April 13 for

6    the close of the non-retained expert fact discovery.  Then with

7    respect to experts, on the plaintiff's side what's your

8    expectation as to the number of experts?

9          MS. McGINNIS:  I think at this point, your Honor,

10   maybe one or two experts.

11         THE COURT:  And on the defense side?

12         MR. MAXWELL:  Probably leave that up to Mr. Premo.

13         Mr. Premo?

14         MR. PREMO:  I think -- this is Steven Premo, your

15   Honor.

16         I think two experts at most.

17         THE COURT:  Okay.  So what I would think would make

18   sense here is to kind of shorten a little bit the proposal that

19   you had for the time for experts.  I think that the proposal

20   was 60 days after the close of discovery for any expert on

21   which the party has the burden of proof.  I think that what

22   would make sense here is to shorten that a little bit.  I don't

23   see why that can't be done in 30 days.  So I would say May 14.

24         And in order to facilitate the responding reports,

25   May 15 -- May 14, I should say, is for the Rule 26(a)(2)

1    reports.  What I will require is that by April 27 anybody who's

2    going to serve a report on May 14 disclose the identity of the

3    expert or experts and at least the subjects of the reports.  So

4    that to the extent somebody didn't have in mind having an

5    expert on that subject and they decide they wanted to, they

6    would be able at least to make that judgment before getting the

7    report.  Because what I am going to do is hold to the 30 days

8    for any rebuttal or responsive reports.  So those will be due

9    June 13.

10          And then the depositions of any experts are to be

11   completed by July 13.  Given the number of experts, I think 30

12   days is plenty of time to do it.

13          With respect to deadlines to amend pleadings, I think

14   that the proposal was 60 days before the close of discovery, is

15   that right?

16          MS. McGINNIS:  Forty-five days --

17          THE COURT:  Forty-five.

18          MS. McGINNIS:  -- close of fact discovery.

19          THE COURT:  That's fine.  So let's make it February

20   28.  I'm going to short you by two days.  Okay?

21          I am not going to set any dispositive motion

22   deadlines.  We're so far away from that, and it may be that

23   those aren't something that are appropriate once everybody has

24   seen all the discovery.  But if there are dispositive

25   deadlines, I think that that's something for Judge Shah to set.

1    I'm not going to presume to set the schedule to bind him on --

2    on that issue.

3          I think the only other matters raised, one of them was

4    with respect to the motion for protective order that I have

5    already ruled on.  Another was the location of depositions of

6    certain MiMedx people.  And I guess at this point I don't view

7    that issue as ripe.

8          All right.  Is there anything else with respect to the

9    report or scheduling that you think we need to discuss this

10   morning?  Discovery schedule.

11         MR. GRIESMEYER:  As far as scheduling goes -- I'm

12   sorry.  Chris Griesmeyer on behalf of Mr. Fox.

13         As far as scheduling, scheduling on the motion to

14   quash.

15         THE COURT:  Right.  That I was going to turn to in a

16   moment.  How does the plaintiff want to handle this?  Do you

17   want to brief it?  You want to argue it?

18         MS. McGINNIS:  The motion to quash, your Honor?

19         THE COURT:  Yes.

20         MS. McGINNIS:  I'm sorry.  We can just argue it, your

21   Honor.

22         THE COURT:  Okay.  We're not going to do that today.

23   So --

24         MS. McGINNIS:  Your Honor, if we're not going to do

25   that today, we -- we will take an opportunity to do a written

 1    response.  Yeah, it won't be long.

 2              THE COURT:  Okay.  That's fine.

 3              Jenny, what's my schedule look like next Wednesday?

 4              THE CLERK:  You have status hearings at 9:00 o'clock,

 5    and the status and ruling at 10:00 o'clock.

 6              THE COURT:  Which case is that in?

 7              THE CLERK:  That one is on Jain versus Butler.

 8              THE COURT:  Okay.

 9              THE CLERK:  Then a settlement conference at 1:30.

10              THE COURT:  11:00 a.m. on the 27th.  Can you do your

11    response -- how long do you want to do response?

12              MS. McGINNIS:  Today is what, Wednesday?

13              THE CLERK:  Today is Wednesday.

14              MS. McGINNIS:  Don't know what day it is.

15              I definitely get it to you by Monday.  We may be able

16    to get it to you by Friday, your Honor.

17              THE COURT:  Okay.

18              MS. McGINNIS:  I like to have until Monday, if

19    that's --

20              THE COURT:  Monday, Monday noon?

21              MS. McGINNIS:  Yes, sir.

22              MR. MAXWELL:  Your Honor, I apologize.  You said the

23    27th?  I have a dental appointment that morning.  I hope it's

24    uneventful, but I do have the appointment.

25              THE COURT:  What time?

1      MR. MAXWELL:  It's at 8:00 a.m.

2      THE COURT:  Is it downtown?

3      MR. MAXWELL:  No, your Honor.  It's over in Irving

4  Park, Edgewater area.

5      THE COURT:  Okay.  So you don't think you can be here

6  by 11:00?

7      MR. MAXWELL:  Oh, I'm sorry.  I thought you said 9:00

8  a.m.

9      THE COURT:  No, 11:00.

10      MR. MAXWELL:  11:00 a.m. is fine, your Honor.

11      THE COURT:  Is that okay?  Are you sure?

12      MR. MAXWELL:  Yes.

13      THE COURT:  You're not going to be numbed up so you

14  won't be able to articulate?

15      MR. MAXWELL:  I hope not.

16      THE COURT:  Okay.  All right.  And why don't we say

17  you can give me any response in writing by noon on the 25th.

18  Okay?

19      MS. McGINNIS:  Thank you, your Honor.

20      THE COURT:  One thing that would be useful to address

21  in the response, because I will ask you about it, and that is

22  in terms of Exhibit D, which reflected certain competing

23  compromise proposals, what each of you perceive as the

24  difference in the competing proposals that leads you not to

25  agree on one of them.  Okay?

1    MS. McGINNIS:  Thank you, your Honor.

2    MR. PREMO:  Yes, your Honor.

3    THE COURT:  All right.  Then I will see you next on

4  the 27th.  Thank you.

5    MR. MAXWELL:  Thank you, your Honor.

6    MS. McGINNIS:  Thank you.

7    THE CLERK:  Court stands in recess.

8    (Which were all the proceedings heard in this case.)

9                          CERTIFICATE

10    I HEREBY CERTIFY that the foregoing is a correct

11  transcript from the digital recording of proceedings had at the

12  hearing of the aforementioned cause on the day and date hereof,

13  to the best of my ability given the limitations of using a

14  digital recording system.

15

16   /s/Alexandra Roth                          10/23/2017

   _____    _____
17   Official Court Reporter                      Date
   U.S. District Court
18   Northern District of Illinois
   Eastern Division
19

20

21

22

23

24

25