IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:16-cv-11715-MSS-SIS |
| -vs- | ) | |
| | ) | |
| MICHAEL FOX, | ) | Judge Manish S. Shah |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| MICHAEL FOX, | ) | |
| | ) | |
| Counter-Plaintiff | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Counter-Defendant, | ) | |
| | ) | |
| _____ | ) | |

## JOINT ESI REPORT AND MOTION

Plaintiff/Counter-Defendant MiMedx Group, Inc. ("MiMedx") and Defendant/Counter-Plaintiff Michael Fox ("Fox" or "Mr. Fox") hereby jointly present a report to the Court on the status of the parties' ESI discussions, pursuant to ECF No. 107, as follows:

### I.    Summary of Status:

The parties made significant progress on ESI discovery. The parties have largely agreed on the custodians to be searched, the temporal period for the data to be searched, and the search terms to be run. MiMedx is agreeing collect documents from 24 total custodians, including 5 senior executives, and to review approximately 180,000 documents for potential production. MiMedx initially proposed searching 19 e-mail custodians, which Fox did not oppose. Fox then

requested that MiMedx search 18 additional custodians. On the November 6, 2017 meet and confer call, Fox indicated that he was reducing the number of his proposed e-mail custodians from 18 to six, and MiMedx has agreed to five of those six custodians (*see* Ex. D at 8:4-10)). In addition, Mr. Fox has agreed to collect documents from his personal devices and review approximately 64,000 documents.

*High Hits:* Several of the search terms on both sides have yielded results that are unreasonably high. Accordingly, each side is considering whether and how to potentially narrow those requests. (Ex. G at 25:2-16.) For example, several terms proposed by Mr. Fox resulted in more than 10,000 hits. (*See* Ex. F.) Fox has not yet proposed any modifications of those terms. Rather, Fox has asked that MiMedx's ESI vendor itemize the number of search term hits per custodian to determine whether a particular custodian's data is resulting in a high volume of hits for a given search term. MiMedx is checking with its vendor to determine the feasibility of this request. Fox has also suggested that MiMedx's counsel review and produce a small sample of documents "hit" by the search terms. This might allow Fox to exclude irrelevant subject matter using a NOT modifier. Again, MiMedx is checking with its vendor to determine the feasibility of this request. Similarly, a handful of terms proposed by MiMedx resulted in approximately 4,000-9,000 hits each. (*See* Ex. E.) MiMedx provided proposed edits to those search terms on November 10, 2017 via email, and is awaiting information from Mr. Fox about whether the proposed modifications resulted in fewer hits. Fox has submitted MiMedx's edits to its ESI vendor and is awaiting results. The parties will continue to meet and confer on these terms, and will seek the Court's further guidance if the parties reach an impasse on them.

*Areas of Disagreement:* The parties have reached an impasse on five issues related to appropriate custodians and/or search terms. The parties' remaining disputes are as follows:

2

- Whether MiMedx must also collect and search Debbie Dean's emails, in addition to the other custodians already being collected.

- Whether certain MiMedx employees' company-owned phones should be searched.

- Whether certain search terms in Mr. Fox's proposed "Set 2" and "Set 3" should be run across MiMedx-collected data.

- Whether MiMedx executives' text messages, if produced, can be produced "attorneys'-eyes only" under the protective order in place in this action.

- Whether the parties will identify (1) the make, model, serial number, and phone number of custodians' phones searched; (2) the make, model, serial number, and phone number of any custodians' phones a party has chosen *not to search* along with the reasons why.

For the Court's review, the parties have attached as exhibits relevant portions of the following documents[1]:

- Exhibit A:  Mr. Fox's October 31, 2017 ESI Proposal.

- Exhibit B:  Mr. Fox's November 1, 2017 Email Regarding Search Terms.

- Exhibit C:  MiMedx's November 2, 2017 Letter in Response to Mr. Fox's Proposals.

- Exhibit D:  Transcript of the Parties' November 6, 2017 Meet and Confer.

- Exhibit E:  Mr. Fox's November 8, 2017 Report of Search Term "Hits"

- Exhibit F:  MiMedx's November 8, 2017 Report of Search Term "Hits"

- Exhibit G:  Transcript of the Parties' November 8, 2017 Meet and Confer.

- Exhibit H:  November 6, 2017 Letter from Shanon McGinnis to Mack Reed regarding settlement communication from different action

- Exhibit I:  Letter from Mack Reed to Shanon McGinnis Regarding the Wargo Communication (November 7, 2017).

The parties' respective positions on these issues are set out below.

## I.      Issue 1: Whether MiMedx must also collect and search Debbie Dean's emails, in

---

[1] For the Court's convenience, the parties have redacted all information that is not currently at issue before the Court in this Motion.

**addition to the other custodians already being collected.**

*MiMedx's Position:* Mr. Fox's inclusion of Ms. Dean as a custodian is not proportional to the needs of the case given the amount of data already being collected and Fox's limited reason provided for her inclusion. Fed. R. Civ. P. 26(b)(1); *see also PolyOne Corp. v. Lu*, No. 1:14-CV-10369, 2017 WL 2653130, at *1 (N.D. Ill. June 20, 2017)(denying motion to compel collection of additional custodians and search terms where, inter alia, the additional value of the custodians and search terms was low in comparison to the material already collected). MiMedx has already agreed to collect and produce documents from **24 custodians**, including the highest-ranking officers at the company, which is millions of pages of data collected. (*See, e.g.*, Ex. C at 4, 8; Ex. D at 10:4-16; Ex. F) Moreover, Mr. Fox only claims that Ms. Dean is relevant because: (1) Ms. Dean was present at one particular meeting that was also attended by several other individuals, and (2) Ms. Dean is a "highly placed" executive that Mr. Fox "anticipate[s]" will have relevant information. (Ex. A at 10; Ex. D at 25:17-20.) MiMedx, however, is producing the data of several of the other attendees at this particular meeting and highly placed executives, including MiMedx's CEO and MiMedx's President. Additionally, Mr. Fox claims the tortious interference occurred *after* the meeting attended by all these executives and does not allege, even on information and belief, that Ms. Dean was involved in any purported tortious interference. Accordingly, the additional collection of Ms. Dean's emails is not necessary or proportional. (Ex. C at 4, 8; Ex. D at 26:5-27:18; Ex. G at 24:12-18.)

Additionally, in response to the arguments raised below by Mr. Fox, MiMedx states:

First, Mr. Fox argues that he is "only" asking for searches of 5 custodians, but this is not true. Mr. Fox is asking for searches of **25 total custodians**. He agreed to the 19 offered by MiMedx and then asked for 6 more on top of that. MiMedx agreed to 24 of the 25 total custodians, and objects to Ms. Dean as out of all proportion of the needs of the case given what

MiMedx has already agreed to produce and Mr. Fox's limited argument regarding her relevance.

Further, contrary to Mr. Fox's arguments, MiMedx *has* offered evidence of burden. MiMedx has presented the number of documents that are *already at issue* for review and potential production—approximately 180,000. Assuming an attorney can review documents at 50 documents an hour (a high rate), that is *3,600 attorney hours* for first level review alone. Simply multiply the attorney's rate by that number of hours, and you have costs in the hundreds of thousands of dollars. Moreover, this review cost does not even include: (1) all of the loading, storage, and production costs associated with that review; (2) second level review; or (3) privilege review and logging. To the extent that Fox now argues he "took great pains" to reduce custodians, this is only the case because he originally requested 38 additional custodians and 41 additional search terms, resulting in hundreds of thousands of additional documents. Indeed, those additional custodians Mr. Fox is no longer pursuing were irrelevant to the claims and defenses in this case. Mr. Fox cannot demonstrate his reasonableness by relying on the overbreadth his original requests.

Finally, Mr. Fox's only reason for seeking Ms. Dean's emails is his speculation that Ms. Dean "could" have created documents regarding the relevant meeting that were only sent to her. Initially, this is not an argument that Mr. Fox raised during the meet and confer process. But even Mr. Fox's own allegations are that MiMedx's CEO communicated that MiMedx would follow-up with CPN (ECF No. 67 ¶ 46), and MiMedx has already agreed to collect and review its CEO's emails.[2] At this stage of the litigation, considering the significant amount of data MiMedx has already agreed to search, the addition of Ms. Dean as a custodian is simply not

---

[2] From Mr. Fox's own allegations, it is clear he had discussions directly with CPN during the relevant time period. If CPN had mentioned any communications solely with Ms. Dean, Mr. Fox surely would have pointed this out at least during the meet and confer process.

warranted.

**Fox's Position:** Fox took great pains to strike 18 of his proposed additional e-mail custodians, focusing only on six custodians specifically named in his Counterclaim. Executive Vice President and Chief Compliance Officer Deborah Dean is one of those custodians. Ms. Dean has been involved in the events surrounding Fox's separation as well as events surrounding MiMedx's tortious interference with Fox's subsequent employment. She was just one of five MiMedx representatives present for a critical meeting that led to Fox losing his job at his subsequent employer. (*See* Fox Am. Counterclaim ¶ 47; Ex. D 26:19 – 25; 27:1–15). Ms. Dean is hence a "key player" whose text message communications may contain critical information about MiMedx's decision-making with respect to Fox. *See* 18 Sedona Conf. J. 145, 164 (2017) ("[E]xtrinsic evidence may be required to demonstrate the importance of the information sought or the effort required in order to produce it. Extrinsic evidence may include . . . . *whether the requested information was created by "key players,"* *whether the creation of the information requested was contemporaneous with key facts of the case*, *or whether the information is unique*."). Although MiMedx asserts before inspection that ESI located on Ms. Dean's e-mail would be cumulative and duplicative of other custodians' ESI, the ESI located on Ms. Dean's e-mail may be unique. It could be that Dean was the only listed custodian who created or maintained e-mails on the critical events giving rise to Fox's claims, whereas others were careful not to put anything in writing. It could be that Dean drafted an e-mail containing meeting minutes or privately reflected on her or others' conduct that she sent only to herself. In sum, Ms. Dean's status as a highly placed executive who is among the small cadre of key players in the events giving rise to Fox's claims warrants her inclusion among the custodians. (Ex. A at 10–12).

In refusing to search Ms. Dean's e-mails, MiMedx has failed to enter any evidence that

6

adding Ms. Dean's e-mails would violate the rule of proportionality. (*See* Ex. D 11:12–22; 29:23- 25; 30: 1–6 (explaining that Fox is unwilling to make additional concessions absent any statement of work, invoice, or statement of MiMedx's financial condition showing that the burden of his requests is undue)). Absent from its objection is any discussion of its financial condition, a statement or work or invoice, or its calculation of the amount in controversy, which is necessary to establish whether a given discovery production is disproportional given the needs of the case. Fed. R. Civ. P. 26(b)(1) (stating that any proportionality determination requires an examination into the "amount in controversy . . . [and] the parties' resources"); 18 Sedona Conf. J. 145, 164 * n.36 (2017); *Ashmore v. Allied Energy*, No. 8:14-cv-00227-JMC, 2016 WL 301169, at *3 (D.S.C. Jan. 25, 2016) ("Defendant did not submit any documentation (i.e., statement of work or invoice) that either establishes the proposed cost of production or a cost estimate for an alternative form of production (such as by disc or hard drive). Moreover, there is no information before the court regarding Defendant's resources or financial condition to assess its ability to fund the cost of the document production. . . . *Without the aforementioned cost/financial information, the court concludes that Defendant cannot demonstrate that the document production to Plaintiff is unduly burdensome, unreasonable, or oppressive*." (citations omitted) (emphasis added)). Instead MiMedx has made only general assertions and vague estimates. *See, e.g.*, Ex. D 27:13–15 ("So Miss Dean seems to be just purely duplicative and nothing more than just an extra burden to add on top of this.") The burden is on MiMedx, not Fox, to show that Fox's request for one additional custodian is unreasonable. MiMedx has utterly failed to meet its burden. It is little wonder why MiMedx has failed to present evidence of its financial condition while it complains about ESI: the Company is reporting record revenues

quarter after quarter and boasts $36.5 million cash on hand.[3]

MiMedx's reliance on *Polyone Corp.* is misplaced. In *Polyone Corp.*, the defendants sought to compel additional search terms across **nearly 40 custodians** based on a single LinkedIn message. *See Polyone Corp.*, 2017 WL 2653130 at *3; *Polyone Corp.*, Defs.' Memo., ECF No. 260, Ex. L. The Court denied the request because (1) the defendants brought their motion after the close of discovery and after extensive discovery had already been completed; and (2) the factual basis for the motion had only an attenuated connection to the defendants' claims. *See Polyone Corp.*, 2017 WL 2653130, at *3. Here, Fox is requesting a search of only five additional custodians' text messages well before the close of discovery. Furthermore, the custodians are key players in the events giving rise to Fox's counterclaims.

## II.    Issue 2: Whether certain MiMedx employees' company-owned phones should be searched.

*MiMedx's Position:* The parties have narrowed Mr. Fox's initial request for MiMedx to collect all personal and company-owned devices of 7 custodians (including laptops, phones, and desktops) down to collection of text messages from those 7 custodians' company-owned cell phones. (Ex. C at 10; Ex. D at 28:6-17). MiMedx offered to produce responsive text messages for 2 of the custodians, the CEO and President, provided that the parties maintain the text messages as attorneys-eyes only. (Ex. G at 16:3-17:25.) Given the volume of information that is already being provided to Mr. Fox (emails from 24 custodians) and the seniority of the individuals for whom MiMedx has offered to collect text messages, collection and review of additional text messages is not only duplicative, but is not proportional to the needs of the case. (*Id.*) Notably, Mr. Fox is collecting text messages for one individual, and MiMedx has offered to collect text messages for two individuals—indeed, the two most senior executives at MiMedx.

---

[3] Press Release, MiMedx Announces Record Results For Third Quarter Of 2017 And Raises Full Year Revenue Guidance (Oct. 26, 2017), available at https://tinyurl.com/ybm2yzfa.

Accordingly, additional text message collection should be denied. *See, e.g.*, *Kellgren v. Petco Animal Supplies, Inc.*, No. 3:13CV644L(KSC), 2017 WL 979045, at *11 (S.D. Cal. Mar. 13, 2017) (collection of personal text messages in addition to significant company email collection was not proportional to the needs of the case).

Additionally, in response to the arguments raised below by Mr. Fox, MiMedx states:

Mr. Fox attempts to frame this issue as if he "only" asking for data from 7 custodians. But Mr. Fox's requests for text messages cannot be viewed in isolation. In fact, Mr. Fox is asking for the emails of 24 custodians (which includes approximately 180,000 documents for review), plus the emails of another custodian (Ms. Dean), plus the text messages on company-owned phones of 2 custodians that MiMedx agreed to provide, plus the text messages on company-owned phones of an additional 5 custodians. Indeed, Mr. Fox's statements regarding Issue 5 appear to imply that it intends to seek more than just the text messages on company-owned devices—adding potential additional burdens here.

Moreover, Mr. Fox is wrong to state that MiMedx has produced no evidence of burden. As discussed above, first level review of emails alone will run in the hundreds of thousands of dollars. Moreover, MiMedx explained that collection and review of text messages is always more burdensome. (Ex. C at 10.) Indeed, Mr. Fox's own vendor seems to have had some difficulty processing the text messages in order to enable searches of that data. (Ex. G at 9:13-10:19.)

*Fox's Position:* MiMedx has failed to enter any evidence that searching the text message communications of Kuntz, Carlton, Cashman, Lilly, and Dean would cause the Company an undue burden and violate the rule of proportionality. (*See* Ex. D 11:12–22; 29:23- 25; 30: 1–6). Absent from its objection is any discussion of its financial condition, a statement or work or

9

invoice, or its calculation of the amount in controversy, which is necessary to establish whether a given discovery production is disproportional given the needs of the case. Fed. R. Civ. P. 26(b)(1) (stating that any proportionality determination requires an examination into the "amount in controversy . . . [and] the parties' resources"); 18 Sedona Conf. J. 145, 164 * n.36 (2017); *Ashmore*, 2016 WL 301169, at *3. Indeed, after Fox raised the absence of such evidence on the Parties' November 6, 2017 meet-and-confer, MiMedx's counsel suggested that they would collect this information for the parties' November 8, 2017 meet-and-confer. (Ex. D 13:6–23). However, to date, MiMedx still has not provided a statement of work, invoice, or statement of the Company's financial condition that would allow Fox and this Court to assess MiMedx's claim of undue burden. Instead MiMedx has made only general assertions and vague estimates. Ex. B ("Additionally, the collection, production, and review of text messages is more expensive and more difficult than email.") Furthermore, the amount in controversy for Mr. Fox's claims are substantial. (Ex. D. 30:7–22 (estimating Fox's damages will exceed $900,000 annually and will run into the seven, possibly eight, figures).

    *Kellgren*, relied upon by MiMedx, does not help the Company's case. To the contrary, *Kellgren* is a perfect foil to the present dispute, demonstrating the reasonableness of Fox's proposed text message custodian and search term list. The plaintiffs in *Kellgren* sought the text message communications of **240** defendant District Managers and General Managers. *Kellgren*, 2017 WL 979045 at *17. The plaintiffs alleged, *but failed to establish*, that District Managers had company-issued cellular phones. *Id*. at *36. The defendant argued that their managers' cellular phones were outside the company's possession, custody, or control. By contrast, here Fox seeks the text message communications of just **7** MiMedx representatives who are identified in Fox's Counterclaim and who are key players in the events giving rise to Fox's claims.

Moreover, MiMedx admits that all of the proposed custodians have Company-issued cellular phones. (Ex. E 16:10–23;) MiMedx has not asserted, and cannot assert, that it lacks sufficient control over the custodians' cellular phones.

### III.    Issue 3:  Whether certain search terms in Mr. Fox's proposed "Set 2" and "Set 3" should be run across MiMedx-collected data.

*MiMedx's Position:*  MiMedx has objected to the overall burden of searching the "Set 2" terms, because those result in 113,201 additional, de-duped documents for review, on top of the hundreds of thousands of documents MiMedx has already agreed to review for production. (*See* Ex. F.) And MiMedx has objected to producing for any term with hits over 10,000; Mr. Fox is considering ways to modify those terms to reduce the burden, but has not yet provided any concessions on those terms. Indeed, Mr. Fox has insisted on further information from MiMedx before even considering any modifications to any of the high-hit terms.

However, MiMedx has also objected to some of the additional search terms requested by Mr. Fox in connection with his "Set 2" (certain senior custodians' emails from November 30, 2016 to present) and "Set 3" (certain senior custodians' text messages from company-owned phones) on relevance grounds, because they seek information not pertinent to any of the claims and defenses.[4] (Ex. C at 8, 12; Ex. D at 20:2-24:2.)  Mr. Fox, for example, is requesting MiMedx provide all information regarding a third-party's unemployment hearing, which is irrelevant to his claims. (Ex. A at 12; Ex. B; Ex. C at 8, 12; Ex. D at 20:2-24:2.)  Similarly, Mr. Fox is requesting certain terms that are inflammatory (like "ruin" and "bankrupt*") and unrelated to his claims, which involve only claims about statements allegedly made about Mr. Fox's

---

[4] MiMedx objected to some of Mr. Fox's additional proposed terms in Set 2 and Set 3, and Mr. Fox withdrew some of these objectionable terms. Accordingly, MiMedx did not run any of the withdrawn Set 2 terms over the appropriate custodians' emails and the withdrawn terms are not the subject of this Motion. Moreover, MiMedx will not be in a position to run the non-objectionable Set 3 terms until the parties resolve the issue of personal devices noted above.

truthfulness and about certain actions related to Mr. Fox's wages and stock upon his termination. (Ex. C at 8, 12; Ex. D at 20:2-24:2.) Accordingly, these additional search terms are not relevant. Fed. R. Civ. P. 26(b)(1). Given the lack of relevance and the volume of data MiMedx is already gathering and reviewing, MiMedx should not be required to review documents with no relevance or at best minimal relevance to this dispute.

*Fox's Position:* First, MiMedx misleads and overstates its burden by claiming Fox's proposal results in "113,201 additional, de-duped documents *for review*," as it is unanimously agreed that Fox will work with MiMedx to modify search terms to reduce the number of documents MiMedx *will in fact need to review*.

Fox stands accused of permitting and failing to report the sale of Halo products by MiMedx employee Jason Mahnke. MiMedx claims Fox's conduct constitutes a breach of his obligations to MiMedx and that the Company has suffered damages of an undisclosed amount. Fox seeks Documents and Communications regarding Mr. Tornquist's unemployment hearing, because Mr. Kuntz specifically discussed MiMedx's Complaint against Fox and the allegations against him, as well as the non-competitiveness of Halo Medical products. Kuntz stated: "There were employees that were selling products through a company called Halo Medical. These were ancillary non-competitive products." This is consistent with other admissions by MiMedx that the Company considers Halo and CPN Biosciences products to be ancillary to and non-competitive with MiMedx products. Search terms targeted toward discussions about Luke Tornquist's unemployment hearing thus seek information about the claims and defenses in this case, including Fox's purported breaches as well as MiMedx's alleged but undisclosed damages.

MiMedx claims that Fox's request for terms such as "ruin*", "bankrupt*", "destr*", "punish*" are unrelated to his claims. But Fox has alleged that MiMedx has taken adverse

actions against him out of malice. Fox Am. Counterclaim ¶ 76, 88. Thus, evidence of malice, ill-will, and personal hostility toward Fox is critical to his tortious interference claim and will be relevant to any punitive damages analysis for his common law claims. MiMedx's pearl-clutching complaint that Fox's proposed search terms are inflammatory is not a legitimate discovery objection. Were it otherwise, a defendant could evade running search terms including racial epithets in a race discrimination case, simply because the defendant found the searches inflammatory.

IV.     **Issue 4:  Whether MiMedx executives' text messages, if produced, can be produced attorneys-eyes only.**

*MiMedx's Position:*   As noted above, MiMedx offered to produce 2 of its executives' text messages as a compromise to Mr. Fox's request for 7 of its executives' text messages. (Ex. G at 16:3-18.)  However, as MiMedx noted on the meet and confer call, MiMedx information has continued to end up in the press and information unrelated to this litigation is being brought into this case unnecessarily and used publicly.   Indeed, Mr. Fox's proposed amended counterclaims contain extraneous information about other individuals that is not relevant even to any of Mr. Fox's claims.  Additionally, as noted in a hearing before Judge Shah, a confidential settlement offer was used improperly in a public filing in this Action. (ECF No. 119 at 5:18-8:23.)  Accordingly, MiMedx requested that these, more personal documents be treated as Attorneys' Eyes Only at this stage of the litigation.   (Ex. G at 16:3-18.)  Just like with Mr. Fox's phone logs, if there are certain texts Mr. Fox's counsel thinks it needs to show and discuss with Mr. Fox, MiMedx is willing to meet and confer on the specific texts after production. Accordingly, MiMedx should be permitted to designate these text messages as Attorneys Eyes Only at this stage of the litigation.  Fed. R. Civ. P. 26(c) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression" in discovery.)

13

Additionally, in response to Mr. Fox's arguments below, MiMedx states:

Mr. Fox's arguments prove MiMedx's concerns. Mr. Fox admits that his statements in his latest pleadings "received some attention" from the media. He then specifically argues that discovery in this litigation should be used as a vehicle—not to get to the truth of the claims in this case—but to put as much pretrial discovery in the public eye as soon as possible to harm MiMedx in the press.

Indeed, the example of the allegations Mr. Fox provides confirms the need for confidential treatment of discovery materials. What Mr. Fox fails to inform the Court is that the is that the settlement communication he included in his revised pleading in this case was not made to Mr. Fox, but *to different individuals in different lawsuits altogether*. The only reason Mr. Fox even has access to this document is because his Counsel used to represent those individuals, though Counsel has refused to confirm whether those individuals authorized this disclosure. Instead, Mr. Fox took this communication from his counsel, and filed it in a public forum so it could be picked up by the media. Moreover, MiMedx's counsel certainly did not authorize this use, when this settlement communication was made under circumstances where counsel believed the confidentiality would be maintained. Indeed, Mr. Fox's one-sided disclosure of only *part* of a bi-lateral settlement communication that was solicited by the defendants in that other action—conveniently leaving out his counsel's communication on the topic—indicates exactly how Mr. Fox will attempt to misuse discovery in this matter. That is, to selectively disclose material seeking only publicity for those statements, instead of gathering facts for *this case*. It is for this reason that MiMedx has requested some minimal protections to make sure that the documents it provides in discovery do not go immediately to the media.

***Fox's Position:*** This Court should deny MiMedx's request that text message

communications by its executives over Company-issued phones containing highly specific search terms be designated Attorneys' Eyes Only. "[T]he public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding." *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 944-945 (7th Cir. 1999) (internal citations omitted). "As a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings." *American Tel. & Tel. Co. v. Grady*, 594 F.2d 594, 596 (7th Cir. 1979). In deciding whether those compelling reasons exist, the district court must balance the interests involved: the harm to the party seeking the protective order and the importance of disclosure to the public. *Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997). In order to show good cause, the party must present a detailed discussion of the information sought to be protected, supported by valid reasons and legal citations. *Baxter Int'l v. Abbott Labs*, 297 F.3d 544, 548 (7th Cir. 2002). MiMedx's showing is non-existent in this regard.

MiMedx argues that text messages sent or received by its executives over Company-issued phones and containing highly specific key words should be subject to an Attorneys' Eyes Only designation, just like Fox's entire phone and text logs over a period of two period. However, this Court granted an Attorneys' Eyes Only designation for Fox's phone and text logs for compelling reasons: the dragnet on Fox's phone records would undoubtedly collect vast swaths of irrelevant communications that would also be sensitive and personal.[5] The same does not hold true for certain text message communications containing specific key words. Rather, the presumption should be that such communications will not be subject to any confidentiality

---

[5] Had MiMedx only sought phone and text logs between Fox and a specific set of individuals, for instance, an Attorneys' Eyes Only designation may have been unnecessary.

designation, much less Attorneys' Eyes Only.

The language in the parties' agreed-upon protective order does not support MiMedx's position, as text messages are not a category of documents subject to Attorneys' Eyes Only designations. MiMedx is attempting to abuse confidentiality designations in an improper attempt to shield these proceedings from the public, as MiMedx has already done throughout this case.[6]

It is worth recalling that MiMedx is a publicly traded company with an investing public interested in the goings on of its litigation. MiMedx filed a public lawsuit against Fox. Then, clearly intending to harm Fox's reputation, MiMedx disseminated this fact across the business wires in a defamatory press release accusing Fox of misconduct. MiMedx later accused Fox of lacking integrity in a conference call with investors. Since then, MiMedx has commented on its lawsuit against Fox in yet another nationally disseminated press release and added commentary on its website suggesting Fox lacks credibility.

On November 3, 2017, Fox moved to amend his First Amended Counterclaim to bring claims of whistleblower retaliation. Fox added factual details that relate to MiMedx's retaliatory motive and intent, including an independently tortious, retaliatory, non-privileged, and non-confidential communication by MiMedx's counsel. In that communication, made while the Company was under an SEC subpoena, MiMedx's counsel conditioned the release of civil claims against SEC whistleblowers on those whistleblowers recanting their sworn statements to federal authorities—in plain violation of federal regulations. Fox's counsel has already painstakingly explained to MiMedx that the Wargo e-mail is non-privileged, non-confidential, and admissible in these proceedings. Ex. I. Rather than respond to Fox's letter and authority, MiMedx plows on and continues to make a frivolous argument that its tortious communications are confidential.

---

[6] For example, MiMedx improperly claimed all of its Responses to Requests for Admissions are subject to the Court's Protective Order.

MiMedx hence chose an odd document to justify greater confidentiality in these proceedings; if anything, the document reveals that MiMedx's misconduct warrants greater public scrutiny.

Fox's proposed Second Amended Counterclaim has received some attention from the investing public. With the shoe now on the other foot, MiMedx is facing public scrutiny for *its misconduct* and suddenly dislikes the attention this lawsuit is receiving. This is not a sufficient basis to shroud pretrial discovery in confidentiality.

## V. Issue 5: Whether the parties will identify (1) the make, model, and serial number of custodians' cellular phones searched; (2) the make, model, and serial number of any custodians' cellular phones a party has chosen *not to search* along with the reasons why.

*Fox's position:* On October 31, 2017, Fox proposed that, for each text message custodian, the parties identify the make, model, serial number of all personal devices searched. Ex. A at 11. Fox had also proposed that the parties specifically identify any personal devices that either party has chosen *not to search* along with the reasons why.[7] *Id.* Fox made this proposal after a photograph surfaced online on October 30, 2017 suggesting that MiMedx CEO and Board Chairman Parker H. "Pete" Petit always carries two cellular phones with him. Fox similarly used two phones over the applicable time period, requiring the imaging of two devices – which Fox disclosed to MiMedx. In its November 2, 2017 correspondence, MiMedx refused to respond to these proposed instructions. *See* Ex. B at 1 n.1. During the parties' November 8, 2017 meet and confer, Fox brought the matter up a second time. Fox's proposal is intended to create transparency around the parties' ESI search and ensure that the parties are not withholding information or documents that would frustrate the discovery process. If MiMedx is only searching one phone for a particular custodian who has two (or more) phones, MiMedx's ESI

---

[7] Although on November 8 Fox's counsel suggested MiMedx *at minimum* agree to identify all searched and unsearched Company-owned personal devices for the proposed custodians, MiMedx refused. Fox reiterates his proposal for the identification of all searched and unsearched cellular phones, whether Company- or personally-owned, for the reasons set forth above.

search is *de facto* incomplete. Alternatively, if one phone is personally owned and MiMedx later claims it lacks possession, custody, or control over the personal device, Fox will need to issue a third-party subpoena to capture text messages on personally-owned device. Contrary to MiMedx's argument below, Fox is not attempting to expand data sources: MiMedx claims it lacks sufficient custody or control over non-Company-issued personal devices, and hence Fox must obtain that discovery outside the parties' ESI agreements. Without full transparency regarding the universe of cellular phones searched and unsearched for the proposed custodians, it is difficult for the parties to determine whether each has met its ESI search obligations or whether third-party subpoenas will need to be issued to capture other relevant and discoverable ESI. This precise issue was discussed between the parties and with the Court at the September 20, 2017, hearing. When the parties could not agree to an ESI order and Fox had proposed identification of custodians and data repositories in a list to be included in the ESI order, the Court aptly suggested that the parties discuss what databases are likely to have relevant information. (See 9/20/17 Hr'g Tr. at 37:1-9; see also *id*. at p. 39: 20-25.) Counsel for MiMedx agreed (at the time), but has since departed from that sentiment. (*Id*. at 37: 14.) Mr. Fox and his counsel did not contemplate at the time of the September 20, 2017, hearing that MiMedx would refuse to run search terms over devices that have potentially responsive information or that MiMedx would claim that such devices were not in its possession or under its control. In discussing these issues during conferences over the past several weeks, Mr. Fox has made some concessions in an attempt to reach an agreement, but where there are concessions Mr. Fox will need other basic assurances, such as specific identifying information for devices that will not be voluntarily subject to a search by MiMedx. Obviously, the need for a higher level of specific identifying information for any such devices that exist and are not being searched is greater so

18

that these devices can be accurately identified and possibly imaged, if necessary, in the future.

Fox asks that the Court require these mutual disclosures to streamline discovery and deter ball-hiding. Otherwise the parties will waste substantial time and expense serving and responding to additional discovery, writing and responding to deficiency letters, and moving to compel the disclosure of this basic information.

*MiMedx's position:* Mr. Fox raised this issue for the first time at the end of the parties' November 8, 2016 meet and confer. Preliminarily, to the extent Mr. Fox is seeking information about devices that are not company-owned, this request for any information related to personal devices in connection with ESI discussions between the parties is improper – that information is not within MiMedx's possession, custody or control. Moreover, MiMedx agreed in subsequent email correspondence to provide the make and model for any MiMedx-owned cell phones that it collected (though it views this as unnecessary). However, MiMedx does not need to provide the serial number for the collected devices, and Fox indicated no actual need for or relevance of such information. Indeed, Mr. Fox previously represented to this Court that he *did not need any of this information*:

> MR. MAXWELL: That's fine, Your Honor. We can agree to custodians and sources
>
> without the make, model, serial number, things like that that wasn't broached previously.

(See 9/20/17 Hr'g Tr. at 40:3-5.)

Moreover, if the "make, model, serial number" from which MiMedx is collecting is not necessary, that information for the devices from which it is *not collecting* is even less relevant. It simply adds an unnecessary step when the parties have already narrowed the proposed sources of documents through the meet and confer process. Specifically, over the course of the weeks where the parties have negotiated ESI, Mr. Fox has narrowed his initially overbroad efforts from

every data source of numerous custodians to: (1) MiMedx email for 25 custodians (24 of which MiMedx has agreed to provide) and (2) text messages from company-owned phones of 7 custodians (2 of which MiMedx has agreed to provide). Mr. Fox does not need MiMedx to collect the very "make, model, serial number" information he previously agreed he did not need about data sources that he is no longer seeking. And if Mr. Fox is actually using this request to *expand* the data sources that the parties have spent weeks narrowing down, then he has not engaged in a good faith meet and confer on ESI.

Dated: November 9, 2017.

Respectfully submitted,

**PLAINTIFF MIMEDX GROUP, INC.**

/s/ *Shanon J. McGinnis*
One of Its Attorneys

Joseph D. Wargo, *pro hac vice*, Georgia Bar
   No. 738764
Shanon J. McGinnis, *pro hac vice*, Georgia
   Bar No. 387598
David M. Pernini, *pro hac vice*, Georgia Bar
   No. 572399
WARGO & FRENCH, LLP
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1511
E-mail: jwargo@wargofrench.com
E-mail: smcginnis@wargofrench.com
E-mail: dpernini@wargofrench.com

SIDLEY AUSTIN LLP
Ami N. Wynne
Jason G. Marsico
One South Dearborn
Chicago, Illinois 60603
Phone: (312) 853-7000
Fax: (312) 835-7036
Email: awynne@sidley.com

Email: jmarsico@sidley.com

*COUNSEL FOR PLAINTIFF*
*MIMEDX GROUP, INC.*

**MICHAEL FOX**

 */s/ Adam C. Maxwell*

Christopher S. Griesmeyer (ARDC No. 6269851)
Adam C. Maxwell (ARDC No. 6306534)
Greiman, Rome & Griesmeyer, LLC
Two North LaSalle, Suite 1601
Chicago, Illinois 60602
Bus: (312) 428-2750
Fax: (312) 332-2781
cgriesmeyer@grglegal.com
amaxwell@grglegal.com

 */s/ Stephen M. Premo*

Clayton D. Halunen (N.D. Ill. Bar No. 219721)
Mack H. Reed (ARDC No. 6287171)
Stephen M. Premo, *pro hac vice,* Minnesota Bar
No.393346

Christopher Moreland, *pro hac vice*, Minnesota Bar
No. 278142
Halunen Law
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
halunen@halunenlaw.com
reed@halunenlaw.com
premo@halunenlaw.com
moreland@halunenlaw.com

*ATTORNEYS FOR DEFENDANT/COUNTER-*
*PLAINTIFF MICHAEL FOX*

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2017, the following parties received the above via ECF:

| | |
|---|---|
| Christopher S. Griesmeyer | Clayton D. Halunen |
| Adam Maxwell | Mack H. Reed |
| Greiman, Rome & Griesmeyer, LLC | Stephen M. Premo |
| Two North LaSalle, Suite 1601 | Christopher Moreland |
| Chicago, Illinois 60602 | Halunen Law |
| cgriesmeyer@grglegal.com | 1650 IDS Center |
| amaxwell@grglegal.com | 80 South Eighth Street |
| | Minneapolis, MN 55402 |
| | hulunen@halunenlaw.com |
| | reed@halunenlaw.com |
| | premo@halunenlaw.com |
| | moreland@halunenlaw.com |

_/s/ Ami N. Wynne_

Ami N. Wynne
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Phone: (312) 853-7000
awynne@sidley.com