UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MiMedx Group, Inc.,

      Plaintiff/Counter-Defendant,

    v.

Michael Fox,

      Defendant/Counter-Plaintiff.

No. 16 CV 11715

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

MiMedx filed this lawsuit against a former employee, Michael Fox. Fox responded by asserting various counterclaims against MiMedx. MiMedx now seeks to dismiss Fox's counterclaims for breach of contract, defamation, and declaratory judgment. Fox also requests leave to amend his counterclaim to add claims under the Dodd–Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h), and the Illinois Whistleblower Protection Act, 740 ILCS 174/1 *et seq*. For the reasons discussed below, both the motion to dismiss and the motion for leave to amend are granted in part, denied in part.

## I.     Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint (or here, a counterclaim) must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); *Firestone Fin. Corp. v. Meyer*, 796 F.3d 822, 826–27 (applying the Rule 12(b)(6) standard to the defendants' counterclaim). The court must construe all factual

allegations as true and draw all reasonable inferences in the plaintiff's favor, but the court need not accept legal conclusions or conclusory allegations. *Iqbal*, at 678–79. The court should grant leave to amend pleadings freely "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Leave to amend need not be granted, however, if it is clear that any amendment would be futile." *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013).

## II.  Background

Michael Fox was employed at MiMedx, first as a Regional Sales Director and later as an Area Vice President. [67] at 29, ¶ 8, 10.[1] MiMedx developed and marketed products for wound care, utilizing a particular method to manipulate placental tissue to create skin grafts for surgical applications. [112] at 8, ¶ 11. MiMedx awarded Fox stock options each quarter of his employment. [67] at 30, ¶ 12–16; *id*. at 31, ¶ 17–18; [112] at 10, ¶ 19–24; *id*. at 11, ¶ 25. The company's stock incentive plan provided that employees terminated for cause could not exercise options that had been granted to them under the plan. [67] at 37, ¶ 58. The plan defined "cause" as dishonesty, refusal or continued failure to perform duties for the company, fraudulent conduct, or any conduct that could be materially damaging to the company without reasonable good faith that such conduct was in the best interest of the company. *Id*. at 38, ¶ 59. MiMedx's board of directors determined whether an employee would be fired for cause; such determination would be final and conclusive. *Id*. at 38, ¶ 60; *id*. at 49.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

Aside from the acts alleged to be retaliatory in his proposed amended counterclaim, Fox was never disciplined or informed by anyone at MiMedx that his performance was unsatisfactory. [112] at 9, ¶ 17. And though Fox performed strongly throughout his employment—in his fourth year of employment, for example, he was a top performing sales manager—MiMedx demoted him in December 2015, for his refusal to participate in a channel-stuffing scheme in which MiMedx fraudulently recognized revenue in its certified financial statements before the revenue had been realized or realizable and earned. [112] at 7, ¶ 2; *id.* at 11, ¶ 26. To effectuate the scheme, MiMedx entered into a distribution agreement with AvKARE, Inc., which allowed MiMedx to sell directly to the U.S. Department of Veterans Affairs. *Id.* at 11, ¶ 27. MiMedx sales representatives ordered products under AvKARE's account through MiMedx's software, meaning MiMedx controlled AvKARE's demand for MiMedx products. *Id.* ¶ 28. The orders would be billed to AvKARE's account, but shipped directly to VA hospitals, and MiMedx would recognize revenue for the orders at the time of shipment. *Id.* These orders, which the VA had not requested, were often in quantities well in excess of what the VA needed. *Id.* at 12, ¶ 38. MiMedx sales representatives were then responsible for ensuring the resale of the products to end customers and did not receive commission for an AvKARE sale until the product was resold. *Id.* at 12, ¶ 29, 31; *id.* at 14, ¶ 40. MiMedx intended to slowly issue returns for these products over time, concealing its actions by balancing the returns against actual revenue in future reporting periods. *Id.* at 13, ¶ 36.

In 2014, MiMedx senior managers began directing senior sales managers, including Fox, to significantly increase the amount of inventory placed in VA hospitals through AvKARE. *Id*. at 14, ¶ 39. From then on, at the end of every quarter, senior management pressured the regional sales directors to place additional orders on behalf of AvKARE for products neither AvKARE nor the customer had ordered or needed. *Id*. ¶ 40. Fox became worried that this practice would compromise relationships with the customers, and in 2015 he began to push back against management directives. *Id*. ¶ 41. Fox refused to participate in the scheme and directed his sales force not to order AvKARE products unless they felt the products were needed. *Id*. Fox repeatedly raised objections that the company's AvKARE revenue was a "false performance number" used only to affect the stock price, and MiMedx senior management officials acknowledged that the number did not accurately reflect actual sales. *Id*. at 15, ¶ 42–43. Fox's refusal to participate caused him to miss an artificially inflated revenue quota—the first quota Fox had ever missed during his career with MiMedx. *Id*. ¶ 44.

In October 2015, after MiMedx's Chairman of the Board and CEO, Parker Petit, learned about Fox's objections to MiMedx's scheme, Petit verbally reprimanded Fox at a meeting. *Id*. ¶ 46. Two months later, Fox was demoted—resulting in a large reduction in Fox's managerial responsibilities and annual compensation. *Id*. at 16, ¶ 48–49. MiMedx could not implement its scheme without the cooperation of its area vice presidents, like Fox. *Id*. at 15–16, ¶ 47. Later in December, a MiMedx senior director spoke on the phone with a member of the sales

team saying, "I need to know not what you're putting on for yourself but what additional could you put on to help us hit the number for the quarter because we're short overall. And so do you have any additional space?" *Id*. at 16–17, ¶ 51. The following year, in March 2016, a phone call between the same salesperson and Fox's eventual replacement, Steve Blocker, took place. *Id*. at 18, ¶ 55. On that call, Blocker expressed frustration at having to meet a "false number" and concern that customers that didn't "have carte blanche at their facilities [were] starting to get, you know, questions" and that floor managers were "looking at how many grafts [were] spilling out of every cabinet available." *Id*. at 19, ¶ 55. Blocker also stated that "[t]here's just an insinuation that there will be hell to pay. And, you know, [Petit] says: Well, you don't want to be on the wrong end and not hit your number, you know." *Id*. at 20, ¶ 56.

Around the same time, Fox was on a conference call with various MiMedx executives discussing a new initiative through which MiMedx would ship shoebox-sized boxes containing small graft products to targeted VA hospitals. *Id*. at 22, ¶ 58. Fox expressed his concerns, saying everyone knew those boxes would be returned. *Id*. A MiMedx official noted that he understood Fox's concerns, but that they were going through with the project nonetheless. *Id*. In March 2016, MiMedx sent out the grafts discussed on the conference call to VA hospitals that had no use for them. *Id*. at 23, ¶ 61–62. Most of those grafts remained unused and were returned or concealed by sales representatives until MiMedx authorized their return. *Id*. ¶ 65. MiMedx failed to disclose, among other things, the contingent nature of the sales to

AvKARE, its complete control over AvKARE's subsequent sales, MiMedx's ongoing involvement in ensuring resale of the products sold to AvKARE, that AvKARE was not obligated to pay MiMedx until the product was resold, and that MiMedx maintained liability for AvKARE tissues that went missing while being stored at VA facilities. *Id.* at 28, ¶ 74; *id.* at 29, ¶ 74–76.

In November 2016, two other MiMedx employees submitted a joint report asserting their belief that the company was engaging in a fraudulent revenue recognition scheme in violation of the Sarbanes–Oxley Act.[2] *Id.* at 30, ¶ 78. A month later, Fox attended an emergency meeting with MiMedx leadership during which Petit stated that the employees who had submitted the report would be "hurt professionally and with every possible resource available." *Id.* at 31, ¶ 84–85. MiMedx later fired and sued those two employees, who then filed their own suit against MiMedx, along with a whistleblower complaint with the SEC. *Id.* at 32–33, ¶ 91; *id.* at 37, ¶ 114. After reading that whistleblower complaint, MiMedx came to believe Fox had provided the whistleblowers with information relating to the company's violations. *Id.* at 33, ¶ 92. Fox was notified that his employment had been terminated on December 29, 2016, during a phone call with MiMedx's Executive Vice President and Thornton Kuntz, the Senior Vice President of Administration. [67] at 31, ¶ 20; *id.* at 31–32, ¶ 22; [112] at 34, ¶ 95–96. Kuntz informed Fox that he was terminated for cause and that he would have only until

[2] Sarbanes–Oxley, 15 U.S.C. § 7241, requires an officer filing periodic reports as required by the act to ensure that "the report does not contain any untrue statement of a material fact or omit to state a material fact."

the end of the day to exercise his vested stock options. [67] at 32, ¶ 23–24. When Fox pointed out that the market was already closed for the day, Kuntz replied, "exactly." *Id*. at 32, ¶ 24; [112] at 34, ¶ 97. In not allowing Fox to exercise his vested options, MiMedx withheld nearly $250,000 in Fox's deferred compensation. [112] at 7, ¶ 3. Kuntz confirmed Fox's for-cause termination in a letter. [67] at 32, ¶ 25; *id*. at 79–80; [112] at 34, ¶ 98.

The next day, MiMedx issued a press release entitled, *MiMedx Files Lawsuits against Two Additional Former Sales Employees for Breach of Contractual Obligations*, naming Fox and explaining its decision to terminate his employment. [67] at 82. The release, quoting MiMedx's President and Chief Operating Officer, stated that,

> [t]he Company took employment actions with various other employees based on the degree of transgression and the openness and willingness of these employees to cooperate in the Company's investigation. No legal actions have been taken with individuals who have cooperated and have been truthful with the Company during the investigation.

*Id*. The press release went on to quote MiMedx CEO, Petit, saying,

> when an employee violates the duty of loyalty and contractual obligations by selling competitive products or other products, employment actions must be taken. Although the sales employees who participated in these violations were a very small number of the more than 300 employees in our sales organization, we are always disappointed when individuals choose to follow self-serving financial motives rather than adhere to the high standards of conduct and compliance that we foster and instill at MiMedx.

*Id*. The press release ended with a safe-harbor statement, which read in part, "[t]his press release includes statements that look forward in time or that express management's beliefs, expectations or hopes." *Id*. at 83. In January, Fox voluntarily

met with the SEC, providing information relating to MiMedx's alleged violations of securities laws. [112] at 7, ¶ 4; *id*. at 37, ¶ 115.

One of the sales representatives who had worked under Fox and whose employment was also terminated sent Kuntz, the Senior Vice President of Administration, an email regarding the company's justifications for her termination. [67] at 33, ¶ 33. Kuntz replied, stating that

> [t]he leadership of [the] group did not meet expectations related to the investment made by the Company, and as a result, management decided to disband the roles. While we regret that the direct leadership provided to the [group] was ineffective and inadequate; nonetheless, the necessary results were not achieved in aggregate to sustain those positions.

*Id*. at 86. Later, on a conference call, Petit said,

> [w]e think it's well known we terminated four and filed lawsuits against them. We've terminated some others and didn't file lawsuits because we felt that they hadn't reached the point of being problematic. And then we've had some others that came clean with us. We sat people down and said just tell us the truth, and we'll go from there. Most of these others—all of them didn't tell us the truth. It appeared they were—continued to dig deeper with their lies, and the few that came clean with us, they're still here. . . . Mostly disappointing to me is the lack of integrity that we uncovered in the process.

[67] at 34, ¶ 36; [112] at 36–37, ¶ 110. The purpose of the call was to discuss MiMedx's earnings with investors and financial analysts. *Id*.

In early April 2017, Fox accepted a job with CPN Biosciences, LLC. [67] at 34, ¶ 40; [112] at 38, ¶ 119. He was to receive a $200,000 annual salary, plus commissions, including 2% of all national sales. [67] at 34–35, ¶ 41; [112] at 38–39, ¶ 120. In May 2017, CPN's Chairman informed Fox that he had been in regular communication with MiMedx regarding CPN's employment of previous MiMedx employees and that MiMedx had recently requested a list of all such employees. [67]

at 35–36, ¶ 45; [112] at 39, ¶124. MiMedx and CPN executives met to discuss whether the companies' products were competitive and whether MiMedx would pursue litigation against CPN for hiring its former employees. [67] at 36, ¶ 46–47; [112] at 40, ¶ 125–26. A month later, CPN's chairman terminated Fox, stating that although he was confident CPN's products were not competitive with MiMedx's products, CPN could not handle any more "legal drama" with MiMedx. [67] at 36, ¶ 49; [112] at 40, ¶ 128. CPN assured Fox that it would re-hire him once the legal uncertainty surrounding his employment was resolved. [67] at 42, ¶ 93.

## III.    Analysis

MiMedx moves to dismiss Fox's counterclaims for breach of contract, defamation, and declaratory judgment, and opposes Fox's motion to amend his pleadings to add counterclaims that MiMedx violated Dodd–Frank and the Illinois Whistleblower Act.

### A.    Motion to Dismiss

In his first amended counterclaim, Fox asserts that MiMedx breached its contract with him in its failure to allow him to exercise his vested stock options pursuant to the company's stock incentive plan. He further alleges that MiMedx, through its officials, defamed him in the press release it published regarding his termination, in emails to a former employee, and on a conference call to discuss the company's recent firings with investors. Fox also seeks a declaratory judgment that his employment with CPN would not violate his noncompetition agreement with MiMedx.

###### 1.    *Breach of Contract (Count I)*

The parties agree that Florida law applies to disputes over a breach of the 2006 Stock Incentive Plan. *See* [102] at 32. Under Florida law, the elements for a breach of contract claim are: (1) a valid contract, (2) a material breach, and (3) damages. *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So.2d 737, 740 (Fla. Dist. Ct. App. 2000). MiMedx argues that Fox has failed to allege that MiMedx materially breached the stock incentive plan because the plan excludes employees who are terminated for cause, preventing their participation in the plan's benefits. Pursuant to the plan, MiMedx argues, it has sole discretion to determine cause for termination. MiMedx also points out that Fox was told multiple times that his termination was for cause.

In response, Fox argues that MiMedx did not fire him for cause and that the meaning of "cause" (lowercase)—as opposed to "Cause" (capitalized) and defined in the plan—is ambiguous, and the contractual provision at issue cannot be interpreted at the motion to dismiss stage. Fox asserts that to show he was terminated for cause MiMedx must rely on extrinsic evidence, such as the phone call and letter informing him of his termination. Even if the court could interpret the contract at this stage, Fox argues, he has stated a claim. Because Kuntz informed Fox that he had until the end of the day to exercise his stock options, and because the plan provides that only those employees not terminated for cause can exercise their stock options, Fox reasons that he must not have been terminated for cause.

The plan grants MiMedx's board full and final authority to take any action with respect to the plan, including the authority to construe and interpret the plan's provisions. [102] at 24. More specifically, the board may "in its sole discretion modify or extend the terms and conditions for exercise, vesting or earning of an Award." *Id*. It can also reduce or cancel an award upon the occurrence of certain specified events, such as "termination of employment for cause." *Id*. The plan defines "Cause," but leaves the determination of whether "Cause" exists to the board, "and its determination shall be final and conclusive." *Id*. at 20. If an employee is terminated for cause his options lapse. *Id*. at 27.

Fox has failed to state a claim for breach of contract. The plan grants MiMedx[3] ample discretion to determine whether an employee is terminated for cause and if so, that employee is not entitled to collect the stock incentives provided therein. Even if Fox were correct that "cause" and "Cause" have different meanings under the plan, MiMedx has discretion to rescind benefits for other reasons. *Id*. at 24 (providing that the events for which MiMedx can cancel an award "may include, *but shall not be limited to*, termination of employment for cause") (emphasis added). Further, MiMedx's determination that termination is for cause is final and conclusive. Fox's own allegations, and the exhibits attached to his counterclaim, demonstrate that he was terminated for cause, and he has failed to allege that his

---

[3] Really the Administrator, which is essentially defined as the board, has authority under the plan. But Fox does not allege that the improper party made the for-cause determination; rather, he argues that no determination was made at all.

termination violated any of the provisions in the stock incentive plan. *See* [67] at 32, ¶ 23; *id*. at 79. Fox's counterclaim for breach of contract is dismissed.

## 2. *Defamation (Count II)*

Fox alleges that MiMedx officers made defamatory statements about him in a press release published the day after his termination, in an email exchange between Kuntz and one of Fox's former subordinates, and on a conference call with investors. To state a defamation claim the plaintiff must show that the "defendant made a false statement concerning the plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by the defendant, and that the plaintiff suffered damages as a result." *Madison v. Frazier*, 539 F.3d 646, 653 (7th Cir. 2008). If a statement is "so obviously and materially harmful" to a plaintiff that harm to his reputation can be presumed, it is defamatory *per se* and the plaintiff need not prove actual damages. *Bryson v. News Am. Publ'ns, Inc.*, 174 Ill.2d 77, 87 (1996). Illinois recognizes four categories of statements as actionable *per se*. *Id*. at 88. The two categories relevant here are "words that impute an inability to perform or want of integrity in the discharge of duties of office or employment" and words that "impute a lack of ability, in [one's] trade, profession, or business." *See id.*

A statement may fit within a *per se* category but not be actionable "if it cannot reasonably be interpreted as stating actual facts about the plaintiff." *Hopewell v. Vitullo*, 299 Ill.App.3d 513, 518 (1st Dist. 1998) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). To determine whether a statement may reasonably be interpreted as stating facts about the plaintiff, courts consider: (1) the

precision of the statement, (2) whether the statement is objectively verifiable and (3) the literary and (4) public and social contexts of the statement. *Moriarty v. Greene*, 315 Ill.App.3d 225, 235 (1st Dist. 2000). If the writer expresses a "subjective view, an interpretation, a theory, conjecture or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Id.* (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993)). When determining whether a statement is a nonactionable opinion, courts look at the totality of the circumstances, *Moriarty*, 315 Ill.App.3d at 234, and consider whether the reasonable reader, in light of the context in which the statement is made, would interpret the statement as a factual assertion. *Brennan v. Kadner*, 351 Ill.App.3d 963, 970 (1st Dist. 2004).

Fox first asserts that Petit's statement during a conference call with investors is defamatory *per se*. On that call, Petit addressed the lawsuits MiMedx had recently filed against four former employees—one of whom was Fox, though none of the employees were mentioned by name. Petit went on to note that some other MiMedx employees had chosen to "c[o]me clean," but that "[m]ost of these others," however, "continued to dig deeper with their lies." [67] at 34, ¶ 36. "Mostly disappointing to me," Petit added, was "the lack of integrity . . . uncovered in the process." *Id.* Petit referenced a lack of integrity in the discharge of one's duties of office, and so his statement falls within a *per se* category. MiMedx argues, however, that his statement is not actionable because it refers to the lack of integrity of the *other employees* whose conduct MiMedx had more recently discovered, not to Fox. If

13

Petit's statement can reasonably be construed as referring to someone other than Fox, it is not actionable under the innocent construction rule. *See Tuite v. Corbitt*, 224 Ill.2d 490, 503 (2006). Though Petit's reference to a lack of integrity could be imputed to Fox, an equally likely reading is that it refers to the other employees referenced in the preceding sentences. And a statement that is reasonably capable of an innocent construction is not actionable. *Bryson*, 174 Ill.2d at 90. Here the statement arguably references two distinct groups: the four employees that were fired and face litigation and other employees who have experienced varying levels of discipline depending on their willingness to cooperate. Because Fox is not a member of the latter group accused of a lack of integrity, he was not defamed.

Even assuming Petit's statement references Fox, it attacks his "lack of integrity," which cannot be reasonably interpreted as stating facts about Fox. *See Hopewell*, 299 Ill.App.3d at 519–20 (concluding that the statement "fired because of incompetence" was not actionable because it did not state facts about the plaintiff). The word "integrity" has a broad scope and will be interpreted by different people to mean different things. Nothing in the context surrounding the statement makes it more clearly factual—the context further reveals that it is based on Petit's personal disappointment that the employees had acted without integrity. Finally, whether someone lacks integrity is not objectively verifiable. There is no baseline against which to measure integrity to determine whether Fox acted with or without it. Petit's statement expressed an opinion and was vague and indefinite and is therefore not actionable.

Next, Fox alleges MiMedx defamed him through Kuntz's statements in an email exchange with one of Fox's former subordinates, who MiMedx had also fired. There, the employee asked MiMedx to clarify the situation surrounding her termination. She noted her understanding that the whole group Fox had overseen had been terminated. Kuntz replied, "[t]he leadership of that group did not meet expectations related to the investment made by the Company" and "was ineffective and inadequate." [67] at 86. Fox again alleges that these statements amount to defamation *per se*, and they do fall into a *per se* category. Here the statements are undoubtedly about Fox; he was a leader of the group referenced. But statements that Fox failed to "meet expectations" of management and "was ineffective and inadequate" do not state facts about him. Although these terms have meanings that are commonly understood, those meanings are imprecise. Each of these terms is vague and could be interpreted to include a vast array of different behavior. Similarly, these terms are not objectively verifiable. Each is broad, and without a more precise understanding of what Kuntz meant, it would be impossible to determine whether or not these statements were true. Nothing in the context of the email reveals that these vague terms somehow stated verifiable facts. Kuntz's email statements were not defamatory.

Finally, Fox alleges the press release filed the day after his termination contains defamatory *per se* statements. The press release states,

> two additional sales employees engaged in acts warranting termination of employment as well as other actions. Correspondingly, lawsuits have now been filed against these two former sales employees, Michael Fox and Harold Purdy. Additionally, we have taken disciplinary action against a small

number of other individuals . . . found to be associated with this or similar improper acts.

[102] at 35. The press release goes on to state that "[n]o legal actions have been taken with individuals who have cooperated and have been truthful," but that "when an employee violates the duty of loyalty and contractual obligations by selling competitive products or other products, employment actions must be taken." *Id*.

Fox argues that, read together these statements imply that his employment was terminated because he sold competitive products, violating his duty of loyalty and contractual obligations. The claim that Fox sold competitive products in violation of his contract, read on its own, is specific, but the reasonable reader would not know what MiMedx meant by "competitive or other" products that breached a contractual obligation. Different readers would have different views of the meaning of the phrase. *Rose v. Hollinger Int'l, Inc.*, 383 Ill.App.3d 8, 18 (2008). Moreover, the context in which the statements were made reveals that they are based solely on the subjective views of MiMedx officials. The document itself is a press release written by MiMedx; it is not a news story written by an apparently neutral party. *See Moriarty*, 315 Ill.App.3d at 235 (finding that statements in "a regularly featured column by a journalist who regularly expressed his personal opinions" were nonactionable); *but cf. Missner v. Clifford*, 393 Ill.App.3d 751, 770 (1st Dist. 2009) (holding that a press release "replete with details" contained objectively verifiable, defamatory facts accusing plaintiff of criminal conduct). A reasonable reader would not take the generic statements as a literal assertion of

objectively verifiable fact. Further, the press release ends with a disclaimer affirming that the statements in the press release reflect the beliefs of MiMedx officials. Although a defendant cannot insulate defamatory statements merely by prefacing them with "I think" or "I believe," here, because the statements are insufficiently precise and, in context, present only the subjective views of MiMedx officials, they do not state facts about Fox and are nonactionable. MiMedx's motion to dismiss Fox's defamation counterclaim is granted with respect to all of the alleged statements.

### 3. *Declaratory Judgment (Count V)*

Fox seeks a declaratory judgment that his employment at CPN would not violate any contractual obligations to MiMedx. A declaratory judgment should be issued only when it serves a useful purpose. *See Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987). The purpose of a declaratory judgment is "to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued." *Cunningham Bros. v. Bail*, 407 F.2d 1165, 1167–68 (7th Cir. 1969) (quoting *E. Edelmann & Co. v. Triple-A Specialty Co.*, 88 F.2d 852, 854 (7th Cir. 1937)). The Declaratory Judgment Act contemplates two situations: (1) where the controversy has ripened to the point where one of the parties could invoke a corrective remedy but has not done so; and (2) where though the controversy is real and immediate, it has not ripened to such point, and it would be unfair or inefficient to require the parties to wait. *Tempco Elec.*, 819 F.2d at 749.

MiMedx argues that Fox's claim for declaratory judgment fits neither of these situations (because the conflict has ripened and it has sued Fox), that it is duplicative of his claim for tortious interference with business expectancy,[4] and that there are no allegations of continuing conduct necessitating this forward-looking relief.

MiMedx argues that because resolution of Fox's tortious interference claim may render the declaratory judgment claim unnecessary, Fox should not be allowed to bring a separate claim for declaratory judgment. It is true that declaratory judgment jurisdiction is discretionary (so long as there is a justiciable controversy) and so a court may decline to hear a claim for declaratory judgment when pending litigation could resolve the questions posed by the declaratory judgment. *See Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1218 (7th Cir. 1980). It is also true, however, that when exercising its discretion to grant jurisdiction for a declaratory judgment a court must consider the public interest and the plaintiff's need for the requested relief. *Id.*

If Fox prevails on his tortious interference claim—proving that MiMedx intentionally interfered with his business relationship with CPN—there would be no need to clarify the status of his noncompetition agreement. But if Fox fails to state a claim for tortious interference, perhaps because he could not prove that MiMedx acted with the requisite intent, whether his employment with CPN would violate his contractual obligations to MiMedx would remain unclear. Because the

---

[4] MiMedx does not challenge this claim in its motion to dismiss.

issues raised by the declaratory judgment are similar, and in some instances identical, to others raised by this litigation, allowing Fox to bring his claim will not be overly burdensome on the parties or the court. And any burden is outweighed by the potential harm to Fox if clarification of this issue is delayed. Fox continues to be unable to work for CPN, and CPN has assured him that if this issue is resolved in his favor he will be re-hired. Fox may pursue his declaratory judgment claim.

In sum, Fox's claims for breach of contract and defamation are dismissed, but the declaratory judgment claim is not dismissed.

## B. Motion to Amend Counterclaim

Fox seeks to amend his counterclaim to add claims under the Dodd–Frank Act and the Illinois Whistleblower Act. MiMedx opposes, arguing that the proposed claims are futile because they would not withstand a motion to dismiss, were made in bad faith, and would create undue delay.

### 1. *Dodd–Frank (Count VI)*

Fox seeks to amend his counterclaim to allege that MiMedx unlawfully retaliated against him for whistleblowing activity by demoting him, firing him, and interfering with his subsequent employment with CPN. MiMedx argues in part that Fox cannot state a claim under Dodd–Frank because he is not a whistleblower. Fox's Dodd–Frank claim raises two main issues. First, whether Dodd–Frank's whistleblower protection extends to post-employment reporting and encompasses Fox's post-termination interview with the SEC. And second, whether Fox's internal

reports expressing concerns to his superiors at MiMedx qualify him as a whistleblower under the act.

Dodd–Frank prohibits an "employer" from taking adverse action, or discriminating, against a "whistleblower" because of any lawful act done by the whistleblower in providing information to or assisting an investigation of the SEC. 15 U.S.C. § 78u-6(a)(6). "Whistleblower" is defined as "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws to the Commission, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6).

The act does not limit its protections to current employees. Whistleblowers are "individuals" not "current employees." "Employer" as used in Dodd–Frank is not defined and does not contain any temporal qualifier indicating it applies only to current employers. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997) (holding "employee," as used in Title VII of the Civil Rights Act, was ambiguous and reading it to include former employees). Reading the term "employer" to encompass a former employer's actions against ex-employees makes sense in light of the purpose of the Dodd–Frank whistleblower provision, which is to encourage disclosure of suspected securities violations through monetary incentives and protection from retaliatory actions. *See* 15 U.S.C. § 78u-6(b), (h). Fox alleges MiMedx interfered with his subsequent employment because he cooperated with the SEC. Because employers are prohibited from retaliating against former-employee whistleblowers, Fox has stated a claim for unlawful retaliation.

The second issue Fox's proposed Dodd–Frank claim raises is whether internal reporting is sufficient to qualify one as a whistleblower, conferring protection against retaliation. The circuits are currently split on this question, and the issue is pending before the Supreme Court. *Digital Realty Trust, Inc. v. Somers*, 137 S.Ct. 2300 (2017). The source of disagreement stems from a possible inconsistency between the act's definition of "whistleblower," which is limited to those who report securities-law violations "to the Commission," 15 U.S.C. § 78u-6(a)(6), and § 78u-6(h)(1)(A)(iii), which prohibits retaliation against someone for "making disclosures that are required or protected under the Sarbanes–Oxley Act of 2002 (15 U.S.C. 7201 *et seq*.), this chapter, including section 78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission." Because Sarbanes–Oxley protects individuals who internally report violations, some courts have found it difficult to reconcile the two provisions.

The Fifth Circuit held that internal reporting was insufficient to trigger the act's protections. *Asadi v. G.E. Energy*, 720 F.3d 620, 630 (5th Cir. 2013). The court reasoned that the language of the act was unambiguous—that employers are prohibited from retaliating against whistleblowers, and whistleblowers are those who have provided information *to the Commission. Id*. The Second and Ninth Circuits have taken a different approach, relying instead on the purpose of Dodd–Frank and Congressional intent, and deferring to the SEC's interpretation—which prohibits retaliation for internal reporting. *See generally Somers v. Digital Realty Trust, Inc.*, 850 F.3d 1045 (9th Cir. 2017); *Berman v. Neo@Ogilvy, LLC*, 801 F.3d

145 (2d Cir. 2015). The Seventh Circuit has not taken sides. *Verfuerth v. Orion Energy Sys., Inc.*, No. 16-3502, 2018 WL 359814, at *3 (7th Cir. Jan. 11, 2018).

I agree with the Fifth Circuit that the text is clear, and I adopt its approach. A "whistleblower" protected by Dodd–Frank is someone who provides information to the SEC. Fox was not a whistleblower until he communicated with the Commission. So while Fox has stated a claim with respect to his participation in SEC proceedings and MiMedx's subsequent interference with his employment at CPN, his proposed counterclaim fails to state a claim under Dodd–Frank based on his internal reporting. Because both his demotion and termination took place prior to his external reporting, he has failed to allege that these actions constituted unlawful retaliation in response to a protected activity.

### 2. Illinois Whistleblower Act (Count VII)

Fox also seeks to amend his counterclaim to add claims under the Illinois Whistleblower Act. Section 15(b) of the act prohibits "[a]n employer" from retaliating "against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b). Unlike Dodd–Frank, the Illinois act extends whistleblower protections only to an "individual who is employed on a full-time, part-time, or contractual basis by an employer." 740 ILCS 174/5. Internal reporting is insufficient to trigger the act's protections. *Sweeney v. City of Decatur*, 2017 Ill.App. (4th) 160492 ¶ 19; *Huang v. Fluidmesh Networks, LLC*, No. 16-cv-9566, 2017 WL

3034672, at *3 (N.D. Ill. July 18, 2017); *Zelman v. Hinsdale Twp. High School Dist. 86*, 10-C-00154, 2010 WL 4684039, at *2 (N.D. Ill. Nov. 12, 2010).

Post-employment reporting to a government agency is insufficient to state a claim for retaliation based on that employee's wrongful termination. *Elliott v. Superior Pool Products, LLC*, 15-cv-01126, 2017 WL 1197669 at *6 (C.D. Ill. Mar. 30, 2017). It makes sense that an employee who is fired cannot plausibly allege that his termination was caused by whistleblowing that had not yet occurred at the time of his termination. Fox's claim is different, however, in that he also alleges that MiMedx retaliated against him by interfering with his subsequent employment— meaning his post-employment reporting to government officials could have caused the alleged retaliation. Nevertheless, Fox has failed to state a claim under § 15(b). The language of the statute is clear. An employer may not retaliate against an employee, and an employee is someone who *is* employed. 740 ILCS 174/5. Nothing in the act prohibits retaliation against former employees. Because neither internal reporting, nor post-employment reporting warrant whistleblower protection under § 15(b), Fox may not amend his counterclaim to include this claim.

The Illinois act also prohibits an employer from retaliating against an employee for refusing to partake in illegal activity. 740 ILCS 174/20. Fox alleges that MiMedx retaliated against him for his refusal to engage in its fraudulent channel-stuffing scheme. Because Fox refused to participate in the scheme by sending unwanted orders to hospitals, he alleges, MiMedx demoted and later fired him. MiMedx argues Fox has failed to allege that he refused to participate in

23

anything illegal because, although he alleges that the subsequent reporting of those sales as revenue was illegal, the sales themselves were not. And because Fox only alleges that he refused to partake in the sales, and not the reporting of those sales, the action he refused to engage in was not illegal. MiMedx's reading of the complaint is too narrow. Fox alleges that MiMedx engaged in an unlawful scheme—part of which was having its salespeople ship unwanted products to hospitals. This step enabled other MiMedx employees to report distorted numbers in the company's financial disclosures. Fox adequately alleges that MiMedx engaged in an illegal scheme to defraud, that he refused to participate in that scheme, and that MiMedx responded to his refusal by demoting and firing him. He is granted leave to amend his counterclaim to include a claim under § 20.

Next, Fox seeks to add a claim for "other retaliation" pursuant to 740 ILCS 174/20.1. But this provision relates to disclosures of "public corruption or wrongdoing." Fox disclosed private corruption, so § 20.1 does not apply. He may not add a § 20.1 counterclaim.

Finally, Fox asserts that MiMedx threatened to retaliate against him in violation of § 20.2 of the act. 740 ILCS 174/20.2. MiMedx does not challenge this portion of Fox's proposed counterclaim. Because Fox has adequately alleged that MiMedx threatened him with an act that would constitute retaliation, his motion for leave to amend to add a claim under § 20.2 is granted.

### 3. Bad Faith and Undue Delay

In addition to arguing that Fox's proposed amendments are futile, MiMedx argues that they are made in bad faith and would promote undue delay. The current case schedule affords adequate time to litigate the merits; the proposed amendment is not untimely. It may be that Fox is using his counterclaims for purposes unrelated to this litigation, but he has allegations that state plausible claims. His motives may not be pure,[5] but proper case management will avoid bad-faith or in terrorem tactics. For example, irrelevant and unnecessary allegations may be susceptible to a Rule 12(f) motion to strike, and discovery should not be conducted on any allegations that are irrelevant to Fox's stated claims. Leave to amend should be granted freely, and so Fox may amend his counterclaim to include the claims discussed above that are not futile.

---

[5] MiMedx believes Fox is participating in a scheme to manipulate MiMedx's stock price by publicizing negative allegations about the company. I have considered MiMedx's evidence of this plot, but I conclude that it does not overcome the interests in resolving plausible claims on their merits.

## IV.    Conclusion

MiMedx's motion to dismiss, [89], is granted in part and denied in part. Counts I and II of Fox's first amended counterclaim, [67], are dismissed. Fox's motion to amend his counterclaim, [112], is granted in part and denied in part. He is granted leave to amend his counterclaim to add a Dodd–Frank retaliation claim based on MiMedx's interference with his subsequent employment (Count VI) and Illinois Whistleblower Act claims under 740 ILCS 174/20 and 20.2 (Count VII). Fox shall file his amended counterclaims as a separate entry on the docket by January 31, 2018, and MiMedx shall answer the counterclaims by February 14, 2018.

ENTER:

Manish S. Shah
United States District Judge

Date:  January 24, 2018