**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:16-CV-11715 |
| | ) | |
| MICHAEL FOX, | ) | Judge Manish S. Shah |
| | ) | Magistrate Judge Sidney I. Schenkier |
| Defendant. | ) | |
| | | |
| | | |
| MICHAEL FOX, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Counter-Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF FOX'S
OMNIBUS MOTION TO COMPEL DISCOVERY**

**INTRODUCTION AND FACTS**

As the Court is aware, this case arises out of a dispute between Michael Fox and his former employer, MiMedx Group, Inc. By their respective pleadings, the parties have asserted myriad causes of action against one another. Those most relevant to this discovery disputes are Fox's claims that MiMedx tortiously interfered with his employment with CPN and that it subjected him to unlawful retaliation in violation of state law, specifically the Illinois Whistleblower Act. As discussed in further detail below, Fox's retaliation claim requires an in-depth inquiry into MiMedx's motives for firing Fox. Fox's tortious interference claim requires an

1

inquiry into whether MiMedx's conduct was with malice, that is, made with positive desire and intention to annoy or injure Fox. *Certified Mech. Contrs., Inc. v. Wight & Co.*, 515 N.E.2d 1047, 1054 (Ill. Ct. App. 1987). Hence, evidence tending to show MiMedx singled out Fox among other former MiMedx employees and got him fired from his subsequent employer is relevant to Fox's tortious interference claim. And evidence tending to explain *why* MiMedx interfered with Fox's subsequent employment remains relevant. *Cf. Haddad v. ITT Indus.*, No. 1:05-CV-370-TLS, 2007 U.S. Dist. LEXIS 3132, at *27-28 (N.D. Ind. Jan. 12, 2007) ("Though the [the employer's] motivation [for interfering with the employee's subsequent employment] is not part of an element of either the blacklisting or tortious interference claim, it would be relevant evidence in proving those claims.").

During the course of discovery Fox requested documents relevant to his claims (and MiMedx's defenses), and he sought additional relevant information through depositions of MiMedx employees, officials, and corporate designees. Unfortunately, MiMedx has responded to Fox's requests with laundry lists of objections and inappropriate instructions not to answer deposition questions. Further, CPN has refused to permit third-party vendor inspection to recover admittedly deleted text messages responsive to Fox's subpoena, even though Fox has offered to cover the expense involved. This omnibus motion to compel followed.

## **ARGUMENT**

1.  **The Court should compel Parker Petit to answer questions regarding his personal knowledge of, or beliefs regarding, the allegations in former employees' lawsuits and their underlying facts.**

MiMedx CEO Parker Petit ███████████████████████████████████. He was also ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███. Petit's personal thoughts, feelings, and opinions about the lawsuits against MiMedx and their underlying facts is relevant to MiMedx's motives for terminating Fox and his desire to tortiously interfere with Fox's subsequent employment.

In his deposition, Petit admitted that he participated in the decision to fire Fox, and professed familiarity with the reasons therefor. (Premo Decl. Ex. 1, Petit Dep., 268:14-25.) Per Petit, MiMedx fired Fox for cause, specifically "because he blatantly lied to us [MiMedx]" and because he "breached his duty of loyalty to us" by denying knowledge of and/or failing to report the fact that other MiMedx employees were selling products MiMedx now claims are competitive with its own (despite previously conceding to the contrary). (*Id*. at 269:4-273:1, 275:4-276:1.)

Prior to sitting for his deposition, Petit was not shy about expressing his opinion as to the veracity of Fox's allegations. In November 2017, for example, he helped draft a statement for publication on MiMedx's website, wherein he proclaimed that the matters Fox described in his counterclaim are "not facts," but rather are "merely repetitions of the same allegations made in other terminated employee litigation." (Premo Decl. Ex. 2, *MiMedx Addresses Legal Excerpts* (11/8/17).) In that statement, Petit went on to insist: (a) that "there is no credible evidence of any wrongdoing on behalf of members of MiMedx management;" (b) that Fox's "claims and accompanying allegations are without merit;" and (c) that said claims "contain[ed] numerous accusations which reasonable due diligence would have proven to be without merit." (*Id*.) Finally, he noted that Fox's counsel had filed an amended pleading, which, according to Petit, proved Fox's initial pleading to be "meritless." (*Id*.) He concluded by asserting that "this change should clearly make one doubt Fox's credibility." (*Id*.) When asked in his deposition if he

continues to stand by that statement, ████████████████████ (Premo Decl. Ex. 1, Petit Dep., 264:10-22.)[1]

When asked whether he believed Mr. Fox was involved in Mr. Kruchoski and Mr. Tornquist's complaint of fraud to the Company, Petit opined:



(Premo Decl. Ex. 1, Petit Dep. 304:12-22.)

Despite: ██████████████████████



---

[1] Since Petit's deposition, MiMedx has removed its legal commentary from its website, stated that these and other previous statements cannot be relied upon, and announced that it must restate roughly six years' of financial statements due to investigation results focused on accounting treatment afforded to "sales and distribution practices" for two unnamed distributors for which "certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods." MiMedx Group, Inc. 8-K (June 6, 2018). *Cf. generally* Second Am. Counterclaim (ECF No. 147) (recounting MiMedx's fraudulent revenue recognition scheme in both private and public sales channels and MiMedx's failure to disclose agreements with distributors that differed from the explicit terms of the contract). MiMedx further disclosed that the forthcoming Restatement will have a "material impact" on its prior financial statements. MiMedx Group, Inc. 8-K (June 6, 2018).

[2] (Premo Decl. Ex. 1, Petit Dep., 278:15-20.)

[3] (*Id*. at 283:17-284:11.)

████████████████ Petit refused to answer questions as to his beliefs regarding the underlying facts of this case. For instance, when Fox's counsel asked Petit whether he personally believed Messrs. Kruchoski and Tornquist made their complaint of fraud to MiMedx as part of a larger scheme by Fox and others to sell non-MiMedx products and get out of their non-competes, ████████████████████████. (*Id.* at 304:23–312:10.)

"The attorney-client privilege protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice." *Sandra T.E. v. South Berwyn School Dist.* 100, 600 F.3d 612, 618 (7th Cir. 2010). Because this privilege "is in derogation of the search for the truth,"[5] the Seventh Circuit has historically cautioned that "[t]he scope of the privilege should be 'strictly confined within the narrowest possible limits.'" *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983) (citation omitted); *see also Matter of Walsh*, 623 F.2d 489, 493 (7th Cir. 1980) (confirming that the attorney-client privilege "must not be lightly created nor expansively construed"). Courts in this District have held similarly, confirming that "'it is the privilege, not the duty to disclose, that is the exception,'"[6] and holding that therefore it "protects disclosure of communications," and "not the underlying facts by those who communicated with the attorney."[7] *Roth v. Aon Corp.*, 254 F.R.D. 538, 540 (N.D. Ill. 2009). Given the foregoing, "[t]he mere assertion of privilege is not

---

[4] (*Id.* at 304:12-22.)

[5] *In re Grand Jury Proceedings*, 220 F.2d 568, 571 (7th Cir. 2000).

[6] *Patrick v. City of Chicago*, 154 F. Supp. 3d 705, 710 (N.D. Ill. 2015) (citation omitted).

[7] As the United States Supreme Court explained in *Upjohn Corp. v. United States*, "[a] fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." 449 U.S. 383, 395-96 (1981) (citation omitted).

enough,"[8] and MiMedx "must establish the elements" thereof "as to each record sought <u>and each</u> <u>question asked</u>" in order to sustain its burden. *Matter of Walsh*, 623 F.2d at 493.

In considering MiMedx's objection it is also important to note that "the attorney-client privilege does not prohibit the disclosure of *all* communications between a client and her attorney." *U.S. v. Werger*, 709 F.2d 1151, 1154 (7th Cir. 1983) (italics in original). Instead, it "protects only the client's <u>confidences</u>." *United States v. Weger*, 709 F.2d 1151, 1154 (7th Cir. 1983) (emphasis added). Accordingly, the courts have "consistently 'refused to apply the privilege to information that the client intends his attorney to impart to others . . .,' <u>or which the</u> <u>client intends shall be published or made known to others</u>." *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984) (citation omitted). Stated another way, "[a]ny disclosure inconsistent with maintaining the confidential nature of the attorney client relationship waives the attorney-client privilege," and that waiver applies "not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter.*" United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir. 1982).

In this case, Fox's counsel <u>did not</u> ask what Petit talked about with MiMedx's attorneys relative to Fox's claims, nor did he ask what information Petit may have gleaned or what opinions he may have formed in connection with those conversations. Fox's queries were simple factual inquiries into the state of mind of a central decision-maker in Fox's retaliatory discharge and bad actor in Fox's firing from CPN. Fox's questions do not even arguably implicate communications between Petit and MiMedx's counsel. And even if they did, any communications they may have had regarding Petit's view of Fox's claims cannot be characterized as confidential given that he authored a press release publicly proclaiming them to

---

[8] *U.S. v. BDO Seidman*, 337 F.3d 802, 810 (7th Cir. 2003).

be "meritless," and telling anyone who would listen that they should "doubt Fox's credibility." (Premo Decl. Ex. 2, *MiMedx Addresses Legal Excerpts* (11/8/17).) Because Petit has spoken publicly regarding his beliefs about Fox's allegations, his personal thoughts, feelings, and opinions are not, and cannot be, privileged.

MiMedx's counsel frustrated the fair examination of Petit. Because Petit's state of mind and motives for his actions against former employees are of critical relevance to the claims and defenses in this litigation, it was improper of Mr. Pernini to instruct Petit not to answer basic questions about his personal beliefs regarding the circumstances leading to adverse actions against Fox and other whistleblowers. Accordingly, the Court should order that his deposition be reconvened, and that he be compelled to answer Fox's questions as to his personal beliefs regarding the allegations in former employees' lawsuits and their underlying facts.

> **2.** **The Court should compel Petit to disclose whether he directed MiMedx's counsel to condition settlement of the Kruchoski and Tornquist litigation on an apology to MiMedx and withdrawal of the complaints they made to government regulators.**

MiMedx's channel-stuffing scheme has given rise to several legal proceedings, including lawsuits involving Fox's fellow whistleblowers, and former MiMedx co-workers, Jess Kruchoski and Luke Tornquist. Initially, Messrs. Kruchoski and Tornquist were represented by Halunen Law. During that time, MiMedx's counsel sent an email purporting to indicate MiMedx's interest in resolving the claims Kruchoski and Tornquist had advanced, but which was actually an attempt to extort a public apology from their counsel and thwart ongoing government investigations. In that email, MiMedx's counsel Joseph Wargo asserted that Kruchoski and Tornquist's complaints had "hampered" MiMedx and demanded that Kruchoski, Tornquist, and their attorneys, "contact any and all governmental authorities you previously have reached out to and (a) withdraw previously-made complaints and (b) provide a statement that your clients'

initial complaint was frivolous. . .” (Premo Decl. Ex. 3, Email correspondence from Joseph Wargo to Clayton Halunen dated 4/3/17.)

At the time Wargo sent his email: (a) both Kruchoski and Tornquist had already reported MiMedx's channel stuffing to the SEC in sworn statements; (b) Fox had already given a voluntary interview to the SEC, during the course of which he confirmed and expounded upon MiMedx's participation in the channel stuffing scheme and its corresponding violation of federal security laws; and (c) the SEC had issued a subpoena to MiMedx, thereby confirming its instigation of a formal investigation with respect thereto. (*See* ECF No. 147, Second Am. Counterclaim ¶¶ 4, 98-100.) Given the foregoing, Fox's counsel appropriately inquired during the course of Petit's deposition as to whether ███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ (Premo Decl. Ex. 1, Petit Dep., 313:14-23.) ██████████████████████████████████████████ ███████████. (*Id.* at 313:24-314:3.)

Fatal to that instruction, however, is the crime-fraud exception, which vitiates the attorney-client privilege “if the attorney is assisting his client to commit a crime or a fraud.” *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 769 (7th Cir. 2006); *see also U.S. v. Boender*, 649 F.3d 650, 655 (7th Cir. 2011) (confirming that “‘[t]he crime-fraud exception helps to ensure that the attorney-client privilege does not protect communications made ‘in furtherance of a crime or fraud’”) (citation omitted).

In order for the crime-fraud exception it to apply, there must simply “be ‘something to give colour to the charge;’” i.e., “there must be ‘prima facie evidence that it has some foundation in fact.’” *U.S. v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007) (quoting *Clark v. United States*,

289 U.S. 1, 15 (1993)); *see also BDO Seidman*, 492 F.2d at 818 (explaining that the Seventh Circuit "expressly [has] rejected" the notion that the party urging application is required "to make out a prima facie case of each element of a particular crime or common law fraud to invoke the crime-fraud exception," and confirming that all he must do is show "some foundation in fact"); *Sound Video Unlimited, Inc. v. Video Shack Inc.*, 661 F. Supp. 1482, 1486 (N.D. Ill. 1987) (explaining that the party invoking the crime-fraud exception meets his evidentiary burden merely by "establish[ing] some connection between the communications at issue and the alleged offence"). Importantly, "it is the intent of the client, rather than the intent of the lawyer, that governs whether the crime-fraud exception applies." *First Merit Bank, N.A. v. Teets*, No. 15 C 01573, 2015 WL 8153878, at *3 (N.D. Ill. Dec. 8, 2015) (emphasis added). Moreover, Fox "need not make a specific showing of the client's intent in consulting the attorney," but he is required to "support the inference that the attorney's representation or advice assisted the client in committing the alleged offense." *Sound Video Unlimited*, 661 F. Supp. at 1486.

At issue in this case is whether MiMedx took actions against Fox as part of an effort to silence, punish, or discredit known or suspected whistleblowers as part of a broader effort to thwart or impede federal investigations into the Company. Petit's motivations in his dealings with those who objected to MiMedx's channel-stuffing scheme are of critical relevance to the claims and defenses in this case. Contrary to MiMedx's anticipated assertions, the facts of MiMedx's retaliatory campaign leading to and following his termination do not lose relevance to Fox's remaining claims simply because Fox's Dodd-Frank claim was dismissed.

By the above-cited email, MiMedx and its counsel acted to obstruct, influence, or impede the SEC's investigation by conditioning the end of expensive civil litigation on Tornquist and

Kruchoski recanting their truthful reports detailing MiMedx's violation of federal securities laws.

Such conduct violates several statutes and regulations, including but not necessarily limited to:

- 18 U.S.C. § 1513(e), which provides that "[w]hoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years or both;"

- 18 U.S.C. § 1512(c)(2), which provides that "[w]hoever corruptly . . . (2) otherwise obstructs, influences, or impedes any official proceeding,[9] or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both;" and

- 18 U.S.C. § 1505, which provides, in relevant part, that "[w]hoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, . . . shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both."

In his deposition, ██████████████████████████████████████████
████████████████████████████████████████████████████. (Premo Decl.

Ex. 1, Petit Dep., 268:23-25, 278:15-20.) Thus, it is extremely likely that he instructed or

authorized Mr. Wargo to send the above-described email, which potentially violates the

foregoing statutes. At the very least Fox has "establish[ed] some connection between the

communications at issue and the alleged offense,"[10] thereby confirming the existence of "'prima

facie evidence'" that his invocation of the crime-fraud exception "'has some foundation in fact.'"

*Al-Shahin*, 474 F.3d at 946 (citation omitted). Accordingly, "'the seal of secrecy is broken' and

---

[9] For purposes of this statute, "official proceeding" includes "a proceeding before a Federal Government agency which is authorized by law." 18 U.S.C. § 1515(a)(1)(C). Per 18 U.S.C. § 1512 (f)(1), "an official proceeding need not be pending or about to be instituted at the time of the offense."

[10] *Sound Video Unlimited,* 661 F. Supp. at 1486.

the [attorney-client] privilege is inapplicable.'" *Id.* (Citation omitted). Petit should be compelled to answer questions regarding his authorization of the Wargo communication.

**3. The Court should compel MiMedx to re-produce a 30(b)(6) designee, and to additionally produce Alexandra O. Haden, because its prior 30(b)(6) designee, William Taylor, was not adequately prepared to testify about the topics upon which he had been designated.**

Fox contends that after MiMedx fired him, it tortiously interfered with his subsequent employment at CPN. Critically relevant to Fox's claims in that regard is information as to the nature, extent, and substance of any communications between MiMedx and CPN, including communications relating to Fox or any other former MiMedx employees who were later hired by CPN. In an attempt to obtain such information, Fox served a 30(b)(6) notice asking MiMedx to designate a corporate representative to provide testimony on a number of topics, including the following:

2. Businesses whom MiMedx contends are its competitors, the factual basis for that contention, as well as the timing, facts, and circumstances that give rise to MiMedx's understanding that each particular business was competitive.

\*\*\*

16. The timing, facts, and circumstances regarding MiMedx's communications with CPN Biosciences, LLC ("CPN") since December 29, 2016, specifically:

(1) The participants in the communications;

(2) The method in which these communications took place (e.g., text message, phone call, email, in-person meeting, etc.)

(3) The content of those communications as they relate to, mention, or concern the following subject matters;

i. Mr. Fox

ii. [Former MiMedx employees later hired by CPN] Taft Mills, Tony Thompson, Ben Yimlamai, Susan Schardt,

        Brian Anders, Avi Carter, or Veronica Loch, individually or collectively;

    iii.    The competitiveness *vel non* of MiMedx's products with CPN's products;

    iv.    The details of the contemplated joint venture, partnerships or other business relationship between MiMedx and CPN and when those discussions concluded;

    v.    The settlement of claims between CPN and MiMedx.

  (4)    The content of all communications between MiMedx and CPN between July 14, 2017 to July 31, 2017, including the method in which these communications took place (e.g., text message, phone call, e-mail, in-person meeting, etc.)

(Premo Decl. Ex. 4, Fourth Amended Notice of Deposition.)

In response, MiMedx produced its President, William Taylor, who proved woefully unprepared to testify meaningfully on the subjects for which MiMedx designated him.

Because the testimony of a witness designated pursuant to Rule 30(b)(6) is binding upon it, MiMedx had "an affirmative duty to produce a representative who can answer questions that are within the scope of the matters described in the notice." *Harris v. New Jersey*, 259 F.R.D. 89, 92 (D.N.J. 2007); *see also Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007) ("The law is well-settled that corporations have an 'affirmative duty' to make available as many persons as necessary to give 'complete, knowledgeable, and binding answers' on the corporations behalf.") (citation omitted). Stated another way, MiMedx was required to:

"make a conscientious good faith effort to designate the persons having knowledge of the matters sought by the [discovering party] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed by [the discovering party] as to the relevant subject matters."

*Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 338, 342 (N.D. Ill. 1995) (emphasis added) (citation omitted); *see also Sprint Communications v. Theglobe.com, Inc.,* 236 F.R.D. 524, 527 (D. Kan. 2006) (confirming that corporate defendants "have a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them fully to unevasively answer questions about the designated subject matter"). In preparation for the Rule 30(b)(6) deposition the corporation must review all matters known or reasonably available to it in a good faith effort to find out the relevant facts and to collect information, review documents and "interview those employees with personal knowledge." *QBE Ins. Corp. v. Jorda Enters.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012) (precluding a corporation from introducing testimony and exhibits on those issues for which the corporate representative was unable to provide 30(b)(6) testimony).

Despite the foregoing obligations, when Fox's counsel asked Taylor about the subjects upon which he had been designated to testify, his most frequent responses ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████. The following exchanges provide illustrative (but not exhaustive) examples of Mr. Taylor's evasive deposition testimony:







\*\*\*

(Premo Decl. Ex. 5, Taylor Dep., 357:17-379:19) (emphasis added) (internal objections omitted).)

Critically, Mr. Taylor testified that ████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████.



(*Id.* at 368:6–371:12.)

In light of the foregoing, it is evident that Taylor did not have personal knowledge of many of the subject matters on which MiMedx designated him to testify. Additionally, he admitted that he failed to "use documents . . . [or] other resources" to obtain that knowledge – for example simply inquiring of colleagues who were parties to relevant conversations or communications. *Sprint Communications*, 236 F.R.D. at 528; *QBE Ins. Corp.*, 277 F.R.D at 687–700. Such failure cannot be excused by Taylor's citation to, and regurgitation of, documents purporting to reference conversations, meetings, or other communications to which he was not a

party because "a corporation may not take the position that its documents state the company's position." *Great American Ins. Co.*, 251 F.R.D. at 539. This is particularly true where Taylor did nothing - for example, simply speaking with participants - to determine whether the documents accurately captured the contents of oral communications referenced. "'[I]f a corporation has knowledge or a position as to a set of alleged facts or an area of inquiry, it is its officers, employees, agents or others who must present the position, give reasons for the position, <u>and, more, importantly, stand subject to cross-examination</u>.'" *Id.* at 487 (emphasis added) (citation omitted).

Courts have granted relief on facts analogous to those presented here; i.e., where a 30(b)(6) deponent lacked personal knowledge of the designated subject matter(s) and admittedly failed to make inquiry of individuals likely to have such knowledge. In *Mattel, Inc. v. MGA Entertainment, Inc.*, for example, the court granted similar motion, describing itself as being "satisfied" that the plaintiff's 30(b)(6) witnesses were "inadequately prepared" where those witnesses, like Taylor, "did not speak to individuals likely to possess knowledge" about the specified subjects, and where they failed to "discuss the circumstances of the email chain at issue" with the senders/recipients thereof. *Mattel*, No. CV-04-9049, 2010 WL 3705868, at *9 (C.D. Cal. Sept. 17, 2010); *Accord Janko Enters. v. Long John Silver's, Inc.*, No. 3:12-CV-345-S, 2014 U.S. Dist. LEXIS 185334, at *20 (W.D. Ky. Apr. 2, 2014) (granting a continued deposition of the 30(b)(6) deponent where the deponent had not spoken with individuals with personal knowledge on the deposition topic and, "[b]eyond examining the documents previous provided by [the representative's corporation to the opposing party] in discovery, little else appears to have been done to prepare [the witness] to offer specific responses about what actually occurred with respect to [a critical question in the case].").

16

While Fox understands that a 30(b)(6) designee "need not have perfect responses to each question, nor a clairvoyant ability to predict every single question that may be posed,"[11] he does have a "right to a prepared witness"[12] who is "thoroughly educated about the noticed deposition topics and facts known to the corporation or its counsel." *Great American Ins. Co. of New York v. Vegas Const. Co., Inc.*, 251 F.R.D. 534, 538 (D. Nev. 2008) (emphasis added) (citation omitted). MiMedx's production of an unprepared witness in the person of Taylor "is tantamount to a failure to appear," which can justify "a panoply of sanctions, from the imposition of costs to entry of default." *U.S. v. Taylor*, 166 F.R.D. 356, 363 (M.D.N.C. 1996); *see also Resolution Trust Corp. v. Southern Union Co., Inc.*, 985 F.2d 196, (5th Cir. 1993) (holding that if "the principal has failed to designate an available, knowledgeable, and readily identifiable witness then the appearance is, for all practical purposes, no appearance at all").

Although the responsibility MiMedx bears with respect to preparing its corporate representatives "may be onerous," it is necessary to "negate any possibility" of what occurred here; i.e., "that an inquiring party will be directed back and forth from one corporate representative to another, vainly searching for a deponent who is able to provide a response which would be binding upon that corporation." *Sprint Communications*, 236 F.R.D. at 528.

Accordingly, as a sanction, MiMedx should be compelled to re-produce a corporate representative, and to ensure that he is "thoroughly educated" with respect to topics on which he was designated to testify, in particular, MiMedx's communications with CPN. Given that MiMedx still must produce a corporate representative to testify regarding its communications with the Securities and Exchange Commission, this is a sensible solution.

---

[11] *Oy*, 2013 WL 5675516, at *2 (citations omitted).

[12] *Bergstrom, Inc. v. Glacier Bay, Inc.*, No. 08 C 50078, 2010 WL 3516190, at *3 (N.D. Ill. Aug. 31, 2010) (emphasis added);

As an additional component of the sanction, MiMedx should be compelled to produce Secretary and General Counsel Alexandra O. Haden to discuss her communications with CPN for a period of no more than one hour and thirty minutes. She is a fact witness in this case. CPN has admitted that "MiMedx drama" and "MiMedx legal drama" was a cause of Fox's termination. She was a participant in several communications with CPN, including communications before Fox's termination as well as the September 6, 2017 phone conference, which immediately preceded her e-mailing a copy of the Fox Counterclaim to CPN's counsel and its Chairman. Because MiMedx was unable—or perhaps unwilling—to produce a representative qualified to talk about this communication, Fox should have the opportunity to cross-examine Ms. Haden as to the contents of her communications with a third party—communications that in no way invade attorney-client privilege.

### 4. The Court should compel MiMedx to produce purportedly privileged documents for in camera review.

During discovery the parties engaged in several "meet and confer" sessions, during which each challenged the privilege designations of the other. Following those discussions, MiMedx provided an amended privilege log,[13] which continues to include several documents that likely do not qualify for protection under either the attorney-client privilege or the work-product doctrine. Accordingly, Fox respectfully requests that the Court compel MiMedx to submit these documents for in camera review.

In considering Fox's request, it is important to note that MiMedx bears the burden of establishing application of the attorney-client privilege on a "on a document-by-document basis,"[14] and that said privilege only "protects disclosure of communications," and "not the

---

[13] Attached as Exhibit 6 to the Declaration of Stephen Premo.
[14] *O'Toole v. Perez*, No. 14 C 2467, 2016 WL 4975203, at *2 (N.D. Ill. Sept. 16, 2016).

underlying facts by those who communicated with the attorney." *Roth v. Aon Corp.*, 254 F.R.D. 538, 540 (N.D. Ill. 2009). Moreover, "the privilege is limited to situations in which the attorney is acting as a legal advisor—business and financial advice are not protected." *RBS Citizens, N.A. v. Husain*, 291 F.R.D. 209, 217 (N.D. Ill 2013).

While it may be true that corporations seek legal advice with respect to important decisions, "the inclusion of general counsel does not transform all business discussions into privileged attorney-client communications." *RBS Citizens, N.A.*, 291 F.R.D. at 217 (emphasis added). Indeed, "[w]here a document is prepared for simultaneous review by legal and non-legal personnel and business advice is requested, it is not primarily legal in nature and is therefore not privileged." *Id.* (Citation omitted.) Therefore, in the corporate context, the privilege only applies to communications by an employee on matters within the scope of his corporate duties "when the employee is aware that the information is being provided to enable the corporation to obtain legal advice." *Stryker Corp. v. Ridgeway*, Nos. 1:13-CV-1066; 1:14-CV-889, 2015 WL 4425947, at *3 (W.D. Mich. July 20, 2015) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981)).

As the party claiming protection from the work-product doctrine, MiMedx bears the burden of showing that it applies,[15] and to sustain that burden it must "demonstrate by competent evidence and with particularity" that the doctrine protects "each document that is claimed to be privileged." *Towne Place Condo Ass'n v. Phila. Indemn. Ins. Co.*, 284 F. Supp. 3d 889, 899 (N.D. Ill. 2018). While certain documents "prepared to assist with a business decision may be protected work product where the document also can be said to have been prepared 'because of' the prospect of litigation," it is critical to remember that the Seventh Circuit "takes an extremely narrow view of this concept, allowing 'dual purpose' documents to be protected as work product

---

[15] *Webster Bank, N.A. v. Pierce & Assoc., P.C.*, No. 16 C 2522, 2018 WL 704693, at *4 (N.D. Ill. Feb. 5, 2018).

only if the 'primary motivating purpose' behind their creation is to aid in future litigation."
*Webster Bank, N.A.*, 2018 U.S. Dist. LEXIS 118653, at *13. Thus, even if some of the
documents MiMedx has identified in its privilege log "were prepared by lawyers and reflect legal
thinking," they are not protected by the work-product doctrine unless they were "prepared with
the primary motivating purpose of aiding in possible future litigation." *Id*. at *15. And, of course,
"[m]aterials created in the ordinary course of business which may have the incidental effect of
being helpful in litigation are not privileged." *RBS Citizens, N.A.*, 291 F.R.D. at 217.

 With the foregoing principles in mind, Fox asks the Court to undertake an in camera
review of the following documents over which MiMedx has claimed privilege in its revised log:
Document Nos. 1-8, 10-12, 25-27, 29, 32-34, 48, 53-56, 72-79, 81, and 107-108. Although
MiMedx asserts both attorney-client privilege and work product protection over these
documents, <u>none</u> include an attorney as either an author or primary recipient,[16] and the generic
descriptions MiMedx has provided – e.g., "confidential document prepared by or at the direction
of counsel" or "confidential communication regarding legal advice and strategy" – are not
"sufficiently detailed to allow the court" (or Fox) "to determine whether [MiMedx] has
discharged its burden of establishing the requirements" for protection. *Allendale Mut. Ins. Co. v.
Bull Data Sys.*, 145 F.R.D. 84, 88 (N.D. Ill. 1992); *see also Rao v. Bd. of Trs.*, No. 14-cv-
0662016 U.S. Dist. LEXIS 145298, at *16 (N.D. Ill. Oct. 16, 2016) (confirming that the party
withholding documents is required to provide an "adequate privilege log," which must "describe
the nature of the documents, communications, or tangible things not produced or disclosed," and
must "do so in a manner that without revealing the information itself privileged or protected, will
enable the other parties to assess the claim") (citation omitted); *RBS Citizens, N.A.*, 291 F.R.D. at

---

[16] As noted above, the mere "inclusion of general counsel does not transform all business
discussions into privileged attorney-client communications." *RBS Citizens,* 291 F.R.D. at 217.

218 (explaining that the privilege log must provide "a specific explanation of why the document is privileged'") (citation omitted).

The United States Supreme Court "has approved the practice of requiring parties who seek to avoid disclosure of documents available for in camera inspection," and "the practice is well established in the federal courts." *U.S. v. Zolin*, 491 U.S. 554, 569 (1989). And because an in camera review "'is a smaller intrusion upon the confidentiality of the attorney-client relationship than is public disclosure,'" the Court has held that "a lesser evidentiary showing is needed to trigger in camera review than is required ultimately to overcome the privilege." *Id*. at 572. Thus, the burden Fox bears in connection with this motion is "not a stringent one." *Id*.

Ultimately, "the decision whether to engage in in camera review rests in the sound discretion of the district court," which "should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review," and "the relative importance to the case of the alleged privileged information." *Id*. As explained in detail above, Fox has "show[n] a factual basis sufficient to support a reasonable, good faith belief that in camera inspection may reveal evidence that information in the materials is not privileged." *In re Grand Jury Investigation*, 974 F.2d 1068, 1075 (9th Cir. 1992). Accordingly, the Court should grant his motion.

**5. The Court should compel MiMedx to re-produce SVP of Global Sales Michael Carlton to answer questions regarding MiMedx's relationship with ▮▮▮▮▮▮▮▮▮▮▮▮.**

Fox has alleged that MiMedx engaged in illegal channel stuffing through both its "government and private sales channels[,]" (*See* ECF No. 147, Second Am. Counterclaim ¶¶ 4, 37, 99 (emphasis added)), and that Fox had refused to participate in MiMedx's channel-stuffing scheme. Among the distributors involved in MiMedx's unlawful activities is ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, as Fox noted in his deposition, ▮▮▮▮▮▮▮▮▮▮



(Premo Decl. Ex. 7, Fox Dep., 157:1-161:9.) Fox went on to explain that ▮

(*Id.* at 282:9-15

(emphasis added).)

In a Minute Order dated May 16, 2018, Judge Shah held that because MiMedx's channel stuffing is "the alleged misconduct that forms a factual predicate to Fox's [Illinois Whistleblower Act] claim," evidence pertaining thereto is relevant to this case. (*See* ECF No. 263.) It necessarily follows that evidence of the relationship between MiMedx and the distributors who participated in that misconduct – including ▮ – is likewise relevant.

Despite (or perhaps because of) the foregoing, when Fox's counsel inquired into the relationship between MiMedx and ▮ during the deposition of MiMedx SVP of Global Sales Michael Carlton, ▮ (*See* Premo Decl. Ex. 8, Carlton Dep., 313:1-324:14.) Fatal to that directive is the fact that "absent a claim of privilege," which MiMedx's counsel did not advance, "it is improper for counsel at a deposition to instruct a client not to answer." *Coates v. Johnson & Johnson*, 85 F.R.D. 731, 733 (N.D. Ill. 1980).

While MiMedx will no doubt counter that Fed. R. Civ. P. 30(d)(3) would have permitted its counsel to file a motion seeking to terminate or limit Carlton's deposition "on the ground that it is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses the deponent or party," he did not do that. Nor would such a motion have been

appropriate given: (a) the allegations in Fox's Second Amended Counterclaim implicating CPM in MiMedx's channel-stuffing activities; and (b) the Judge Shah's prior ruling confirming that evidence pertaining thereto is relevant to Fox's remaining claims. Ultimately:

> It is not the prerogative of counsel, but of the court to rule on objections. Indeed, if counsel were to rule on the propriety of questions, oral examinations would be quickly reduced to an exasperating cycle of answerless questions and court orders. Alternatively, if the plaintiffs' attorney believed that the examination was being conducted in bad faith, that the information sought was privileged, or that the deponents were being needlessly annoyed embarrassed, or oppressed, he should have halted the examination and applied immediately to the ex parte judge for a relief on the questions, or for a protective order pursuant to Rule 30(d).

*Coates*, 85 F.R.D. at 733 (citation omitted).

In light of the foregoing, MiMedx should be compelled to re-produce Carlton, who, in turn, should be compelled to answer questions regarding the Company's relationship with ▮ and its participation in MiMedx's unlawful channel stuffing activities. Additionally, given the indisputable impropriety of the instruction not to answer, the Court should award Fox the costs and attorney's fees he has incurred in bringing this motion and the costs associated with retaking Carlton's deposition.

**6.     The Court should compel MiMedx to produce personnel records for comparator employees, including disciplinary records and acknowledgments of receipt relative to MiMedx policies and procedures. (Defendant's 3rd Set of Requests for Production Nos. 11-19).**

Fox has alleged that MiMedx subjected him to unlawful discrimination/retaliation in violation of the Illinois Whistleblower Act and that it tortiously interfered with his subsequent employment out of a desire and intention to harm him. Critical to proving Fox's claims is evidence tending to establish that MiMedx has treated other employees subject to the same policies and procedures more leniently or that it has treated other employees who engaged in similar protected conduct with similar harshness. Further, MiMedx employee Steve Blocker's

written acknowledgements confirming his understanding that his work-related phone calls were neither private nor confidential are relevant in rebutting his general averment that he had expected his calls with Kruchoski regarding MiMedx's channel-stuffing (which Kruchoski recorded) were private and are hence inadmissible. *See* Fox Resp. in Opp. to Mot. to Strike (ECF No. 194) at 11–16.

Given the foregoing, Fox asked MiMedx to produce personnel records (including disciplinary histories) for a number of his former MiMedx colleagues, each of whom (a) were subject to the same or similar corporate rules or policies; (b) were reasonably subject to the same supervisors or decision-makers regarding personnel matters; and either (1) reported and objected to MiMedx's fraudulent schemes or comparable conduct or (2) engaged in conduct of comparable seriousness to that which MiMedx has used to as post hoc rationalization of Fox's termination. Specifically, Fox asked MiMedx to produce this comparator evidence for fellow whistleblowers Jess Kruchoski and Luke Tornquist; for current or former MiMedx sales force members Jennifer Duncan, Jason Mahnke, Sam Ball, Steve Blocker, and Brad Borth; and for current MiMedx management officials SVP of Wound Care Kevin Lilly and Senior Director of Operations Lou Roselli. (*See* Premo Decl. Ex. 9, Pl. Resp. and Obj. to Def. 3rd Set of Req. for Prod. Nos. 11-19, at 14-19.)

MiMedx refused to provide these documents, contending primarily that Fox's requests are overly broad and unduly burdensome, and that they seek information "that is irrelevant and immaterial to the subject matter of the pending litigation." (*Id*.) MiMedx also threw in a number of other boilerplate objections (as it has in response to virtually every single one of Fox's discovery requests); e.g., trade secret, attorney-client privilege, work product, outside the scope of ESI, etc., etc., etc. (*Id*.)

Fed. R. Civ. P. 26(b)(1) permits litigants to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the issues at stake in the action, the amount in controversy, the parties relative access to relevant information, the parties resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Although Rule 26 was amended in 2015 to include the oft-cited proportionality requirement, it remains true that "for purposes of production, the concept of relevance in discovery [remains] quite broad." *Duracell U.S. Operations v. JRS Ventures, Inc.*, No. 17 C 3166, 2018 WL 704686, at *7 (N.D. Ill. Feb. 5, 2018).

In apparent recognition of the foregoing principles, the Illinois federal courts have consistently held that the employees who are the subject of the requesting party's inquiry about possible comparators in discrimination and retaliation cases, "then the relevance objection falls to the wayside." *Sokn v. Fieldcrest Community Unit School Dist.*, No. 10-1122, 2013 WL 84702, at *4 (C.D. Ill. Jan. 7, 2013). Accordingly, "information about potential comparators is relevant and discoverable." *Assaf v. OSF Healthcare System*, No. 11-4108, 2014 WL 321860, at *3 (C.D. Ill. Jan. 29, 2014) (emphasis added).

"The similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (internal quotations omitted); *see also Kuttner v. Zaruba*, 819 F.3d 970, 974 (7th Cir. 2016). For instance, evidence an employer has taken adverse actions against other persons within the claimant's protected class or within another protected class (sometimes called "me too" evidence) is probative of intent. *Zafar Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008) ("[T]his kind of 'me too' evidence

can be relevant to a discrimination claim."); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (holding that a defendant's behavior toward or comments directed at other employees in the same protected group constitutes evidence of intentional discrimination against the plaintiff); *Quigley v. Winter*, 598 F.3d 938, 951 (8th Cir. 2010) (affirming the district court's decision to allow testimony from three other tenants who claimed they were victims of sexual harassment); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1287 (11th Cir. 2008) ("[T]he 'me too' evidence was admissible both because it was probative of the intent of the supervisors of Bagby Elevator to retaliate and discriminate against Goldsmith and was relevant to Goldsmith's hostile work environment claim."); *Simpson v. Kay Jewelers*, 142 F.3d 639, 642 (3d Cir. 1998) (noting that an employee may prove discrimination with evidence that employer has discriminated against other persons within the plaintiff's protected class or within another protected class).

Although it is not a prerequisite to establishing the relevance or discoverability of the above-named employees' personnel records, Fox volunteers some facts supporting the basis for requesting this discovery in the first place.

- Kruchoski and Tornquist both objected to the same fraudulent channel-stuffing scheme Fox had refused to participate in. Kruchoski was placed on a performance improvement plan[17] one business day after, and directly because of, his November 2, 2016 complaint of fraud, and was accused of insubordination. MiMedx terminated Kruchoski and Tornquist on December 12, 2016.

- Current MiMedx employee Jason Mahnke admitted to breaching his obligations to MiMedx but remains with the Company.

- Former MiMedx employee Jennifer Duncan is believed to have objected to MiMedx's channel-stuffing scheme and immediately received a retaliatory disciplinary letter before resigning.

---

[17] MiMedx has not provided this disciplinary write-up in response to Fox's discovery requests.

26

- Brad Borth is a former Regional Sales Director at MiMedx who is believed to have written a "Dear Pete" letter complaining of corporate malfeasance and terminated shortly thereafter.

- MiMedx Executive Vice President Kevin Lilly is alleged to have made vulgar, sexually charged, and derogatory statements about women, including former MiMedx employees and prostitutes, during a work-related trip—in apparent violation of the Company's anti-harassment policy—but remains employed at MiMedx. (Powers Decl. ¶¶ 18–22.)

Nor can MiMedx avoid responding to Fox's requests by making a blanket claim that they are unduly burdensome or disproportionate to the needs of the case because "[t]he mere fact that a party will be required to expend a considerable amount of time, effort, or expense in answering [a] discovery request[] is not a sufficient reason to precluded discovery." *Halvorson v. Credit Adjustments, Inc.*, No. 15-cv-6228, 2016 WL 1446219, at *2 (N.D. Ill. Apr. 11, 2016) (citation omitted). Instead, "[c]laims of undue burdensomeness require a <u>specific showing</u> of what is involved." *In re Peregrine*, 2015 WL 1344466, at *4 (quoting *Schaap v. Executive Indus., Inc.*, 130 F.D. 384, 387 (N.D. Ill. 1990). To support this burden, MiMedx "must actually show that responding to [Fox's] discovery would be unduly burdensome," which "'typically requires affidavits or other evidence supporting a party's assertion of burden.'" *Halvorson*, 2016 WL 1446219, at *2 (citation omitted). "Without a particularized showing," the court "<u>has no choice</u>" but to overrule the objection. *In re Peregrine*, 2015 WL 1344466, at *4 (emphasis added).

In objecting to Fox's request that it produce the foregoing comparator evidence, MiMedx has not even attempted to explain how providing personnel records of nine similarly situated current or former MiMedx employees would be burdensome at all, much less unduly so. Nor could it credibly make such a claim as those personnel records are almost certainly stored electronically, meaning that MiMedx can access them virtually immediately and produce them almost instantaneously. Given the relevance of this information, and MiMedx's failure to provide

27

any actual evidence tending to support its claim of burden, the Court should grant Fox's motion and compel MiMedx to produce personnel records for the above-named comparator employees (including their disciplinary records and acknowledgments that they received and understand MiMedx's policies and procedures), provided that social security numbers and private health information is redacted.

### 7. The Court should compel MiMedx to produce "Dear Pete" communications from former MiMedx employees Brad Borth and Tom Tierney (Defendant's Third Set of Requests for Production No. 36).

Fox seeks "Dear Pete" letters or e-mail communications that former MiMedx employees Brad Borth and Tom Tierney sent to Petit. (Premo Decl. Ex. 9, Pl.'s Resp. to Def.'s 3rd Set of Requests for Production No. 36, at 33-34).[18] Fox's counsel has reason to believe both Brad Borth and Tom Tierney made complaints to Petit about MiMedx's unlawful sales and accounting practices and were terminated shortly afterward. In meet-and-confers, MiMedx does not dispute that Borth and Tierney made complaints to Petit but again raises a relevancy objection. That Borth and Tierney made such reports objecting to MiMedx's practices; that Petit was purported aware of those complaints; and that Borth and Tierney were terminated shortly afterward is discoverable and relevant comparator evidence probative of intent. (*See* comparator discussion above.)

---

[18] Fox narrowed his request to these two individuals in meet-and-confers. ████████████████████

**8.** **The Court should compel CPN to search for and produce deleted text messages sent or received by CPN Chairman Mihir Taneja or Adam Miscik regarding (1) the reasons for terminating Fox and not terminating other MiMedx employees; and (2) any communications between CPN and MiMedx concerning Fox or other former MiMedx employees who then became employed by CPN.**

As this Court is aware, CPN was required to produce communications regarding, *inter alia*: (1) the reasons for terminating Fox and for not terminating other former MiMedx employees; and (2) any communications between CPN and MiMedx concerning Mr. Fox or other former MiMedx employees who then became employed by CPN. (*See* Premo Decl. Ex. 10, Subpoena Duces Tecum on CPN, Request Nos. 3–5; as modified by Minute Entry Order, ECF No. 202.). In response to this Court's Order, CPN produced no text message communications at all and no internal communications regarding CPN's reasons for terminating Fox or for not terminating other employees. Premo Decl. ¶ 2. In meet-and-confers, CPN's counsel admitted that any responsive text messages sent or received by either Taneja or Adam Miscik (another alleged co-decision-maker in Fox's termination from CPN) had been deleted and CPN would not attempt to retrieve them. Premo Decl. ¶ 2.



Evidence shows that on ███████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████. (Premo Decl. Ex. 13, Taneja Dep. 198:22–24; 233:4-234:20; 236:5–237:15.)[19] ██████████████████████ ██████████ (Premo Decl. Ex. 11, AT&T Records.) ████████████████ ██████████████████████ (Premo Decl. Ex. 12.) On July 20, 2017, Taneja fired Fox over the phone. (*Id.*)███████████████████████████ ███████████████████████

---

[19] ███████████████████████████████████████████████████ █████████████████████████████████████████████ (Premo Decl. Ex. 13, Taneja Dep. 236:5–13.).

29



███████████████████████████████████ (*See* Premo Decl. Ex. 11, AT&T Records.) ███████

███████████████████████████████████████████████████ (Premo

Decl. Ex. 13, Taneja Dep. 223:14–224:5; Petit Dep. 236:15–20.)

During his deposition, Taneja admitted that ███████████████████████

███████████████████████ (Taneja Dep. at 267:5–7; 268:23–269:7.) ████████

████████████████████████████████████████ (*Id.* at

267:5–7.) ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████ (Premo Decl. Premo Decl. Ex. 14.)

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████ (*See* Premo Decl. Ex. 13, Taneja Dep. 92:16–

96:18; 227:1-228:25.) ████████████████████████████████

(*See id.*) ████████████████████████████████████████

███████████ (*Id.* at 96:16-17.) ████████████████████████████

(*Id.* at 227:12–13.)

In light of CPN's and Taneja's admissions, Fox asked CPN to submit Taneja and

Miscik's cell phones to a third-party ESI vendor to recover any responsive text messages for

retrieval and production. Such messages are relevant to Fox's claims in that they would show

(directly or by inference): (a) that MiMedx had the intent or capacity to influence CPN's

personnel decisions; (b) that MiMedx was attempting to interfere with Fox's employment at

CPN; (c) that MiMedx had a desire and intention to harm and annoy Fox; and (d) that ███ ████████████████████████████████████████████. Given the relevance of the text messages Fox seeks, the only potential concern regarding their production might be the costs associated with searching Taneja's and Miscik's phone and retrieving them. However, Fox has obviated that concern by offering to pay all third-party ESI vendor costs associated with such search and retrieval. Thus, his request cannot be unduly burdensome, nor can it be or disproportionate to the needs of this case given the critical relevance of the information sought to key issues in this case, as well as Fox's inability to access the information by any other means. *See* Fed. R. Civ. P. 26(b)(1). Accordingly, the Court should compel the production and search of Taneja's and Miscik's mobile phone for deleted or undeleted text messages relating to Fox, for not firing other former MiMedx employees, and communications between MiMedx and CPN concerning former MiMedx employees.

> **9. The Court should compel MiMedx to produce accounts receivable reports, which illustrate the extent of its channel stuffing activities ((Defendant's 3rd Set of Requests for Production Nos. 21-22.)**

In his Third Request for Production of Documents, Fox asked MiMedx to produce two accounts receivable reports; specifically:

- The document entitled "AR Aging Summary Report as of Effective Date 06-22-2016", which Charlie Fernandez disseminated via e-mail on June 22, 2016; and

- An Accounts Receivable Aging Summary Report sufficient to show MiMedx's outstanding accounts receivable for AvKARE, Inc., as of December 31, 2016.

(Premo Decl. Ex. 9, Pl. Resp. and Obj. to Def. 3rd Set of Req. for Prod. Nos. 21-22, at 21-22.)

MiMedx refused Fox's request, regurgitating its customary litany of boilerplate objections, contending that the information Fox seeks is irrelevant, and insisting that producing communications from two individuals to Petit would somehow be unduly burdensome. (*Id*.) Yet

again, MiMedx offered no "affidavits or other evidence supporting [its] assertion of burden,'"[20] leaving the Court "no choice" but to overrule that objection. *In re Peregrine*, 2015 WL 1344466, at *4.

MiMedx's relevancy objection is equally unavailing, as the information contained in the accounts receivable reports confirms the existence (and illustrates the expansiveness) of MiMedx's channel stuffing activities. Specifically, these reports detail the amounts owed to MiMedx by the various third-parties it used to effectuate its channel stuffing, and the length of time those amounts remained outstanding. As noted above, Judge Shah has already ruled that the question of "whether MiMedx engaged in the alleged misconduct;" i.e., channel stuffing, "forms a factual predicate to Fox's claim under the Illinois Whistleblower Act." (ECF No. 263, Minute Order dated 5/16/18.) It follows as simple matter of logic that evidence tending to confirm MiMedx's participation in such conduct is likewise relevant and discoverable.

And even if the accounts receivable reports were not relevant to MiMedx's channel stuffing, they would remain relevant and discoverable because MiMedx cited them in its Complaint and because it relies on them to support its claims. Specifically, MiMedx has alleged that during the course of his employment at MiMedx, Fox "had access and was privy to" certain "confidential business sales information of MiMedx concerning its customers," including "accounts receivable reports detailing the amounts owed by MiMedx's customers and the aging of those accounts." (ECF No. 18, Amend Compl. ¶24 (emphasis added).) MiMedx goes on to allege that Fox provided those reports "to then current employees of MiMedx," which purportedly "violated Fox's contractual and fiduciary duties to MiMedx." (*Id*. at ¶ 29.)

---

[20] *Halvorson*, 2016 WL 1446219, at *2 (citation omitted).

Critically, Fox's counsel is aware that at least one other MiMedx employee—Charlie Fernandez—distributed copies of accounts receivable reports to MiMedx sales personnel – who, per MiMedx, are "not entitled to access" such information[21] – via email in the summer of 2016. This was approximately six months before MiMedx fired Fox for (allegedly) doing the exact same thing. The accounts receivable reports, and the email to which they were attached, are directly relevant to MiMedx's claims against Fox and his defenses thereto, in that they tend to prove Fox did not thereby violate MiMedx's policies and that MiMedx singled Fox out for adverse employment action and treated him differently from other employees who engaged in the same alleged conduct but who, unlike Fox, did not refuse to participate in the Company's channel stuffing scheme. Accordingly, the Court should compel MiMedx to produce them.

**10. The Court should compel MiMedx to produce documents pertaining to the investigation being conducted by the Securities and Exchange Commission (Defendant's 3rd Set of Requests for Production Nos. 31, 33-34).**

In his Third Set of Requests for Production Fox asked MiMedx to produce documents it has created, received, or otherwise obtained possession of or control over relating to the investigation the SEC is currently conducting into the channel stuffing allegations that gave rise to this (and other) lawsuits. Specifically, Fox requested:

31. All text messages between, among, or including Petit, Taylor, Carlton, Lilly, Kuntz, Cashman, or Dean since December 15, 2016 to September 15, 2017 relating to or concerning the Securities & Exchange Commission or the Securities and Exchange Commission's investigation into MiMedx.

33. All documents and communications MiMedx has received from the Securities and Exchange Commission since December 12, 2016.

34. All documents and communications MiMedx sent to the Securities and Exchange Commission since December 12, 2016, relating to or concerning Fox.

---

[21] (*See* ECF No. 18, Amend. Compl. ¶ 29.)

33

MiMedx refused to produce documents, arguing that Fox's requests are overly broad, unduly burdensome, irrelevant, not reasonably calculated to lead to the discovery of admissible evidence, not proportional to the needs of the case, and/or that they implicated trade secrets, the attorney-client privilege, or the work-product doctrine. (Premo Decl. Ex. 9, Pl. Resp. and Obj. to Def. 3rd Set of Req. for Prod. Nos. 31, 33-34.)

This Court has already ruled that as part of "the alleged misconduct that forms a factual predicate" to Fox's Illinois Whistleblower Act claim, evidence pertaining to MiMedx's communications with the SEC is relevant and discoverable. (ECF No. 263, Minute Order dated 5/16/18 (overruling MiMedx's objections to producing a 30(b)(6) witness regarding MiMedx's communications with the SEC).) Additionally, MiMedx has offered no affidavits or other evidence supporting its claim of undue burden. Finally, MiMedx has not even attempted to identify any trade secrets that might be implicated in documents it provided to the SEC, nor has it bothered to try and explain how any particular document it has produced to government regulators remains protected by the attorney-client or the work-product doctrine. As noted above, MiMedx bears the burden of establishing the applicability of it privilege claims on a "on a document-by-document basis." *O'Toole*, 2016 WL 4975203, at *2. It has failed to support that burden here, and the Court should therefore compel MiMedx to produce all documents exchanged between itself and the SEC regarding Fox and/or the Commission's investigation into MiMedx's unlawful channel stuffing before Fox re-deposes MiMedx's 30(b)(6) witness to testify on these same topics addressed in Judge Shah's recent order overruling MiMedx's objections.

11. **The Court should compel MiMedx employee Stephen Blocker to answer questions about ███████████████████████████████████████.**

On April 25, 2018, Fox's counsel deposed former MiMedx account executive and current MiMedx Assistant Vice President Steve Blocker. During the course of that deposition, Blocker ████████████████████████████████████████████████████████████████ ████. (Premo Decl. Ex. 15, Blocker Dep., 52:6-54:25.) ██████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████. (*Id.* at 59:23-60:3 ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████. When Fox's counsel asked Blocker ███████████████████████████████████ ████████████████████████████████████████████████████ MiMedx's counsel instructed Blocker not to answer, citing the attorney-client privilege and the work product doctrine. Although Blocker admitted ███████████████████████████████████████, Mr. Pernini prevented Blocker from answering any questions about ████████████████████████████████████████████████ ████████████████████████. (*Id.*) Further, Mr. Pernini instructed Blocker not to answer questions unrelated to the communications themselves that would shed light on the application or scope of Mr. Pernini's claims of privilege. The following exchanges provide an illustrative, but by no means exhaustive, example of Mr. Pernini's improper instructions:

███ ████████████████████████████

████████████████████████████████████████████
████████████████████████





***



\*\*\*



(*Id.* at 57:9-58:2; 59:11-60:3; 123:5-124:6; 124:16-125:5; 125:12-20; 125:25-126:8; 127:16-128:10; 128:25-129:3; 129:16-130:15.)

As explained in detail above, the attorney-client privilege applies only "where legal advice is sought from a professional legal advisor acting as such, and the communication relates to that purpose and is made in confidence by the client." *Patrick*, 154 F. Supp. 3d at 710. Fox's counsel asked Blocker questions about ███████████████████████████████████████ ███. Absent an attorney-client relationship (and from Blocker's testimony none existed), or any assertion by Blocker that ███████████████████████████████████████ ███████████████████████████████████████████████,[22] there is no attorney-client privilege. Accordingly, Mr. Pernini's reliance thereon as a basis for his instruction not to answer was misplaced.

---

[22] ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████.

Likewise inappropriate was Mr. Pernini's sweeping invocation of the work-product doctrine. *Rawat*, 2011 WL 3876957, at *2. As noted above, the party asserting work product protection has the burden of showing all of its elements" on "'a document by document basis.'" *Id*. During Blocker's deposition Mr. Pernini did not object to the disclosure of any particular document, but instead issued a blanket work-product objection when Fox's counsel asked

██████████████████████████████████████████████████████████████

███████████████████. Unfortunately for MiMedx the doctrine does not apply that broadly. It actually "operates in narrow confines,"[23] and must be applied with due consideration for its purpose, which is "to keep counsel's work from his opponent in the litigation so that it will not be used against him." *In re Visa Check/MasterMoney Antitrust Litigation*, 190 F.R.D. 309, 314 (E.D.N.Y. 2000).

In connection with his myriad instructions not to answer, MiMedx's counsel never identified any particular document that he (or any other lawyer) had prepared in anticipation of litigation. Accordingly, MiMedx has failed to even arguably meet the burden it bears in establishing its entitlement to protection under the work-product doctrine. As such, the Court should compel MiMedx to re-produce Blocker, who should, in turn, be compelled to answer questions ████████████████████████████████████████████████████████

████████████████████████████████████████████████████.

**12.     The Court should compel MiMedx to produce documents responsive to Fox's 3rd Set of Requests for Production of Documents Nos. 1-8, 10, 24, 26-30, 32, 46-66, in accordance with search terms that Fox has proposed, to which MiMedx has largely agreed, or this Court has previously ordered.**

In February 2018, Fox served a Third Set of Requests for Production of Documents on MiMedx. On March 23, 2018, MiMedx responded with a litany of objections and refused to

---

[23] *Front Royal Ins. Co. v. Gold Players, Inc.*, 187 F.R.D. 252, 257 (W.D. Va. 1999).

engage in any search for responsive documents—despite the deadline for production occurring before the discovery deadline. (*See generally* Premo Decl. Ex. 9, Pl. Resp. and Obj. to Def. 3rd Set of Req. for Prod.).

After further meet-and-confers, on April 4, 2018, MiMedx stated that it would consider search terms that Fox proposed for Request Nos. 1-8, 10, 24, 26–30, 32, 44–66. Premo Decl. Ex. 16. On April 6, 2018, Fox's counsel sent proposed search terms to MiMedx. Premo Decl. Ex. 17. On April 23, 2018, MiMedx replied that Fox's search returned over 16,500 documents for review. As a compromise, MiMedx proposed running a handful of searches that would result in 1,080 hits for review. After some back and forth, on May 21, 2018, Fox's counsel proposed two targeted e-mail searches.[24]

| Email Searches | | | |
|---|---|---|---|
| **Custodians** | **Search Terms** | **Time Frame** | **TOTAL HITS** |
| Petit Taylor Carlton Lilly Kuntz Cashman | • GAAP<br>• "audit committee"<br>• Recogni* /10 reven*<br>• ("federal revenue")<br>• Sarbanes-Oxley OR SOX OR Sarbanes/Oxley OR Sarbanes OR Oxley<br>• Jess OR Kruchoski<br>• Luke OR Tornquist<br>• Complain*<br>• Violat*<br>• Discipl*<br>• Warn* | November 1, 2016 to November 7, 2016 at 12:40 p.m. CST | 1025 |
| Petit Taylor Cashman | • tmizell@avkare.com AND credit* OR return* OR missing OR reconcile* OR commiss* | October 1, 2015 to October 1, 2016 | 5 |

---

[24] Despite agreeing to consider additional search terms, and despite Fox narrowing his requested search terms to obtain a number of hits that MiMedx deemed acceptable, MiMedx has refused to agree to Fox's proposed search terms after more than two months of negotiations.

Emails containing these terms are responsive to Fox's 3rd Set of Requests Nos. 1, 3, 5, 7, 46, 29–30, 51–52. (*See* Premo Decl. Ex. 9.) For instance, the first set of search terms cover a seven-day period immediately before and immediately after Messrs. Kruchoski and Tornquist objected to the Company's fraudulent channel-stuffing scheme. MiMedx has refused to produce, for example, (1) the joint report of securities fraud by Fox's former subordinates, Messrs. Kruchoski and Tornquist; (2) internal communications evincing corporate officers' reactions to Messrs. Kruchoski and Tornquist's joint report; and (3) the discipline Kruchoski received one business day after Kruchoski and Tornquist's joint report and internal communications regarding the decisional process to discipline. This is not only relevant comparator evidence; Mr. Petit has already testified that he believed Fox had some involvement in Kruchoski and Tornquist's report—no doubt because of Fox's extensive knowledge of the fraud and his prior refusal to engage in it. Fox respectfully asks this Court to order MiMedx to produce all non-privileged documents containing these search terms, along with a privilege log, containing these search terms.

Finally, Fox has further asked that MiMedx produce text messages from its previous searches containing search terms "Jess", "Luke", "Kruchoski", or "Tornquist", as well as any text messages immediately before and after messages containing the search terms. Notably, this Court has previously ordered MiMedx, and MiMedx has previously agreed, to search for and produce responsive documents containing these search terms within the scope outlined below.

| Text Messages | | | |
|---|---|---|---|
| **Custodians** | **Search terms** | **Scope** | **TOTAL HITS** |
| Petit Taylor | Jess Kruchoski Luke Tornquist | November 1, 2016 to date of collection (previously agreed to and searched by MiMedx). *See* ECF No. 124 at 2 (ordering the search of Petit and Taylor's company-owned cell phones); Premo Decl. Ex. 18 (search terms previously run by MiMedx). | 22 |
| Carlton Lilly Kuntz Cashman | Jess Kruchoski Luke Tornquist | December 12−29, 2016<br><br>*See* ECF No. 178 (granting a "search for and production of texts from custodians Lilly, Carlton, Kurtz and Cashman for the period December 12−29, 2016, using the search terms previously used in the search of texts for Petit and Taylor."). | -- |

Text messages containing these terms are responsive to Fox's 3rd Set of Requests Nos. 46, 29–30, 51–52. Premo Decl. Ex. 9. These text messages have already been searched and reviewed pursuant to the parties' agreements and this Court's Orders. Fox respectfully asks this Court to order MiMedx to produce all non-privileged text messages containing these search terms, along with a privilege log.

## **CONCLUSION**

For the foregoing reasons, Fox respectfully asks the Court to grant the relief requested above.

Dated: June 20, 2018     Respectfully submitted,

**MICHAEL FOX**

  */s/ Stephen M. Premo*    
One of His Attorneys

Clayton D. Halunen (N.D. Ill. Bar No. 219721)
Mack H. Reed (ARDC No. 6287171)
Stephen M. Premo (*admitted pro hac vice*)
Christopher J. Moreland (*admitted pro hac vice*)
Halunen Law
1650 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Telephone:  (612) 605-4098
Facsimile:  (612) 605-4099
halunen@halunenlaw.com
reed@halunenlaw.com
premo@halunenlaw.com
moreland@halunenlaw.com

*/s/ Christopher S. Griesmeyer*    
Christopher S. Griesmeyer (ARDC No. 6269851)
Adam C. Maxwell (ARDC No. 6306534)
Greiman, Rome & Griesmeyer, LLC
Two North LaSalle, Suite 1601
Chicago, Illinois 60602
Bus: (312) 428-2750
Fax: (312) 332-2781
cgriesmeyer@grglegal.com
amaxwell@grglegal.com

*ATTORNEYS    FOR    DEFENDANT/COUNTER-
PLAINTIFF MICHAEL FOX*

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2018, I electronically filed the attached **Memorandum of Law in Support of Fox's Omnibus Motion to Compel Discovery** with the Clerk of the Court via the CM/ECF System, which will send notification of such filing to those registered to receive electronic notices via email transmission at the email addresses provided by them:

Ami N. Wynne
Jason G. Marsico
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
awynne@sidley.com
jmarsico@sidley.com

Joseph D. Wargo
Shanon J. McGinnis
David M. Perini
Heather N. Fugitt
WARGO & FRENCH, LLP
999 Peachtree Street, NE, 26th Floor
Atlanta, GA 30309
jwargo@wargofrench.com
smcginnis@wargofrench.com
dpernini@wargofrench.com
hfugitt@wargofrench.com

I further certify that on June 20, 2018, I sent a true and correct copy of the foregoing **Memorandum of Law in Support of Fox's Omnibus Motion to Compel Discovery** to the following recipients via e-mail and U.S. Mail:

Jenay E. Iurato
Iurato Law Firm, PL
10012 N. Dale Mabry, Suite 203
Tampa, Florida 33618
jenay@iuratolawfirm.com

Chris Whelchel
Michael Carpenter
GRAY LAYTON KERSH SOLOMON
FURR & SMITH, P.A.
516 S New Hope Road
Gastonia, NC 28054
jwargo@wargofrench.com
smcginnis@wargofrench.com
dpernini@wargofrench.com
hfugitt@wargofrench.com

*/s/Stephen M. Premo*
Stephen M. Premo (*admitted pro hac vice*)
Halunen Law
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
premo@halunenlaw.com