IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 1:16-cv-11715-MSS-SIS |
| -vs- | ) | |
| | ) | |
| MICHAEL FOX, | ) | Judge Manish S. Shah |
| | ) | |
| Defendant. | ) | |
| _____ | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| MICHAEL FOX, | ) | |
| | ) | |
| Counter-Plaintiff | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF/COUNTER-DEFENDANT MIMEDX GROUP, INC.'S MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

FACTS ............................................................................................................................... 3

    A.  Fox's Employment at MiMedx: ............................................................................ 3
    B.  Fox's Contractual and Legal Duties: .................................................................... 3
    C.  MiMedx Discovered Fox Breached His Duties: .................................................. 4
    D.  Fox's "Code Red Plan": ....................................................................................... 4
    E.  Fox Failed to Report Known Wrongdoing: ......................................................... 5
    F.  Fox Improperly Forwarded MiMedx Confidential Information ........................... 5
    G.  Fox Behaved In A Manner Unbefitting A National Vice President .................... 6
    H.  MiMedx Interviewed Fox and Fox Lied .............................................................. 6
    I.  MiMedx Terminated Fox ...................................................................................... 7
    J.  After Acquired Evidence ...................................................................................... 7
    K.  Fox's Employment at CPN .................................................................................. 7
    L.  ████████████████████████████████████ ....... 9
    M.  Fox Filed Counterclaims in this Action ............................................................... 9

LEGAL STANDARDS ...................................................................................................... 9

ARGUMENT .................................................................................................................... 10

I.      THERE IS NO EVIDENCE THAT MIMEDX TORTIOUSLY INTERFERED
       WITH FOX'S EMPLOYMENT AT CPN. ............................................................ 10

    A.    Fox Cannot Show that MiMedx Intentionally and Unjustifiably Interfered
         Fox's Employment at CPN, Which Interference Induced or Caused CPN to
         Terminate Fox. .............................................................................................. 10
    B.    Fox Cannot Show A Reasonable Belief in a Continuing Expectancy at CPN.
         ...................................................................................................................... 13

II.     FOX'S ILLINOIS WHISTLEBLOWER ACT SHOULD BE DISMISSED .......... 14

    A.    Fox Cannot Prove MiMedx Retaliated or Threatened Retaliation "Because
         Of" A Refusal to Participate in Allegedly Illegal Activity ............................ 15
    B.    Fox's Only Alleged "Refusal to Participate" Occurred In Q3 2015. ........... 17
    C.    Fox Cannot Prove that MiMedx Retaliated or Threatened to Retaliate
         "Because Of" His Alleged Q3 2015 "Refusal to Participate" ....................... 18

        i.     MiMedx Did Not "Demote" Fox ..................................................... 18
        ii.    MiMedx Promoted Fox to National Vice President for Legitimate,
           Non-  Retaliatory Reasons ............................................................. 20

iii.    MiMedx's Actions on December 29, 2016 Lack Any Causal Connection to Fox's Alleged "Refusal to Participate" During Q3 2015. ................................................................................................ 20

iv.    MiMedx's Alleged "Threat" Lacks Any Causal Connection to Fox's Alleged "Refusal to Participate" During Q3 2015. ........................... 23

v.    Any Damages for Alleged Retaliation Are Cut-Off Pursuant to the Doctrine of After-Acquired Evidence ................................................ 24

III.    FOX'S ILLINOIS WAGE PAYMENT AND COLLECTION ACT CLAIM SHOULD BE DISMISSED AS MOOT ................................................................. 25

CONCLUSION ............................................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alderson v. Weinstein*,
    2018 IL App (2d) 170498 ........................................................................................25

*Ali v. Cook Cty. Bd. of Review*,
    No. 05 C 1708, 2006 WL 5505098 (N.D. Ill. Jan. 9, 2006), *aff'd sub nom. Ali v. Shaw*, 481
    F.3d 942 (7th Cir. 2007) ........................................................................................13

*Barber v. Am. Airlines, Inc.*,
    241 Ill. 2d 450 (2011) ............................................................................................25

*Byker v. Sequent Computer Sys., Inc.*,
    No. 96 C 2297, 1997 WL 639045 (N.D. Ill. Oct. 1, 1997) ................................10, 12

*Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & W. Ry. Co.*,
    195 Ill. 2d 356 (2001) ............................................................................................11

*Cashman v. Shinn*,
    109 Ill. App. 3d 1112, 441 N.E.2d 940 (1982) ......................................................13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).............................................................................................9, 10

*Chen v. City of Chicago*,
    2017 IL App (1st) 153582-U ..................................................................................25

*Collins v. Bartlett Park Dist.*,
    2013 IL App (2d) 130006, 997 N.E.2d 821 ...........................................................15

*Corah v. Bruss Co.*,
    2017 IL App (1st) 161030, 77 N.E.3d 1038, 1043 .................................................15

*Elue v. City of Chicago*,
    No. 16 CV 09564, 2017 WL 2653082 (N.D. Ill. June 20, 2017)......................16, 20

*Garcia v. U.S. Postal Serv.*,
    414 F. App'x 855 (7th Cir. 2011) ..........................................................................20

*Hindo v. Univ. of Health Scis./Chicago Med. Sch.*,
    237 Ill. App. 3d 453 (1992) ...................................................................................14

*Huang v. Fluidmesh Networks, LLC*,
    No. 16-CV-9566, 2017 WL 3034672 (N.D. Ill. July 18, 2017)..............................15

*James v. Intercontinental Hotels Grp. Res., Inc.*,
   No. 09-CV-781, 2010 WL 529444 (N.D. Ill. Feb. 10, 2010) .................................................13

*Keen v. Merck Sharp & Dohme Corp.*,
   No. 15-CV-1178, 2018 WL 1156203 (N.D. Ill. Mar. 5, 2018).................................................19

*Lalowski v. Corinthian Sch., Inc.*,
   No. 10 C 1928, 2013 WL 1788353 (N.D. Ill. Apr. 26, 2013).................................................24

*LaRiviere v. Bd. of Trustees of S. Illinois Univ.*,
   2015 IL App (5th) 140443-U ..................................................................................................16

*Lucas v. Cty. of Cook*,
   2013 IL App (1st) 113052, 987 N.E.2d 56 ...............................................................15, 17, 18

*McKennon v. Nashville Banner Pub. Co.*,
   513 U.S. 352 (1995).................................................................................................................24

*MiMedx v. Fox*,
   No. 8:18-mc-00012-EAK-CPT (M.D. Fla.), ECF No. 6 at 15 ................................................12

*Money Mgmt., Inc. v. Thomas*,
   2017 IL App (2d) 160333-U .....................................................................................................18

*Montes v. Cicero Pub. Sch. Dist. No. 99*,
   141 F. Supp. 3d 885, 900–01 (N.D. Ill. 2015) ........................................................................13

*Montoya v. Atkore Int'l, Inc.*,
   No. 17 C 3628, 2018 WL 1156245 (N.D. Ill. Mar. 2, 2018) ............................................15, 17

*Morris v. Ashland, Inc.*,
   No. 12 C 5487, 2014 WL 4066213 (N.D. Ill. Aug. 15, 2014)..............................16, 17, 20, 23

*Nelson v. Levy Home Entm't, LLC*,
   No. 10 C 3954, 2012 WL 403974 (N.D. Ill. Feb. 8, 2012)......................................................17

*Parks v. Speedy Title & Appraisal Review Servs.*,
   318 F. Supp. 3d 1053, 1070 (N.D. Ill. 2018) ..........................................................................16

*Porter v. City of Chicago*,
   700 F.3d 944 (7th Cir. 2012) ...................................................................................................16

*Roberts v. Bd. of Trustees Cmty. Coll. Dist. No. 508*,
   2018 IL App (1st) 170067.........................................................................................................15

*Robinson v. Alter Barge Line, Inc.*,
   513 F.3d 668 (7th Cir. 2008) ...................................................................................................15

*Sardiga v. N. Tr. Co.*,
 409 Ill. App. 3d 56, 948 N.E.2d 652 (2011) ...........................................................15

*Schlicksup v. Caterpillar, Inc.*,
 No. 09-CV-1208, 2010 WL 2774480 (C.D. Ill. July 13, 2010)..............................16

*Smith v. Allstate Ins. Corp.*,
 No. 00 C 7822, 2001 WL 1000736 (N.D. Ill. Aug. 29, 2001)...................16, 18, 19

*Tyrrell v. Neiman-Marcus Grp., Inc.*,
 No. 94 C 5979, 1996 WL 28478 (N.D. Ill. Jan. 19, 1996) ....................................12

*USA Satellite & Cable, Inc. v. Mac Naughton*,
 No. 15 C 6331, 2018 WL 4110745 (N.D. Ill. Aug. 28, 2018)................................11

*Werblood v. Columbia Coll. of Chicago*,
 180 Ill. App. 3d 967, 536 N.E.2d 750 (1989) ......................................................13

*Williams-Green v. J. Alexander's Restaurants, Inc.*,
 277 F.R.D. 374 (N.D. Ill. 2011)...........................................................................25

*Zelenika v. Commonwealth Edison Co.*,
 No. 09 C 2946, 2012 WL 3005375 (N.D. Ill. July 23, 2012) ..........................16, 17

**Statutes**

740 ILCS 174/15...........................................................................................14, 23

740 ILCS 174/20.....................................................................................14, 17, 23

740 ILCS 174/20.1........................................................................................14, 23

740 ILCS 174/20.2........................................................................................14, 23

740 ILCS 174/5....................................................................................................18

Illinois Wage Payment and Collection Act......................................................2, 3, 25

**Other Authorities**

Fed R. Civ. P. 56(a) ...............................................................................................9

## INTRODUCTION

Defendant Michael Fox ("Fox"), a former national-level Vice President at Plaintiff MiMedx Group, Inc. ("MiMedx"), was properly terminated by MiMedx for repeatedly violating his contractual and other duties to MiMedx, including:

- developing and beginning to implement a "Code Red Plan" to start an independent distributorship and to recruit other MiMedx employees to join him while employed as a national vice president of MiMedx;

- failing to disclose to MiMedx that other MiMedx employees were violating their duties by selling other companies' medical products on the side while fully employed by MiMedx, and actively encouraging such actions;

- deliberately disclosing confidential information to those not entitled to receive it, including forwarding confidential documents to his personal email to avoid detection;

- lying about his knowledge of these activities during MiMedx's investigation; and

- fostering an atmosphere antagonistic to management, including emailing subordinates with violent threats against others members of management.

In addition, MiMedx discovered that, while employed by MiMedx, Fox engaged in a sexual relationship with a direct subordinate and failed to report this to MiMedx. Indeed, MiMedx discovered that Fox exchanged texts saying the subordinate "owed" Fox for his acts of "playing favorites" over other team members. Despite all this evidence, in Fox's counterclaims, he argues his termination and other personnel actions taken by MiMedx were unjustified and retaliatory. Fox even tries to blame his failure at his next job on MiMedx, claiming that MiMedx tortiously interfered with that job. As set forth below, all these claims fail as a matter of law.

First, Fox cannot show that MiMedx tortiously interfered with his subsequent employment at CPN Biosciences, LLC ("CPN"). Rather, the evidence shows that Fox failed spectacularly as a CPN employee. Indeed, CPN's Chairman and CFO both testified that Fox was fired for his poor performance—███████████████████████████

████████████████—and that MiMedx had nothing to do with his termination. Ignoring this testimony, Fox contends that █████████████████████████████████████████████ ████████████████, MiMedx must have interfered with his employment. Such rank speculation cannot survive summary judgment.

Second, Fox's claim under the Illinois Whistleblower Act ("IWA") fails because Fox cannot show MiMedx retaliated against him "because of" any "refusal to participate" in illegal activity. Fox only identifies one purported "refusal" in the third quarter of 2015 ("Q3 2015"), after which he falsely claims MiMedx demoted him, and then—well over a year later—fired him, reduced his pay and prevented him from selling stock options. The undisputed facts, however, show precisely the opposite. MiMedx *promoted* Fox in January 2016, giving him a national title and a $████ increase in base salary, resulting in a total compensation increase of over $████. Such a promotion is not an adverse employment action. Further, Fox cannot establish any causal link between the purported Q3 2015 "refusal" and actions *14 months* later both because of the substantial passage of time and because MiMedx had legitimate, non-retaliatory reasons for its actions.[1]

In any case, Fox's damages must be cut off under the after-acquired evidence doctrine. As MiMedx confirmed in March 2017, Fox had a sexual relationship with a direct subordinate throughout most of 2016 and he failed to report that relationship to MiMedx—a terminable offense. Thus, any damages for the IWA claim must be cut off as of March 2017.

Finally, because MiMedx has tendered the entire amount Fox claims he is owed under the Illinois Wage Payment and Collection Act, this claim is now moot. The Court should thus grant

---

[1] Indeed, Fox's story makes no logical sense. It requires this Court to believe that MiMedx retaliated by giving Fox a promotion and a significant raise, then waited 14 months to fire him.

MiMedx summary judgment.

## FACTS

**A. *Fox's Employment at MiMedx:*** MiMedx is a leading regenerative medicine company that sells products used in numerous applications, including in wound care. Pl's Stmt. of Undisp. Material Facts ("SUMF") ¶ 1. Fox joined MiMedx in July 2012, eventually becoming an Area Vice President ("AVP") supervising sales employees in a region of the country. *Id*. ¶ 2. In December 2015, as part of a new company initiative, Fox was promoted to national Vice President of Federal and Academic Institutions. *Id*. ¶¶ 7-9, 11. MiMedx gave Fox a $ ▮▮▮ base salary raise, with an opportunity for bonuses for meeting certain goals.[2] *Id*. Due to this promotion, Fox made over $ ▮▮▮ more in 2016 than he had in 2015. *Id.* ¶ 14.

**B. *Fox's Contractual and Legal Duties:*** As part of his employment, Fox signed a Non-Competition Agreement, in which he agreed not to sell certain non-MiMedx products, including collagen-based products, both during and for one year following his employment. *Id.* ¶ 4. Fox also agreed to "faithfully devote [his] best efforts" to MiMedx. *Id.* ¶ 4. Fox also signed a Confidentiality and Non-Solicitation Agreement, in which he agreed to maintain the confidentiality of MiMedx information while employed and for three years thereafter, and also agreed not to solicit employees or customers while employed and for one year thereafter. *Id.* ¶ 5. Fox also agreed to "faithfully perform the duties assigned to him" and to not engage in any activities that would interfere in his full-time employment or cause a conflict of interest. *Id.* ¶ 5. Fox also agreed to abide by all company policies. *Id.* ¶ 5. Among other things, MiMedx's policies (a) require that employees disclose all activities that ***might*** cause a conflict of interest

---

[2] Fox received advances on these bonuses, but if he failed to meet his goals he had to "true-up" at the end of the quarter. *Id.* ¶ 9.

(including outside employment), (b) prohibit employees from transmitting confidential information to "other employees inside the Company who do not have a legitimate need and authorization to know the information," and (c) require employees to report any actual or apparent violations of the law or ethical standards. *Id.* ¶ 6.

**C. MiMedx Discovered Fox Breached His Duties:** In late 2016, MiMedx learned that a number of employees were selling medical products for other companies on the side while employed by MiMedx, in violation of their contracts and duties of loyalty to MiMedx. *Id.* ¶ 34. In investigating this side-selling, MiMedx learned that Fox not only knew of and encouraged these side sales, but had plans to take personal advantage of these breaches, as described below.

**D. Fox's "Code Red Plan":** MiMedx discovered that on May 6, 2016, while serving as a national vice president, Fox started developing his "Code Red Plan," an apparent plan to form an independent distributorship by recruiting current MiMedx salespeople to sell non-MiMedx products, in addition to MiMedx products. Fox's Code Red document listed current MiMedx employees Fox would hire, and the products from other companies that he would sell. *Id.* ¶ 16-17. His stated goal on May 9, 2016, was to become a "distributor with power" to increase his "influence and negotiating power." *Id.* ¶ 18. Fox was not waxing poetically; he took concrete steps to begin executing his plan:

- ███████████████████████████████████████████████████████
  ██████████████████████████████████████████ *Id.* ¶ 19, 48.
  ███████████████████████████████████ *Id.* ¶ 19.

- ███████████████████████████████████████████████. *Id.* ¶ 20.
  As a result, Fox could receive confidential, CPN information and sign-up to sell, but could not share any information he received with his current employer—MiMedx— which he was required to do under MiMedx's policies regarding conflicts of interest.

- On May 16, 2016, Fox set up his own LLC, known as F3 Medical, LLC. *Id.* ¶ 21.

- ████████████████████████████████████████████████████████

4

████████████████████████████████████████████ *Id.* ¶
22.

While Fox ultimately did not decide to sell for CPN at that time (*id.* ¶ 23), his plan to start a

distributorship was known by other employees.  *Id.* ¶ 24.

     **E.  *Fox Failed to Report Known Wrongdoing:***  In addition to having his own plan, Fox

was aware of and encouraged other employees' side sales, but hid those facts from management.

For example, Fox knew about and encouraged Taft Mills' selling CPN products on the side, yet

he never reported that to MiMedx.  *Id.* ¶¶ 25-26.  Another employee Jason Mahnke,

unequivocally testified that Fox encouraged him to sell on the side.  *Id.* ¶ 27.  Fox also received a

text message in October 2014 from yet another employee, Jess Kruchoski, discussing the

"commission numbers" that another MiMedx employee could "make connecting [a non-MiMedx

product] at San Antonio."  *Id.* ¶ 28.

     **F.  *Fox Improperly Forwarded MiMedx Confidential Information:***  MiMedx

discovered that, in direct violation of MiMedx policies, Fox forwarded confidential, national

reports numerous times to employees at MiMedx who were not entitled to receive them.  *Id.* ¶¶

29-32.  For example, on January 6, 2016, Fox forwarded a confidential report to his personal

email, and then forwarded that report on to Jess Kruchoski's personal email.  *Id.* ¶ 31.  There was

no business reason for Fox to send information to his personal email, much less to the personal

email of another employee, who he was not even supervising at the time.  *Id.* ¶ 31.  When asked

at his deposition, Fox could not provide a business reason for why he sent this material to Mr.

Kruchoski—because there is no such reason.  *Id.* ¶ 31.  Moreover, on November 1, 2016, Fox

again forwarded confidential MiMedx information to his personal email and then on to Mr.

Kruchoski's personal email—this time, a spreadsheet containing ***three years*** of nationwide,

customer-specific data.  *Id.* ¶ 32.  Again, there is no conceivable business reason to provide for

Fox to have provided this information to Kruchoski.

**G. Fox Behaved In A Manner Unbefitting A National Vice President:** Fox also behaved in a manner unfitting of a national vice president. Fox fostered discontent within the sales force, including threats of violence to management. *Id.* ¶ 33. For example, Fox told one lower-level employee he wanted to "break" the "chicken neck" of his boss. *Id.* ¶ 33, Ex. 34. Similarly, Fox wrote to his direct subordinate that another member of MiMedx's management needed ███████████ *Id.* ¶ 33, Ex. 45. When a lower-level employee stated, "I can't believe the disconnect with HQ and how fucking ungrateful and out of touch they are with what we do every day," Fox apparently agreed and stated that management provided "the worst example of leadership [he had] ever seen." *Id.* ¶ 33, Ex. 46. On at least one occasion, Fox even suggested to another lower-level employee that they each "bolt" from MiMedx if the Company was not sold by October 2016. *Id.* ¶ 33, Ex. 33.

**H. MiMedx Interviewed Fox and Fox Lied:** MiMedx interviewed Fox on December 12, 2016 about his knowledge of side sales. *Id.* ¶ 35. During this interview, Fox lied to management, denying any knowledge of anyone selling on the side. *Id.* ¶ 35. Fox continued these lies in an affidavit provided to this Court, where Fox denied ever knowing of or enabling any employee to sell products on the side. ECF No. 28 at 35 ("I have never knowingly worked with or enabled Jess Kruchoski ('Kruchoski') – or any other current or former MiMedx employee – to sell any products other than MiMedx products to MiMedx customers."). His statements to MiMedx management and this Court, however, are false. *See id.* ¶ 26, Ex. 32 (May 24, 2016 text message, in which Mills states: "First CPN contract signed today! Word!" and Fox responds: "WoooooHoooo!"). When confronted with his knowledge of Taft Mills's side sales at his deposition, Fox argued that he believed that CPN's products were not "competitive" so he did

not disclose that information to MiMedx. *Id.* ¶ 36. As Fox knows, however, MiMedx's non-competition agreements preclude employees from selling, *inter alia*, collagen-based products. *Id.* ¶ 4. Fox, who received ███████ from CPN and subsequently was employed by them, was fully aware that at least two of CPN's products are collagen-based products. *Id.* ¶¶ 19-20, 48, 50. Thus, even his *post hoc* explanation for his statements is false.

**I. MiMedx Terminated Fox:** As a result of the foregoing, on December 29, 2016, MiMedx terminated Fox for cause. *Id.* ¶¶ 37-38. By operation of contract, any stock options not yet exercised by Fox lapsed on this date. *Id.* ¶ 39. Moreover, MiMedx determined that Fox had not met his performance objectives for the fourth quarter of 2016, and thus MiMedx exercised a "true-up" on the previously-paid advance of his bonus. *Id.* ¶ 40. After MiMedx terminated Fox, MiMedx filed this Action to recover for his contractual and legal breaches.

**J. After-Acquired Evidence:** After his termination, MiMedx discovered that Fox, while employed with MiMedx, had an ongoing sexual relationship with a direct subordinate that he never disclosed to management. *Id.* ¶¶ 42-44; *see also id.*, Ex. 26 (Fox's subordinate offering him a "15k massage"); *Id.* ¶ 27 (Fox tells his subordinate she owes him "$18,328 of back rubs" and he is on the "Fox Value Analysis Committee"); *Id.* ¶ 28 (after Fox implies they are sharing a hotel room, his subordinate says Fox might have to start doing that with another team member "so that ur not playing favorites"). Fox's failure to report this clear conflict of interest is a terminable offense. *Id.* ¶ 44.

**K. Fox's Employment at CPN:** Following his termination from MiMedx, on April 10, 2017, Fox went through with his original plan and joined CPN. *Id.* ¶ 50. ███████████ ███████████████████████████████████████████████████████ *Id.* ¶ 52. As CPN testified, however, Fox utterly failed to achieve these promises. *Id.* ¶ 53-56. Indeed, Fox

███████████████████████████████—despite the fact that he had a salary of ███████████

████████████████. *Id.* ¶ 51, 54. ██████████████████████████ *Id.* ¶ 56.

     Moreover, discovery has established that, instead of delivering on his promises, ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ *Id.* ¶ 58.  Less than a week later, Fox had a

████████████████████████████████████████████████

████████████████████████████████████████—when, in fact,

he worked at CPN.[3]  *Id.* ¶ 59. ████████████████████████████

████████████████████████████████████████ *Id.* ¶ 60.

     As a result of his consistently poor performance, on July 20, 2017, CPN terminated Fox.

*Id.* ¶ 61.  During this same time, ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

*Id.* ¶ 66-68.  For example, ████████████████████████████████

████████████████. *Id.* ¶ 69. ████████████████████████████

████████████████████. *Id.* ¶ 69. ████████████████████████

████████████████████████████ *Id.* ¶ 69.

     Discovery also confirmed that Fox continued a surreptitious sexual relationship with the

same MiMedx subordinate, ████████████████████████████.  As was his

--------

[3] Indeed, Fox appears to have internalized this lie so much that he repeated the lie at his
deposition until confronted with the date of the meeting.  *Id.* ¶ 59.

pattern, ███████████████████████████. *Id.* ¶¶ 71-72. ██████████████

███████████████████████████████ *Id.* ¶ 73.



*L.* ████████████████████████████████

███████████████████████████████████

██████████████ *Id.* ¶ 57. ██████████████████████

██████████████████████████████████████

████████████████████████████ *Id.* ¶ 76. ████████

████████████████████████████████████

███████████████████████████████████ *Id.*

¶ 77. Nor did MiMedx ever threaten to sue CPN for any reason, including Fox. *Id* ¶ 78.

**M. Fox Filed Counterclaims in this Action:** On August 24, 2017, Fox filed

counterclaims for, *inter alia*, tortious interference with his employment of CPN and violations of

the IWA, which counterclaims he amended on September 7, 2017. ECF Nos. 60, 67. Fox

amended his counterclaims to add, *inter alia*, a claim for retaliation under the IWA. ECF Nos.

112, 147. Fox claims that MiMedx retaliated against him for allegedly "refus[ing] to participate"

in illegal "channel stuffing." ECF No. 147. Fox testified that the first—and only—time he

"refused to participate" in alleged "channel stuffing" was in Q3 2015, after which, he testified

that he "***could not*** impact their needs to stock shelves." SUMF ¶¶ 45-46 (emphasis added).

## LEGAL STANDARDS

Summary judgment must be granted when no genuine dispute regarding any material fact

exists such that the movant is entitled to judgment as a matter of law. Fed R. Civ. P. 56(a). The

moving party must identify the relevant factual material that "demonstrate[s] the absence of a

genuine issue of material fact," a burden that can be met by demonstrating the lack of evidence

9

to support a necessary element of the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). If the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment must be entered in favor of the moving party. *Celotex*, 477 U.S. at 322.

## ARGUMENT

## I. THERE IS NO EVIDENCE THAT MIMEDX TORTIOUSLY INTERFERED WITH FOX'S EMPLOYMENT AT CPN.

To prove a claim for tortious interference with business expectancy, Fox must prove: (1) a reasonable expectancy of continuing a business relationship; (2) the defendant's knowledge of the expectancy; (3) "an intentional and unjustified interference by the defendant" that induced or caused a breach; and (4) damage resulting from the defendant's interference. *Byker v. Sequent Computer Sys., Inc.*, No. 96 C 2297, 1997 WL 639045, at *12 (N.D. Ill. Oct. 1, 1997). But Fox has not shown that MiMedx engaged in any "intentional and unjustified interference" that caused CPN to terminate Fox's employment, because (1) he cannot show MiMedx engaged in any wrongful conduct, and (2) CPN terminated him for his poor performance, and not for anything MiMedx said or did. Moreover, in light of his poor performance, Fox cannot show he even had a "reasonable expectancy" of continuing in his employment at CPN.

### A. *Fox Cannot Show that MiMedx Intentionally and Unjustifiably Interfered With Fox's Employment at CPN, Which Interference Induced or Caused CPN to Terminate Fox.*

The core of Fox's claim for tortious interference is that MiMedx engaged in some unspecified wrongful conduct, which conduct led CPN to terminate Fox's employment. ECF No. 147 ¶¶ 103-116, 122-127. Fox is wrong on both accounts.

First, Fox cannot produce any evidence showing that MiMedx engaged in any "intentional and unjustified" conduct. Specifically, under Illinois law, a plaintiff must "show not

merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference'—that the defendant has committed some impropriety in doing so." *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & W. Ry. Co.*, 195 Ill. 2d 356, 369–70 (2001). Accordingly, a plaintiff "must show that the defendants engaged in 'active persuasion, encouragement or inciting' to produce a breach." *USA Satellite & Cable, Inc. v. Mac Naughton*, No. 15 C 6331, 2018 WL 4110745, at *4 (N.D. Ill. Aug. 28, 2018).

Here, the evidence affirmatively shows that MiMedx did not engage in any such "intentional and unjustified conduct" that would constitute "active persuasion, encouragement or inciting" CPN to terminate its relationship with Fox. The Chairman of CPN declared that the allegation that "MiMedx engaged in some wrongful conduct that led CPN to fire Mr. Fox" is "false." SUMF ¶ 74. Indeed, he confirmed that MiMedx never asked, suggested, or implied that CPN should fire Fox for any reason. *Id.* ¶ 75-76. In fact, ██████████████████████████ ████████████████████████████████████████████████████ *Id.* ¶ 77.

Second, Fox cannot demonstrate that MiMedx "caused a breach or termination of" Fox's employment with CPN. CPN's Chairman and corporate designee both testified that CPN terminated Fox because of his poor performance. *Id.* ¶ 61. Specifically, CPN testified:



*Id.* ¶ 63. During his four months at CPN, ████████████████████████████████, Fox

only ███████████████████████████████████████████████. *Id.*
¶¶ 54-56, 65.  CPN determined that Fox's poor results did not justify his continued employment
██████████, and therefore terminated him.  *Id.* ¶¶ 53-55.

In contrast, Fox's claim rests only on speculation.  He first argues that MiMedx created
"legal drama" for CPN and threatened to sue unless CPN fired Fox.  ECF No. 147 ¶¶ 108-15.[4]
CPN's Chairman confirmed that MiMedx never threatened to sue CPN ***for any reason***, including
its employment of Fox.  SUMF ¶ 78.  Fox's second theory, advanced in discovery briefing, is
that MiMedx promised CPN something of value ██████████████ to fire Fox.  *See*
*MiMedx v. Fox*, No. 8:18-mc-00012-EAK-CPT (M.D. Fla.), ECF No. 6 at 15.  CPN's Chairman,
however, confirmed that ████████████████████████
██████████████████████████.  *Id.* ¶ 76.

Fox is left with mere speculation that the timing of CPN's termination of Fox was
somehow suspicious.  This claim, however, is belied by the fact ██████████████
█████████████████████████████████████████████████
██████████████████  *Id.* ¶ 66-70.  Moreover, Fox's theory would require
this Court to reject sworn testimony about CPN's actual motivations, and instead speculate as to
what MiMedx "must" have done or said.  Such speculation is insufficient to survive summary
judgment.  *See Byker v. Sequent Computer Sys., Inc.*, No. 96 C 2297, 1997 WL 639045, at *12–
13 (N.D. Ill. Oct. 1, 1997) (granting summary judgment where plaintiff's claim of interference
by previous employer was "speculative"); *Tyrrell v. Neiman-Marcus Grp., Inc.*, No. 94 C 5979,

---

[4] Notably, to the extent that Fox's counterclaim implies that it would have been wrong for
MiMedx to raise Fox's non-compete with CPN—and there is no evidence MiMedx did—such
conduct would in no way be "unjustified."  Fox's non-compete agreement contains a specific
clause in which Fox "expressly consent[ed] to the Company providing a copy of this Agreement
to any of the Employee's future employers."  SUMF ¶ 4.

1996 WL 28478, at *4 (N.D. Ill. Jan. 19, 1996) (granting summary judgment where the plaintiff argued that something "must" have happened to cause potential employers not to offer him a job). Fox's baseless argument that MiMedx "must have" done something because CPN terminated him at the same time ████████████████████████████████ cannot survive summary judgment in light of the undisputed evidence to the contrary.

**B.      _Fox Cannot Show A Reasonable Belief in a Continuing Expectancy at CPN._**

Fox's tortious interference claim also fails because he cannot demonstrate a reasonable expectancy of continuing his business relationship with CPN. To succeed on a claim of tortious interference in an employment context, a plaintiff must show "a reasonable expectancy" of continued employment and "the mere hope of continued employment, without more, does not * * * constitute a reasonable expectancy" to state a cause of action for tortious interference. *Werblood v. Columbia Coll. of Chicago*, 180 Ill. App. 3d 967, 976, 536 N.E.2d 750, 756 (1989); *see also Montes v. Cicero Pub. Sch. Dist. No. 99*, 141 F. Supp. 3d 885, 900–01 (N.D. Ill. 2015) (unfounded expectation of continued employment cannot support tortious interference). Moreover, "subjective hopes [of continued employment] are insufficient under Illinois law." *Ali v. Cook Cty. Bd. of Review*, No. 05 C 1708, 2006 WL 5505098, at *2 (N.D. Ill. Jan. 9, 2006), *aff'd sub nom. Ali v. Shaw*, 481 F.3d 942 (7th Cir. 2007).

In an at-will employment relationship, all "parties to the at-will contract must be willing and desirous of continuing it in order for the [interference] action to lie..." *Cashman v. Shinn*, 109 Ill. App. 3d 1112, 1118, 441 N.E.2d 940, 944 (1982) (granting summary judgment on tortious interference claim, where all decision-makers had already decided to fire plaintiff). A plaintiff might be able to establish that expectancy if he/she can demonstrate "an exemplary work record, positive performance evaluations, and previous promotions" over a long period of time. *James v. Intercontinental Hotels Grp. Res., Inc.*, No. 09-CV-781, 2010 WL 529444, at *4

(N.D. Ill. Feb. 10, 2010) (allowing claim to proceed at motion to dismiss stage based on allegations of significant past good performance).  However, where a third-party employer intended to terminate plaintiff, no such expectancy exists.  *See Hindo v. Univ. of Health Scis./Chicago Med. Sch.*, 237 Ill. App. 3d 453, 461 (1992) (summary judgment proper where the evidence showed that the third-party employer was "desirous" of terminating plaintiff).

Here, Fox's employment at CPN was at-will, and as set forth above, CPN was not "willing and desirous" of continuing Fox's employment.  Indeed, CPN's Chairman was so desirous of ending CPN's relationship with Fox that he testified ███████████████ ████████████████████████████████ SUMF ¶ 62 (emphasis added).[5] Furthermore, as he had at MiMedx, Fox had an ongoing, surreptitious sexual relationship ████ ██████████████████████████████████████████████████████ ██████████████████████████████ *Id.* ¶ 71-73.  Thus, Fox could not have a reasonable expectation of continued employment at CPN.

Because Fox cannot prove that MiMedx caused the termination of his employment at CPN, and cannot prove he had a continued expectancy of remaining at CPN, this Court should grant summary judgment as to Count Two of Fox's Second Amended Counterclaims.

## II.  FOX'S ILLINOIS WHISTLEBLOWER ACT SHOULD BE DISMISSED.

Fox's claim that MiMedx violated the IWA also fails.  Specifically, Fox claimed that MiMedx violated 740 ILCS 174/20 and 740 ILCS 174/20.2, by retaliating against him (or by threating to retaliate against him) because of his alleged refusal to participate in purportedly

---

[5] Indeed, Fox himself appeared not to have a continued expectation of staying with CPN, as he spent months complaining about CPN's management and making other plans for employment, and lying to others that he was not employed at CPN.  *See supra* Introduction, Section K.

illegal "channel stuffing." ECF No. 147 at ¶¶ 44, 141-42.[6] Yet, for each act of allegedly retaliatory conduct, (1) Fox cannot prove that the alleged retaliatory conduct is an adverse employment action, (2) Fox cannot demonstrate that MiMedx engaged in the conduct "because of" a "refusal to participate," and/or (3) the alleged retaliation is not actionable under the IWA.

A.  **_Fox Cannot Prove MiMedx Retaliated or Threatened Retaliation "Because Of" A Refusal to Participate in Allegedly Illegal Activity_**

To sustain a cause of action under the IWA, Fox "must establish that (1) he _refused to participate_ in an activity that would result in a violation of a state or federal law, rule, or regulation, and (2) his employer _retaliated_ against him _because of_ that refusal." _Huang v. Fluidmesh Networks, LLC_, No. 16-CV-9566, 2017 WL 3034672, at *4 (N.D. Ill. July 18, 2017) (emphasis added); _see also Corah v. Bruss Co._, 2017 IL App (1st) 161030, ¶ 15, 77 N.E.3d 1038, 1043. With regard to the "refusal to participate" prong, Illinois courts have held that "the language of section 20 is unambiguous and that a 'plaintiff must actually refuse to participate' in an activity that would violate a law or regulation." _Corah,_ 77 N.E.3d at1043. Accordingly, courts have held that "refusing" to participate in illegal activity is just that—a refusal—it "does not mean 'complaining' or 'questioning.'" _Sardiga v. N. Tr. Co._, 409 Ill. App. 3d 56, 62, 948 N.E.2d 652, 657 (2011); _Lucas v. Cty. of Cook_, 2013 IL App (1st) 113052, ¶ 25, 987 N.E.2d 56, 65 (same). Thus, "[t]o refuse to participate, the plaintiff must have **_had the opportunity to participate_** and rejected that opportunity." _Montoya v. Atkore Int'l, Inc._, No. 17 C 3628, 2018 WL 1156245, at *4 (N.D. Ill. Mar. 2, 2018) (emphasis added); _see also Roberts v. Bd. of Trustees Cmty. Coll. Dist. No. 508_, 2018 IL App (1st) 170067, ¶ 41 (adhering to line of cases holding "there must be a request or demand by the employer that the employee engage in the

---

[6] This Court did not permit Fox to add claims that MiMedx violated 740 ILCS 174/15 and 740 ILCS 174/20.1, because doing so would be futile. ECF No. 145 at 23-24.

illegal or unlawful conduct."); *see Robinson v. Alter Barge Line, Inc.*, 513 F.3d 668, 670 (7th Cir. 2008) (complaining was not a "refusal to participate"); *see also Collins v. Bartlett Park Dist.*, 2013 IL App (2d) 130006, ¶ 28, 997 N.E.2d 821, 828 (mere complaint could not constitute a "refusal to participate").  Accordingly, Fox must prove he did more than simply complain.

Further, under the IWA, only termination or other "adverse employment actions" are actionable.  *LaRiviere v. Bd. of Trustees of S. Illinois Univ.*, 2015 IL App (5th) 140443-U, ¶ 23; *see also Parks v. Speedy Title & Appraisal Review Servs.*, 318 F. Supp. 3d 1053, 1070 (N.D. Ill. 2018) (holding purpose of IWA is "to protect employees from *adverse employment actions*").  Accordingly, Fox must prove that each alleged retaliatory act constituted an "adverse employment action" under Illinois law. *Elue v. City of Chicago*, No. 16 CV 09564, 2017 WL 2653082, at *5 (N.D. Ill. June 20, 2017).  However, "[n]ot everything that makes an employee unhappy is an actionable adverse action." *Id*. at *5.  Rather, a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012) (applying standard in Title VII case);[7] *see also Smith v. Allstate Ins. Corp.*, No. 00 C 7822, 2001 WL 1000736, at *6 (N.D. Ill. Aug. 29, 2001) (require a "change in the terms and conditions of employment" that is "more disruptive than a mere inconvenience or an alteration of job responsibilities.").

Finally, to prove the causal element of an IWA claim, a plaintiff must prove that the

---

[7] The IWA's standard for retaliation asks whether "the act or omission would be materially adverse to a reasonable employee."  *Schlicksup v. Caterpillar, Inc.*, No. 09-CV-1208, 2010 WL 2774480, at *7 (C.D. Ill. July 13, 2010) (citing 740 ILCS 174/20.1).  Accordingly, courts have noted that the IWA and Title VII have "similar" definitions of retaliation.

"refusal to participate in an illegal activity caused [the plaintiff's] employer to retaliate against [him]." *Morris v. Ashland, Inc.*, No. 12 C 5487, 2014 WL 4066213, at *6–7 (N.D. Ill. Aug. 15, 2014). Notably, for Illinois retaliation claims, the burden to prove causation remains on the employee at all times—no burden-shifting test is applied.[8] Thus, a "defendant need not come forward with any explanation for the discharge, but 'if an employer chooses to come forward with a valid, nonpretextual basis for discharging its employees and the trier of fact believes it, the causation element required to be proven is not met.'" *Zelenika v. Commonwealth Edison Co.*, No. 09 C 2946, 2012 WL 3005375, at *18 (N.D. Ill. July 23, 2012); *see also Nelson v. Levy Home Entm't, LLC*, No. 10 C 3954, 2012 WL 403974, at *8 (N.D. Ill. Feb. 8, 2012) (causation "not met if the employer has a valid basis, which is not pretextual, for discharging the employee."). On summary judgment, where an employer provides an alternative basis for termination, the non-movant must "produce evidence from which a rational factfinder could infer that the company *lied* about its proffered reasons for the employees' dismissal." *Morris*, 2014 WL 4066213, at *4 (emphasis added).

### B. *Fox's Only Alleged "Refusal to Participate" Occurred In Q3 2015.*

Fox claimed that he "refused to participate" in MiMedx's purported illegal "channel stuffing." ECF No. 147 ¶ 44. At his deposition, Fox testified that the first and only time he "refused to participate" in alleged channel stuffing was in Q3 2015.[9] SUMF ¶ 45. Other than this single alleged Q3 2015 refusal, Fox does not—and admittedly cannot—assert any other "refusals to participate." Fox claims that after Q3 2015, he was moved into a position where he "could not impact" alleged channel stuffing. *Id*. ¶ 46. Without an "opportunity to participate,"

---

[8] Illinois courts "reject[] Title VII's burden-shifting framework in favor of the 'traditional tort law approach to the allocation of proof.'" *Zelenika*, 2012 WL 3005375, at *18.
[9] The only evidence of this alleged "refusal" is Fox's own, self-serving testimony.

Fox could not "refuse to participate" in anything. *Montoya*, 2018 WL 1156245, at \*4 (N.D. Ill. Mar. 2, 2018). Thus, for purposes of evaluating his IWA claim, the only potential protected conduct is his purported "refusal to participate" in alleged "channel stuffing" during Q3 2015.[10]

### C. *Fox Cannot Prove that MiMedx Retaliated or Threatened to Retaliate "Because Of" His Alleged Q3 2015 "Refusal to Participate"*

Fox asserts that MiMedx engaged in three categories of retaliatory conduct as a result of his alleged actions in Q3 2015, each of which fails. Specifically, Fox testified that MiMedx retaliated against him for his third quarter 2015 "refusal to participate" by: (a) "demoting" him in January 2016,[11] and (b) terminating him 14 months later, "reducing" his final pay, and "preventing" him from selling his stock options on December 29, 2016.[12] SUMF ¶ 47. Fox also pled that MiMedx "threatened" to retaliate for conduct protected by IWA. ECF No. 147 ¶ 142.

### i. *MiMedx Did Not "Demote" Fox*

As an initial matter, Fox was not "demoted" in January 2016. In fact, as stated in MiMedx's letter to Fox regarding the new position, which Fox signed, MiMedx offered Fox a "promotion" that he accepted. SUMF ¶ 7. Fox moved from being an AVP, serving one of

---

[10] To the extent Fox alleged mere "complaints" about MiMedx's purported practices (*see, e.g.*, ECF No. 147 ¶¶ 41-43, 57), those are not actionable protected conduct under 740 ILCS 174/20. *See, e.g.*, *Lucas*, 2013 IL App (1st) 113052, ¶ 25.

[11] Fox also claimed MiMedx would not give him as many people on his team as he wanted. *Id.* ¶ 47. This does not amount to an adverse employment action. *Smith*, 2001 WL 1000736, at \*6 ("not everything that makes an employee unhappy is an actionable adverse action," which must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."). Moreover, the only change in headcount appears to be one person who left his team and was immediately replaced. *Id.* ¶ 10.

[12] At his deposition, Fox identified a number of alleged retaliatory acts that occurred after his termination, including MiMedx's filing suit in this Action and MiMedx's alleged tortious interference. But as this Court has already held, "[n]othing in the [IWA] prohibits retaliation against former employees." ECF No. 145; *see also* 740 ILCS 174/5 (defining a protected "employee" as someone "who is employed on a full-time, part-time, or contractual basis") (emphasis added). Accordingly, alleged post-termination retaliation is not actionable under the IWA. *See, e.g.*, *Money Mgmt., Inc. v. Thomas*, 2017 IL App (2d) 160333-U, ¶ 33 (holding party cannot bring IWA claim for alleged post-termination retaliation).

several regions in the country, to a national vice president with nationwide responsibility.  *Id*. ¶
2, 7.  MiMedx gave him a $███ raise in base salary (a 28% increase), along with bonus
potential.  *Id*. ¶ 8.  Indeed, Fox made over $███ more in 2016 than in 2015.[13]  *Id*. ¶ 14.

As a matter of law, Fox's promotion was not an "adverse employment action."  Courts in
the Seventh Circuit have found in discrimination and retaliation cases that "lateral transfer[s],"
transfers "involving no reduction in pay and no more than a minor change in working
conditions," and even losses of titles are ***not*** adverse employment actions.  *See, e.g.*, *Smith*, 2001
WL 1000736, at *6 (collecting cases).  Here, Fox's pay did not just remain flat—it went up
significantly; the scope of Fox's position did not remain regional—it became national.
Moreover, Fox cannot show that this position required a "dramatic downshift" in skill level for
this national position.  The whole point of the position was to expand MiMedx's footprint in all
of the VAs across the entire country.  *Id*. ¶ 11.  Thus, Fox's promotion to national Vice President
of Federal and Academic Institutions was not "materially adverse."

In an attempt to manufacture an adverse employment action, Fox characterized this move
as a "demotion" and falsely asserted that he made ***less*** money in 2016, after he took the role.
Fox repeated this lie in his counterclaim, at his deposition, and in response to requests for
admission.  *Id*. ¶ 13.  The undisputed facts, however, confirm that Fox's claim is false.  In fact,
Fox's W-2s confirm that he made over $███ more in 2016 and Fox's own damages expert
testified that Fox made more in 2016 than in 2015.  *Id*. ¶ 15 ("Q.  So it would be a true statement
to say that Fox's -- Mr. Fox's total compensation from MiMedx in 2016 was higher than his total
compensation from MiMedx in 2015, correct?  A.  Correct.").

---

[13] Fox claims he is owed at least $8,060 in additional salary for 2016 (*Id*. ¶ 41), which would
mean that, according to him, he should have made at least $███ more in 2016 than in 2015.

Finally, to the extent Fox claims that the position was a "demotion" because he somehow felt pushed aside, courts have held that "[w]hether a reassignment would be a promotion, demotion or lateral transfer is not determined by the employee's perceptions." *Keen v. Merck Sharp & Dohme Corp.*, No. 15-CV-1178, 2018 WL 1156203, at *8 (N.D. Ill. Mar. 5, 2018).

### ii.    *MiMedx Promoted Fox to National Vice President for Legitimate, Non-Retaliatory Reasons*

Notwithstanding that Fox's move to national vice president was not an adverse employment action, Fox also cannot show that MiMedx offered him the position "because of" his alleged Q3 2015 "refusal to participate." MiMedx's 30(b)(6) representative confirmed that MiMedx had a legitimate, non-retaliatory reason for offering Fox this new position. Specifically, MiMedx was starting a new initiative to get further penetration in the federal and academic institutions, and MiMedx offered it to Fox because the new position fit his skill set. *Id.* ¶ 11.

For an IWA claim, Fox at all times retains the burden of demonstrating causation between the protected activity (in this case the Q3 2015 "refusal to participate") and the alleged retaliatory act. Because MiMedx has offered legitimate reasons for the alleged retaliatory activity (in this case offering Fox the new position), Fox now must produce evidence from which a rational factfinder could find that MiMedx "***lied*** about its proffered reasons for the employees' dismissal.'" *Morris*, 2014 WL 4066213, at *4 (emphasis added). Fox has provided no such evidence. Two witnesses confirm that MiMedx created this position as part of a new initiative at the company to help further expand its federal business. *Id.* ¶ 11. Moreover, one simply does not retaliate against someone by offering him more money and a national title.

### iii.    *MiMedx's Actions on December 29, 2016 Lack Any Causal Connection to Fox's Alleged "Refusal to Participate" During Q3 2015.*

Fox also fails to provide a causal link between his Q3 2015 "refusal to participate" and various allegedly retaliatory actions MiMedx took on December 29, 2016, as part of his

termination. *Id.* ¶ 47. As an initial matter, in this Circuit, time gaps of more than one year between the protected activity and the alleged adverse employment action, without plaintiff's providing any other evidence of retaliation, cannot establish the requisite causal connection. *See, e.g., Garcia v. U.S. Postal Serv.*, 414 F. App'x 855, 858–59 (7th Cir. 2011) (collecting cases and upholding dismissal of national origin retaliation claim). Accordingly, courts dismiss IWA claims where more than one year passed between the "refusal to participate" and the adverse employment action. *Elue*, 2018 WL 4679572, at *8 (plaintiff could not demonstrate "link" between protected activity and adverse employment action, which happened over a year apart).

Here, at least 14 months passed between the end of Q3 2015 and the alleged retaliation on December 29, 2016. Fox is unable to prove any facts linking his Q3 2015 "refusal to participate" with his termination over one year later. Indeed, this argument is illogical. Under Fox's theory, MiMedx was so upset by his "refusal" in Q3 2015 that it retaliated by keeping Fox on as an employee, promoting him, giving him a significant raise and a national title, waiting 14 months, and *only then* firing him. Moreover, this act of promoting him and providing him a $▆▆▆▆ raise in the wake of the alleged "refusal" breaks any causal chain between the only asserted protected conduct and anything that came after it. On this ground alone, Fox cannot meet his burden of proving causation, and the Court should grant MiMedx summary judgment.

Moreover, the evidence establishes that MiMedx did not terminate Fox because of this alleged "refusal to participate." Rather, MiMedx had legitimate, non-retaliatory reasons for firing him, unrelated to anything he claims he did in Q3 2015. Namely, after having promoted him to a national position and giving him a substantial raise, MiMedx learned in December 2016 that Fox engaged in repeated and serious violations of company policy, breached his contracts with the company, and otherwise behaved in a manner not befitting a national vice president. He

21

created a "Code Red" plan, formed an LLC, and entered into a NDA with another company, intending to distribute that company's products, apparently with the goal of forming an independent distributorship and taking MiMedx employees with him. *Id*. ¶¶ 16-22. He knew and failed to report—and indeed encouraged—other employees' side sales. *Id*. ¶¶ 25-28. He breached his confidentiality obligations to the company by disclosing materials to individuals not entitled to receive that sensitive information. *Id*. ¶¶ 29-32. He tolerated and fostered an environment of animosity towards MiMedx leadership among his subordinates. *Id*. ¶ 33. And he was not honest or forthcoming about any of this—especially his knowledge of side sales— when asked about this during a company investigation. *Id*. ¶¶ 34-36.

Fox similarly cannot show MiMedx reduced his final pay check in retaliation for his Q3 2015 "refusal." Fox had an arrangement whereby he was paid advances on his bonus and then had to "true-up" if he did not earn the entire bonus.[14] *Id*. ¶ 9. When MiMedx determined that Fox had not earned his bonus for the fourth quarter of 2016, it took that true-up out of Fox's last pay check.[15] *Id*. ¶ 40. MiMedx did not do this in retaliation for anything, but rather, because MiMedx had a contractual right to recover the unearned bonus.

Nor can Fox show that MiMedx retaliated against him by calling him after the stock market closed, thus preventing him from exercising stock options. Rather, Fox would have been unable to exercise any of his options no matter what time MiMedx called, because his options had already lapsed by operation of contract. Specifically, pursuant to the contract, if Fox is

---

[14] Fox also asserts that MiMedx retaliated by giving him a "zero" on his business plan. This business plan is how MiMedx determined what bonus to pay Fox. *Id*. ¶ 8, Ex. 2. Accordingly, this is not a separate alleged "act" of retaliation, but is bound up in the issue of his reduction of pay.

[15] As discussed below, because the amount in controversy for Fox's Wage Act claim is so low, MiMedx has offered to pay him the disputed amount. However, MiMedx does not concede that it violated the act, and certainly does not admit that any actions were taken in retaliation.

terminated for cause, his options "*shall lapse* and no longer be exercisable *as of* his Termination Date." *Id*. ¶ 39. (emphasis added). In contrast, someone who is not terminated for cause may exercise his/her stock options "to the extent exercisable *on the* Participant's Termination Date." *Id*. ¶ 39. (emphasis added). As this Court already found when dismissing Fox's claim for breach of this agreement, Fox was terminated for cause. ECF No. 145 at 11. And it is undisputed that Fox's "Termination Date" was December 29, 2016. SMUF ¶ 37. Accordingly, "as of" December 29, 2016, Fox's options had lapsed and were not exercisable.

For Fox to prevail, he would have to show that these reasons for terminating him and taking other actions were "lies," which he cannot do. *Morris*, 2014 WL 4066213, at *4.[16]

### iv. *MiMedx's Alleged "Threat" Lacks Any Causal Connection to Fox's Alleged "Refusal to Participate" During Q3 2015.*

Finally, Fox's claim that MiMedx "threatened" to retaliate against him in violation of the IWA must fail, as he cannot connect any alleged threat to any protected conduct. Under the IWA, "[a]n employer may not threaten any employee with any act or omission if that act or omission would constitute retaliation against the employee *under this Act*." 740 ILCS 174/20.2 (emphasis added). Accordingly, just as an employer may not *actually* retaliate against someone because he/she engaged protected conduct covered by the IWA (*see* 740 ILCS 174/15, 740 ILCS 174/20, 740 ILCS 174/20.1), an employer may not *threaten to* retaliate against someone because he engaged in protected conduct. Here, this Court has already determined that, as a matter of law, Fox (a) could not have engaged in protected conduct under 740 ILCS 174/15, because he did not report to the government until after he was fired, and (b) could not have engaged in

---

[16] As this Court is aware, much of Fox's counterclaim focuses on the alleged actions of two other individuals that Fox claims "blew the whistle" in November and December 2016. ECF No. 147 ¶¶ 77-91. These allegations are *irrelevant* to his IWA claim. "Aiding" other alleged whistleblowers is not protected conduct under the IWA. *See* 740 ILCS 174/20.

protected conduct under 740 ILCS 174/20.1, because he did not disclose "public" corruption. ECF No. 145 at 22-24. Accordingly, Fox must demonstrate that MiMedx "threatened" to retaliate against him for his alleged Q3 2015 "refusal to participate." 740 ILCS 174/20.

Here, again, as set forth above, Fox is unable to prove causation. The only purported "threat" that Fox has identified was a statement allegedly made by MiMedx's former CEO in a December 12, 2016 meeting, 14 months *after* Fox's only claimed "refusal." *See, e.g.*, ECF No. 147 ¶ 91. It is simply illogical to assert that MiMedx would threaten to retaliate against Fox for something he claimed already happened, with MiMedx's full knowledge, over a year before. Moreover, even in Fox's testimony, the purported comment related to two other individuals and was not directed toward any "refusal to participate" by Fox. Accordingly, Fox cannot connect any alleged "threat" to retaliate with any protected activity.

### v. *Any Damages for Alleged Retaliation Are Cut-Off Pursuant to the Doctrine of After-Acquired Evidence*

Finally, even if Fox had a cognizable IWA claim, any alleged damages are cut-off by the after-acquired evidence doctrine, which is available in retaliation cases. *See, e.g.*, *Lalowski v. Corinthian Sch., Inc.*, No. 10 C 1928, 2013 WL 1788353, at *8 (N.D. Ill. Apr. 26, 2013). Specifically, under the after-acquired evidence doctrine, damages are cut-off as of the date the employer learned of wrongdoing that would constitute a terminable offense. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995).

Here, Fox had a secret affair with his direct subordinate, ███████████████

██. *Id*. ¶ 42-44. He admittedly did not disclose this relationship to MiMedx's leadership. *Id*. ¶ 42. Company policy requires individuals in a reporting structure to advise MiMedx about such a relationship, allowing MiMedx to take any necessary corrective actions to protect against conflicts of interest or sexual harassment claims. *Id*. ¶ 44. Failure to report such a relationship is

a terminable offense. *Id.* ¶ 44. Not only is it tantamount to deception, keeping such a relationship a secret can open the company up to legal risks. Here, Fox and his subordinate exchanged numerous, intimate text messages, including some that might be read as seeking *quid pro quos* or otherwise showing favoritism. *Id.* ¶ 43 MiMedx had sufficient evidence to confirm Fox had committed a terminable offense by March 2017, and thus, his damages must be cut-off as of that date. *Id.* ¶ 44.

Because Fox cannot prove that MiMedx retaliated against him "because of" his alleged Q3 2015 "refusal to participate," Count Four of Fox's Second Amended Counterclaim must be dismissed. Alternatively, any claim for damages under the IWA must be cut-off at March 2107.

## III.  FOX'S ILLINOIS WAGE PAYMENT AND COLLECTION ACT CLAIM SHOULD BE DISMISSED AS MOOT

Fox confirmed through his expert that his claim for unpaid wages under the IWPCA is limited to $8,060 plus 2% interest per month and reasonable attorneys' fees. *See id.* ¶ 41. So that the parties do not waste this Court's resources on such a low value claim, on October 12, 2018, MiMedx tendered to Fox checks that, after required withholding, amount to $8,978.74, which is the full amount of his damages plus interest. *Id.* ¶ 79. Pursuant to Illinois law, Fox's IWPCA claim is mooted by this tender. *See, e.g., Barber v. Am. Airlines, Inc.*, 241 Ill. 2d 450, 457, (2011) (as a matter of Illinois law, tender to plaintiff of full amount owed for Illinois law claim renders case moot); *Chen v. City of Chicago*, 2017 IL App (1st) 153582-U, ¶¶ 34-35 (same), *Alderson v. Weinstein*, 2018 IL App (2d) 170498, ¶ 7-8 (same).[17]

## CONCLUSION

WHEREFORE, premises considered, MiMedx respectfully request that the Court enter an

---

[17] To the extent Fox seeks his reasonable attorneys' fees expended in pursuing this $8,060, the Court can dismiss the claim as moot and retain jurisdiction to establish the reasonable amount of fees. *Williams-Green v. J. Alexander's Restaurants, Inc.*, 277 F.R.D. 374, 380 (N.D. Ill. 2011).

order granting MiMedx's motion for summary judgment and (1) dismiss Count One of Fox's Second Amended Counterclaims (IWPCA claim), (2) dismiss Count Two of Fox's Second Amended Counterclaims (Tortious Interference claim), and (3) dismiss Count Five of Fox's Second Amended Counterclaims (IWA claim), or in the alternative, find that any damages claim under Count Five are cut-off as of March 2017.

Dated: October 12, 2018.              Respectfully submitted,

**PLAINTIFF MIMEDX GROUP, INC.**

*/s/ David M. Pernini*
Joseph D. Wargo, *pro hac vice*, Georgia Bar
    No. 738764
Shanon J. McGinnis, *pro hac vice*, Georgia
    Bar No. 387598
David M. Pernini, *pro hac vice*, Georgia Bar
    No. 572399
Heather N. Fugitt, *pro hac vice* Georgia Bar
    No. 475152
WARGO & FRENCH, LLP
999 Peachtree Street, NE
26th Floor
Atlanta, Georgia 30309
Telephone: (404) 853-1500
Facsimile: (404) 853-1511
E-mail: jwargo@wargofrench.com
E-mail: smcginnis@wargofrench.com
E-mail: dpernini@wargofrench.com
E-mail: hfugitt@wargofrench.com

SIDLEY AUSTIN LLP
Ami N. Wynne
Jason G. Marsico
One South Dearborn
Chicago, Illinois 60603
Phone: (312) 853-7000
Fax: (312) 835-7036
Email: awynne@sidley.com
Email: jmarsico@sidley.com

*Counsel for Plaintiff*
*MiMedx Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2018, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to the

following counsel of record for the parties in this action:

Christopher S. Griesmeyer
Adam C. Maxwell
Greiman, Rome & Griesmeyer, LLC
Two North LaSalle, Suite 1601
Chicago, Illinois 60602
cgriesmeyer@grglegal.com
amaxwell@grglegal.com

Clayton D. Halunen
Christopher J. Moreland
Stephen M. Premo
Halunen Law
IDS Center, Suite 1650
80 South 8th Street
Minneapolis, MN 55402
halunen@halunenlaw.com
moreland@halunenlaw.com
premo@halunenlaw.com


/s/ Ami N. Wynne


Ami N. Wynne
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Phone: (312) 853-7000
Fax: (312) 835-7036

28