**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 1:16-cv-11715-MSS-SIS |
| | ) | |
| -vs- | ) | |
| | ) | Judge Manish S. Shah |
| MICHAEL FOX, | ) | |
| | ) | |
| Defendant. | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| MICHAEL FOX, | ) | |
| | ) | |
| Counter-Plaintiff | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Counter-Defendant. | ) | |
| | ) | |

**DEFENDANT/COUNTER-PLAINTIFF MICHAEL FOX'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………………...1

STATEMENT OF FACTS ESTABLISHING THE
EXISTENCE OF A GENUINE ISSUE FOR TRIAL……………………………………………2

    A. Fox Refuses to help MiMedx channel stuff;
       gets demoted, then fired……………………………………………………………2

    B. MiMedx tortuously interferes with Fox's
       employment at CPN……………………………………………………………...5

SUMMARY JUDGMENT STANDARD…………………………………………………...8

ARGUMENT……………………………………………………………………………...8

    I.  THE RECORD IS REPLETE WITH EVIDENCE THAT
       MIMEDX TORTIOUSLY INTERFERED WITH FOX'S
       EMPLOYMENT AT CPN……………………………………………………8

        A. There is evidence in the record that MiMedx "committed
           some impropriety" in causing Fox's termination from CPN………………………9

        B. Fox had a reasonable belief in a continuing expectancy
           of employment at CPN………………………………………………………...12

    II.  FOX HAS STATED A VIABLE CLAIM UNDER THE
       THE ILLINOIS WHISTLEBLOWER ACT ("IWA")………………………………14

        A. MiMedx demoted Fox immediately after he refused
           to participate in illegal channel stuffing…………………………………………15

        B. Fox's firing on December 29, 2016 is causally related
           to his refusal to participate in MiMedx's illegal channel
           stuffing…………………………………….....……………………………………..18

        C. MiMedx's "non-retaliatory" reasons for firing Fox
           are pretextual……………………………………………………………………..20

           1.  MiMedx does not prohibit side selling
                non-MiMedx products……………………………………………………21

           2.  MiMedx does not have (or at least does not enforce)
                a policy against internal dissemination of Combined
                RSD Reports or sales data……………………………………………22

i

3. Fox did not lie to MiMedx management about
his knowledge of side-selling…………………………………………...23

4. The after-acquired evidence does not apply here……………………………23

III. FOX'S ILLINOIS WAGE PAYMENT AND
COLLECTION ACT CLAIM IS NOT MOOT……………………………………….25

CONCLUSION…………………………………………………………………………..25

## TABLE OF AUTHORITIES

<u>Cases</u>

*Acoustical Surfaces, Inc. v. Vertetek Corp.*,
   No. 13-CV-4837, 2014 WL 1379864 (N.D. Ill. Apr. 8, 2014) ................................................. 8

*Ali v. Shaw*,
   481 F.3d 942 (7th Cir. 2007) ...................................................................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ....................................................................................................................... 8

*Bice v. McKinley*,
   No. 86 C 7324, 1988 WL 96368 (N.D. Ill. Sept. 12, 1988) ....................................................... 8

*Casna v. City of Loves Park*,
   574 F.3d 420 (7th Cir.2009) ......................................................................................................... 18

*Che v. Massachusetts Bay Transp. Authority*,
   342 F.3d 31 (1st Cir. 2003) .......................................................................................................... 19

*Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*,
   40 F.3d 146 (7th Cir. 1994) ........................................................................................................... 8

*Coleman v. Donahoe*,
   667 F.3d 835 (7th Cir. 2012) ....................................................................................................... 21

*Corah v. Bruss Co.*,
   2017 IL App (1st) 161030, 77 N.E.3d 1038 ................................................................. 15, 16, 20

*Crady v. Liberty Nat. Bank & Tr. Co. of Indiana*,
   993 F.2d 132 (7th Cir. 1993) ....................................................................................................... 16

*Delli Santi v. CNA Ins. Companies*,
   88 F.3d 192 (3d Cir. 1996) .......................................................................................................... 21

*Dowd & Dowd, Ltd. v. Gleason*,
   352 Ill. App. 3d 365, 816 N.E.2d 754 (Ill. Ct. App. 2004) ................................................... 9, 13

*Fratto v. Am. Airlines, Inc.*,
   No. 94 C 7765, 1996 WL 288520 (N.D. Ill. May 30, 1996) ..................................................... 20

*Freiburger v. Timmerman*,
   No. 13 CV 8174, 2016 WL 4493448 (N.D. Ill. Aug. 26, 2016) ................................................. 9

*Ghiles v. City of Chicago Heights*,
No. 12 CV 7634, 2018 WL 1377909 (N.D. Ill. Mar. 19, 2018)................................................. 9

*Gordon v. Town of Hunter*,
No. 91-CV-0305, 1996 WL 77391 (N.D.N.Y. Feb. 16, 1996) ................................................. 17

*Hamilton v. Spraying Sys., Inc.*,
No. 02 C 9093, 2004 WL 2191330 (N.D. Ill. Sept. 28, 2004) ................................................. 17

*Hedberg v. Indiana Bell Tel. Co.*,
47 F.3d 928 (7th Cir. 1995) ........................................................................................... 12, 13

*Hindo v. Univ. of Heath Scis./Chicago Med. Sch.*,
273 Ill. App. 3d 453 (1992) ................................................................................................ 13

*U.S. E.E.O.C. v. Custom Companies, Inc.*,
Nos. 02 C 3768, 2007 WL 734395 (N.D. Ill. Mar. 8, 2007)............................................. 24, 25

*Johnson v. Cambridge Indus., Inc.*,
325 F.3d 892 (7th Cir. 2003) ............................................................................................. 16

*Kachmar v. SunGard Data Systems, Inc.*,
109 F.3d 173 (3d Cir. 1997) ............................................................................................... 19

*Kapotas v. Better Government Assoc.*,
2015 IL App (1st) 140534, 30 N.E.3d........................................................................... 10

*Knox v. State of Ind.*,
93 F.3d 1327 (7th Cir. 1996)............................................................................................... 16

*Loudermilk v. Best Pallet Co., LLC*,
636 F.3d 312 (7th Cir. 2011).......................................................................................... 14, 18

*Mabins v. AEP NVH OPCO, LLC*,
No. 16 C 10261, 2018 WL 1397426 (N.D. Ill. Mar. 20, 2018) ................................................. 24

*McClendon v. Ind. Sugars, Inc.*,
108 F.3d 789 (7th Cir.1997).............................................................................................. 18

*McKennon v. Nashville Banner Pub. Co.*,
513 U.S. 352 (1995) ......................................................................................................... 24

*Morris v. Ashland, Inc.*,
No. 12 C 5487, 2014 WL 4066213 (N.D. Ill. Aug. 15, 2014) ...................................... 20, 22, 23

*Palmateer v. Int'l Harvester Co.*,
   140 Ill. App. 3d 857, 489 N.E.2d 474 (1986) ...................................................... 17

*Porter v. City of Chicago*,
   700 F.3d 944 (7th Cir. 2012) .............................................................................. 16, 17

*Raymond v. U.S.A. HealthCare Ctr.-Fort Dodge, L.L.C.*,
   468 F. Supp. 2d 1047 (N.D. Iowa 2006) ............................................................. 17

*Redd v. Dougherty*,
   578 F. Supp. 2d 1042 (N.D. Ill. 2008) ................................................................ 12

*Renta v. Cty. of Cook*,
   735 F. Supp. 2d 957 (N.D. Ill. 2010) .................................................................. 17

*Republic Gear Co. v. Borg-Warner Corp.*,
   406 F.2d 57 (7th Cir. 1969) ................................................................................. 10, 11

*Rodriguez, ex rel. Fogel v. City of Chicago*,
   No. 08 CV 4710, 2011 WL 1103864 (N.D. Ill. Mar. 25, 2011) .......................... 23

*Seung-Whan Choi v. Bd. of Trustees of Univ. of Illinois*,
   No. 16 C 11627, 2017 WL 3278823 (N.D. Ill. Aug. 2, 2017) ............................ 17

*Sheehan v. Donlen Corp.*,
   173 F.3d 1039 (7th Cir. 1999) ............................................................................. 24

*Thomson v. Illinois Human Rights Comm'n*,
   2016 IL App (2d) 160011-U, ¶ 79 ...................................................................... 20, 21

*UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.*,
   264 F. Supp. 3d 897 (N.D. Ill. 2017) .................................................................. 9

*United States v. Bald Eagle Realty*,
   21 F. Supp. 2d 1332 (D. Utah 1998) ................................................................... 12

*Waukesha Foundry, Inc. v. Industrial Engineering, Inc.*,
   91 F.3d 1002 (7th Cir. 1996) ............................................................................... 8

*Wolf v. Buss (America) Inc.*,
   77 F.3d 914 (7th Cir. 1996) ................................................................................. 23

<u>Statutes</u>

740 ILCS 174/20......................................................................................................... 14
740 ILCS 174/20.2...................................................................................................... 14
820 ILCS 113/14(a).................................................................................................... 25
820 ILCS 115/2.......................................................................................................... 25

## **INTRODUCTION**

Defendant/Counter-Plaintiff Mike Fox hired on with Plaintiff/Counter-Defendant MiMedx in 2012 and by October 2013 had risen to the position of Area Vice President ("AVP"). Fox was, frankly, a rock star, having been described by his supervisor as "the total package" and "one of the most talented managers I've ever worked with." By the end of 2015, Fox was earning ███████ ███████████████████████ as an AVP. His rise was halted, however, in the third quarter of 2015, when he refused to participate in the unlawful "channel stuffing" scheme that had been devised and implemented at the direction of MiMedx's most highly placed corporate officers. That refusal continued until January 2016, at which time MiMedx retaliated against Fox in violation of the Illinois Whistleblower Act ("IWA") by forcing him out of his AVP position and into a job that ██ ████████████████████████████████████████████████████████████ drastically reduced Fox's managerial responsibilities. After demoting Fox, MiMedx fired him (also in violation of the IWA), ████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████ , after learning Fox had gotten a new job at CPN Biosciences ("CPN"), ████████ MiMedx reached out to threaten CPN with litigation, ████████████████████████████████████████████ ████████████████████████████████████████ Ultimately, CPN fired Fox because of the "legal drama" MiMedx had manufactured, thereby tortiously interfering with the employment relationship between Fox and CPN.

MiMedx has moved for summary judgment, but as the discussion that follows will demonstrate, there is ample evidence in the record from which a jury could conclude that MiMedx retaliated against Fox in violation of the IWA "because of" his refusal to participate in its illegal channel stuffing scheme, and that it tortiously interfered with his subsequent employment at CPN. Accordingly, MiMedx cannot establish its entitlement to judgment as a matter of law on any of Fox's claims, and its motion should be denied.

**STATEMENT OF FACTS ESTABLISHING
THE EXISTENCE OF A GENUINE ISSUE FOR TRIAL**

**A.     Fox refuses to help MiMedx channel stuff; gets demoted, then fired.**



By Q3 2015, Fox had had enough of his employer's illegal antics, ██████████████████ ██████████████████████████████████████████████ ███████████████████████████ RSOF ¶ 45. ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ *Id.* ████ ████ While MiMedx tries to cast Fox's refusal as a one-time thing, it was actually ongoing, and it continued until January 2016, when he was "moved aside," "put in a different position;" and "taken out of any ability to control shipping into the VAs;" specifically VP of Federal and Academic Affairs. RSOF ¶ 7; MiMedx SOF ¶ 46.

In its motion, MiMedx describes Fox's move to the federal VP position off as a promotion benevolently offered and willingly accepted. The evidence proves it was anything but. Indeed, Fox was "not offered anything." *Id.* Instead, he was informed by his boss, SVP of Global Sales Mike Carlton, that "you're taking this spot" because then-CEO Pete Petit wanted him "in a different role." RSOF ¶ 7. Nor was the new job a promotion, as Carlton conceded when he described it as a "lateral move." RSOF ¶ 7.

2

MiMedx ignores that admission and focuses instead on its claim that Fox received an increase in "annual compensation" as a result of the move. Again, the evidence tells a different story. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ RSOF ¶ 8. ██████████████████████

██████████████████████████ *Id*. Thus, to the extent MiMedx implies that Fox's forced move was accompanied by a per se increase in "annual compensation," that contention is inaccurate.[1]

Additionally, being forced into the federal VP position resulted in a significant decrease in Fox's managerial responsibilities by "pulling [him] from a team of 60 people and driving a lot of revenue" to place him with "a limited team of 6" where he was "taken out of any ability to control shipping into the VAs." RSOF ¶ 7, MiMedx SOF ¶ 46. Essentially, based on the responsibility and the number of people who reported to Fox after the move, it was demotion which was levied against him in retaliation for not putting extra product on the shelf. *See* SOF ¶ 7.

Not satisfied with demoting Fox, MiMedx fired him on December 29, 2016. Fox Statement of Additional Facts ("Fox SAF") ¶ 9. Less than two hours later, it sued him, and then retroactively reduced his rate of pay for the last nine days of his employment to the Illinois minimum wage of $8.25 per hour. *Id*. While MiMedx contends that the gap in time between Fox's initial (though ongoing) refusal to participate in its channel stuffing scheme in late 2015, and his termination in

---

[1] MiMedx also relies heavily on the fact that Fox's W-2 income went up in 2016 after he assumed the federal VP role. The reason for that increase, however, is not that MiMedx paid Fox more, but rather, as Fox understands it, is a function of the fact that that in January 2016, he exercised existing MiMedx stock options, the value of which was included in his 2016 W-2. RSOF ¶ 13.

late 2016 insulates it from liability, even a cursory examination of the facts surrounding Fox's

firing reveals MiMedx's overt hostility toward his protected activity and its retaliatory animus.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ Fox SAF ¶

1. ████████████ in December 2016, MiMedx summoned Fox (and others) to its headquarters

for a meeting. *Id.* ¶ 3. ████████████████████████████

███████████████████████████████████████████████████

██████ *Id.* ¶ 4. ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ *Id.* ¶ 5. ██████████████

███████████████████████████████████████████████████

████████████████████████████████ *Id.* ¶ 6. ██████████

██████████████ *Id.* ¶ 7.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ Fox SAF ¶ 8. ██████████

4

██████████████████████████████████████████████████

████████████████████████████████████ *Id.*

████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████ RSOF ¶ 37. ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████ *Id.*

### B. MiMedx tortiously interferes with Fox's employment at CPN.

On April 10, 2017, Fox hired on with CPN as its Vice President of Business Operations.

██████████████████████████████████████████████████

████████████████████████████████████████████ █ ████████

██████████████████████████████████████████████

██████████████████████████████████████████ RSOF ¶

35. █████████████████████████████████████████████ CPN's

products are not competitive but rather are "ancillary and non-competitive." RSOF ¶ 48.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ RSOF ¶ 53. ████████████████████████████████

██████████████████████████████████████ *Id.*

---

[2] Fox SAF ¶ 12.

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ *Id.*

On or about June 1, 2017, CPN President Miscik called Fox to tell him about the upcoming "confidential meeting" scheduled between CPN and MiMedx leadership." RSOF ¶ 53. Per Miscik, the purpose of the meeting was "to educate MiMedx on its products" and, more specifically, "to explain to MiMedx that CPN's products were ancillary and not competitive" and thereby "convince MiMedx that suing CPN for employing ex-MiMedx employees was unnecessary and unjustified." *Id.* ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

RSOF ¶ 53. ██████████████████████████████████████████████████████

SVP of Sales Kevin Lilly was present at that meeting and confirmed that Fox was discussed. *Id.*

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████ RSOF ¶ 53; Fox SAF ¶ 18. ███████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████ RSOF ¶ 53. █████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.*

6



RSOF ¶ 53.

*Id.*

RSOF ¶ 53.

RSOF ¶ 53.

Tanja fired Fox over phone. Fox SAF ¶ 21. Per Fox:

> By way of explanation for terminating my employment, Taneja stated that <u>CPN and its lawyers could not handle any more of the MiMedx "legal drama."</u> More specifically, Taneja told me "As you know, we've been dealing with a lot of MiMedx bullshit. We cannot handle legal drama from MiMedx. We don't have the time, the resources, or the money to have our lawyers working on this at the level they are. For that reason, we need to let you go."

RSOF ¶ 53.

on July 21, Miscik called Fox and reiterated the sentiments expressed by Taneja, likewise noting "CPN's desire to avoid the 'legal drama' MiMedx was causing." RSOF ¶ 61. Miscik also complemented Fox's leadership skills, stating that "[y]ou're obviously a strong leader. We see why a lot of people enjoy working with you." *Id*. Importantly, when Fox inquired as to the status of other former-MiMedx employees who were then working at CPN, Miscik responded, "[t]his is something that is specific to you." *Id*.



Fox SAF ¶ 25.

*Id.*

## SUMMARY JUDGMENT STANDARD

As the party moving for summary judgment, MiMedx "has the burden of demonstrating the absence of a material fact," and that it is "therefore entitled to judgment as a matter of law." *Bice v. McKinley*, No. 86 C 7324, 1988 WL 96368, at *3 (N.D. Ill. Sept. 12, 1988). In considering whether MiMedx has carried its burden, this Court "must view the evidence, and all reasonable inferences that can be drawn from the evidence, in the light most favorable to the non-moving party;" namely, Fox. *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Additionally, "it is not [the Court's] function to resolve factual disputes, nor weigh conflicting evidence" in connection with this motion. *Waukesha Foundry, Inc. v. Industrial Engineering, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996). Instead the Court's role is "only to determine if a genuine issue of material fact exists for trial." *Id.* Such an issue exists, of course, if "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## ARGUMENT

**I. THE RECORD IS REPLETE WITH EVIDENCE THAT MIMEDX TORTIOUSLY INTERFERED WITH FOX'S EMPLOYMENT AT CPN.**

The prohibition against tortious interference with a business expectancy recognizes "that one's business relationships constitute a property interest and are entitled to protection from unjustified tampering by another." *Acoustical Surfaces, Inc. v. Vertetek Corp.*, No. 13-CV-4837, 2014 WL 1379864, at *7 (N.D. Ill. Apr. 8, 2014). The elements of a tortious interference claim

are: "(1) a valid business expectancy by the plaintiff; (2) the defendant's knowledge of that expectancy; (3) the defendant's intentional and unjustified interference, which prevented the realization of that expectancy; and (4) damages. *Ghiles v. City of Chicago Heights*, No. 12 CV 7634, 2018 WL 1377909, at *6 (N.D. Ill. Mar. 19, 2018).

### A. There is evidence in the record that MiMedx "committed some impropriety" in causing Fox's termination from CPN.

MiMedx argues that Fox cannot show it tortiously interfered with his employment at CPN because CPN Chairman Mihir Taneja "confirmed that MiMedx never asked, suggested, or implied that CPN should fire Fox for any reason." EFC No. 342 (MiMedx Br.) at 11. There are two flaws with MiMedx's position, one factual, one legal, and both fatal.

First, from a factual standpoint, there actually is evidence in the record that MiMedx "asked, suggested, or implied" that CPN should fire Fox. As noted above, CPN President Adam Miscik told Fox that one of the purposes to be served by the June 6, 2017 "confidential meeting" between MiMedx and CPN was to "convince MiMedx <u>that suing CPN for employing ex-MiMedx employees was unnecessary and unjustified</u>." RSOF ¶ 53 (emphasis added). This is evidence from which a jury could conclude that MiMedx threatened to sue CPN if it chose to retain Fox in its employ. And that sounds the death knell for MiMedx's motion because the Illinois courts "will allow a tortious interference claim to stand where the plaintiff has alleged that the defendant made threats about litigation in order to interfere with the plaintiff's business relationships." *UIRC-GSA Holdings Inc. v. William Blair & Co., L.L.C.*, 264 F. Supp. 3d 897, 908 (N.D. Ill. 2017).

Second, from a legal standpoint, Fox is not required to prove that MiMedx actually asked CPN to fire him to prevail on his tortious interference claim. Instead, all he needs to show is that there is some evidence in the record from which a jury could conclude that MiMedx "'has committed some impropriety' in causing termination of the business relationship." *Freiburger v.*

*Timmerman*, No. 13 CV 8174, 2016 WL 4493448, at *20 (N.D. Ill. Aug. 26, 2016); *see also Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 381, 816 N.E.2d 754, 768 (Ill. Ct. App. 2004) (holding that to succeed on a tortious interference claim, the plaintiff must show "'purposeful interference,' meaning the defendant has committed some impropriety"). Stated another way, Fox must simply "'set forth facts which suggest that defendant acted with the purpose of injuring plaintiff's expectancies.'" *Kapotas v. Better Government Assoc.*, 2015 IL App (1st) 140534, ¶ 80, 30 N.E.3d at 596. While "[i]ll-will toward the person harmed is not required," it will suffice. *Republic Gear Co. v. Borg-Warner Corp.*, 406 F.2d 57, 61 (7th Cir. 1969).

In this case, Fox has easily made the requisite showing, as the record is dominated by evidence that MiMedx "acted with the purpose of injuring [Fox's] expectancies" at CPN.



RSOF ¶ 37.

RSOF ¶ 35.

RSOF ¶ 48.

RSOF ¶ 53, Fox SAF ¶ 14.



RSOF ¶ 53.

*Id*.

CPN could not handle any more of the MiMedx "legal drama." RSOF ¶ 61; Fox SAF ¶ 21.

Fox SAF ¶ 23. Moreover, when Fox inquired of CPN President Adam Miscik if any other former MiMedx employees were also being shown the door, Miscik replied, "[t]his is something that is specific to you." RSOF ¶ 61.

---

[3] RSOF ¶ 53.

███████ Fox SAF ¶ 25. All of this is evidence from which a jury could conclude that MiMedx acted with the purpose of injuring Fox's expectancies at CPN when it interjected itself into their employment relationship. At the very least, fact questions remain in that regard.

### B. Fox had a reasonable belief in a continuing expectancy of employment at CPN.

Illinois law imposes "a rebuttable presumption that at-will employment will continue as long as both parties desire that the economic relationship remain in place,"[4] and liability will attach if "the employment agreement would have continued in the absence of the defendant's interference." *Redd v. Dougherty*, 578 F. Supp. 2d 1042, 1055 (N.D. Ill. 2008) (emphasis added), *aff'd sub nom. Redd v. Nolan*, 663 F.3d 287 (7th Cir. 2011). Importantly, courts have recognized that the question of "[w]hether, in the absence of [defendant's] interference a particular [business] relationship was sufficiently likely to [continue] is a factual question for the jury to answer." *United States v. Bald Eagle Realty*, 21 F. Supp. 2d 1332, 1335 (D. Utah 1998)

MiMedx contends that Fox could not have had a reasonable expectancy of continued employment because CPN was "desirous of ending CPN's relationship with Fox."[5] ECF No. 342, MiMedx Br. at 14. Fatal to that contention is absence of evidence in the record tending to prove (or even suggest) that CPN was "desirous" of firing Fox before MiMedx interjected itself into their employment relationship. Indeed, "[f]rom [his] first day of employment at CPN through the date

---

[4] *Ali v. Shaw*, 481 F.3d 942, 945 (7th Cir. 2007).

[5] MiMedx also notes that Fox failed to disclose that he was involved in a romantic relationship ████████████████████████████████████████████████



████████ ECF 342, (MiMedx Br.) at 14. ████████████████████████████

████████████ RSOF ¶ 73. ████████████████████████ *Id.* ████

████████████████████████████████████████ is speculation, which and cannot support MiMedx's motion. *See Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (holding that "[s]peculation does not meet a party's burden" on summary judgment).

of [his] termination, no one ever told [Fox] that they were dissatisfied with [his] performance as CPN's Vice President of Business Operations." RSOF ¶ 53. ███████████████████

████████████████████████████████████████████████████

████████████████████████████ RSOF ¶¶ 53, 66.

Further contradicting MiMedx's claim that CPN was "desirous" of terminating Fox's employment are the sentiments that Taneja and CPN President Miscik conveyed to him when they let him go. Specifically, Miscik complemented Fox's leadership skills, stating "you're obviously a strong leader. We see why a lot of people enjoy working with you." RSOF ¶ 61. Taneja went further, assuring Fox that "[o]nce you have this MiMedx BS behind you, we'll hire you back in a second." RSOF ¶ 53. He went on to conclude that "[w]e have many different businesses we're involved in, and we'd be glad to have you back." *Id.*

The foregoing facts are distinguishable from the lone case MiMedx cites in alleged support of its position; i.e., *Hindo v. Univ. of Heath Scis./Chicago Med. Sch.*, 237 Ill. App. 3d 453 (1992). In *Hindo*, the plaintiff was appointed by the defendants to the position of radiology department chairman in 1981, and served in that capacity until he was fired in 1990, whereon he sued, alleging causes of action arising from his termination. *Hindo*, 273 Ill. App. 460. The court granted summary judgment to the defendants noting, unremarkably, that "both parties to [an] at will contract must be willing and desirous of continuing in it in order for an action of tortious interference with contract to lie when the contract is at will." *Id.* at 461. In that case the court concluded that the parties were not "desirous" of continuing the employment relationship because "[t]he record discloses that plaintiff's position as chief of the service of radiology" was "in jeopardy as early as January 1988" – nearly two years before he was ultimately terminated. *Id.* at 457. There was also

13

evidence that Hindo submitted his resignation in February 1990 (though he later disputed it was an official resignation), which defendants accepted. *Id*. at 456, 461.

In this case, there is no evidence that Fox's job at CPN was "in jeopardy" before MiMedx interjected itself. As noted above, no one at CPN told Fox they were dissatisfied with his performance before, or even when, he was terminated, and Taneja: (a) admitted the firing was related to MiMedx "legal drama;" and (b) assured Fox CPN would "hire [him] back in a second" once "you have this MiMedx BS behind you." RSOF ¶ 53. ███████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████ post hoc rationalizations do not, and cannot, defeat Fox's reasonable expectation of continued employment with CPN. *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) (where the court reversed an order granting summary judgment to defendant which alleged it fired plaintiff because of a "violation of company policy," noting that defendant "did not give that explanation to [plaintiff]," and concluding that therefore "that information can't prevail at the summary judgment stage").

In light of the foregoing, it is evident that MiMedx's reliance on *Hindo* is misplaced. In fact, the only relevance that case has here is to conclusively confirm that a party moving for summary judgment must make a far more compelling showing than the one MiMedx has proffered.

## II. FOX HAS STATED A VIABLE CLAIM UNDER THE ILLINOIS WHISTLEBLOWER ACT ("IWA").

The Illinois Whistleblower Act (IWA), which provides, in relevant part, that "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in the violation of State or federal law, rule, or regulation . . ." 740 ILCS 174/20. The Act further prohibits employers from "threaten[ing] any employee with any act or omission if that act or omission would constitute retaliation against the employee under the Act." 740 ILCS 174/20.2.

In order to prevail on his IWA claim, Fox must simply establish that "(1) he refused to participate in an activity that would result in a violation of a state or federal law, rule or regulation and (2) his employer retaliated against him because of the refusal." *Corah v. Bruss Co.*, 2017 IL App (1st) 161030, ¶ 15, 77 N.E.3d 1038, 1043. In this case, Fox has alleged that MiMedx demoted, and later fired him in retribution for his refusal to participate in its unlawful channel stuffing scheme, and the record is replete with evidence confirming that it did so.

### A. MiMedx demoted Fox immediately after he refused to participate in illegal channel stuffing.

MiMedx apparently concedes (at least for purposes of its instant motion) that Fox has satisfied the first element of his IWA claim; i.e., he "refused to participate in an activity that would result in a violation of a state or federal law, rule or regulation;" specifically channel stuffing. It contends, however, that it did not subject Fox to any adverse employment actions, or that if it did, Fox cannot demonstrate the requisite causal connection between those adverse actions and his protected activity. In this regard, MiMedx first denies that it subjected Fox to an adverse employment action by forcing him into the federal VP position in January 2016. More specifically, MiMedx insists the move was a "promotion," relying primarily if not entirely, on its claim that Fox's annual compensation purportedly went up significantly when he assumed the federal VP role. ECF No. 342, (MiMedx Br.) at 19.

While it is true that Fox's move to the federal VP role included an increase in base salary,

██████████████████████████████████████████████

████████████████████████ RSOF ¶ 8. ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████ *Id.* ████████████

than that ($475,730.02) as an AVP in 2015. *Id*. Thus, to the extent MiMedx claims Fox's forced change in position was accompanied by a per se increase in overall compensation, and was thus a promotion, that contention is inaccurate.[6]

Moreover, the practical effect of the move was to significantly reduce, if not entirely revoke, Fox's managerial responsibilities by "pulling [him] from a team of 60 people and driving a lot of revenue" and placing him with "a limited team of 6" in "a role that [he] could not impact their needs to stock shelves." RSOF ¶ 7. Given the reduced target compensation and reduction in managerial responsibility and control, Fox described the move as a demotion. *Id*.

The foregoing is critical, and fatal to MiMedx's position, given that the Illinois courts define the scope of what constitutes "adverse employment actions 'quite broadly,'" requiring only that a particular action "materially alter the terms or conditions of employment" to be actionable. *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). Because "[t]he definition of an adverse employment action is generous,"[7] the concept is not limited to termination, but includes such things as "significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat. Bank & Tr. Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993). Ultimately, there are no "hard and fast rules" when it comes to determining what constitutes an adverse employment action. *Porter*, 700 F.3d at 955. Indeed, "the law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit. *Knox v. State of Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996). Accordingly, whether particular conduct on the part of an employer "constitutes a

---

[6] MiMedx also notes that the "wages, tips, [and] other income" reflected on Fox's W-2 for 2016 is greater than it was in 2015. While that may be true, the reason is not that MiMedx paid Fox more salary in 2015, but rather is a function of the fact that that in January 2016 Fox exercised existing MiMedx stock options, the value of which was included in his 2016 W-2. RSOF ¶ 13.
[7] *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

materially adverse employment action is generally a jury question," and thus not subject to resolution via summary judgment. *Renta v. Cty. of Cook*, 735 F. Supp. 2d 957, 974 (N.D. Ill. 2010);[8] *see also Seung-Whan Choi v. Bd. of Trustees of Univ. of Illinois*, No. 16 C 11627, 2017 WL 3278823, at *6 (N.D. Ill. Aug. 2, 2017) (confirming that "the question of whether a change in an employee's working conditions is materially adverse is a normally a question of fact").

Because "'adverse actions can come in many shapes and sizes, it is important . . . to consider the particular factual details of each situation when analyzing whether an adverse action is material.'" *Hamilton v. Spraying Sys., Inc.*, No. 02 C 9093, 2004 WL 2191330, at *10 (N.D. Ill. Sept. 28, 2004). In this case, the "particular factual details" demonstrate that when Fox refused to participate in MiMedx's illegal channel stuffing scheme, it forced him out of a position in which he was earning ███████████████████████ and into one ███████████████ ██████████████████████ and ██████████████ material responsibilities. This "materially alter[ed] the terms or conditions of [Fox's] employment"[9] for the rest of his tenure at MiMedx, thus constituting an adverse employment action. At the very least, there remains a genuine issue of material fact in that regard, which precludes summary judgment.

Fact questions likewise remain with respect to MiMedx's motivation in forcing the move.[10] In this case, Fox refused to participate in MiMedx's channel stuffing scheme beginning in Q3

---

[8] *on reconsideration in part*, No. 05 C 2995, 2011 WL 249501 (N.D. Ill. Jan. 26, 2011).

[9] *Porter*, 700 F.3d at 954.

[10] As with the question of whether a particular employment action is adverse, courts across the country, including those in Illinois, have held that the "motivations elements of a retaliation claim are generally fact questions for the jury." *Raymond v. U.S.A. HealthCare Ctr.-Fort Dodge, L.L.C.*, 468 F. Supp. 2d 1047, 1055 (N.D. Iowa 2006); *Gordon v. Town of Hunter*, No. 91-CV-0305, 1996 WL 77391, at *7 (N.D.N.Y. Feb. 16, 1996) (explaining that the reason for imposition of adverse employment action "is, generally, a question of fact, involving as it does the employer's motivation"); *Palmateer v. Int'l Harvester Co.*, 140 Ill. App. 3d 857, 860, 489 N.E.2d 474, 476 (1986) ("The issue of motive or intent is a question of material fact, not normally subject to summary judgment").

2015, at which time he was working as an AVP. Because MiMedx did not discontinue its illegal activity, Fox's refusal to participate continued literally up to the minute MiMedx forcibly removed him from that position in January 2016. In other words, there is no gap in time between Fox's refusal to participate and MiMedx's retaliation therefor. This is critical (dispositive actually) given that the Seventh Circuit has recognized: (a) that "[t]he closer two events are, the more likely that the first caused the second;" and (b) that occasionally "an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011); *see also Casna v. City of Loves Park,* 574 F.3d 420, 427 (7th Cir.2009) (inference of causality reasonable where supervisor recommended termination the day after an employee made a protected statement and employee was terminated three days later); *McClendon v. Ind. Sugars, Inc.,* 108 F.3d 789, 797 (7th Cir.1997) (inference of causality reasonable when two to three days separated employee's protected statement and termination).

Given the immediacy of MiMedx's retaliation in response to his refusal to participate, Fox respectfully submits this case, like *Loudermilk*, is one in in which the "adverse action comes so close on the heels of a protected act that an inference of causation is sensible," if not inescapable. *Loudermilk*, 636 F.3d at 315. Ultimately, however "[a] jury, not a judge, should decide whether the inference is appropriate." *Id*.

> **B.     Fox's firing on December 29, 2016 is causally related to his refusal to participate in MiMedx's illegal channel stuffing.**

MiMedx next contends that Fox cannot demonstrate a causal connection between his refusal to participate in its illegal channel stuffing activities and his termination because "in this Circuit, time gaps of more than one year between the protected activity and the alleged adverse employment action, without plaintiff's providing any other evidence of retaliation, cannot establish

the requisite causal connection."[11] ECF No. 324 (MiMedx Br.) at 21. The obvious flaw in MiMedx's argument is that Fox is not relying on temporal proximity alone, but has provided ample "other evidence" of retaliation. Specifically:

- MiMedx retaliated against Fox by demoting him demoting him in January 2016, at which time he was continuing in his refusal to participate in its unlawful channel stuffing. That demotion was an adverse employment action that continued through the date of his termination.

- ███████████████████████████████████████████████████████
RSOF ¶ 45.

- In December 2016, ████████████████████████████████████
████████████████████████████████████████████[12]
███████████████████████████ Fox SAF ¶¶ 3-6.

- The day after MiMedx fired Fox, Petit issued a press release stating it had terminated Fox for selling competitive products, which Petit knows he did not do. Fox SAF ¶ 10.

- ███████████████████████████████████████████████████████
███████████████████████████████████ RSOF ¶ 37.

In light of the foregoing, there is evidence in the record from which a jury could conclude that ████████ MiMedx) had it out for Fox from the minute he refused to play its illegal reindeer games beginning in the third quarter of 2015, and that it demoted him, and later fired him (while

---

[11] It is critical to recall that that temporal proximity is "but one method of proving retaliation." *Che v. Massachusetts Bay Transp. Authority*, 342 F.3d 31, 38 (1st Cir. 2003); *see also Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997) (explaining that "it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case," and concluding that therefore "the absence of immediacy between the cause and effect does not disprove causation") (emphasis added).

[12] ██████████████████████████████████████████████████ Fox SAF ¶ 8.

at the same time illegal reducing his rate of pay to the Illinois minimum wage and preventing him from exercising his stock options) "because of the refusal." *Corah*, 77 N.E.3d at 1043. Accordingly, MiMedx has failed to establish its entitlement to judgment as a matter of law on Fox's claim under the IWA.

### C. MiMedx's "non-retaliatory" reasons for firing Fox are pretextual.

Although Fox has presented direct evidence of MiMedx's retaliatory motive ████████ ████████████████████, such "[d]irect evidence is not necessary to establish a retaliatory motive" in an IWA claim. *Morris v. Ashland, Inc.*, No. 12 C 5487, 2014 WL 4066213, at *4 (N.D. Ill. Aug. 15, 2014). Indeed, Fox prove his claim simply by showing that the reasons MiMedx has proffered for his termination are "'not believable,'" or, in a word, are pretextual. *Id.* (Citation omitted). Pretext, in turn, can be established "'by showing either 1) that a discriminatory reason more likely motivated the employer, or 2) that the employer's proffered explanation is unworthy of credence." *Fratto v. Am. Airlines, Inc.*, No. 94 C 7765, 1996 WL 288520, at *6 (N.D. Ill. May 30, 1996). Ultimately, "[w]hether an employer's articulated reason is pretextual is a question of fact." *Thomson v. Illinois Human Rights Comm'n*, 2016 IL App (2d) 160011-U, ¶ 79.

In this case, MiMedx claims it fired Fox because: (1) he "failed to disclose to MiMedx management that individuals were selling non-MiMedx products on the side;" (2) he purportedly "improperly disclosed MiMedx confidential information to employees not entitled to receive that information;" and (3) "when asked about whether or not he was aware that MiMedx employees were selling on the side" he "lied to MiMedx management." RSOF ¶ 33. Even a cursory review of the evidentiary record, however, reveals that each of these reasons is "unworthy of credence."

### 1. MiMedx does not prohibit side selling non-MiMedx products.

Its contention to the contrary notwithstanding, MiMedx does not have (or at least does not enforce) a policy that either prohibits its employees from side selling non-MiMedx products or that requires them to report others who do so. As Fox explained in his deposition, "[i]t states in our compliance booklet if it doesn't interfere with your job and it's not anything that's of conflict or competitive nature, you're allowed to do it;" i.e., sell products that do not compete with MiMedx. RSOF ¶ 25. Fox's understanding is confirmed ██████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████ RSOF ¶ 36. ██████████████████████████████████████████

██████████████████████████ *Id.* ███████████████████████████

██████████████████████████████████████████

It is well-settled that "the selective enforcement of a rule 'calls into question the veracity of the employer's explanation.'" *Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012) (emphasis added); *see also Delli Santi v. CNA Ins. Companies*, 88 F.3d 192, 202 (3d Cir. 1996) (confirming that by "showing that the company did not enforce [its] policy by the evidence that other employees were [violating it] without any fear of investigation or repercussion, nor especially termination," the "jury, by drawing reasonable inferences from the evidence adduced at trial, could rationally conclude that the legitimate non-retaliatory reason offered by CNA was a pretext for discharging Delli Santi). Stated another way, evidence that MiMedx selectively enforced its purported policy requiring employees to report colleagues who sold non-competitive products on the side is evidence from which a reasonable jury could infer pretext, or in the parlance

advocated by MiMedx, that it "'lied about its proffered reasons for the employees' dismissal.'" *Morris*, 2014 WL 4066213, at *4.

### 2. MiMedx does not have (or at least does not enforce) a policy against internal dissemination of Combined RSD Reports or sales data.

MiMedx's Corporate Compliance and Ethics Plan expressly authorizes the sharing of "confidential information and Trade Secrets" with MiMedx employees who "have a legitimate need and authorization to know the information." RSOF ¶ 29. In his deposition, Fox explained that the definition of "confidentiality," as used in MiMedx's policies, meant that "nobody outside the company [MiMedx] ever sees any information" so designated. *Id*. His understanding is corroborated ████████████████████████████████████████████

████████████████████████████ RSOF ¶ 29. ████████████████████

████████████████████████████████ *Id*. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *Id*.

████████████████████████████████████████████████████

████████████ RSOF ¶ 29. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *Id*. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ *Id*.

As with its purported policy requiring employees to report the side-selling of noncompetitive products, MiMedx's "selective enforcement" of this rule calls into question the veracity of its explanation and provides a basis for jury to infer pretext, thereby precluding summary judgment.

### 3. Fox did not lie to MiMedx management about his knowledge of side-selling.

On December 12, 2016, Fox was summoned to a meeting at MiMedx's headquarters. At that meeting, then-CEO Pete Petit reported that a number of MiMedx employees had been selling products "that were <u>competitive</u> with the Company," and he inquired as to Fox's knowledge of other employees selling such <u>competitive</u> products. RSOF ¶ 35. Fox responded truthfully, explaining that he "had no knowledge of, and was unaware that, any MiMedx employee had ever sold <u>competing</u> products or otherwise engaged in competition against the company." *Id.*

MiMedx now contends it asked Fox about side-selling generally. Fox, in turn, swears that the inquiry was limited to competitive products. By definition, determining who is telling the truth requires a credibility analysis. But the Court can neither "make a credibility determination nor choose between competing inferences"[13] in connection with this motion, and this too, is a question for the jury.

### 4. The after-acquired evidence does not apply here.

Finally, MiMedx argues that under the after-acquired evidence doctrine,[14] Fox's damages are cut off as of March 2017, the date it allegedly discovered that he had been involved in, but failed to report, a romantic relationship with a co-worker while in its employ. ECF No. 324, MiMedx Br. at 24. Per MiMedx, this was "a terminable offense." *Id.*

---

[13] *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 922 (7th Cir. 1996).
[14] As the employer, it bears the burden of proof on this affirmative defense. *See Rodriguez, ex rel. Fogel v. City of Chicago*, No. 08 CV 4710, 2011 WL 1103864, at *14 (N.D. Ill. Mar. 25, 2011).

It is well-settled that "[w]here an employer seeks to rely upon after acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee <u>in fact would have been</u>" – not merely could have been – "<u>terminated on those grounds alone</u> if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995) (emphasis added); The Court's focus, of course, must be on its "actual employment practices, not just the standards established by its employee manuals.'" *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1048 (7th Cir. 1999) (citation omitted). While MiMedx is not required to prove "that it has previously terminated an employee for the precise misconduct at issue, the absence of such evidence is one factor a jury may consider when deciding whether Plaintiff 'in fact would have been terminated' for [his] actions." *Mabins v. AEP NVH OPCO, LLC*, No. 16 C 10261, 2018 WL 1397426, at *8 (N.D. Ill. Mar. 20, 2018).

As noted above, MiMedx alleges it found out Fox had a "secret affair" with a colleague, and contends that "[c]ompany policy requires individuals in a reporting structure to advise MiMedx about such a relationship." ECF No. 324 (MiMedx Br.) at 24. In support of that contention, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████ RSOF ¶ 44.

Courts in this District have consistently refused to apply the after-acquired evidence doctrine in cases with facts similar to those presented here. Illustrative of such refusal is *U.S. E.E.O.C. v. Custom Companies, Inc.*, which is a sexual harassment case arising under Title VII. *Custom Companies*, Nos. 02 C 3768, 2007 WL 734395, at *1 (N.D. Ill. Mar. 8, 2007). In that case,

the defendants argued that the plaintiff should not be awarded back pay because they later found out she had lied on her application, which, per defendants, was cause for termination. *Id*. at *15. The court rejected that argument, noting that the defendant had "do[ne] nothing more than assert that [Plaintiff] would have been fired had it discovered this falsehood," and going on to conclude that "[i]n order to carry their burden, Defendants must do more than merely reiterate their policy." *Id*.

Like the defendants in *Custom Companies*, MiMedx has done nothing more than reiterate its purported policy regarding the reporting of intra-office romances ████████████████████ ██████████████. The law requires much more, and MiMedx's patent failure to provide it precludes application of its affirmative defense.

## III.   FOX'S ILLINOIS WAGE PAYMENT AND COLLECTION ACT CLIAM IS NOT MOOT.

Mimedx notes that it has proffered two checks purporting to represent the amount of pay (plus 2% interest) it withheld from Fox when it unlawfully and retroactively reduced his rate of pay to the Illinois minimum wage during the last two weeks of his employment. Per MiMedx, this moots Fox's claim under the Illinois Wage Payment and Collection Act ("IWPCA"). Not so. The IWPCA contemplates payment of "final compensation" – which includes "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed by the employer pursuant to an employment contract or agreement between the 2 parties" – as well as "all costs and all reasonable attorney's fees." 820 ILCS 115/2, 820 ILCS 113/14(a). All items have not yet been paid, and the claim is not moot.

## <u>CONCLUSION</u>

WHEREFORE, premises considered, Fox respectfully requests that the Court deny MiMedx's motion for summary judgment in its entirety.

Dated: December 3, 2018                    Respectfully submitted,


                                           **HALUNEN LAW**


                                           */s/ Christopher J. Moreland*
                                           Clayton D. Halunen (N.D. Ill. Bar No. 219721)
                                           Christopher J. Moreland *(admitted pro hac vice)*
                                           1650 IDS Center
                                           80 South Eighth Street
                                           Minneapolis, MN  55402
                                           Telephone:  (612) 605-4098
                                           Facsimile:  (612) 605-4099
                                           halunen@halunenlaw.com
                                           moreland@halunenlaw.com

                                           *ATTORNEYS   FOR   DEFENDANT/COUNTER-*
                                           *PLAINTIFF MICHAEL FOX*


26

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2018, I served the attached Defendant/Counter-Plaintiff Michael Fox's Memorandum of Law in Opposition to Plaintiff/Counter-Defendant's Motion for Summary Judgment by filing the same, which will send notification of such filing to those registered to receive electronic notices via email transmission at the email addresses provided by them:

Ami N. Wynne      Joseph D. Wargo
Jason G. Marsico     Shanon J. McGinnis
SIDLEY AUSTIN LLP    David M. Perini
One South Dearborn    WARGO & FRENCH, LLP
Chicago, IL  60603     999 Peachtree Street, NE, 26th  Floor
awynne@sidley.com    Atlanta, GA  30309
jmarsico@sidley.com    jwargo@wargofrench.com
             smcginnis@wargofrench.com
             dpernini@wargofrench.com

*/s/Christopher J. Moreland*

27